RECEIVED
7/10/2017
CLERK, U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE, FLORIDA

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA, JACKSONVILLE DIVISION

| | |
|---|---|
| Commodity Futures Trading Commission, | |
| Plaintiff, | Case No. 3:17-cv-774-J-32/MCR |
| vs. | COMMODITY FUTURES TRADING COMMISSION'S COMPLAINT FOR INJUNCTIVE RELIEF AND DEMAND FOR JURY TRIAL |
| Jason B. Scharf (d/b/a Citrades.com and AutoTradingBinary.com); CIT Investments LLC; Brevspand EOOD; CIT Investments Ltd.; A&J Media Partners, Inc.; Michael Shah; and Zilmil, Inc., | |
| Defendants. | Hon. _____ |

FILED
7/10/2017
CLERK, U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE, FLORIDA

## I.  SUMMARY

1.   Defendants in this case are the perpetrators of a massive fraud involving investments in so-called "binary options."

2.   From at least June 2013 through the present ("Relevant Period"), Defendant Jason Scharf ("Scharf"), individually and acting through a common enterprise that includes Defendants Brevspand EOOD, CIT Investments LLC, CIT Investments Ltd., and A&J Media Partners, Inc. (collectively, "Citrades Entities," and together with Scharf, "Citrades Defendants"), has operated an illegal binary options scam using the instrumentalities of interstate commerce.  During the Relevant Period, the Citrades Defendants received at least $16 million in customer funds from at least 8,000 customers, most of whom reside in the U.S.

3.   The Citrades Defendants fraudulently solicit these customers to enter into illegal, off-exchange binary options transactions.  The Citrades Defendants do this through

S-7

their websites, which include "citrades.com" and "autotradingbinary.com," and through mass emails and telemarketing. In these solicitations, the Citrades Defendants offer customers self-traded, "managed," and "autotraded" accounts that the Citrades Defendants falsely and misleadingly claim will generate guaranteed profits.

4.    The Citrades Defendants fail to disclose that their customers lose money, either through "trading" or through the Citrades Defendants' misappropriation of customer funds. Once the Citrades Defendants receive customer funds, they route those funds through numerous foreign corporations and overseas accounts. The Citrades Defendants then use the customer funds to pay Defendant Scharf's business and personal expenses.

5.    Defendant Zilmil, Inc. ("Zilmil"), and its principal, Defendant Michael Shah (together, "Zilmil Defendants"), are third-party "affiliate marketers" who drive internet traffic to citrades.com and numerous other binary options websites using the instrumentalities of interstate commerce. Zilmil does this by developing and selling so-called binary options autotrading systems with names like "Millionaire Money Machine."

6.    A customer who signs up for one of Zilmil's systems is instructed to open and fund an account with a binary options website such as Citrades. Once the customer funds an account, Zilmil's autotrading system places trades on behalf of the customer until the customer's account is depleted.

7.    Zilmil receives a commission of up to $450 for every customer that deposits money with a binary options firm. During the Relevant Period, Zilmil made more than $5 million from the sale of its autotrading systems and another $3.6 million in commissions

from the binary options websites. At least $500,000 of those commissions came from the Citrades Defendants.

8.      By virtue of this conduct and further conduct described below, the Citrades Defendants have engaged, are engaging, or are about to engage, in acts and practices in violation of the following sections of the Commodity Exchange Act ("Act"), 7 U.S.C. §§ 1-26 (2012), and accompanying regulations ("Regulations"), 17 C.F.R. §§ 1.1-190.10 (2017):

a.      Section 2(e) of the Act, 7 U.S.C. § 2(e) (2012), which prohibits off-exchange retail transactions in swaps;

b.      Section 4c(b) of the Act, 7 U.S.C. § 6c(b) (2012), and Regulation 32.2, 17 C.F.R. § 32.2 (2017), which prohibit offering or entering into off-exchange transactions in commodity options;

c.      Section 4d(a)(1) of the Act, 7 U.S.C. § 6d(a)(1) (2012), which prohibits soliciting or accepting orders, and accepting money, for commodity options or swap transactions without registration as a futures commission merchant ("FCM");

d.      Section 4m(1) of the Act, 7 U.S.C. § 6m(1) (2012), which prohibits advising others, for compensation or profit, as to the value of or the advisability of trading in any swap or commodity option without registration as a commodity trading advisor ("CTA");

e.      Section 4c(b) of the Act, 7 U.S.C. § 6c(b), and Regulation 32.4, 17 C.F.R. § 32.4 (2017), which prohibit fraud in connection with commodity options transactions;

3

f.      Section 4*o*(1) of the Act, 7 U.S.C. § 6*o*(1) (2012), which prohibits fraud by, among others, a CTA, and Regulation 4.41(a), 17 C.F.R. § 4.41(a) (2017), which prohibits fraud in advertising by, among others, a CTA or any principal thereof;

g.      Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2012), and Regulation 180.1(a), 17 C.F.R. § 180.1(a) (2017), which prohibit fraud in connection with, among other things, swap transactions.

9.      By virtue of this conduct and further conduct described below, the Zilmil Defendants have engaged, are engaging, or are about to engage, in acts and practices in violation of the following sections of the Act and Regulations:

a.      Section 4c(b) of the Act, 7 U.S.C. § 6c(b), and Regulation 32.2, 17 C.F.R. § 32.2, which prohibit offering or entering into off-exchange transactions in commodity options;

b.      Section 4m(1) of the Act, 7 U.S.C. § 6m(1), which prohibits advising others, for compensation or profit, as to the value of or the advisability of trading in any swap or commodity option without registration as a CTA;

c.      Section 4c(b) of the Act, 7 U.S.C. § 6c(b), and Regulation 32.4, 17 C.F.R. § 32.4, which prohibit fraud in connection with commodity options transactions;

d.      Section 4*o*(1) of the Act, 7 U.S.C. § 6*o*(1), which prohibits fraud by, among others, a CTA, and Regulation 4.41(a), 17 C.F.R. § 4.41(a), which prohibits fraud in advertising by, among others, a CTA or any principal thereof;

e.      Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), and Regulation 180.1(a), 17 C.F.R.

§ 180.1(a), which prohibit fraud in connection with, among other things, swap

transactions.

10.     Accordingly, pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2012), the

Commission brings this action to enjoin Defendants' unlawful acts and practices and to

compel Defendants' compliance with the Act and Regulations, and to further enjoin

Defendants from engaging in certain commodity options- and swaps-related activities.

11.     In addition, the Commission seeks civil monetary penalties and remedial

ancillary relief, including, but not limited to, trading and registration bans, restitution,

disgorgement, rescission, pre- and post-judgment interest, and such other relief as the Court

may deem necessary and appropriate.

12.     Unless restrained and enjoined by this Court, Defendants are likely to

continue to engage in the acts and practices alleged in this Complaint and similar acts and

practices, as more fully described below.

## II.      JURISDICTION & VENUE

13.     This Court has jurisdiction over this action pursuant to 7 U.S.C. § 13a-1(a),

which provides that whenever it shall appear to the Commission that any person has engaged,

is engaging, or is about to engage in any act or practice constituting a violation of any

provision of the Act or any rule, regulation or order promulgated thereunder, the Commission

may bring an action in the proper District Court of the United States against such person to

enjoin such practice, or to enforce compliance with the Act, or any rule, regulation, or order

thereunder.

14.     Venue properly lies with this Court pursuant to 7 U.S.C. § 13a-1(e), because

Defendants are found in, inhabit, or transact business in the Middle District of Florida, and

the acts and practices in violation of the Act and Regulations have occurred within this

District, among other places.

## III.   THE PARTIES

15.     Plaintiff Commodity Futures Trading Commission ("CFTC" or

"Commission") is the independent federal regulatory agency charged with the administration

and enforcement of the Commodity Exchange Act and regulations promulgated thereunder.

16.     Defendant Jason B. Scharf is a natural person who resides in Valley Village,

California.  Scharf has never been registered with the Commission in any capacity.

17.     Defendant CIT Investments LLC ("CIT Investments") was a Nevada limited

liability corporation with its principal place of business at Scharf's home in Valley Village,

California.  CIT Investments dissolved on June 8, 2015.  CIT Investments has never been

registered with the Commission in any capacity.

18.     Defendant Brevspand EOOD ("Brevspand") is a Bulgarian business entity

with a mailing address in Sophia, Bulgaria.  Brevspand's principal place of business is at

Scharf's home in Valley Village, California.  Brevspand has never been registered with the

Commission in any capacity.

19.     Defendant CIT Investments Ltd. ("CIT Anguilla") was an Anguillan business

entity with a mailing address in Stoney Ground, Anguilla.  CIT Anguilla dissolved on

November 10, 2016.  CIT Anguilla has never been registered with the Commission in any

capacity.

20.     Defendant A&J Media Partners, Inc. ("A&J Media") was a California corporation with its principal place of business at Scharf's home in Valley Village, California. A&J Media dissolved on June 1, 2015. A&J Media has never been registered with the Commission in any capacity.

21.     Defendants Brevspand, CIT Investments, CIT Anguilla, and A&J Media (collectively, "Citrades Entities") are part of a single common enterprise, and transact their business through a maze of related companies. The Citrades Entities have common ownership and management, commingle funds, utilize common resources, have a unified marketing strategy, participate in a shared business scheme, and have a common source of revenue.

22.     Defendant Scharf controls and supervises the day-to-day operations of the Citrades Entities. Scharf's home is the principal place of business for the Citrades Entities. Scharf controls the Citrades Entities' bank accounts and enters into contracts on behalf of the Citrades Entities. Scharf controls the Citrades Entities' websites. Scharf was a managing member and shareholder of CIT Investments; Scharf is a manager and shareholder of Brevspand. Scharf is authorized to act as director of CIT Anguilla.

23.     Defendant Michael Shah is a natural person who resides in Jacksonville, Florida. Shah has never been registered with the Commission in any capacity.

24.     Defendant Zilmil, Inc. ("Zilmil") is a Florida Corporation with its principal place of business in Jacksonville, Florida. Zilmil has never been registered with the Commission in any capacity.

25.     Michael Shah controls and supervises the day-to-day operations of Zilmil. Shah is a signatory to and controls Zilmil's bank accounts. Shah is the president, director, and shareholder of Zilmil. He also enters into contracts on behalf of Zilmil.

## IV.     BINARY OPTIONS

26.     A binary option is a type of option contract in which the payout depends entirely on the outcome of a yes/no proposition. The yes/no proposition typically relates to whether the price of a particular asset will rise above or fall below a specified amount at a specified date and time. For example, the yes/no proposition might be whether the price of silver will be higher than $33.40 per ounce at 11:17 am on a particular day.

27.     Once the option holder acquires a binary option through payment of a premium, there is no further decision for the holder to make as to whether or not to exercise the binary option because binary options exercise automatically. Unlike other types of options, a binary option does not give the holder the right to purchase or sell the underlying asset—instead, it is "cash settled." When the binary option expires, the option holder is entitled to a pre-determined amount of money if the customer has made a correct prediction. If the customer has made an incorrect prediction, he or she gets nothing and loses the premium paid.

28.     There are only three designated contract markets currently authorized to offer binary options that are commodity options transactions to retail customers in the U.S.: Cantor Exchange LP, Chicago Mercantile Exchange, Inc., and the North American Derivatives Exchange, Inc. All other entities offering binary options in the U.S. or to U.S. customers are doing so illegally.

## V.     STATUTORY BACKGROUND

### A.     Prohibition Against Off-Exchange Retail Swaps and Options Trading

#### i.     Swaps

29.     Section 2(e) of the Act, 7 U.S.C. § 2(e), makes it unlawful for any person who is a not an eligible contract participant ("ECP")—i.e., any person who *is* a retail customer—to enter into a swap unless the swap is executed on a registered exchange or exempt foreign exchange.

30.     Section 1a(47)(A) of the Act, 7 U.S.C. § 1a(47)(A) (2012), defines "swap" to include, among other things, any agreement, contract, or transaction that: (a) is an option of any kind; (b) provides for payment dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency; or (c) provides on an executory basis for payments based on the value or level of one or more interest or other rates, currencies, commodities, securities, instruments of indebtedness, indices, quantitative measures, or other financial or economic interests or property of any kind, without also conveying an ownership interest in any asset or liability.

#### ii.     Options

31.     Section 4c(b) of the Act, 7 U.S.C.§ 6c(b), makes it unlawful for any person to offer to enter into, enter into, or confirm the execution of, any transaction involving any commodity regulated under the Act which is of the character of, or is commonly known to the trade as, inter alia, an "option", "bid", "offer", "put", or "call", contrary to any rule, regulation, or order of the Commission prohibiting any such transaction or allowing any such transaction under such terms and conditions as the Commission shall prescribe.

32.     Regulation 32.2, 17 C.F.R. § 32.2, makes it unlawful for any person to offer to enter into, enter into, confirm the execution of, maintain a position in, or otherwise conduct activity related to any transaction in interstate commerce that is a commodity option transaction, unless such transaction is conducted in compliance with and subject to the provisions of the Act, including any Commission rule, regulation, or order thereunder, otherwise applicable to any swap.

**B.     Prohibition Against Unregistered FCMs**

33.     Section 4d(a)(1) of the Act, 7 U.S.C. § 6d(a)(1), makes it unlawful for any person to act as an FCM unless such person is registered as such with the Commission.

34.     Section 1a(28)(A) of the Act, 7 U.S.C. § 1a(28)(A), defines FCM as an individual, association, partnership, or trust that is engaged in soliciting or accepting orders for swaps or commodity options, and, in connection with soliciting or accepting such orders, accepts any money, securities, or property (or extends credit in lieu thereof) to margin, guarantee, or secure any trades that result or may result therefrom.

**C.     Prohibition Against Unregistered CTAs**

35.     Section 4m(1) of the Act, 7 U.S.C. § 6m(1), makes it unlawful for a person to act as a CTA without being registered as such with the Commission.

36.     Section 1a(12) of the Act, 7 U.S.C. § 1a(12), defines CTA as any person who, for compensation or profit, engages in the business of advising others, either directly or through publications, writings, or electronic media, as to the value of or the advisability of trading in any swap or commodity option.

**D.      Prohibition Against Fraud**

37.      The Act and Regulations contains numerous anti-fraud provisions applicable to various categories of entities or transactions.

**i.      Options Fraud**

38.      Section 4c(b) of the Act, 7 U.S.C.§ 6c(b), makes it unlawful for any person to offer to enter into, enter into, or confirm the execution of, any transaction involving any commodity regulated under the Act which is of the character of, or is commonly known to the trade as, inter alia, an "option", "bid", "offer", "put", or "call", contrary to any rule, regulation, or order of the Commission prohibiting any such transaction or allowing any such transaction under such terms and conditions as the Commission shall prescribe.

39.      Regulation 32.4, 17 C.F.R. § 32.4, provides that, in connection with an offer to enter into, the entry into, or the confirmation of the execution of, any commodity option transaction, it shall be unlawful for any person, using the instrumentalities of interstate commerce, directly or indirectly: (a) to cheat or defraud or attempt to cheat or defraud any other person; (b) to make or cause to be made to any other person any false report or statement thereof or cause to be entered for any person any false record thereof; or (c) to deceive or attempt to deceive any other person by any means whatsoever.

**ii.      Manipulative & Deceptive Devices In Connection with Swaps**

40.      Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), and Regulation 180.1(a), 17 C.F.R. § 180.1(a), make it unlawful for any person, using the instrumentalities of interstate commerce, directly or indirectly, in connection with, among other things, any swap required to be traded on an exchange, to intentionally or recklessly: (a) use or employ, or attempt to

use or employ, any manipulative device, scheme, or artifice to defraud; (b) make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading; or (c) engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person.

### iii.   CTA Fraud

41.     Section 4o(1) of the Act, 7 U.S.C. § 6o(1), provides, in part, that it shall be unlawful for a CTA, using the instrumentalities of interstate commerce, directly or indirectly: (a) to employ any device, scheme, or artifice to defraud any client or prospective client; or (b) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client.

42.     Regulation 4.41(a)(1) and (2), 17 C.F.R. § 4.41(a)(1), (2), provides in part that no CTA shall advertise in a manner which: (a) employs any device, scheme or artifice to defraud any participant or client or prospective participant or client; or (b) involves any transaction, practice or course of business which operates as a fraud or deceit upon any participant or client or any prospective participant or client.

43.     Regulation 4.41(a)(3), 17 C.F.R. § 4.41(a)(3), provides that no CTA shall advertise in a manner which refers to any testimonial, unless the advertisement or sales literature providing the testimonial prominently discloses: (a) that the testimonial may not be representative of the experience of other clients; and (b) that the testimonial is no guarantee of future performance or success.

## VI.   FACTUAL BACKGROUND

### A.   The Citrades Defendants' Binary Options Scam

44.   Throughout the Relevant Period, Defendant Scharf, acting through various agents, employees, and business entities, including the Citrades Entities, has been operating an illegal binary options scam using the instrumentalities of interstate commerce, including through various websites, such as www.citrades.com ("Citrades website") and www.autotradingbinary.com ("ATB website").

### i.   Citrades.com: "The Most Profitable Click You'll Ever Make"

45.   The Citrades website purports to offer customers the ability to enter into binary options contracts on numerous commodities, indices, and currencies, including, but not limited to foreign exchange and broad-based stock indices.  The website purports to be the "leading platform" for trading binary options online.

46.   The Citrades website is registered to Defendant CIT Anguilla.  Domain records list Defendants Brevspand and Jason Scharf as the technical and billing contacts for the website.

47.   Scharf has the ability to control the Citrades website and pays for the registration of the Citrades domain with his personal credit card.

48.   The Citrades website claims falsely that, "Citrades.com was started by a group of highly accredited Wall Street brokers who wanted to bring everyone in the world an easy way to invest with an educational and no stress platform."

49.   In reality, the Citrades website was started by Jason Scharf, who is not now, and has never been, a highly accredited Wall Street broker.

50.     The Citrades website makes false and misleading statements of material fact, or fails to disclose material facts, about its binary options products, including, but not limited to facts or omissions concerning the likelihood of profit and risk of loss, such as:

a.      describing its binary options as "safe & secure investments;"

b.      stating that "Binary [ ] Options are the fastest and most efficient way to convert your financial decisions into substantial profits;"

c.      stating that opening an account with Citrades is "the most profitable click you'll ever make;"

d.      claiming that traders "profit up to 89%," and that customers can make "up to 500% returns" using the Citrades "one-touch options" feature; and

51.     In reality, there is a substantial risk that Citrades customers will lose money with Citrades, through purported "trading" losses or through misappropriation by the Citrades Defendants. The Citrades website fails to disclose that customers may not profit from their investment, let alone enjoy 500% returns.

**ii.     Self-Traded, Managed, and "Autotraded" Accounts**

52.     In order to open an account, the customer has to provide his or her contact information through the Citrades website, including the customer's name, email address, and telephone number. The customer later receives a follow-up email from Citrades providing the customer with login credentials for the website and instructions for making a deposit.

53.     The Citrades website allows customers to choose to open one of three different types of accounts: self-traded accounts, managed accounts, and "autotraded" accounts.

54.     For self-traded accounts, a customer need only choose the asset he or she wants to trade, click "call" if they believe the price will rise, or "put" if they believe the price will fall. "If the direction chosen by the trader is correct," the website explains, "the payout listed on the trading screen will be the payout provided to the customer as profit" upon expiry of the option.

55.     For managed accounts, the Citrades website offers customers the opportunity to have a "dedicated account manager" direct the trades placed in their account.

56.     For autotraded accounts, the Citrades website provides an "automated, hands-free trading program" through which "expert trades" are "automatically copied" to the customer's account.

### iii.     Fake Testimonials

57.     The Citrades website features testimonials from purported customers. These testimonials are fabricated, and the representations made are false. The fake testimonials make claims such as the following:

> "I never knew how easy it was to pull 85% returns from simple 60 second trades."

> "I can only thank Citrades for the success I have found using their managed account. After a short 2 months I was able to pay for a year of college tuition. Citrades VIP Account Management has been extremely rewarding. I had access to my personal broker who … always had good advice and management strategy that made me profits."

> "Citrades has proven to be a really reliable broker. Depositing is easy, withdrawals are always on time, and the market rates are fair."

58.     These testimonials are false and misleading because they create the impression that entering into binary options transactions via the Citrades website will be

15

profitable for all customers, and that customers can easily withdraw funds. In reality, customers lose money through trading or through misappropriation by the Citrades Defendants.

59.     Moreover, the testimonials on the Citrades website are unaccompanied by the disclosures required by Regulation 4.41(a), including: (a) that the testimonial may not be representative of the experience of other clients; or (b) that the testimonial is no guarantee of future performance or success.

**iv.     AutoTradingBinary: "100% Automated Binary Options Profits"**

60.     The Citrades Defendants operate a second website, www.autotradingbinary.com, to trick customers into funding an account through the Citrades website.

61.     The ATB website is registered to Defendant Brevspand. Domain records list Defendants A&J Media Partners and Jason Scharf as the technical and billing contacts.

62.     The ATB website encourages customers to register for ATB's "hands-off" autotrading service, which it touts as "100% free," while falsely promising "100% automated binary options profits." Once the customer registers, the customer is directed to open an account with the Citrades website.

63.     The ATB website misleadingly fails to disclose its affiliation with Citrades, claiming falsely that, "we are a third-party and are not affiliated with any of the brokers we push, so we do not have a bias like the brokers do." In reality, ATB and Citrades are operated by the Citrades Defendants, and the ATB website is designed to get customers to fund a Citrades account.

64.     The ATB website highlights "trading results" from its so-called "expert traders," whose trades are "automatically copied to your binary options account, even while you sleep!" For example, the ATB website claims that ATB expert trader "Pavel Abdulov" had "85% winning trades" in 2016.

65.     The ATB website also features trading results from its "robots." The ATB website claims that "our robots efficiently predicted the market trends and managed to secure 73 percent trading result."

66.     These trading results are false and misleading. The ATB website fails to disclose that customers do not achieve these results using ATB's so-called autotrading service, or that customer funds are misappropriated by the Citrades Defendants.

**v.     Fraudulent Email and Telephone Solicitations**

67.     Customers who provide their contact information through the Citrades or ATB websites receive emails touting the outsize returns purportedly enjoyed by Citrades and ATB customers.

68.     For example, one email, from "admin@citrades.com," claims that: "October was … our 18th profitable month in a row with our managed accounts …. If you do not have a fully automated managed account with us, I strongly encourage you to get started."

69.     Similarly, another email, from "support@autotradingbinary.com," claims that ATB's "new analyst," "Robert," has had "5 winning months in a row, and his fully managed accounts the past two months have been on fire …. Below you will see a snapshot of Robert's real life strategy performance for the past 30 trading days, which have taken a $12k account to almost $40,000 in a month."

70.     These emails are false and misleading because they fail to apprise customers of the risk of loss from trading in binary options, and that customer experience may be different than the advertised results.  The emails also fail to apprise customers that the Citrades Defendants misappropriate customer funds.

71.     Customers may also receive telephone calls from Citrades and ATB sales representatives promising "guaranteed returns" of as much as 100%.  These promises are false and misleading because trading returns cannot be guaranteed, or because the Citrades Defendants misappropriate customer funds.

**vi.     Customer Losses and Misappropriation by Citrades Defendants**

72.     When a customer seeks to open a Citrades account, the customer is instructed to wire money to one of several overseas bank accounts belonging to foreign entities controlled by Scharf, such as Defendants Brevspand or CIT Anguilla.

73.     Customers can also fund a Citrades account using a credit card.  Customers provide their credit card information to the Citrades Defendants via email.  The Citrades Defendants then use that information to charge the customers' credit cards.

74.     Once a customer funds his or her account, the customer is unlikely to ever recover a penny of his or her funds, either because the funds will be lost to trading or because the funds will be misappropriated by the Citrades Defendants.

75.     The Citrades Defendants keep most of the money overseas, but periodically repatriate funds through transfers to Scharf or his family members, or to U.S. companies controlled by Scharf, such as Defendants CIT Investments and A&J Media.

76.     The Citrades Defendants' binary options scam has been extremely lucrative. During the Relevant Period, more than 8,000 customers—most of them located in the U.S.—sent over $16 million to the Citrades Defendants for the purpose of entering into binary options transactions through the Citrades website.

77.     Once a customer has deposited money in a Citrades account, the Citrades Defendants use various pretexts for refusing to return the customer's money.

78.     One such pretext is the "haywire autotrader." A customer who signs up for an autotraded account with the expectation of guaranteed returns will discover that the supposedly profitable autotrader places losing trade after losing trade until the customer's account is depleted.

79.     Even if the customer turns off the autotrading function, the autotrader continues to place trades on behalf of the customer that result in losses. If the customer asks for a refund or withdrawal of any remaining principal, the request is refused or ignored.

80.     This happened to Customer A, who signed up for the Citrades autotrader with the expectation that it would place profitable trades. Contrary to the representations on the Citrades website, Customer A saw his account balance decline from $47,000 to $10,000 in the space of two months. When Customer A asked for Citrades to return the remaining $10,000, Citrades representatives stopped taking his calls. The $10,000 was never returned.

81.     The Citrades Defendants also use so-called "bonus money" as pretext for refusing to return customer funds. The Citrades website offers customers purported "bonus money" of up to 150% the amount of the customer's deposit.

82.     According to the website, the bonus money is "combined with the current balance to leverage more trading power." "[I]n order to receive the bonus," the Citrades website explains, "you must trade 30 times the amount of the bonus." After that, the website promises, "the bonus funds are immediately available for withdrawal along with the rest of the funds."

83.     Customers who seek a return of their principal or, in some cases, apparent trading profits, are told that they cannot do so because there is bonus money in their account. This is contrary to representations on the Citrades website, which promises that customers can withdraw their principal and profits at "any time"; it is only withdrawal of the bonus money that is conditioned on meeting the trading requirement.

84.     Some customers find that bonus money has been added to their Citrades account, even though the customer did not ask for, or expressly refused, bonus money.

85.     Customer B is one such customer.  Customer B funded a Citrades account with $7,000, but sought to withdraw his principal after Customer B's autotrading account started losing money.  Citrades customer service representatives refused to return Customer B's remaining funds, claiming there was bonus money in his account.  Customer B never asked for or agreed to accept any bonus money.  Customer B's money was never returned.

86.     Many times there is no pretext for refusing to return customer funds.  Citrades representatives simply ignore customer requests to withdraw funds.

**vii.   Citrades VIP Program**

87.     In some cases, customers who make large initial deposits are singled out for special treatment through the Citrades "VIP" program.  In the VIP program, Citrades sales

20

representatives promise customers enormous, guaranteed profits if they invest $20,000 or more.

88.    Sometimes, VIP customers see large initial gains reflected in their online trading accounts. Citrades representatives then solicit the customer for additional deposits. But once the customer deposits additional funds, the customer loses his or her funds to trading or misappropriation by the Citrades Defendants.

89.    Customer C was a Citrades VIP customer. Customer C received an email from a Citrades representative claiming that:

> If you invest in an additional minimum of $14,000.00 we will GUARANTEE, with a 6 month contract, a minimum 5% ROI per month. Not only that, but at the end of each month we will send you 5%* to your bank account for each of the 6 months. This means that on $20,000.00 invested you are guaranteed $6,000.00 ($1,000.00 per month) profit received in hand with no shrinkage on your principal.

90.    Customer C also received a VIP account agreement promising that: "The total principal amount of $124,011.00 is guaranteed against loss … with a monthly minimum guaranteed revenue (ROI) of 6.75% for the 6 month term of this contract."

91.    Customer C deposited $100,000 through the Citrades VIP program. Customer C made these deposits based on the representations in the VIP agreement, and on the strength of what appeared to be profitable trading in his online Citrades account. Indeed, Customer C reported seeing profits of $60,000 after just a few months' trading by one of Citrades's VIP account managers.

92.    When Customer C asked Citrades to send him the "guaranteed returns," Citrades representatives stopped taking his calls. Customer C never received any of his money back from Citrades.

**B.      Zilmil's Autotrading Systems and Affiliate Marketing Scam**

93.      Defendant Zilmil and its principal, Defendant Shah, are "affiliate marketers" for numerous illegal binary options websites, including Citrades.  Zilmil's goal as an affiliate marketer is to drive internet traffic, i.e., customers, to these binary options websites using the instrumentalities of interstate commerce.

94.      Zilmil drives traffic to binary options websites by developing and selling customers so-called binary options autotrading systems.  The autotrading systems are computer programs that automatically place trades on behalf of a customer in the customer's binary options account.

95.      Zilmil promotes the systems on the internet through websites called "landing pages," and through mass emails.  Zilmil's landing pages and mass emails contain numerous false and misleading representations about the systems' performance, e.g., that trading profits are guaranteed.

96.      Zilmil fails to disclose to customers that the trading systems are in fact designed by Zilmil to place trades that result in losses for the customer.  Zilmil also fails to disclose that it gets paid commissions by the binary options websites for sending them customers.

**i.      Zilmil's Landing Pages**

97.      Zilmil promotes its binary options autotrading systems through websites referred to as "landing pages."  A landing page typically consists of a single web page, often with a streaming video, along with a field for the customer to sign to purchase the system.

98.     Zilmil has created and operated numerous landing pages, which it controls and hosts on various webservers. Zilmil's landing pages include, among many others: www.autobinarybot.com; www.binaryarbitrages.com; www.binarycashbot.com; www.binarygenetic.com; www.thebinaryformula.com; www.binaryoverdrive.com; www.binaryturbotrial.com; and www.probinarytips.com.

99.     Zilmil's landing pages contain numerous false and misleading statements and omissions about the performance of the trading systems.

100.    For example, the www.binaryoverdrive.com landing page features a message from "David Collins," who claims to have invented a "autopilot binary options robot" that makes "over $95,436 a month ... every month like clockwork ... with ZERO manual trading!" On the landing page, David Collins offers customers the opportunity to use the robot for free if they deposit money with a binary options website.

101.    In reality, the www.binaryoverdrive.com landing page was created and hosted by Zilmil, not "David Collins." Zilmil used the exact same text on its www.binaryturbotrialtrial.com landing page, attributing it there to "Jeff Anderson." Moreover, the advertised profits are false. Neither Zilmil nor Shah made $95,436 a month trading binary options.

102.    Zilmil fails to disclose that customers do not achieve the outsize profits touted on the landing pages, nor does Zilmil disclose the risks associated with trading off-exchange binary options. Zilmil likewise fails to disclose in the landing pages that Zilmil gets paid by the binary options websites for every first-time depositor.

103.    During the Relevant Period, Zilmil made more than $5 million from the sale of its autotrading systems.

**ii.    Zilmil's Email Marketing**

104.    Zilmil also promotes its trading systems by sending mass emails to potential customers.  These mass emails contain numerous false and misleading about the trading systems, e.g., that customers can "make millions" with the systems, or that customers make profits of $100,000 per month.  The emails also direct customers to open accounts with various binary options websites to which Zilmil drives traffic.

105.    Zilmil sent more than 60 million of these fraudulent emails to more than 1.4 million unique email addresses in just one seven-month period.

106.    In one such email, for example, Zilmil writes:

Welcome to the Millionaire Money Machine! ….

Have you already made your first $100,000 yet?  Most of our members have, but it seems like you haven't activated your account by funding it?

[Insert first name], I want to make you money now, but for me to do that, I need you to at least fund your account so that I can change YOUR life.

You joined us so that you can start afresh, make the millions that you always dreamed about, right?  So allow us to do just that... we just need you to at least fund your account so we can take care of all that.

****

Best wishes,

Trevor & the Millionaire Money Machine Team

107.    In another email, Zilmil writes:

I am SO happy for you. This is your chance now to finally start getting some nice profits into your account – it's only few minutes away.

Take a look at the results today:

George B. made $6,210 in 3 minutes
Martin J. made $5,733 in 4 minutes
Julio S. made $5,892 in 3 minutes
Sam L. made $5,278 in 3 minutes
Mary P. made $6,222 in 3 minutes

And in case you are asking... why only 3 minutes? Well this is the way how
our system works, it makes *consistent* and lighting fast profits in about 3
minutes, then stops for the day.  The average profit you'll make for the day is
about $6,000 and it's done all on autopilot for you 5 days per week!

That's about $100,000 per month [insert first name], how would you like that?
Great, I thought so too... and you can get your very first payment [in a] few
minutes from now, just go fund your new broker account so the software can
start making profits for you:

To your success,

Corey Robinson
Fortune 500 Trader and CEO of www.MoneyPlatform.net

108.     These emails contain numerous false or misleading statements and omissions.

For example, the emails purport to be sent by "Trevor" or "Corey Robinson" when in fact the

emails were written and sent by Zilmil.

109.     The emails also do not disclose that binary options websites pay Zilmil for

sending them customers.

### iii.     "The Autotrader ... is Doing Great, Crushing People Like Immediately"

110.     Zilmil's autotrading systems do not work as advertised.  Instead of placing

winning trades as promised, Zilmil's trading systems place trades that result in customer

losses, sometimes depleting the customer's entire account in just a few hours.

111.     This is by design, as illustrated by the following exchange between Defendant

Shah and the operator of an illegal binary options website to which Zilmil drives traffic.

25

112.     Acknowledging that the purpose of Zilmil's autotrader is to cheat customers, the operator of the website writes to Defendant Shah that, "[t]he autotrader attached to this is doing its job and is doing it great, crushing people like immediately."

### iv.     Zilmil's Campaigns

113.     In the illegal binary options industry, Zilmil's autotrading systems are referred to as "campaigns" or "funnels," because they are essentially ad campaigns designed to funnel (i.e., drive) customers to the binary options websites.

114.     Zilmil is responsible for inducing thousands of people to deposit money with binary options websites.  Zilmil has run dozens, if not hundreds, of binary options campaigns touting its trading systems, and funneling customers to binary options websites, including Citrades.

115.     Zilmil claims to be one of the biggest affiliate marketers in the binary options industry.  Zilmil works with numerous binary options websites and sends them customers on a rotating basis.  Defendant Shah explains this in an email to one binary options website operator:

> I'm Mike Shah, probably have heard of me, we do several thousand ftds [first-time depositors] a month … They told me you were a good broker for USA and we were considering adding you guys in a rotation with ten other brokers we rotate on our launches.  We do high volume, steady traffic, so hit me up if you guys got room on floors/leads.

116.     Zilmil collaborates with the binary options websites to make sure that their sales representatives are ready to "convert" customers who come in through Zilmil's funnels. In an email to one binary options website operator, Shah writes:

> We have a super important launch this Monday (Oct. 20).  And conversions and PLVs depend on everyone being on the same page and on top of their

game, especially sales/retention.  Literally can scale this to be 5000+ ftds like last one ...

Launch name: Millionaire Money Machine MMM.

Front page : http://www.millionairemoneymachine.co

Members area : http://www.millionairemoneymachine.co/members

Software area (after they register on members area): http://software.millionairemoneymachine.co

Support email: support@millionairemoneymachine.co

****

My skype: usdbot for any questions and email: zilmilinc@gmail.com (admin stuff).

Please check it out thoroughly, make sure sales/retention etc. people are all aware and know funnel because that WILL really help conversions ... and we need it to convert from day 1 minute 1.

Thing is affiliates and our partners send us traffic, and if they don't see conversions off the bat, they stop... so we need you guys to be on right off the bat....

(ellipses in original)

117.    Zilmil's work as a marketing affiliate of the binary options industry has been extremely lucrative.  During the Relevant Period, binary options websites have paid Zilmil more than $3.6 million.

**v.     Zilmil's Work for Citrades**

118.    Zilmil used more than twenty different autotrading systems to funnel customers to Citrades.  Those autotrading systems include:

www.millionairemoneymachine.co; www.7daymillionaire.co; www.moneyplatform.net; www.binaryboom.co; and www.binarymachine.co.

119.    During the relevant period, Zilmil received more than $500,000 from the Citrades Defendants as payment for directing customer traffic to the Citrades website.

120.    Defendant Shah (and by extension, Zilmil) knew that the Citrades Defendants intended to defraud customers.

121.    Defendant Shah (and by extension, Zilmil) knew that he was sending customers to the Citrades websites, and that he was being paid a flat fee for each customer who deposited money.

122.    Shah and Zilmil knew that they were being paid for their work for Citrades by Scharf, CIT Investments in California, and also Brevspand from its account in Bulgaria.

## VII.   VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND REGULATIONS

A.   **Against the Citrades Defendants**

### Count One: Illegal Off-Exchange Retail Swaps
### Section 2(e) of the Act, 7 U.S.C. § 2(e)

123.    The allegations set forth in paragraphs 1 through 122 are re-alleged and incorporated herein by reference.

124.    During the Relevant Period, the Citrades Defendants entered into swaps transactions with customers using the instrumentalities of interstate commerce.

125.    The Citrades Defendants did this with customers who were non-ECPs (i.e., retail customers).

126.    The Citrades Defendants are themselves non-ECPs.

127.    The swaps transactions that the Citrades Defendants entered into were not executed on any registered exchange or exempt foreign exchange.

128.     The Citrades Defendants, through the conduct set forth in paragraphs 44 through 92, and by entering into swaps transactions with retail customers, have violated Section 2(e) of the Act, 7 U.S.C. § 2(e).

129.     Defendant Scharf is a controlling person of the Citrades Entities and, through the conduct set forth in paragraphs 44 through 92, has failed to act in good faith, or has knowingly induced, directly or indirectly, the acts constituting the violations.  Accordingly, Scharf is liable for each and every violation of the Act committed by the Citrades Entities, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2012).

130.     During the Relevant Period, the Citrades Entities acted as a common enterprise.  Each member of the common enterprise participated in the common enterprise and facilitated the violative acts of the common enterprise and, thus, are jointly and severally liable for the violations of Section 2(e) of the Act, 7 U.S.C. § 2(e), committed by members of the common enterprise.

131.     Each defendant is liable for the acts, omissions, or failures of agents, employees, or persons otherwise acting for that defendant, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2012), and Regulation 1.2, 17 C.F.R. § 1.2 (2017).

**Count Two: Illegal Off-Exchange Commodity Options**
**Section 4c(b) of the Act, 7 U.S.C. § 6c(b), and Regulation 32.2, 17 C.F.R. § 32.2**

132.     The allegations set forth in paragraphs 1 through 122 are re-alleged and incorporated herein by reference.

133.     During the Relevant Period, the Citrades Defendants offered to enter into, entered into, confirmed the execution of, maintained positions in, and otherwise conducted activities relating to commodity options using the instrumentalities of interstate commerce.

134.    The commodity options that the Citrades Defendants offered to enter into, entered into, confirmed the execution of, maintained positions in, and otherwise conducted activities relating to, were not executed on any registered exchange or exempt foreign exchange.

135.    The Citrades Defendants, through the conduct set forth in paragraphs 44 through 92, and by offering to enter into, entering into, confirming the execution of, maintaining a position in, or otherwise conducting activity related to commodity options, other than on a registered exchange or exempt foreign exchange, have violated Section 4c(b) of the Act, 7 U.S.C. § 6c(b), and Regulation 32.2, 17 C.F.R. § 32.2.

136.    Defendant Scharf is a controlling person of the Citrades Entities and, through the conduct set forth in paragraphs 44 through 92, has failed to act in good faith, or has knowingly induced, directly or indirectly, the acts constituting the violations. Accordingly, Scharf is liable for each and every violation of the Act committed by the Citrades Entities, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2012).

137.    During the Relevant Period, the Citrades Entities acted as a common enterprise. Each member of the common enterprise participated in the common enterprise and facilitated the violative acts of the common enterprise and, thus, are jointly and severally liable for the violations of Section 4c(b) of the Act, 7 U.S.C. § 6c(b), and Regulation 32.2, 17 C.F.R. § 32.2, committed by members of the common enterprise.

138.    Each defendant is liable for the acts, omissions, or failures of agents, employees, or persons otherwise acting for that defendant, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2.

## Count Three: Unregistered FCM
## Section 4d(a)(1) of the Act, 7 U.S.C. § 6d(a)(1)

139.    The allegations set forth in paragraphs 1 through 122 are re-alleged and incorporated herein by reference.

140.    During the Relevant Period, the Citrades Defendants were engaged in soliciting and accepting orders for commodity options or swaps using the instrumentalities of interstate commerce.

141.    During the Relevant Period, the Citrades Defendants accepted money or property (or extends credit in lieu thereof) to margin, guarantee, or secure trades or contracts resulting from commodity options or swaps transactions using the instrumentalities of interstate commerce.

142.    None of the Citrades Defendants has ever been registered with the Commission as an FCM.

143.    The Citrades Defendants, through the conduct set forth in paragraphs 44 through 92, and by soliciting or accepting orders for commodity options or swaps, and accepting money or property (or extends credit in lieu thereof) to margin, guarantee, or secure trades or contracts resulting from those commodity options or swaps without registration as an FCM, have violated Section 4d(a)(1) of the Act, 7 U.S.C. § 6d(a)(1).

144.    Defendant Scharf is a controlling person of the Citrades Entities and, through the conduct set forth in paragraphs 44 through 92, has failed to act in good faith, or has knowingly induced, directly or indirectly, the acts constituting the violations.  Accordingly, Scharf is liable for each and every violation of the Act committed by the Citrades Entities, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2012).

145.    During the Relevant Period, the Citrades Entities acted as a common enterprise.  Each member of the common enterprise participated in the common enterprise and facilitated the violative acts of the common enterprise and, thus, are jointly and severally liable for the violations of Section 4d(a)(1) of the Act, 7 U.S.C. § 6d(a)(1), committed by members of the common enterprise.

146.    Each defendant is liable for the acts, omissions, or failures of agents, employees, or persons otherwise acting for that defendant, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2.

### Count Four: Unregistered CTA
### Section 4m(1) of the Act, 7 U.S.C. § 6m(1)

147.    The allegations set forth in paragraphs 1 through 122 are re-alleged and incorporated herein by reference.

148.    During the Relevant Period, the Citrades Defendants, for compensation or profit, engaged in the business of advising others, either directly or through publications, writings, or electronic media, as to the value of or the advisability of trading in commodity options or swaps using the instrumentalities of interstate commerce.

149.    None of the Citrades Defendants has ever been registered with the Commission as a CTA.

150.    The Citrades Defendants, through the conduct set forth in paragraphs 44 through 92, and by engaging, for compensation or profit, in the business of advising others as to the value of or the advisability of trading in commodity options or swaps without registration as a CTA, have violated Section 4m(1) of the Act, 7 U.S.C. § 6m(1).

151.     Defendant Scharf is a controlling person of the Citrades Entities and, through the conduct set forth in paragraphs 44 through 92, has failed to act in good faith, or has knowingly induced, directly or indirectly, the acts constituting the violations.  Accordingly, Scharf is liable for each and every violation of the Act committed by the Citrades Entities, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2012).

152.     During the Relevant Period, the Citrades Entities acted as a common enterprise.  Each member of the common enterprise participated in the common enterprise and facilitated the violative acts of the common enterprise and, thus, are jointly and severally liable for the violations of Section 4m(1) of the Act, 7 U.S.C. § 6m(1), committed by members of the common enterprise.

153.     Each defendant is liable for the acts, omissions, or failures of agents, employees, or persons otherwise acting for that defendant, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2.

**Count Five: Options Fraud**
**Section 4c(b) of the Act, 7 U.S.C. § 6c(b), and Regulation 32.4, 17 C.F.R. § 32.4**

154.     The allegations set forth in paragraphs 1 through 122 are re-alleged and incorporated herein by reference.

155.     During the Relevant Period, the Citrades Defendants, by the conduct alleged in paragraphs 44 through 92, in or in connection with an offer to enter into, the entry into, or the confirmation of the execution of, any commodity option transaction, using the instrumentalities of interstate commerce, directly and indirectly: (a) cheated or defrauded, and attempted to cheat and fraud, customers and prospective customers; (b) made or caused to be made to customers and prospective customers false reports or statements; and (c)

deceived or attempted to deceive customers and prospective customers, in violation of Section 4c(b) of the Act, 7 U.S.C. § 6c(b), and Regulation 32.4, 17 C.F.R. § 32.4.

156.    Defendant Scharf is a controlling person of the Citrades Entities and, through the conduct set forth in paragraphs 44 through 92, has failed to act in good faith, or has knowingly induced, directly or indirectly, the acts constituting the violations.  Accordingly, Scharf is liable for each and every violation of the Act committed by the Citrades Entities, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2012).

157.    During the Relevant Period, the Citrades Entities acted as a common enterprise.  Each member of the common enterprise participated in the common enterprise and facilitated the violative acts of the common enterprise and, thus, are jointly and severally liable for the violations of Section 4c(b) of the Act, 7 U.S.C. § 6c(b), and Regulation 32.4, 17 C.F.R. § 32.4, committed by members of the common enterprise.

158.    Each defendant is liable for the acts, omissions, or failures of agents, employees, or persons otherwise acting for that defendant, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2.

**Count Six: CTA Fraud**
**Section 4*o*(1) of the Act, 7 U.S.C. § 6*o*(1), and Regulation 4.41(a), 17 C.F.R. § 4.41(a)**

159.    The allegations set forth in paragraphs 1 through 122 are re-alleged and incorporated herein by reference.

160.    During the Relevant Period, the Citrades Defendants acted as a CTA within the meaning of the Act.

161.    During the Relevant Period, the Citrades Defendants, by the conduct alleged in paragraphs 44 through 92, using the instrumentalities of interstate commerce: (a)

employed numerous devices, schemes, or artifices to defraud clients and prospective clients; and (b) engaged in transactions, practices, and courses of business which operated as a fraud or deceit upon clients and prospective clients, in violation of Section 4$o$(1) of the Act, 7 U.S.C. § 6$o$(1).

162.    During the Relevant Period, the Citrades Defendants, by the conduct alleged in paragraphs 44 through 92, advertised in a manner which: (a) employed a device, scheme or artifice to defraud clients and prospective clients; or (b) involved transactions, practices or courses of business which operated as a fraud or deceit upon any clients and prospective clients, in violation of Regulation 4.41(a), 17 C.F.R. § 4.41(a)(1), (2).

163.    Moreover, the Citrades website, which is operated by the Citrades Defendants, advertises in a manner which refers to testimonials, as set forth in paragraphs 57 through 59, without disclosing that the testimonial may not be representative of the experience of other clients, or that the testimonial is no guarantee of future performance or success, in violation of Regulation 4.41(a)(3), 17 C.F.R. § 4.41(a)(3).

164.    Defendant Scharf is a controlling person of the Citrades Entities and, through the conduct set forth in paragraphs 44 through 92, has failed to act in good faith, or has knowingly induced, directly or indirectly, the acts constituting the violations.  Accordingly, Scharf is liable for each and every violation of the Act committed by the Citrades Entities, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2012).

165.    During the Relevant Period, the Citrades Entities acted as a common enterprise.  Each member of the common enterprise participated in the common enterprise and facilitated the violative acts of the common enterprise and, thus, are jointly and severally

liable for the violations of Section 4o(1) of the Act, 7 U.S.C. § 6o(1), and Regulation 4.41(a),

17 C.F.R. § 4.41(a), committed by members of the common enterprise.

166.    Each defendant is liable for the acts, omissions, or failures of agents,

employees, or persons otherwise acting for that defendant, pursuant to Section 2(a)(1)(B) of

the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2.

**Count Seven:  Manipulative & Deceptive Devices in Connection with Swaps**
**Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), and Regulation 180.1(a), 17 C.F.R. § 180.1(a)**

167.    The allegations set forth in paragraphs 1 through 122 are re-alleged and

incorporated herein by reference.

168.    During the Relevant Period, the Citrades Defendants, by the conduct alleged

in paragraphs 44 through 92, intentionally or recklessly, using the instrumentalities of

interstate commerce, directly and indirectly, in connection with swaps: (a) used or employed,

or attempted to use or employ, manipulative devices, schemes, and artifices to defraud; (b)

made, or attempted to make, untrue or misleading statement of a material fact; (c) omitted to

state material facts necessary in order to make statements made not untrue or misleading; and

(d) engaged, or attempted to engage, in acts, practices, and courses of business, which

operated or would operate as a fraud or deceit upon customers and prospective customers, in

violation of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), and Regulation 180.1(a), 17 C.F.R. §

180.1(a)(1), (2), (3).

169.    Defendant Scharf is a controlling person of the Citrades Entities and, through

the conduct set forth in paragraphs 44 through 92, has failed to act in good faith, or has

knowingly induced, directly or indirectly, the acts constituting the violations.  Accordingly,

Scharf is liable for each and every violation of the Act committed by the Citrades Entities, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2012).

170.     During the Relevant Period, the Citrades Entities acted as a common enterprise. Each member of the common enterprise participated in the common enterprise and facilitated the violative acts of the common enterprise and, thus, are jointly and severally liable for the violations of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), and Regulation 180.1(a), 17 C.F.R. § 180.1(a), committed by members of the common enterprise.

171.     Each defendant is liable for the acts, omissions, or failures of agents, employees, or persons otherwise acting for that defendant, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2.

**B.     Against the Zilmil Defendants**

### Count Eight: Off-Exchange Commodity Options
### Section 4c(b) of the Act, 7 U.S.C. § 6c(b), and Regulation 32.2, 17 C.F.R. § 32.2

172.     The allegations set forth in paragraphs 1 through 122 are re-alleged and incorporated herein by reference.

173.     During the Relevant Period, the Zilmil Defendants offered to enter into, entered into, confirmed the execution of, maintained positions in, and otherwise conducted activities relating to commodity options using the instrumentalities of interstate commerce.

174.     The commodity options that the Zilmil Defendants offered to enter into, entered into, confirmed the execution of, maintained positions in, and otherwise conducted activities relating to, were not executed on any registered exchange or exempt foreign exchange.

175.     The Zilmil Defendants, through the conduct set forth in paragraphs 93 through 122, and by offering to enter into, entering into, confirming the execution of, maintaining a position in, or otherwise conducting activity related to commodity options, other than on a registered exchange or exempt foreign exchange, have violated Section 4c(b) of the Act, 7 U.S.C. § 6c(b), and Regulation 32.2, 17 C.F.R. § 32.2.

176.     Defendant Shah is a controlling person of Zilmil and, through the conduct set forth in paragraphs 93 through 122, has failed to act in good faith, or has knowingly induced, directly or indirectly, the acts constituting the violations. Accordingly, Shah is liable for each and every violation of the Act committed by Zilmil, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b).

177.     Each defendant is liable for the acts, omissions, or failures of agents, employees, or persons otherwise acting for that defendant, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2.

### Count Nine: Unregistered CTA
### Section 4m(1) of the Act, 7 U.S.C. § 6m(1)

178.     The allegations set forth in paragraphs 1 through 122 are re-alleged and incorporated herein by reference.

179.     During the Relevant Period, the Zilmil Defendants, for compensation or profit, engaged in the business of advising others, either directly or through publications, writings, or electronic media, as to the value of or the advisability of trading in commodity options or swaps using the instrumentalities of interstate commerce.

180.     None of the Zilmil Defendants has ever been registered with the Commission as a CTA.

181.    The Zilmil Defendants, through the conduct set forth in paragraphs 93 through 122, and by engaging, for compensation or profit, in the business of advising others as to the value of or the advisability of trading in commodity options or swaps without registration as a CTA, have violated Section 4m(1) of the Act, 7 U.S.C. § 6m(1).

182.    Defendant Shah is a controlling person of Zilmil and, through the conduct set forth in paragraphs 93 through 122, has failed to act in good faith, or has knowingly induced, directly or indirectly, the acts constituting the violations.  Accordingly, Shah is liable for each and every violation of the Act committed by Zilmil, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b).

183.    Each defendant is liable for the acts, omissions, or failures of agents, employees, or persons otherwise acting for that defendant, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2.

**Count Ten: Options Fraud**
**Section 4c(b) of the Act, 7 U.S.C. § 6c(b), and Regulation 32.4, 17 C.F.R. § 32.4**

184.    The allegations set forth in paragraphs 1 through 122 are re-alleged and incorporated herein by reference.

185.    During the Relevant Period, the Zilmil Defendants, by the conduct alleged in paragraphs 93 through 122, in or in connection with an offer to enter into, the entry into, or the confirmation of the execution of, any commodity option transaction, using the instrumentalities of interstate commerce, directly and indirectly: (a) cheated or defrauded, and attempted to cheat and fraud, customers and prospective customers; (b) made or caused to be made to customers and prospective customers false reports or statements; and (c)

deceived or attempted to deceive customers and prospective customers, in violation of Section 4c(b) of the Act, 7 U.S.C. § 6c(b), and Regulation 32.4, 17 C.F.R. § 32.4.

186.   Defendant Shah is a controlling person of Zilmil and, through the conduct set forth in paragraphs 93 through 122, has failed to act in good faith, or has knowingly induced, directly or indirectly, the acts constituting the violations.  Accordingly, Shah is liable for each and every violation of the Act committed by Zilmil, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b).

187.   Zilmil, by the actions set forth in paragraphs 93 through 122, willfully aided, abetted, counseled, and procured the commission of, the Citrades Defendants' violations of Section 4c(b) of the Act, 7 U.S.C. § 6c(b), and Regulation 32.4, 17 C.F.R. § 32.4, and acted in combination or concert with the Citrades Defendants in violating the Act and Regulations; Zilmil is therefore liable for each such violation of the Acts or Regulations as principal, pursuant to Section 13(a) of the Act, 7 U.S.C. § 13c(a).

188.   Each defendant is liable for the acts, omissions, or failures of agents, employees, or persons otherwise acting for that defendant, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2.

## Count Eleven: CTA Fraud
### Section 4*o*(1) of the Act, 7 U.S.C. § 6*o*(1), and Regulation 4.41(a), 17 C.F.R. § 4.41(a)

189.   The allegations set forth in paragraphs 1 through 122 are re-alleged and incorporated herein by reference.

190.   During the Relevant Period, the Zilmil Defendants acted as a CTA within the meaning of the Act.

191.    During the Relevant Period, the Zilmil Defendants, by the conduct alleged in paragraphs 93 through 122, using the instrumentalities of interstate commerce: (a) employed numerous devices, schemes, or artifices to defraud clients and prospective clients; and (b) engaged in transactions, practices, and courses of business which operated as a fraud or deceit upon clients and prospective clients, in violation of Section 4$o$(1) of the Act, 7 U.S.C. § 6$o$(1).

192.    During the Relevant Period, the Zilmil Defendants, by the conduct alleged in paragraphs 93 through 122, advertised in a manner which: (a) employed a device, scheme or artifice to defraud clients and prospective clients; or (b) involved transactions, practices or courses of business which operated as a fraud or deceit upon any clients and prospective clients, in violation of Regulation 4.41(a), 17 C.F.R. § 4.41(a)(1), (2).

193.    Moreover, the Zilmil Defendants' promotional materials, including websites and emails, advertise in a manner which refers to testimonials, as set forth in paragraphs 98 through 109, without disclosing that the testimonial may not be representative of the experience of other clients, or that the testimonial is no guarantee of future performance or success, in violation of Regulation 4.41(a)(3), 17 C.F.R. § 4.41(a)(3).

194.    Defendant Shah is a controlling person of Zilmil and, through the conduct set forth in paragraphs 93 through 122, has failed to act in good faith, or has knowingly induced, directly or indirectly, the acts constituting the violations. Accordingly, Shah is liable for each and every violation of the Act committed by Zilmil, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b).

195.     The Zilmil Defendants, by the actions set forth in paragraphs 93 through 122,

willfully aided, abetted, counseled, and procured the commission of, the Citrades

Defendants' violations of the Act and Regulations, and acted in combination or concert with

the Citrades Defendants in violating the Act and Regulations; the Zilmil Defendants are

therefore liable for each such violation of the Acts or Regulations as principal, pursuant to

Section 13(a) of the Act, 7 U.S.C. § 13c(a).

196.     Each defendant is liable for the acts, omissions, or failures of agents,

employees, or persons otherwise acting for that defendant, pursuant to Section 2(a)(1)(B) of

the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2.

**Count Twelve: Manipulative & Deceptive Devices in Connection with Swaps
Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), and Regulation 180.1(a), 17 C.F.R. § 180.1(a)**

197.     The allegations set forth in paragraphs 1 through 122 are re-alleged and

incorporated herein by reference.

198.     During the Relevant Period, the Zilmil Defendants, by the conduct alleged in

paragraphs 93 through 122, intentionally or recklessly, using the instrumentalities of

interstate commerce, directly and indirectly, in connection with swaps: (a) used or employed,

or attempted to use or employ, manipulative devices, schemes, and artifices to defraud; (b)

made, or attempted to make, untrue or misleading statement of a material fact; (c) omitted to

state material facts necessary in order to make statements made not untrue or misleading; and

(d) engaged, or attempted to engage, in acts, practices, and courses of business, which

operated or would operate as a fraud or deceit upon customers and prospective customers, in

violation of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), and Regulation 180.1(a), 17 C.F.R. §

180.1(a)(1), (2), (3).

199.     Defendant Shah is a controlling person of Zilmil and, through the conduct set forth in paragraphs 93 through 122, has failed to act in good faith, or has knowingly induced, directly or indirectly, the acts constituting the violations.  Accordingly, Shah is liable for each and every violation of the Act committed by Zilmil, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b).

200.     The Zilmil Defendants, by the actions set forth in paragraphs 93 through 122, willfully aided, abetted, counseled, and procured the commission of, the Citrades Defendants' violations of the Act and Regulations, and acted in combination or concert with the Citrades Defendants in violating the Act and Regulations; Zilmil is therefore liable for each such violation of the Acts or Regulations as principal, pursuant to Section 13(a) of the Act, 7 U.S.C. § 13c(a).

201.     Each defendant is liable for the acts, omissions, or failures of agents, employees, or persons otherwise acting for that defendant, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2.

## VIII.   RELIEF REQUESTED

202.     WHEREFORE, the Commission respectfully requests that this Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-1, and pursuant to the Court's own equitable powers, enter:

a.       An order finding that the Citrades Defendants violated Sections 2(e), 4c(b), 4d(a)(1), 4m(1), 4o(1), and 6(c)(1) of the Act, 7 U.S.C. §§ 2(e), 6c(b), 6d(a)(1), 6m(1), 6o(1), 9(1), and Regulations 32.2, 32.4, 4.41(a), and 180.1(a);

b.    An order finding that the Zilmil Defendants violated Sections 4c(b), 4m(1), 4o(1), and 6(c)(1) of the Act, 7 U.S.C. §§ 6c(b), 6m(1), 6o(1), 9(1), and Regulations 32.2, 32.4, 4.41(a), and 180.1(a), 17 C.F.R. §§ 32.2, 32.4, 4.41(a), 180.1(a).

c.    An order of permanent injunction prohibiting Defendants and any other person or entity associated with them, from engaging in conduct in the conduct described above, in violation of Sections 2(e), 4c(b), 4d(a)(1), 4m(1), 4o(1), and 6(c)(1) of the Act, 7 U.S.C. §§ 2(e), 6c(b), 6d(a)(1), 6m(1), 6o(1), 9(1), and Regulations 32.2, 32.4, 4.41(a), and 180.1(a), 17 C.F.R. §§ 32.2, 32.4, 4.41(a), 180.1(a).

d.    An order of permanent injunction prohibiting Defendants and any of their agents, servants, employees, assigns, attorneys, and persons in active concert or participation with Defendants, including any successor thereof, from, directly or indirectly:

    i.    Trading on or subject to the rules of any registered entity (as that term is defined in Section 1a(40) of the Act, 7 U.S.C. § 1a(40));

    ii.    Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3(yy), 17 C.F.R. § 1.3(yy) (2017)) for Defendants' own personal accounts or for any accounts in which Defendants have a direct or indirect interest;

    iii.    Having any commodity interests, traded on Defendants' behalf;

iv.     Controlling or directing the trading for or on behalf of any other

person or entity, whether by power of attorney or otherwise, in any

account involving commodity interests;

v.      Soliciting, receiving or accepting any funds from any person for the

purpose of purchasing or selling any commodity interests;

vi.     Applying for registration or claiming exemption from registration with

the Commission in any capacity, and engaging in any activity

requiring such registration or exemption from registration with the

Commission, except as provided for in Regulation 4.14(a)(9),

17 C.F.R. § 4.14(a)(9) (2017); and

vii.    Acting as a principal (as that term is defined in Regulation 3.1(a),

17 C.F.R. § 3.1(a) (2017)), agent or any other officer or employee of

any person (as that term is defined in Section 1a of the Act, 7 U.S.C.

§ 1a) registered, exempted from registration or required to be

registered with the Commission except as provided for in Regulation

4.14(a)(9), 17 C.F.R. § 4.14(a)(9).

e.    An order directing Defendants, as well as any successors thereof, to disgorge

to any officer appointed or directed by the Court all benefits received

including, but not limited to, salaries, commissions, loans, fees, revenues, and

trading profits derived, directly or indirectly, from acts or practices that

constitute violations of the Act and the Regulations, including pre- and post-

judgment interest;

f.      An order directing Defendants, as well as any successors thereof, to make full restitution to every person or entity whose funds Defendants received or caused another person or entity to receive as a result of acts and practices that constituted violations of the Act and the Regulations, as described herein, and pre- and post-judgment interest thereon from the date of such violations;

g.      An order requiring Defendants to pay civil monetary penalties under the Act, to be assessed by the Court, in amounts of not more than the higher of: (1) triple the monetary gain to Defendant for each violation of the Act and the Regulations; or (2) $170,472 for each violation committed, plus pre- and post-judgment interest;

h.      An order requiring Defendants to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2412(a)(2) (2012); and

i.      Enter an Order providing such other and further relief as this Court may deem necessary and appropriate.

Dated: July 10, 2017

Respectfully submitted,

 /s/ Ashley J. Burden

Ashley J. Burden, trial counsel
Eric L. Schleef, trial counsel
Joseph Konizeski, trial counsel
Rosemary Hollinger
Scott R. Williamson

Attorneys for Plaintiff
Commodity Futures Trading Commission
525 W. Monroe St.
Chicago, IL 60661
Tel. (312) 596-0700
Fac. (312) 596-0714
aburden@cftc.gov
eschleef@cftc.gov
jkonizeski@cftc.gov
rhollinger@cftc.gov
swilliamson@cftc.gov