IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA, JACKSONVILLE DIVISION

| | |
|---|---|
| Commodity Futures Trading Commission,<br><br>Plaintiff,<br><br>vs.<br><br>Jason B. Scharf (d/b/a Citrades.com and AutoTradingBinary.com); CIT Investments LLC; Brevspand EOOD; CIT Investments Ltd.; A & J Media Partners, Inc.; Michael Shah; and Zilmil, Inc.,<br><br>Defendants. | Case No. _____<br><br>PLAINTIFF COMMODITY FUTURES TRADING COMMISSION'S EX PARTE MOTION FOR STATUTORY RESTRAINING ORDER, APPOINTMENT OF RECEIVER, AN ACCOUNTING, EXPEDITED DISCOVERY, ORDER TO SHOW CAUSE REGARDING PRELIMINARY INJUNCTION, AND OTHER EQUITABLE RELIEF<br><br>Hon. _____ |

From at least June 2013 through the present ("Relevant Period"), Defendant Jason Scharf ("Scharf"), individually and acting through a common enterprise that includes Defendants Brevspand EOOD, CIT Investments LLC, CIT Investments Ltd., and A&J Media Partners, Inc. (collectively, "Citrades Entities," and together with Scharf, "Citrades Defendants"), have operated a massive scam in which the Citrades Defendants fraudulently solicited customers to enter into illegal, off-exchange investments in so-called "binary options." During the Relevant Period, the Citrades Defendants received at least $16 million in customer funds and opened more than 140,000 accounts.

Defendant Zilmil, Inc. ("Zilmil"), and its principal, Defendant Michael Shah (together, "Zilmil Defendants"), are third-party "affiliate marketers" who drive internet traffic to the Citrades Defendants' websites by fraudulently soliciting customers to sign up for or purchase so-called binary options autotrading systems with names like "Millionaire

Money Machine." When customers sign up for the autotrading systems, they are instructed to send money to the Citrades Defendants. The Citrades Defendants then pay a commission to the Zilmil Defendants for every customer that sends money. During the Relevant Period, the Zilmil Defendants made gross revenues of more than $4 million from sales of its autotrading systems and $500,000 in commissions from the Citrades Defendants.

By virtue of this conduct and further conduct described below, Defendants have engaged are engaging, or are about to engage, in acts and practices in violation the Commodity Exchange Act ("Act"), 7 U.S.C. §§ 1-26 (2012), and accompanying regulations ("Regulations"), 17 C.F.R. §§ 1.1-190.10 (2017). In particular, Defendants have violated the prohibitions against, inter alia, off-exchange commodity options and swaps trading, and fraud.

Accordingly, pursuant to Section 6c of the Act,  7 U.S.C. § 13a-1(b) (2012), the CFTC hereby moves for a statutory restraining order ("SRO"): (1) prohibiting Defendants from destroying or refusing to permit the CFTC from inspecting, when and as requested, all books and records or other documents, (2) freezing Defendants' assets, and (3) appointing a temporary receiver to administer the SRO. The CFTC also moves for an order to show cause why a preliminary injunction should not issue within 14 days of the SRO.

## I.   PARTIES

### A.   The CFTC

Plaintiff Commodity Futures Trading Commission ("CFTC" or "Commission") is the independent federal regulatory agency charged with the administration and enforcement of the Commodity Exchange Act and regulations promulgated thereunder.

2

**B.      The Citrades Defendants**

Defendant **Jason B. Scharf** is a natural person who resides in Valley Village, California.  (Cavers Decl. ¶ 4, Ex. 3.)

Defendant **CIT Investments LLC** ("CIT Investments") was a Nevada limited liability corporation.  (*Id*. ¶ 5.)  Scharf was a managing member and shareholder of CIT Investments.  (*Id*.)  CIT Investments dissolved on June 8, 2015.[1]  (*Id*.)

Defendant **Brevspand EOOD** ("Brevspand") is a Bulgarian business entity with a mailing address in Sophia, Bulgaria.  (Notes on IncidentID 22849616 at 43, Ex. 2-C; *see also* Cavers Decl. ¶ 6, Ex. 3.)  Brevspand's principal place of business is at Scharf's home in Valley Village, California.  (*See* Customer 47478905 Records at 11, Ex. 2-A.)  Scharf is a manager, shareholder, and partner in Brevspand.  (Notes on IncidentID 22849616 at 43, 55, Ex. 2-C.)  Scharf is listed as the CEO of Brevspand in investment contracts sent to customers.  (Cavers Decl. ¶ 6, Ex. 3.)

Defendant **CIT Investments Ltd**. ("CIT Anguilla") was an Anguillan business entity with a mailing address in Stoney Ground, Anguilla.  (Notes on IncidentID 22849616 at 39, Ex. 2-C; *see also* Cavers Decl. ¶ 7, Ex. 3)  Scharf was authorized to act as the director of CIT Anguilla.  (Notes on IncidentID 22849616 at 40, Ex. 2-C.)  CIT Anguilla dissolved on November 10, 2016.  (Cavers Decl. ¶ 7, Ex. 3.)

Defendant **A & J Media Partners, Inc**. ("A&J Media") was a California corporation with its principal place of business at Scharf's home in Valley Village, California.  (*Id*. ¶ 9;

---

[1] An action can be brought against a dissolved Nevada LLC within three years of the effective date of the articles of dissolution for claims that the plaintiff was unaware of, or could not, through the exercise of reasonable diligence, have known about before the date of dissolution.  Nev. Rev. Stat. Ann. § 86.505.

*see also* Customer 52299284 Records at 15, Ex. 2-B.)  Citrades customers were told that

A&J Media is a "DBA" of Citrades.  (Schulte Decl. ¶ 6, Ex. 4; *see also* Emails Between

Schulte and Citrades at 9, Ex. 4-A.)  A&J Media dissolved on June 1, 2015.[2]  (Cavers Decl.

¶ 9, Ex. 3.)  None of the Citrades Defendants has ever been registered with the Commission

in any capacity.  (*Id.* ¶¶ 4-9.)

**C.     The Zilmil Defendants**

Defendant **Michael Shah** is a natural person who resides in Jacksonville, Florida.

(*Id.* ¶ 11.)  Defendant **Zilmil, Inc.** ("Zilmil") is a Florida Corporation with its principal place

of business in Jacksonville, Florida.  (*Id.* ¶ 10.)  Shah is the president and director of Zilmil.

(*Id.*)  Neither Shah nor Zilmil has ever been registered with the Commission in any capacity.

(*Id.* ¶¶ 10-11.)

## II.   FACTUAL BACKGROUND

**A.     The Citrades Defendants' Binary Options Scam**

**1.     Citrades: "The Most Profitable Click You'll Ever Make"**

Throughout the Relevant Period, Defendant Scharf, acting through various agents,

employees, and business entities, including the Citrades Entities, has been operating an

illegal binary options scam through various websites, including but not limited to

www.citrades.com ("Citrades website").  The Citrades website was operating through

February 2017, but has since been taken down.  (Mack Decl. ¶¶ 7-8, Ex. 1.)

---

[2] A California corporation which is dissolved nevertheless continues to exist for the purpose of defending actions against it.  Cal. Corp. Code § 2010.  Such actions can be brought against the dissolved corporation within four years of dissolution.  *Id.* § 2011.

The Citrades website purported to offer customers the ability to enter into binary options contracts on numerous commodities, indices, and currencies, including, but not limited to, foreign exchange and broad-based stock indices.  (Dec. 12, 2016 Citrades Website at 22-26, Ex. 1-A.)  The website purported to be the "leading platform" for trading binary options online.  (*Id*. at 5.)

The Citrades website claimed falsely that, "Citrades.com was started by a group of highly accredited Wall Street brokers who wanted to bring everyone in the world an easy way to invest with an educational and no stress platform."  (Dec. 12, 2016 Citrades Website at 15, Ex. 1-A.)  In reality, the Citrades website was started by Jason Scharf, who is not now, and has never been, a highly accredited Wall Street broker.  (*Compare* Customer 47478905 Records at 4-5, 7, Ex. 2-A, *with* Cavers Decl. ¶ 4, Ex. 3.)

The Citrades website made false and misleading statements of material fact about, or failed to disclose material facts about, its binary options products, including, but not limited to facts or omissions concerning the likelihood of profit and risk of loss, such as:

- describing its binary options as "safe & secure investments" (Dec. 12, 2016 Citrades Website at 6, Ex. 1-A);

- stating that "Binary [ ] Options are the fastest and most efficient way to convert your financial decisions into substantial profits" (*id*.);

- stating that opening an account with Citrades is "the most profitable click you'll ever make" (*id*. at 15); and,

- claiming that traders "profit up to 89%," (*id*. at 6, 18) and that customers can make "up to 500% returns" using the Citrades "one-touch options" feature (*id*. at 20).

   **2.      Self-Traded, Managed, and "Autotraded" Accounts**

The Citrades website allowed customers to choose to open one of three different types of accounts: self-traded accounts, managed accounts, and "autotraded" accounts. (Dec. 12, 2016 Citrades Website at 5-6, 9-10, Ex. 1-A.)  For self-traded accounts, a customer need only choose the asset he or she wants to trade, click "call" if they believe the price will rise, or "put" if they believe the price will fall.  (*Id*. at 5-6.)  For managed accounts, the Citrades website offered customers the opportunity to have a "dedicated account manager" direct the trades placed in their account.  (*Id*. at 5, 9-10.)  For autotraded accounts, the Citrades website provided an "automated, hands-free trading program" through which "expert trades" are "automatically copied" to the customer's account.  (*Id*.)

### 3.      Fake Testimonials

The Citrades website featured testimonials from purported customers.  (Dec. 12, 2016 Citrades Website at 16-17, Ex. 1-A.)  These testimonials are fabricated, and the representations made are false.  (*See* Cavers Decl. ¶ 26, Ex. 3.)  The fake testimonials make claims such as the following:

- "I never knew how easy it was to pull 85% returns from simple 60 second trades." (Dec. 12, 2016 Citrades Website at 16-17, Ex. 1-A.)

- "I can only thank Citrades for the success I have found using their managed account. After a short 2 months I was able to pay for a year of college tuition."  (May 12, 2016 Citrades Website at 33. Ex. 1-B)

- "Citrades has proven to be a really reliable broker.  Depositing is easy, withdrawals are always on time, and the market rates are fair." (Dec. 12, 2016 Citrades Website at 16-17, Ex. 1-A.)

### 4.      AutoTradingBinary: "100% Automated Binary Options Profits"

The Citrades Defendants operated a second website, www.autotradingbinary.com ("ATB website"), to trick customers into funding an account through the Citrades website.

The ATB website was operating through February 2017; it is currently listed as being "under maintenance."  (Mack Decl. ¶¶ 7, 9, Ex. 1.)

The ATB website encouraged customers to register for ATB's "hands-off" autotrading service, which it touted as "100% free," while falsely promising "100% automated binary options profits."  (Autotradingbinary Website at 35-36, Ex. 1-C.)  Once the customer registers, the customer is directed to open an account with Citrades.  (*See id.* at 38; *see also* Moore Decl. ¶ 19, Ex. 5.)

The ATB website failed to disclose its affiliation with Citrades, claiming falsely that, "we are a third-party and are not affiliated with any of the brokers we push, so we do not have a bias like the brokers do."  (Autotradingbinary Website at 38, Ex. 1-C.)  In reality, ATB and Citrades were operated by the Citrades Defendants.  (*Compare* Customer 52299284 Records at 13-15, Ex. 2-B, *with* Customer 47478905 Records at 4-5, 7, Ex. 2-A.)

The ATB website highlighted "trading results" from its so-called "expert traders," whose trades are "automatically copied to your binary options account, even while you sleep!"  (Autotradingbinary Website at 36, Ex. 1-C.)  For example, the ATB website claimed that ATB expert trader "Pavel Abdulov" had "85% winning trades" in 2016.  (*Id.* at 40.)

The ATB website also featured trading results from its "robots."  (Autotradingbinary Website at 39, Ex. 1-C.)  The ATB website claimed that "our robots efficiently predicted the market trends and managed to secure 73 percent trading result."  (*Id.*)

 5.    **Fraudulent Email and Telephone Solicitations**

Customers who provide their contact information through the Citrades or ATB websites receive emails touting the outsize returns purportedly enjoyed by Citrades and ATB

customers.  For example, one email, from "admin@citrades.com," claims that: "October was … our 18th profitable month in a row with our managed accounts ….  If you do not have a fully automated managed account with us, I strongly encourage you to get started."  (Santos Decl. ¶ 11, Ex. 6.)

Similarly, another email, from "support@autotradingbinary.com," claims that ATB's "new analyst," "Robert," has had "5 winning months in a row, and his fully managed accounts the past two months have been on fire ….  Below you will see a snapshot of Robert's real life strategy performance for the past 30 trading days, which have taken a $12k account to almost $40,000 in a month."  (*Id.* ¶ 12.)

Customers also received telephone calls from Citrades and ATB sales representatives promising "guaranteed returns" of as much as 100%.  (See Schulte Decl. ¶ 4, Ex. 4; Moore Decl. ¶¶ 6-7, 10-11, 19, Ex. 5.)

### 6.    Customer Losses, and Misappropriation by Citrades Defendants

Contrary to the Citrades Defendants' representations, there is a substantial risk that customers will lose money trading binary options, either to "trading" losses or to misappropriation by the Citrades Defendants.

When a customer seeks to open a Citrades account, the customer is instructed to wire money to one of several overseas bank accounts belonging to foreign entities controlled by Scharf, such as Defendants Brevspand or CIT Anguilla.  (*See* Dec. 12, 2016 Citrades Website at 12-14, Ex. 1-A; *see also* Schulte Dec. ¶¶ 5-6, Ex. 4; Moore Decl. ¶¶ 11-12, Ex. 5.) Customers can also fund a Citrades account using a credit card.  (*See* Dec. 12, 2016 Citrades Website at 12-14, Ex. 1-A; Moore Decl. ¶¶ 8-9, Ex. 5.)  The Citrades Defendants keep most

of the money overseas, but periodically repatriate funds through transfers to Scharf or his family members, or to U.S. companies controlled by Scharf, including Defendants CIT Investments and A&J Media.  (Cavers Decl. ¶¶ 12-22, Ex. 3.)

The Citrades Defendants use various pretexts for refusing to return the customer's money.  One such pretext is the "haywire autotrader."  This was used with customer Iven Moore, who was instructed by Citrades customer service representatives to sign up for the Autotradingbinary service with the expectation that it would place profitable trades.  (Moore Decl. ¶ 19, Ex. 5.)  Contrary to the representations on the Citrades website, Mr. Moore saw his account balance decline from $47,000 to nothing in the space of two months.  (*Id*. ¶ 20.)  When Mr. Moore asked for Citrades to return the remaining $10,000, Citrades representatives stopped taking his calls.  (*Id*.)  The $10,000 was never returned.  (*Id*. ¶ 21.)

Many times there is no pretext for refusing to return customer funds.  Citrades representatives simply ignore customer requests to withdraw their principal or trading profits.  (Schulte Decl. ¶¶ 12-14, Ex. 4; Santos Decl. ¶¶ 14-15, Ex. 6.)

The Citrades Defendants' binary options scam has been extremely lucrative.  During the Relevant Period, customers opened approximately 140,000 accounts with Citrades and made deposits of more than $16 million for the purpose of entering into binary options transactions.  (*Id*. ¶ 27.)

**7.     Citrades VIP Program**

In some cases, customers who make large initial deposits are singled out for special treatment through the Citrades "VIP" program.  (*See* Dec. 12, 2016 Citrades Website at 7,

Ex. 1-A.)  In the VIP program, Citrades sales representatives promise customers enormous, guaranteed profits if they invest $20,000 or more via the Citrades website.

Citrades customer David Schulte was a Citrades VIP customer.  (Schulte Dec. ¶ 3, Ex. 4.)  Mr. Schulte received an email from a Citrades sales representative claiming that:

> If you invest in an additional minimum of $14,000.00 we will GUARANTEE, with a 6 month contract, a minimum 5% ROI per month.  Not only that, but at the end of each month we will send you 5%* to your bank account for each of the 6 months.  This means that on $20,000.00 invested you are guaranteed $6,000.00 ($1,000.00 per month) profit received in hand with no shrinkage on your principal.

(*Id.* ¶ 5.)

Mr. Schulte also received a VIP account agreement promising that:  "[t]he total principal amount of $124,011.00 is guaranteed against loss … with a monthly minimum guaranteed revenue (ROI) of 6.75% for the 6 month term of this contract."  (*See id.* ¶ 7; *see also* Signed VIP Agreement at 17, Ex. 4-B.)

Mr. Schulte deposited $100,000 through the Citrades VIP program.  (Schulte Decl. ¶ 14.)  Mr. Schulte made these deposits based on the representations in the VIP agreement, and on the strength of what appeared to be profitable trading in his online Citrades account. (*Id.* ¶¶ 4, 11.)  Indeed, Mr. Schulte reported seeing profits of $60,000 after just a few months' trading by one of Citrades's VIP account managers.  (*Id.* ¶ 11.)

When Mr. Schulte asked Citrades to send him the "guaranteed returns," Citrades representatives stopped taking his calls.  (*Id.* ¶¶ 12-13.)  Mr. Schulte never received any of his money back from Citrades.  (*Id.* ¶ 14.)

**B.      Zilmil's Autotrading Systems and Affiliate Marketing Scam**

**1.      Zilmil's Landing Pages**

Zilmil directs customers to binary options websites by developing and selling autotrading systems.  (*See* Binaryoverdrive Website, Ex. 1-D.)   The autotrading systems are computer programs that automatically place trades on behalf of a customer in the customer's binary options account.  (*See id*.)

Zilmil promotes its binary options autotrading systems through websites referred to as "landing pages."  A landing page typically consists of a single web page, often with a streaming video, along with a field for the customer to sign up to purchase the system.

Zilmil has created and operated numerous landing pages, which it controls and hosts on various webservers.  (Casler Decl. ¶¶ 2-6, Ex. 7.)  Zilmil's landing pages have included, among many others: www.autobinarybot.com; www.binaryarbitrages.com; www.binarycashbot.com; www.binarygenetic.com; www.thebinaryformula.com; www.binaryoverdrive.com; www.binaryturbotrial.com; and www.probinarytips.com.  (*Id*. ¶ 5.)

Zilmil's landing pages contain numerous false and misleading statements and omissions about the performance of the trading systems.  For example, the www.binaryoverdrive.com landing page features a message from "David Collins," who claims to have invented a "autopilot binary options robot" that makes "over $95,436 a month … every month like clockwork … with ZERO manual trading!"  (Binaryoverdrive Website at 46, Ex. 1-D.)  On the landing page, "David Collins" offers customers the opportunity to use the robot for free if they deposit money with a binary options website.  (*Id*. at 56.)  In

reality, the www.binaryoverdrive.com landing page was created and hosted by Zilmil, not "David Collins." (*See* Casler Decl. ¶¶ 2-6.) Zilmil used substantially the same text on its www.binaryturbotrialtrial.com landing page, attributing it there to "Jeff Anderson." (Binarytutorial Website, Ex. 1-E.)

### 2. Zilmil's Email Marketing

Zilmil also promotes its trading systems by sending mass emails to potential customers. (*See* Stinson Decl. ¶¶ 2-9, Ex. 9.) These mass emails contain numerous false and misleading statements about the trading systems, e.g., that customers can "make millions" with the systems, or that customers make profits of $100,000 per month. (*See id.* ¶ 9; Spreadsheet of Zilmil Jobs, Ex. 9-B.) The emails also direct customers to open accounts with various binary options websites to which Zilmil drives traffic. (*See* Stinson Decl. ¶ 9, Ex. 9; Spreadsheet of Zilmil Jobs, Ex. 9-B.)

Zilmil sent more than 60 million of these fraudulent emails to more than 1.4 million unique email addresses in just one seven-month period. (Stinson Decl. ¶¶ 6-7, Ex. 9.) In one such email, for example, Zilmil writes:

> Welcome to the Binary Machine! ….
>
> Have you already made your first $100,000 yet? Most of our members have, but it seems like you haven't activated your account by funding it?
>
> [Insert first name], I want to make you money now, but for me to do that, I need you to at least fund your account so that I can change YOUR life.
>
> You joined us so that you can start afresh, make the millions that you always dreamed about, right? So allow us to do just that... we just need you to at least fund your account so we can take care of all that.

(Spreadsheet of Zilmil Jobs, Ex. 9-B at 28.)

In another email, Zilmil writes:

I am SO happy for you. This is your chance now to finally start getting some nice profits into your account – it's only few minutes away.

Take a look at the results today:

George B. made $6,210 in 3 minutes

Martin J. made $5,733 in 4 minutes

Julio S. made $5,892 in 3 minutes

Sam L. made $5,278 in 3 minutes

Mary P. made $6,222 in 3 minutes

And in case you are asking... why only 3 minutes? Well this is the way how our system works, it makes *consistent* and lighting fast profits in about 3 minutes, then stops for the day.  The average profit you'll make for the day is about $6,000 and it's done all on autopilot for you 5 days per week!

That's about $100,000 per month [insert first name], how would you like that? Great, I thought so too... and you can get your very first payment [in a] few minutes from now, just go fund your new broker account so the software can start making profits for you:

To your success,

Corey Robinson

Fortune 500 Trader and CEO of www.MoneyPlatform.net

(*Id*. at 27.)

**3.    "The Autotrader … is Doing Great, Crushing People Like Immediately"**

Zilmil's autotrading systems do not work as advertised.  Instead of placing winning trades as promised, Zilmil's trading systems place trades that result in customer losses, sometimes depleting the customer's entire account in just a few hours.  (*See* Johannsen Decl. ¶ 5, Ex. 10.)

This is by design, as illustrated by the following exchange between Defendant Shah and the operator of an illegal binary options website to which Zilmil drives traffic.

13

Acknowledging that the purpose of Zilmil's autotrader is to cheat customers, the operator of the website writes to Defendant Shah that, "[t]he autotrader attached to this is doing its job and is doing it great, crushing people like immediately."  (Emails between Jared Davis and Michael Shah at 17-18 (emphasis added), Ex. 8-A.)

### 4.     Zilmil's Campaigns

In the illegal binary options industry, Zilmil's autotrading systems are referred to as "campaigns" or "funnels," because they are essentially ad campaigns designed to funnel (i.e., drive) customers to the binary options websites.  (*See* Cavers Decl. ¶ 27, Ex. 3.)  Zilmil is responsible for inducing thousands of people to deposit money with binary options websites. (*See* Emails between Jared Davis and Michael Shah at 4, Ex. 8-A.)  Zilmil has run dozens, if not hundreds, of binary options campaigns touting its trading systems, and funneling customers to binary options websites, including Citrades.  (*See id*.; *see also* Casler Dec. ¶¶ 2-5, Ex. 8; Stinson Decl. ¶¶ 2-9, Ex. 9.)

Zilmil claims to be one of the biggest affiliate marketers in the binary options industry.  (*See* Emails between Jared Davis and Michael Shah at 4, Ex. 8-A.)  Zilmil works with numerous binary options websites and sends them customers on a rotating basis. Defendant Shah explains this in an email to one binary options website operator:

> I'm Mike Shah, probably have heard of me, we do several thousand ftds [first-time depositors] a month … They told me you were a good broker for USA and we were considering adding you guys in a rotation with ten other brokers we rotate on our launches.  We do high volume, steady traffic, so hit me up if you guys got room on floors/leads.

(*Id*.)

Zilmil collaborates with the binary options websites to make sure that their sales representatives are ready to "convert" customers who come in through Zilmil's funnels.  In an email to one binary options website operator, Shah writes:

> We have a super important launch this Monday (Oct. 20).  And conversions and PLVs depend on everyone being on the same page and on top of their game, especially sales/retention.  Literally can scale this to be 5000+ ftds like last one ...
>
> Launch name: Millionaire Money Machine MMM.
>
> ****
>
> My skype: usdbot for any questions and email: zilmilinc@gmail.com (admin stuff).
>
> Please check it out thoroughly, make sure sales/retention etc. people are all aware and know funnel because that WILL really help conversions … and we need it to convert from day 1 minute 1.
>
> Thing is affiliates and our partners send us traffic, and if they don't see conversions off the bat, they stop… so we need you guys to be on right off the bat....

(*Id*. at 10 (ellipses in original).)

### 5.    **Affiliate Networks**

Just as Zilmil and Shah are affiliates of the binary options websites, Zilmil has affiliates of its own to drive traffic to Zilmil's campaign landing pages.  Zilmil provides its affiliates with promotional materials, including banner ads and sample email solicitations.  (Johannsen Decl. ¶ 5, Ex. 10.)  The affiliates then disseminate these promotional materials across the internet, posting them on blogs, message boards, websites, and social media, and by sending them to potential customers via mass emailings.  (*Id*.)

Zilmil connects with its affiliates through "affiliate networks."  Affiliate networks are websites where "vendors" like Zilmil can post products they want promoted (in Zilmil's case,

autotrading systems).  (*Id*. ¶¶ 4-8.)  When a customer purchases one of the autotrading

system, the customer does so through the affiliate network, which acts as a payment

processor.  (*Id*. ¶¶ 5-6.)  The affiliate network forwards a commission to the affiliate whose

marketing efforts were responsible for the sale, and remits the balance to Zilmil.  (*Id*.)

Zilmil has sold numerous binary options autotrading systems through affiliate

networks.  Examples of these autotrading systems include:

- Auto Binary Bot

- Binary Arbitrages (which the Zilmil touts falsely as having "100% Guaranteed Winning Trades")

- Binary Cash Bot

- Binary Genetic (which Zilmil falsely describes as "The FIRST and ONLY Genetic Algorithm Binary Bot"; "ADVANCED Profit Doubler")

- Options Chaos (which Zilmil misleadingly calls an "Extreme Profit Doubling Trading System!"; "My $3 MILLION DOLLAR Strategy REVEALED!"; "Mr X's $3 MILLION Dollar System - ONE OF A KIND!")

- Options Hybrid (which Zilmil touts falsely as "The World's FIRST HFT Binary Trading System – RISKFREE")

- Pro Binary Tips (which Zilmil misleadingly describes as an "Investment Guardian")

- The Binary Formula

(*Id*. ¶ 8.)

During the Relevant Period, Zilmil made more than $4 million in gross sales through

at least one affiliate network, most if not all of it from fraudulent binary options autotrading

products.  (*See id*. ¶¶ 9-10.)

**6.      Zilmil's Work for Citrades**

Zilmil used numerous autotrading systems to funnel customers to Citrades.  (Cavers

Decl. ¶¶ 26-27, Ex. 3.)  Those autotrading systems include:

www.millionairemoneymachine.co; www.7daymillionaire.co; www.moneyplatform.net;

www.binaryboom.co; and www.binarymachine.co.  *(Compare id*., *with* Spreadsheet of Zilmil

Jobs at 22, 25, 28, 31, Ex. 9-B.)

During the relevant period, Zilmil received more than $500,000 from the Citrades

Defendants as payment for directing customer traffic to the Citrades website.  (Cavers Decl.

¶ 22, Ex. 3; see also Emails between Jason Scharf and Michael Shah, Ex. 3-E.)  Zilmil has

received payments from numerous binary options websites, including $881,000 from Banc

de Binary, another unregistered binary options firm that was the subject of a recent CFTC

enforcement action.  (Cavers Decl. ¶ 25, Ex. 3.)

### III.   LEGAL STANDARD

Section 6c of the Act provides that, upon a proper showing, a temporary or permanent

restraining order shall be granted without bond.  7 U.S.C. § 13a-1(b).  In order to obtain a

temporary or permanent restraining order, the CFTC must make out a prima facie case of

illegality, i.e., that a defendant has engaged, or is engaging, in conduct prohibited by the Act

or Regulations.  *CFTC v. Hunter Wise Commodities, LLC*, 749 F.3d 967, 974 (11th Cir.

2014) (affirming preliminary injunction).

A.      **SROs**

A temporary restraining order under Section 6c is referred to as a "statutory restraining order," or "SRO."  An SRO may be sought and entered on an ex parte basis against any person who appears to have violated the Act or Regulations.  7 U.S.C. § 13a-1(a).

The purpose of the SRO is to prevent possible removal or destruction of potential evidence, and to prohibit the movement or disposal of funds, assets and other property which may be subject to claims by customers.[3]  H.R. REP. 97-565, 93, *as reprinted in* 1982 U.S.C.C.A.N. 3871, 3942.  Accordingly, an ex parte SRO may: (1) prohibit a person from destroying, altering, or disposing of, or refusing to permit the CFTC to inspect, when and as requested, any books and records or other documents; (2) prohibit a person from withdrawing, transferring, removing, dissipating, or disposing of any funds, assets, or other property; and (3) appoint a temporary receiver to administer such restraining order and to perform such other duties as the court may consider appropriate.[4]  7 U.S.C. § 13a-1(a).

B.      **Preliminary Injunctions**

Once an SRO has been entered, the court should issue a rule to show cause why a preliminary injunction ("PI") should not issue upon expiration of the SRO.  *See, e.g.*, *CFTC v. Brown*, No. 3:15-CV-354-BJD-MCR, 2015 WL 10963747, at *1 (M.D. Fla. Apr. 8, 2015)

---

[3] The Zilmil Defendants were represented by counsel in connection with the CFTC's investigation.  The CFTC has reason to believe that Scharf may be represented by counsel in connection with an investigation by a different agency.  An ex parte order is nonetheless necessary to prevent Defendants from destroying records or dissipating funds; the CFTC will provide notice to counsel for Defendants once the SRO has been served on Defendants.

[4] The duration of an ex parte SRO must not exceed 14 days unless the court, for good cause, extends the SRO for a like period (i.e., another 14 days), or unless the defendant consents to an extension.  *See CFTC v. Lake Shore Asset Mgmt. Ltd.*, 496 F.3d 769, 771-73 (7th Cir. 2007) (holding that ex parte SROs are subject to time limits in Fed. R. Civ. Proc. 65).

(entering SRO and order to show cause why PI should not issue).  If the defendant fails to show cause, the court should enter a PI effective through the resolution of the case.  *Id.*

PIs are broader than SROs, and include the full range of equitable pre-judgment remedies, including requiring the defendant to cease the illegal conduct.  *See CFTC v. Hunter Wise Commodities, LLC*, No. 12-81311-CIV, 2013 WL 718503, at *9 (S.D. Fla. Feb. 26, 2013) ("[The] unqualified grant of statutory authority to issue an injunction under § 13a-1 carries with it the full range of equitable remedies."), *aff'd*, 749 F.3d 967; *see also CFTC v. Aliaga*, No. 10-21074-CIV, 2011 WL 766271, at *1 (S.D. Fla. Feb. 25, 2011) ("[A] district court may issue a permanent or temporary injunction or restraining order to enjoin or restrain violations of the Act.").  In order to obtain a preliminary injunction against illegal conduct, the CFTC must show a "reasonable likelihood" of future violations.  *Hunter Wise*, 749 F.3d at 974.

## IV.  THE CFTC HAS ESTABLISHED A PRIMA FACIE CASE OF ILLEGALITY AGAINST DEFENDANTS.

### A.  Defendants Violated the Prohibition Against Off-Exchange Commodity Options and Swaps.

Under Sections 4c(b) and 2(e) of the Act and Regulation 32.2, it is unlawful for a person to offer to enter into, enter into, confirm the execution of, maintain a position in, or otherwise conduct activity related to a commodity option or a swap unless that option is traded on a registered exchange.[5]  7 U.S.C. §§ 6c(b), 2(e) (2012); 17 C.F.R. § 32.2 (2017).

---

[5] Section 4c(b) makes it unlawful to offer to enter into, enter into, or confirm the execution of any transaction involving a commodity which is of the character of, or is commonly known as, an option, contrary to any Regulation.  7 U.S.C. § 6c(b).  Regulation 32.2 provides that it shall be unlawful for any person to offer to enter into, enter into, confirm the execution of, maintain a position in, or otherwise conduct activity related to any transaction in interstate commerce that is a commodity option transaction, unless such transaction is conducted in compliance with the provisions of the Act and Regulations otherwise applicable to swaps.  17 C.F.R. § 32.2.

The only exception to this rule is when both parties to the transaction are eligible contract participants ("ECPs").  7 U.S.C. § 2(e).

Courts have consistently held that so-called binary options are commodity options and swaps within the meaning of the Act and Regulations.  *See CFTC v. Vision Fin. Partners, LLC*, Case No. 16-60297-CIV-Cohn/Seltzer, 2016 WL 3163071, at *3 (S.D. Fla. June 3, 2016) (holding that binary options are commodity options within the meaning of Section 4c(b)); *CFTC v. Trade Exch. Network Ltd.*, 117 F. Supp. 3d 29, 34-38 (D.D.C. 2015) (same); *CFTC v. Banc de Binary Ltd.*, No. 2:13-CV-000992-MMD, 2014 WL 691590, at *3-4 (D. Nev. Feb. 20, 2014) (same).[6]

### 1.      The Citrades Defendants Engaged in Off-Exchange Commodity Options and Swaps Trading in Violation of the Act and Regulations.

The Citrades Defendants offered to enter into, entered into, and confirmed binary options transactions through the Citrades website, which purports to be the "leading platform" for binary options, and offers options transactions of numerous commodities. (Dec. 12, 2016 Citrades Website at 6, 22-26, Ex. 1-A.)  The Citrades Defendants also offered to enter into, entered into, and confirmed binary options transactions over the telephone and via email.  (*See* Schulte Decl. ¶¶ 3-6, Ex. 4; Moore Decl. ¶¶ 5-7, 10-14, 19, Ex. 5; Santos Decl. ¶¶ 5-7, 10-12, Ex. 6.)

---

Section 2(e) of the Act makes unlawful for any person, other than an eligible contract participant ("ECP"), to enter into a swap unless the swap is entered into on, or subject to the rules of, a board of trade designated as a contract market under the Act.  7 U.S.C. § 2(e).  Swaps are defined under the Act to include commodity options and other similar instruments.  7 U.S.C. § 1a(47).

[6] *See also CFTC v. Vault Options, Ltd.*, No. 1:16-CV-01881, 2016 WL 5339716, at *5-6 (N.D. Ill. July 20, 2016) (entering default judgment; holding that operators of website offering off-exchange binary options to retail customers violated Sections 4c(b) and 2(e) of the Act, and Regulation 32.2); *CFTC v. Banc de Binary Ltd.*, No. 2:13-CV-000992-MMD-VCF, 2016 WL 782927, at *7-10 (D. Nev. Feb. 29, 2016) (entering consent judgment; holding that operators of website offering off-exchange binary options to retail customers violated Sections 4c(b) and 2(e) of the Act, and Regulation 32.2).

The binary options transactions offered by the Citrades Defendants were not executed on, or subject to the rules of, any registered exchange.[7]  None of the Citrades Defendants is registered with the CFTC as an exchange.  (Cavers Decl. ¶¶ 4-9, Ex. 3.)

The Citrades Defendants' customers are not ECPs.  In order to qualify as an ECP, an individual must have amounts invested on a discretionary basis of $10 million (or of $5 million, if the individual is hedging an asset or liability).  7 U.S.C. § 1a(18)(A)(xi).  The Citrades Defendants' customers fall below this threshold.  (Schulte Decl. ¶ 2, Ex. 4; Moore Decl. ¶ 2, Ex. 5; Santos Decl. ¶ 2, Ex. 6.)

Thus, the CFTC has established a prima face case that the Citrades Defendants engaged in illegal off-exchange commodity options and swaps transactions with non-ECPs.

      2.      **The Zilmil Defendants Engaged in Activity Relating to Off-Exchange Commodity Options in Violation of the Act and Regulations.**

The Zilmil Defendants sold autotrading systems that purport to trade binary options on behalf of customers.  (*See* Johannsen Decl. ¶ 8, Ex. 10; *see also* Casler Decl. ¶¶ 2-6, Ex. 7; Spreadsheet of Zilmil Jobs, Ex. 9-B at 27-28; Binaryoverdrive Website at 46, Ex. 1-D.) Customers who sign up for the autotrading system are instructed by Zilmil to fund binary options trading accounts with unregistered firms like Citrades.  (Spreadsheet of Zilmil Jobs, Ex. 9-B at 28; Binaryoverdrive Website at 56, Ex. 1-D.)  As such, the CFTC has established a prima facie case that Zilmil was "conducting activity" relating to commodity options, i.e., binary options, in violation of Section 4c(b) and Regulation 32.2.

**B.**      **Defendants Committed Fraud in Violation of the Act**

---

[7] Indeed, the Citrades website specifically stated that the binary options transactions are "over the counter," i.e., not on an exchange.  (Dec. 12, 2016 Citrades Website at 19, Ex. 1-A.)

Defendants in this case perpetrated three different kinds of fraud prohibited by the Act and Regulations: (1) fraud by a commodity trading advisor ("CTA")[8], (2) options fraud, and (3) fraud in connection with swaps.[9]

All three types of fraud involve the making of a material misrepresentation, misleading statement, or deceptive omission. *See CFTC v. R.J. Fitzgerald & Co.*, 310 F.3d 1321, 1328-29 (11th Cir. 2002) (holding that district court erred in failing to grant summary judgment for CFTC on options fraud claims); *CFTC v. S. Trust Metals, Inc.*, No. 1:14-CV-22739, 2016 WL 4523851, at *5-6 (S.D. Fla. Aug. 29, 2016) (entering judgment against defendant for fraud in violation of Regulation 180.1). Whether a statement or omission is misleading depends on the "overall message" and the "common understanding of the information conveyed." *See R.J. Fitzgerald*, 310 F.3d at 1328-29. A representation or omission is "material" if a reasonable investor would consider it important in deciding whether to make an investment. *See id.*; *S. Trust Metals*, 2016 WL 4523851, at *6; *CFTC v.*

---

[8] A CTA is someone who: (1) engages in the business of advising others, either directly or through publications, writings, or electronic media, as to the value of or the advisability of trading, inter alia, any commodity option or swap; and (2) does so for compensation or profit. 7 U.S.C. § 1a(12)(A)(i)(I), (III). The Citrades Defendants did this by offering "managed" and "autotraded" accounts to customers in order to get them to deposit. *See CFTC v. Hall*, 632 F. App'x 111, 113-14 (4th Cir. 2015) (operator of website which offered "managed accounts" and "auto trade accounts" qualified as CTA); *CFTC v. British Am. Commodity Options*, 560 F.2d 135, 141 (2d Cir. 1977) (defendant "profit[ed] if its customers and prospective customers acting on its regular information and advice … purchased [ ] options, for, if they did, British American charged a healthy markup of up to 55%."), *cert. denied*, 438 U.S. 905 (1978). The Zilmil Defendants acted as CTAs by selling customers autotrading systems that place binary options trades in customer accounts. (*See* Johannsen Decl. ¶ 8, Ex. 10; *see also* Casler Decl. ¶¶ 2-6, Ex. 7; Spreadsheet of Zilmil Jobs, Ex. 9-B at 27-28; Binaryoverdrive Website at 46, Ex. 1-D.)

[9] Section 4*o*(1) of the Act prohibits fraud by a CTA. 7 U.S.C. § 6*o*(1) (2012). Regulation 4.41(a) prohibits fraudulent advertising by a CTA. 17 C.F.R. § 4.41(a) (2017). Section 4c(b) of the Act, 7 U.S.C. § 6c(b) (2012), together with Regulation 32.4, 17 C.F.R. § 32.4 (2017), prohibit fraud in connection with commodity options. Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2012), together with Regulation 180.1(a), 17 C.F.R. § 180.1(a) (2017), prohibit fraud in connection with swaps.

*Heffernan*, No. CA 404-23302-TLW-TER, 2006 WL 2434015, at *6–7 (D.S.C. Aug. 21, 2006) (summary judgment for CFTC on CTA fraud claim).[10]

The mens rea for all three types of fraud can be established by showing that the defendant acted with scienter. *See* 7 U.S.C. § 6*o*(1)(A); 17 C.F.R. § 4.41(a)(1); 7 U.S.C. § 6c(b); 17 C.F.R. § 32.4; 17 C.F.R. § 180.1(a)(1), (2).  A defendant acts with scienter if it intended to defraud, manipulate, or deceive, or if the defendant's conduct represents an extreme departure from the standards of ordinary care, i.e., recklessness.  *See R.J. Fitzgerald*, 310 F.3d at 1328-29; *see also S. Trust Metals*, 2016 WL 4523851, at *7.

For CTA fraud and fraud in connection with swaps, scienter need not be shown if the defendant engaged in any transaction, practice, or course of business which "operates as" a fraud upon any customer.  *See* 7 U.S.C. § 6*o*(1)(B); 17 C.F.R. § 4.41(a) (2); 17 C.F.R. § 180.1(a)(3).[11]

### 1.    The Citrades Defendants Committed Fraud in Violation of the Act.

The Citrades Defendants made numerous material misrepresentations and omissions, and employed numerous deceptive practices in connection with their binary options scam.

The Citrades Defendants falsely claimed, on their websites and in communications with customers, that customers would enjoy outsize returns of "up to 500%."  (*See, e.g.*, Dec. 12, 2016 Citrades Website at 6, 15-18, 20, Ex. 1-A.)  The Citrades Defendants further

---

[10] The CFTC is not required to demonstrate reliance on a misstatement or omission, as required in private fraud suits.  *See R.J. Fitzgerald*, 310 F.3d at 1328 n.6 ("'[R]eliance" on the representations is not a requisite element in an enforcement action."); *S. Trust Metals*, 2016 WL 4523851, at *5-6 ("In an enforcement action brought to protect the public interest, the Commission need not prove reliance to establish an antifraud violation.").

[11] *See also CFTC v. Wilson*, 19 F. Supp. 3d 352, 363 (D. Mass. 2014) (Section 4*o*(1)(B) "has no scienter requirement"), *aff'd sub nom.*, *CFTC v. JBW Capital*, 812 F.3d 98 (1st Cir. 2016); *Heffernan*, 2006 WL 2434015, at *6 ("[S]cienter is not required to prove a violation of 6*o*(1)(B) and Regulation 4.41(a)(2), so long as the conduct operated as a fraud on the customer.").

misrepresented to customers that profits and principal were "guaranteed." (*See* Dec. 12,

2016 Citrades Website at 6, Ex. 1-A; Schulte Decl. ¶¶ 5-7, Ex. 4; Moore Decl. ¶¶ 6-7, 10-11,

19, Ex. 5.) These are material misrepresentations in violation of the Act and Regulations.

*See CFTC v. Matrix Trading Grp., Inc.*, No. 00-8880-CIV, 2002 WL 31936799, at *5-6 (S.D.

Fla. Oct. 3, 2002) ("[P]romises of large and certain profits … are material and fraudulent.");

*see also R.J. Fitzgerald*, 310 F.3d at 1329-30 (statement fraudulent if it "overemphasizes

profit potential and downplays risk of loss, presenting an unbalanced image of the two"). In

reality, customers lost their entire investments to trading or to misappropriation by the

Citrades Defendants. (*See* Moore Decl. ¶¶ 15-21, Ex. 5; *see also* Schulte Decl. ¶¶ 12-14, Ex.

4; Santos Dec. ¶¶ 13-15, Ex. 6.)

Additionally, the Citrades Defendants fabricated glowing testimonials in order to

make customers believe that trading binary options with the Citrades Defendants would be

safe and profitable. (*See* Dec. 12, 2016 Citrades Website at 16-17, Ex. 1-A; May 12, 2016

Citrades Website at 33. Ex. 1-B.) Fabricating testimonials is a manipulative and deceptive

device in violation of the Act and Regulations. *See Heffernan*, 2006 WL 2434015, at *7

(summary judgment for CFTC where defendant fabricated testimonials).

The Citrades Defendants also misappropriated customer funds. The Citrades

Defendants assured customers that they could withdraw their funds at any time (or, for VIP

customers, any time after a six-month lock-up period). (Dec. 12, 2016 Citrades Website at

16-17, Ex. 1-A; Signed VIP Agreement at 15, Ex. 4-B; Moore Decl. ¶ 10, Ex. 5.) When

customers sought to withdraw funds from Citrades, however, their requests were refused or

ignored. (*See* Schulte Decl. ¶¶ 12-13, Ex. 4; Moore Decl. ¶¶ 15-21, Ex. 5; Santos Dec. ¶¶ 13-

24

15, Ex. 6.)  By failing to allow customers with withdraw funds, the Citrades Defendants

engaged in misappropriation, which constitutes "willful and blatant fraudulent activity."

*CFTC v. Machado*, No. 11-22275-CIV, 2012 WL 2994396, at *5 (S.D. Fla. Apr. 20, 2012)

(entering default judgment for CFTC); *see also CFTC v. Wall St. Underground, Inc.*, 281 F.

Supp. 2d 1260, 1266-67 (D. Kan. 2003) (prima facie case of fraud where customers seeking

refund were "routinely rerouted to various extensions until disconnected"), *aff'd*, 128 F.

App'x 726 (10th Cir. 2005).

     Moreover, the Citrades Defendants made material misrepresentations about their

track record and experience.  The Citrades Defendants told customers that Citrades was

started by a "group of highly-accredited Wall Street brokers."  (Dec. 12, 2016 Citrades

Website at 15, Ex. 1-A.)  In reality, the Citrades website was started by Jason Scharf, who is

not now, and has never been, a highly accredited Wall Street broker.  (*Compare* Customer

47478905 Records at 4-5, 7, Ex. 2-A, *with* Cavers Decl. ¶ 4, Ex. 3.)  "Misrepresentations as

to the trading record and experience of a firm or broker are fraudulent because past success

and experience are material factors to reasonable customer."  *See CFTC v. Next Fin. Servs.

Unlimited*, No. 04-80562-CIVRYS, 2006 WL 889421, at *4 (S.D. Fla. Mar. 30, 2006)

(summary judgment for CFTC on fraud claim where defendant used alias, mispresented

experience and track record).

     The Citrades Defendants also told customers that the ATB website was "not affiliated

with any of the brokers we push," when in fact the ATB website was an artifice designed to

funnel customers to the Citrades website.  (*Compare* Customer 52299284 Records at 13-15,

Ex. 2-B, *with* Customer 47478905 Records at 4-5, 7, Ex. 2-A.)  This was a misstatements and

deceptive business practice that would have been material to customers.  *See Next Fin. Servs.*, 2006 WL 889421, at *4.

The nature of the misrepresentations show that the Citrades Defendants acted with scienter.  The Citrades Defendants offered customers outsize, guaranteed returns knowing that customers were losing money to trading and misappropriation.  (*See* Cavers Decl. ¶ 26, Ex. 3.)  The Citrades Defendants promised easy, on-time withdrawals, yet refused to let customers to withdraw their principal or profits.  The fact that this happened to multiple customers shows that it was not a mistake, but rather a pattern of fraudulent conduct.  (*See* Schulte Decl. ¶¶ 12-13, Ex. 4; Moore Decl. ¶¶ 15-21, Ex. 5; Santos Dec. ¶¶ 13-15, Ex. 6.) The fact that the Citrades Defendants were operating illegal, unregistered binary options trading business through a network of foreign and domestic shell corporations further strengthens the inference of scienter.  (*See* Cavers Decl. ¶¶ 12-22, Ex. 3.)

Additionally, the Citrades Defendants' misrepresentations operated as a fraud on customers.  Customers invested money in binary options and allowed the Citrades Defendants to trade for them; they did this based on the Citrades Defendants' claims of security and profitability.  (*See* Schulte Decl. ¶ 4, Ex. 4; Moore Decl. ¶ 5, Ex. 5; Santos Dec. ¶ 4, Ex. 6.)

As such, the CFTC has established a prima facie case that the Citrades Defendants engaged in CTA fraud, fraud in connection with commodity options, and fraud in connection with swaps.

**2.      The Zilmil Defendants Committed Fraud in Violation of the Act.**

The Zilmil Defendants made numerous material misrepresentations and omissions, and employed numerous deceptive practices in connection with their affiliate marketing scam.

The Zilmil Defendants made promises of large and certain profits, which are material and fraudulent as a matter of law. *See Matrix Trading Grp.*, 2002 WL 31936799, at *5-6. For example, the Zilmil Defendants claim that their autotrading systems make "over $95,436 a month … every month like clockwork," and have "100% Guaranteed Winning Trades." (Binaryoverdrive Website at 46, Ex. 1-D; Johannsen Decl. ¶ 5, Ex. 10.)  In reality, the Zilmil Defendants' autotrading systems are designed to place losing trades.  (Emails between Jared Davis and Michael Shah at 17-18, Ex. 8-A; *see also* Johannsen Decl. ¶ 5, Ex. 12.)

Additionally, the Zilmil Defendants hid behind false identities, using aliases and false testimonials to try and sell their autotrading systems.  *See Next Fin. Servs.*, 2006 WL 889421, at *4.  In emails to customers, the Zilmil Defendants misrepresent themselves as dozens if not hundreds of alter egos, such as "Corey Robinson, Fortune 500 Trader and CEO of www.MoneyPlatform.net."  (Spreadsheet of Zilmil Jobs at 27, Ex. 9-B.)  On landing pages, the Zilmil Defendants misrepresented themselves as, inter alia, "David Collins," or "Jeff Anderson," claiming to be expert traders and touting outsize returns.  (Binaryoverdrive Website at 46, Ex. 1-D; Binarytutorial Website, Ex. 1-E.)

Moreover, the Zilmil Defendants also failed to disclose that they are affiliate marketers for binary options firms like Citrades, and get paid a commission for every first-time depositor.  (*See* Cavers Decl. ¶ 27, Ex. 3; see also Emails between Jared Davis and Michael Shah, Ex. 8-A; Emails between Jason Scharf and Michael Shah, Ex. 3-E.)  A

reasonable investor would find this material in deciding whether to use the Zilmil Defendants' autotrading systems.

The nature of the misrepresentations shows that the Zilmil Defendants acted with scienter.  The Zilmil Defendants touted outsize returns when they knew their autotrading systems were designed to place losing trades.  (Emails between Jared Davis and Michael Shah at 17-18, Ex. 8-A.)  The Zilmil Defendants were also aware of customer complaints that their supposedly profitable autotrading systems did exactly the opposite of what they were supposed to.  (*See* Johannsen Decl. ¶ 5, Ex. 12.)  The Zilmil Defendants knowingly misrepresented their identities, credentials, and track records on dozens (if not hundreds) of landing pages, and in millions of emails.  (Spreadsheet of Zilmil Jobs, Ex. 9-B; Binaryoverdrive Website at 46, Ex. 1-D.)

The Zilmil Defendants' high level of sophistication and pattern of behavior shows that the Zilmil Defendants' conduct was willful.  The Zilmil Defendants were in charge of a large-scale, coordinated effort to drive customers to illegal binary options websites using fraudulent misrepresentations about autotrading systems.  (Cavers Decl. ¶ 27, Ex. 3; Emails between Jared Davis and Michael Shah at 4, Ex. 8-A.)  The Zilmil Defendants made millions of dollars from the sale of their trading systems, and millions of dollars in commissions from illegal, off-exchange binary options websites.  (Cavers Decl. ¶¶ 22, 25, Ex. 3; Johannsen Decl. ¶¶ 9-10, Ex. 10.)  There can be no doubt that the Zilmil Defendants acted with scienter.

In addition to acting with scienter, the Zilmil Defendants misrepresentations operated as a fraud on customers.  Zilmil sold more than $4 million worth of fraudulent autotrading systems, and funneled hundreds, if not thousands, of customers to Citrades and other binary

options firms.  (Johannsen Decl. ¶¶ 9-10, Ex. 10; Cavers Decl. ¶¶ 22, 25, 27, Ex. 3.)  The Zilmil Defendants' sales figures and commissions are testament to the effectiveness of their fraudulent binary options autotrading system campaigns.

## V.   THERE IS A REASONABLE LIKELIHOOD OF FUTURE VIOLATIONS BY DEFENDANTS.

To determine whether there is a reasonable likelihood of future violations sufficient to issue a PI, courts should look at the egregiousness of the defendant's actions, the isolated or recurrent nature of the infraction, the degree of scienter involved, the sincerity of the defendant's assurances against future violations, the defendant's recognition of the wrongful nature of his conduct, and the likelihood that the defendant's occupation will present opportunities for future violations.  *Hunter Wise*, 2013 WL 718503, at *9.  The nature of Defendants' conduct satisfies these requirements.

Defendants were actively engaged in defrauding hundreds if not thousands of people through an elaborate, well-organized scheme.  Defendants' violations are not isolated or one-time events, but rather part of a pattern and practice that has been ongoing for several years.

Indeed, the Citrades Defendants have been operating an unregistered binary options website since before June 2014.  (Schulte Decl. ¶ 3, Ex. 4.)  Although the Citrades Defendants have taken down or suspended the Citrades and ATB websites, their fraud continues because they have failed to repay customers and are continuing to misappropriate customer funds.  The Citrades Defendants do not appear to have any other source of income, and are likely to continue their misconduct if not enjoined.

The Zilmil Defendants have been engaged in affiliate marketing for the binary options firms since before June 2014.  (Casler Decl. ¶ 2, Ex. 9.)  The Zilmil Defendants have

made millions of dollars defrauding people in coordinated internet campaigns; the Zilmil Defendants work directly with binary options websites like Citrades to provide them with customers. The Zilmil Defendants' high level of scienter militates strongly in favor of a preliminary injunction against further misconduct.

Defendants have not had the opportunity to provide assurances against future violations, nor to recognize the wrongful nature of their conduct. Given the willful and ongoing nature of their fraudulent enterprises, however, any such assurances or recognitions should be rejected by the Court in favor of a preliminary injunction against future violations.

## VI.  THE CFTC REQUIRES EXPEDITED DISCOVERY

The district court has broad discretion to dictate the sequence of discovery, and may allow discovery in advance of a Rule 26(f) conference where the moving party has established "good cause." Fed. R. Civ. P. 26(d)(1); L.R. 3.05(c)(2)(B); *see also, e.g.*, *TracFone Wireless, Inc. v. Holden Prop. Servs., LLC*, 299 F.R.D. 692, 694 (S.D. Fla. 2014). "Good cause may be found where the need for expedited discovery, in consideration of the administration of justice, outweighs the prejudice to the responding party." *TracFone*, 299 F.R.D. at 694 (internal quotation omitted).

In order to protect investors from further loss, the CFTC must immediately identify and preserve Defendants' assets for any order of restitution this Court may issue. The CFTC must also preserve Defendants' books and records (which Defendants might otherwise destroy) and identify customers who were victims of Defendants' fraud. Expedited discovery allows the Commission to prepare for any hearing this Court may schedule on the Commission's Motion to Show Cause Why a Preliminary Injunction Should Not Issue. As a

result, the CFTC requests that the Court enter an Order authorizing expedited discovery and allowing the Commission leave to (1) take the depositions of Michael Shah and Jason Scharf (as we as depositions of Zilmil and the Citrades Entities) prior to the hearing on its Motion for Preliminary Injunction, (2) request that Defendants produce, on an expedited basis, any relevant documents not otherwise required to be produced under any Statutory Restraining Order this Court may enter, and (3) issue subpoenas to third parties in order to obtain information about individuals who may have been defrauded and to help identify, locate, and preserve Defendants' assets.

## VII.   CONCLUSION

For the foregoing reasons, the CFTC respectfully requests that the Court grant its motion for an ex parte statutory restraining order (1) prohibiting Defendants from destroying or refusing to permit the CFTC from inspecting, when and as requested, all books and records or other documents, (2) freezing Defendants' assets, (3) compelling an accounting from Defendants, and (4) appointing a temporary receiver to administer the SRO.

The CFTC also requests that the Court grant its motion for an order to show cause why a preliminary injunction should not issue within 14 days of the order.  If no such cause is shown, the CFTC respectfully requests that the Court enter a preliminary injunction continuing the asset freeze and receiver, and enjoining Defendants from operating their binary options and affiliate marketing scams.

Dated: July 10, 2017

Respectfully submitted,

 /s/ Ashley J. Burden

Ashley J. Burden, trial counsel
Eric L. Schleef, trial counsel
Joseph Konizeski, trial counsel
Rosemary Hollinger
Scott R. Williamson

Attorneys for Plaintiff
Commodity Futures Trading Commission
525 W. Monroe St.
Chicago, IL 60661
Tel. (312) 596-0700
Fac. (312) 596-0714
aburden@cftc.gov
eschleef@cftc.gov
jkonizeski@cftc.gov
rhollinger@cftc.gov
swilliamson@cftc.gov