IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA, JACKSONVILLE DIVISION

| | |
|---|---|
| Commodity Futures Trading Commission,<br><br>　　　　　Plaintiff,<br><br>　　　　　vs.<br><br>Jason B. Scharf (d/b/a Citrades.com and AutoTradingBinary.com); CIT Investments LLC; Brevspand EOOD; CIT Investments Ltd.; A & J Media Partners, Inc.; Michael Shah; and Zilmil, Inc.,<br><br>　　　　　Defendants. | Case No. 3:17-cv-774-J-32MCR<br><br>Plaintiff CFTC's Response to Zilmil Defendants' Motion to Modify Consent Preliminary Injunction<br><br>Hon. Timothy J. Corrigan |

　　　　As set forth in the CFTC's Motion for Statutory Restraining Order (Doc. 5, hereinafter, "SRO Mot."), the Defendants Zilmil, Inc., and its principal Michael Shah (collectively, "Zilmil Defendants") masterminded a wide-ranging and extremely lucrative internet scam which involved promoting and selling software systems for trading derivative instruments referred to as "binary options." These trading systems had names like "millionaire money machine," and the Zilmil Defendants told customers that they could expect "profits of $100,000 per month." (*Id*. at 12.)

　　　　In reality, the trading systems did not work as promised, and in fact were designed to place losing trades. (*Id*. at 13-14 ("The autotrader … is doing great, crushing people like immediately.").) Once a customer signed up for one of the Zilmil Defendants' trading systems, they would be solicited to deposit money in unregistered, internet-based binary options firms like Citrades.com. (*Id*. at 17.) The Zilmil Defendants would receive a

commission from the binary options firms, as much as $450 for every first-time depositor. (*Id*. at 27.)

The Zilmil Defendants' conduct violates, *inter alia*, the anti-fraud provisions of the Commodity Exchange Act ("Act") and accompanying regulations ("Regulations"), as well as the prohibition against conducing activity with respect to off-exchange swaps or options contracts, i.e., binary options. (*Id*. at 19-21, 26-20.)

On July 12, 2017 the Court entered a statutory restraining order ("SRO") against the Zilmil Defendants (Doc. 8) on the basis of the evidence presented by the CFTC in its motion. The Court did so after multiple days' consideration, as well as a two-hour hearing on the evidence presented by the CFTC. In the SRO, the Court found that there was good cause to believe the Zilmil Defendants fraudulently solicited customers in connection with their so-called binary options trading systems. (*Id*. at 4.) As part of the SRO, the Court ordered a freeze prohibiting the transfer, removal, or dissipation of the Zilmil Defendants' assets, and appointing a temporary receiver. (*Id*. at 8-9.)

On August 8, 2017 the Zilmil Defendants consented to the entry of a preliminary injunction ("Consent PI") which continued the asset freeze through trial and stipulated to the appointment of a permanent receiver. (Doc. 30.) The Zilmil Defendants did not contest the Court's finding that there was good cause to believe the Zilmil Defendants engaged in fraud. (*Id*.) The Court entered the Consent PI the following day. (Doc. 32.)

In the months that followed, the Receiver froze almost $8 million in assets from the Zilmil Defendants, and retained a forensic accountant to trace the millions of dollars that flowed though the Zilmil Defendants' accounts. (Doc. 82, Receiver's Second Status Report.)

The Zilmil Defendants have invoked their Fifth Amendment rights against self-incrimination throughout this litigation, refusing to testify, provide meaningful discovery responses, or produce the Court-ordered accounting required by the SRO and Consent PI. (Ex. 1, Def. Shah's Resps. to CFTC's Req. for Admissions; Ex. 2, 3/16/18 Hearing Trans. at 75:15-75:18.)

Not only that, third-party discovery has revealed that the Zilmil Defendants engaged in a campaign of document destruction in a deliberate attempt to cover up their illegal conduct. In recent depositions, two individuals whom the Zilmil Defendants paid to create fraudulent promotional videos testified that Michael Shah instructed them to destroy all binary-options related records after Shah had received subpoenas from the CFTC. (Ex. 3, Wright Test. at 42:3-43:19; Ex. 4, Berry Test. at 30:4-31:25.)

Third-party discovery has also led to document productions—and forthcoming testimony—from two individuals who worked as "mailers" for the Zilmil Defendants, sending out mass emails for the Zilmil Defendants' fraudulent binary options trading systems. The documents produced include chat messages from Shah, in which he refers to his binary options trading systems as a "scam," and the binary options firms as scammers. (Ex. 5, Dasso Decl.)

Despite these developments, the Zilmil Defendants argue in their instant Motion to Modify Consent Preliminary Injunction (Doc. 109, hereinafter "Mot.") that the Zilmil Defendants' assets should be un-frozen, and that the receivership should be dissolved. The Zilmil Defendants argue that their sought-after relief should be granted because the CFTC misled the Court in connection with the SRO, and because the CFTC failed to adduce

evidence showing that the CFTC has jurisdiction over the Zilmil Defendants' activities, or that the Zilmil Defendants caused customer losses.

The Zilmil Defendants' arguments are based on mischaracterizations of the record and significant misapprehensions of the law. Moreover, the Zilmil Defendants have failed to adduce any declarations, affidavits, testimony, or other evidence to contradict the substantial evidence of fraud presented at the SRO hearing. The Zilmil Defendants ignore or mischaracterize the evidence in the record, and fail to address new evidence uncovered during the litigation, which militates strongly in favor of continuing the freeze and receivership.

**1.     The Zilmil Defendants Have Submitted No Declarations, Affidavits, Documents, or Witness Testimony to Rebut the CFTC's Evidence of Fraud.**

As a threshold matter, the Zilmil Defendants fail to adduce any affidavits, declarations, documents, or witness testimony rebutting the CFTC's evidentiary showing. (*See* Mot.) The Zilmil Defendants do not deny that they sold or promoted the binary options trading systems described in the SRO papers. (*See id.*) Nor do the Zilmil Defendants deny that they made misrepresentations in mass emails and on websites about profitability of the binary options trading systems.[1] (*See id.*) Indeed, the Zilmil Defendants cannot deny these

---

[1] The Zilmil Defendants criticize the CFTC for attaching excerpts of the websites to the SRO motion that omitted what they refer to as "disclaimers." (Mot. at 15-16.) The Zilmil Defendants' boilerplate "disclaimers" are irrelevant and ineffective because they do not disclose that the representations made are fraudulent (including fabricated testimonials), or that Zilmil is being paid to provide leads to unregistered binary options firms. *CFTC v. Heffernan*, C.A. No. 4:04–23302–TLW–TER, 2006 WL 2434015, at *8-9 (D.S.C. Aug. 21, 2006) (entering summary judgment for CFTC where defendant fabricated testimonials). The Zilmil Defendants complain that the CFTC caused the Court wrongly to believe that the lack of a particular disclaimer was in-and-of-itself a violation. (Mot. at 15-16.) It is. The Zilmil Defendants' websites contain false testimonials about the profitability of Zilmil's binary options trading systems. (*See, e.g.*, Doc. 109-1, Ex. I to Mot.) Regulation 4.41(a)(3), 17 C.F.R. § 4.41(a)(3), provides that no commodity trading advisor ("CTA") shall advertise in a manner which refers to any testimonial, unless the advertisement or sales literature providing the testimonial prominently discloses: (a) that the testimonial may not be representative of the experience of other clients; and

things, and have refused to provide information to the CFTC on the basis of the Fifth Amendment rights against self-incrimination. (*See* Ex. 1, Def. Shah's Resps. to CFTC's Req. for Admissions; Ex. 2, 3/16/18 Hearing Trans. at 75:15-75:18 ("The one thing that we were unwilling to recommend to our client is that he give a detailed accounting, because he had invoked the Fifth Amendment.").)

The Zilmil Defendants also do not deny that they received payments from unregistered binary options firms for referring customers. (*See* Mot.) In fact, the Zilmil Defendants' counsel has admitted that they do this:

> THE COURT: And so what is the relationship with --so in the scenario you're painting, what is the interaction between Zilmil and Mr. Scharf?
>
> \*\*\*\*
>
> MR. KING: *So through a series of clicks, you can get to a Citrades, for example. And then Citrades would pay, as Mr. Burden described, $450 per first-time depositor, so yes, there was a relationship, certainly.*

(Ex. 2, 3/16/18 Hearing Trans. at 73:8-74:4 (emphasis added).)[2]

The Zilmil Defendants' failure to adduce any evidence in opposition to the CFTC's evidentiary showing is fatal to their motion, and precludes any un-freezing of their assets.

---

(b) that the testimonial is no guarantee of future performance or success. (*See* Doc. 3, Compl. ¶ 193.) Zilmil's websites do not have this disclosure, the absence of which is in-and-of-itself a violation. *See CFTC v. Hall*, 49 F. Supp. 3d 444, 451 (M.D.N.C. 2014), *aff'd*, 632 F. App'x 111 (4th Cir. 2015).

[2] John Cotton, counsel for the Zilmil Defendants during the CFTC's pre-filing investigation, explained that his clients used emails and websites to refer customers to Global Trader 365 and Vault Options, which are also unregistered binary options firms. *See CFTC v. Vault Options, Ltd.*, No. 1:16-CV-01881, 2016 WL 5339716, at \*1 (N.D. Ill. July 20, 2016) (entering final default and final judgment). Mr. Cotton explained:

> As to what Zilmil did for GT 365 and Vault, as I explained in our call, they were website, or search engine optimizers, who assisted in getting prospective customer internet traffic to the two for the purpose of allowing the two to themselves convert interested members of the public to actual customers.

(Ex. 6, 12/14/15 Email from J. Cotton, Counsel to Zilmil Defendants, to CFTC.)

*See CFTC v. Rice*, 498 F. App'x 462, 465-66 (5th Cir. 2012) (denying motion to modify preliminary injunction because defendant "did not provide any evidence in rebuttal, not even a personal affidavit").

**2.     Jennifer Johannsen's Declaration Shows that the Zilmil Defendants Offered Binary Options Trading Systems Via ClickBank.**

In lieu of rebutting the CFTC's presentation, the Zilmil Defendants argue that the declaration of Jennifer Johannsen, appended to the SRO, does not support the CFTC's assertion that the Zilmil Defendants sold or promoted binary options trading systems through ClickBank. The Zilmil Defendants argue further that the CFTC's assertion is undermines by Ms. Johannsen's deposition testimony. (Mot. at 3-6.) This is wrong.

The Zilmil Defendants complain that Ms. Johannsen's declaration does mention "autotrading systems." (*Id.* at 4-5.) This is semantics. Ms. Johannsen's declaration lists products offered by the Zilmil Defendants through ClickBank. (Doc. 5-10, Johannsen Decl. ¶ 8.) The Zilmil Defendants do not dispute that they offered these products on ClickBank. These products, along with their descriptions, include:

- Auto Binary Bot
- Binary Arbitrage
- Binary Arbitrages (described by Zilmil as, "100% Guaranteed Winning Trades")
- Binary Cash Bot
- Binary Genetic ("The FIRST and ONLY Genetic Algorithm Binary Bot; ADVANCED Profit Doubler")
- Binary Options Fire Sale ("Over 44 Xtreme Trading Systems - JUST $1 O")
- Options Chaos ("Extreme Profit Doubling Trading System!"; "My $3 MILLION
- DOLLAR Strategy REVEALED!"; "Mr X's $3 MILLION Dollar System – ONE OF A KIND!")

6

- Options Hybrid ("The Worlds FIRST HFT Binary Trading System - RISKFREE")
- Pro Binary Tips ("Investment Guardian")
- The Binary Formula

(*Id.*)

The Zilmil Defendants also argue that Ms. Johannsen's declaration does not say that the trading systems "do not work as advertised," as the CFTC argues in its SRO Motion. (Mot. at 5.) More semantics. Ms. Johannsen's declaration highlights customer complaints submitted to ClickBank, complaining, e.g., that "The promised 70% success rate (80% was promised for Binary Options Pro) turned out for me to be 10 losses on 10 trades." (Doc. 5-10, Johannsen Decl. ¶ 12.)[3]

The Zilmil Defendants argue that they could not have sold binary options trading systems because, according to Ms. Johannsen's testimony, ClickBank does not allow trading systems. (Mot. at 5.) This argument is plainly controverted by the list of products that Zilmil offered on ClickBank, e.g., Binary Genetic ("The FIRST and ONLY Genetic Algorithm Binary Bot; ADVANCED Profit Doubler"). (Doc. 5-10, Johannsen Decl. ¶ 8.) Moreover, Ms. Johannsen testified that the Zilmil Defendants were banned from ClickBank because they were caught selling products that ClickBank did not allow. As Ms. Johannsen explained, "[Shah] had a history of having accounts in different names. And then he would change them to his own name and change the products from what was originally approved to a different product." (Ex. 7, Johannsen Test. at 29:3-29:25; *see also* 63:21-64:11 (same).)

---

[3] The CFTC's SRO motion cites paragraph 5 of Ms. Johannsen's declaration for this proposition. This was an error by the CFTC. The motion should have cited paragraph 12. The CFTC's conclusion that the autotrading systems do not work as advertised is further supported by emails between Michael Shah and Jared Davis, in which Davis tells Shah: "The autotrader attached to this is doing it's job and is doing it great, crushing people like immediately." (Doc. 5-8, Ex. 8 to SRO Mot.)

The Zilmil Defendants next complain that the CFTC failed to provide a breakdown of revenues from binary options trading systems versus other products sold by the Zilmil Defendants. (Mot. at 4-5.) The CFTC is not required to provide any such breakdown of revenues in support of their motion for SRO. The Zilmil Defendants themselves could presumably provide this breakdown, but have failed to do so.[4] The Zilmil Defendants claim in their motion that they sold products on ClickBank relating to, e.g., "heath, beauty, medical, flashlights ….and photography," for which they cite only Ms. Johannsen's testimony. (Mot. at 5 n.1 (citing Johannsen Test. at 181:11-182:18).) Here is what that testimony says:

> Q. …My question is, didn't Zilmil sell lots of other product that had nothing to do with finance on the ClickBank system?
>
> A. Let's pull up that spreadsheet that has the list of all of the products and whether or not they sold or not. There is a true/false column. And so there may have been multiple other products. *I know the health and fitness example that you showed all of the health and fitness products said false that anything had been sold. So I would say that those were not representative of the products he actually sold on the platform.*
>
> Q. On a break I'll check my notes. We will probably revisit that.

(Doc. 109-1, Ex. A to Mot. at 181:20-182:7 (emphasis added).) Contrary to the Zilmil Defendants' representations, Ms. Johannsen explained that most of the products the Zilmil

---

[4] The Zilmil Defendants accuse the CFTC of making misrepresentations when it told that could that it was unaware of any legal business that Zilmil has. (Mot. at 15-16.) As set forth in the transcript, the CFTC advised the Court that it was possible that Zilmil may have legitimate business, or at least business that falls outside of the CFTC's jurisdiction. (Ex. 8, 7/12/17 Hearing Trans. at 16:7-18:7; 55:6-56:7.) The CFTC suggested, and the Court agreed, that the Zilmil Defendants could advise the Court and Receiver as to what that legitimate business might be. (*Id*.) The Receiver could run that part of the business, or let the Zilmil Defendants continue to run it. (*Id*.) The Zilmil Defendants have failed to do this. The only evidence they cite for the proposition that Zilmil does legal business is a production cover letter from John Cotton, Zilmil's previous counsel. (Mot. at 15.) It is unclear why the cite this; the production cover letter does not represent or suggest anything about Zilmil's business. (*See* Doc. 109-7, Ex. G to Mot.) As set forth above, Mr. Cotton sent the CFTC stating that Zilmil's business involved referring depositors to unregistered binary options firms, as did Mr. King in the March 16, 2018 hearing.

Defendants sold were "Forex related or binary options related." (Ex. 7, Johannsen Test. at 28:7-28:13.)

Finally, the Zilmil Defendants claim that they ceased offering trading systems on ClickBank by June 2013. (Mot. at 6-7.) Because this pre-dates the "Relevant Period" described in the Complaint, the Zilmil Defendants argue, the Court should not have considered it. (*Id*.) This is wrong. The Zilmil Defendants do not ague, nor could they, that their actions on ClickBank are barred by the statute of limitations, which goes back to July 2012.[5] And the Relevant Period in the Complaint is defined as "***from at least*** June 2013 through the present," indicating that misconduct could extend further back. (Doc. 3, Compl. ¶ 2 (emphasis added).) The Zilmil Defendants cite no caselaw in support of the proposition that a plaintiff's ability to pursue claims based on otherwise timely misconduct is limited by the time period described in the complaint. Indeed, courts have held that plaintiffs are not so limited. *See Rosen ex rel. Egghead.Com, Inc. v. Brookhaven Capital Mgmt., Co.*, 179 F. Supp. 2d 330, 335 (S.D.N.Y. 2002) ("… Rule 9(f) does not operate to limit plaintiff to the time periods that she was in a position to aver. Defendants cite no case giving Rule 9(f) preclusive effect to such a pleading, and I decline to do so here.").

### 3. The CFTC Has Jurisdiction Over the Zilmil Defendants' Unlawful Conduct.

The Zilmil Defendants argue that the CFTC has failed to show that they received payments as a result of activities "within the CFTC's jurisdiction." (Mot. at 7-9.) It is unclear what the Zilmil Defendants mean by this. In any event, the Zilmil Defendants cite no authority in support of their position.

---

[5] The Complaint was filed July 10, 2017; there is a five year statute of limitations applicable to CFTC actions. 28 U.S.C. § 2462.

9

With respect to money or payments from affiliate networks (e.g., ClickBank), the Zilmil Defendants seem to suggest that the CFTC has failed to show revenues from the sale of products that violate the Act or Regulations, i.e., binary options trading systems. (*Id*. at 7-8.) As set forth above, however, Ms. Johannsen's declaration and testimony establish that the Zilmil Defendants offered binary options trading systems via ClickBank.

With respect to commission payments from binary options firms, the Zilmil Defendants argue that the CFTC lacks jurisdiction over those "transactions." (*Id*. at 7-9.) According to the Zilmil Defendants, this is because some binary options firms may be licensed to do business in Cyprus. (*Id*.) It is not the "transactions" with binary options firms that the CFTC objects to. It is the Zilmil Defendants' conduct, which violates both the ant-fraud and anti-off exchange trading provisions of the Act and Regulations.

The fact that the Zilmil Defendants conduct their fraudulent activities in the U.S. provides the CFTC with jurisdiction over their binary options-related activity. *See Lake Shore Asset Mgmt. Ltd. v. CFTC*, 511 F.3d 762, 765-66 (7th Cir. 2007) ("Federal law controls how Lake Shore must conduct itself within the United States, even though other companies in the same affiliated group do their business outside, and even though most of the group's business is with investors from other nations."). The fact that some binary options firms may be permitted to operate outside of the U.S. does not excuse the Zilmil Defendants' conduct. Indeed, the Act and Regulations expressly apply to conduct by U.S. residents relating to overseas exchanges or trading. *See* 7 U.S.C. § 6(b)(2) (extraterritorial provision). In *CFTC v. Vision Financial Partners, LLC*, the court rejected the same argument that the Zilmil Defendants make here, holding that the CFTC had jurisdiction to bring claims against

a U.S. defendant who solicited customers for investments in offshore binary options firms like Banc de Binary (whom Zilmil does business with).  190 F. Supp. 3d 1126, 1130-31 (S.D. Fla. 2016).

### 4. The Zilmil Defendants' Causation Arguments Fail.

The Zilmil Defendants claim that the "only purpose" of the asset freeze is to secure funds for restitution.  (Mot. at 10.)  Because the CFTC has failed to show that Zilmil's conduct caused any person to suffer trading losses, or that any person relied upon Zilmil's misrepresentations to their detriment, the Zilmil Defendants argue, the freeze should be dissolved.  (Mot. at 10-15, 20-21.)  This argument fails for three reasons.

First, the CFTC is not required to establish causation in order to obtain an asset freeze.  7 U.S.C. § 13a-1(a) requires only that the CFTC make a "proper showing" to obtain an asset freeze, which has been held to mean a "prima facie case of illegality."  *CFTC v. Hunter Wise Commodities, LLC*, 749 F.3d 967, 974 (11th Cir. 2014) (affirming entry of preliminary injunction).  The CFTC has done so here.  Courts have expressly rejected the idea that proof of customer reliance is required to support an asset freeze.  *See Lake Shore Asset Mgmt.*, 511 F.3d at 766 (rejecting argument by defendant that freeze was invalid "because the CFTC has failed to prove that any of its customers relied on a misrepresentation;" court held that "the CFTC need not show reliance by private investors in order to obtain relief").

Second, restitution is not the "only purpose" of the asset freeze, as the Zilmil Defendants claim.  Under 7 U.S.C. § 13a-1(a), the asset freeze may be entered to "prohibit[ ] any person from withdrawing, transferring, removing, dissipating, or disposing of funds,

11

assets, or other property ….." This can be for restitution or for disgorgement. *See CFTC v. Levy*, 541 F.3d 1102, 1113–14 (11th Cir. 2008) (rejecting challenge to asset freeze; holding that "a district court may freeze a defendant's assets to ensure the adequacy of a disgorgement remedy"). Restitution is measured by the customer's losses proximately caused by the defendant's violations of the Act. 7 U.S.C. § 13a-1(a). Disgorgement, by contrast, is measured by ill-gotten gains (i.e., profits), and does not require the CFTC to show loss causation or reliance by customers. *See id.*; *see also CFTC v. Amerman*, 645 F. App'x 938, 944 (11th Cir. 2016) (holding that the CFTC need not prove reliance as to each customer because "the CFTC did not seek restitution; it sought disgorgement, which focuses on 'ill-gotten gains,' not the victim's losses."). While the funds the Zilmil Defendants received from the affiliate networks and binary options firms could be characterized as restitution, they are more easily and more naturally characterized as ill-gotten gains, i.e., disgorgement. It is under this theory that the CFTC expects to proceed on summary judgment and at trial. Thus, there is no need for the CFTC—at any stage of the proceedings—to show that customers relied on, or lost money trading as a result of, the Zilmil Defendants' misrepresentations.

Third, even if the CFTC proceeds under a restitution theory, the nature of the Zilmil Defendants' fraud obviates the need for the CFTC show reliance. Where, as here, the fraudulent misrepresentations are widespread and pervasive, there is no need to show reliance. *CFTC v. Milton*, No. 10-80738-CV, 2013 WL 2158428, at *5-6 (S.D. Fla. May 17, 2013) ("[B]ecause the unlawful conduct in the instant case was pervasive, restitution to all defrauded customers is appropriate …."). As set forth in the SRO papers, the Zilmil

Defendants sent fraudulent solicitations about binary options trading systems to more than 1.4 million unique email addresses. (Doc. 5-7, Ex. 9 to SRO, Casler Decl. ¶ 7.) Moreover, reliance is presumed in cases involving fraudulent omissions. *See Milton*, 2013 WL 2158428, at *5-6. The Zilmil Defendants made a fraudulent omission by failing to apprise purchasers of the binary options trading systems that we received commissions from the binary options firms. (Doc. 5, SRO Mot. at 27.) Thus, the Zilmil Defendants' arguments about loss causation and customer reliance do not militate in favor of un-freezing the Zilmil Defendants' assets.[6]

**5. Michael Shah Instructed Witnesses to Destroy Documents.**

In recent deposition testimony, two witnesses, Mike Wright and Bill Berry, testified that Shah instructed them to destroy binary options-related documents and communications. Shah's instructed them to do this after Shah received subpoenas from the CFTC in January and February 2017. (Ex. 9, Subpoenas to Zilmil and Michael Shah.)

---

[6] The cases cited by the Zilmil Defendants in support of their causation arguments do nothing to advance their position. (Mot. at 10, 20-21 (citing cases).) None of these cases hold that a showing of customer reliance or loss causation is necessary to sustain an asset freeze. None of these cases address the disgorgement. The only two cases that involve preliminary injunctions or receivers are easily distinguishable. *See CFTC v. Comvest Trading Corp.*, 481 F. Supp. 438, 441–42 (D. Mass. 1979) (entering preliminary injunction but denying request for receiver because the defendants, who had not been charged with fraud and had assets of only $11,000); *SEC v. Brigadoon Scotch Distributors, Ltd.*, 388 F. Supp. 1288, 1293 (S.D.N.Y. 1975) (entering preliminary injunction but denying request for receiver in case involving sale of gold coins because remedy was "not necessary" for protection of investors). In *CFTC v. Carnegie Trading Grp., Ltd.*, cited by the Zilmil Defendants, the court entered a restitution award only for those customers who testified at trial at they relied on the defendant's misrepresentations. *Carnegie* is distinguishable because the misrepresentations were not widespread or pervasive—the defendant in that case had only forty-one customers. 450 F. Supp. 2d 788, 806 (N.D. Ohio 2006). The Zilmil Defendants' other cases are completely inapposite. *See CFTC v. S. Tr. Metals, Inc.*, 880 F.3d 1252, 1267 (11th Cir. 2018) (affirming judgment for CFTC on restitution for fraud, remanding part of restitution award based on registration violation to district court to reconsider as disgorgement); *CFTC v. Aurifex Commodities Research Co.*, No. 1:06-CV-166, 2008 WL 299002, at *1 (W.D. Mich. Feb. 1, 2008) (granting summary judgment for CFTC, entering award for restitution); *CFTC v. Matrix Trading Grp., Inc.*, No. 00-8880-CIV, 2002 WL 31936799, at *12 (S.D. Fla. Oct. 3, 2002) (entering award for restitution based on proof that the defendant's sixteen victims relied on his misrepresentations).

Mike Wright testified that he was a freelance copyrighter and video editor who did work for Michael Shah. (Ex. 3, Wright Test. at 7:14-10:4, 13:14-14:2, 28:19-28:25.) Mr. Wright testified that he wrote scripts and created text-only videos for Shah promoting binary options trading systems between 2014 and 2017. (*Id.*) The representations in the scripts and videos, which typically featured testimonials from actors touting the profitability of the trading systems, were entirely fabricated. (*See id*. at 24:7-26:9.) Mr. Wright did "dozens" of binary options projects for Shah. (Id. at 7:14-10:4.)

In Spring or Summer of 2016, however, Wright testified that Shah called him and instructed him to destroy all projects and communications relating to binary options. (*Id*. at 42:3-43:19.) Wright explains:

> Q. When did your work on binary options projects for Michael Shah cease?
>
> A. Probably spring or summer the previous year.
>
> Q. So spring or summer 2017?
>
> A. 2016.
>
> Q. Sorry. Did Mike Shah explain to you why that work was not going on anymore?
>
> A. He said he was going to stop doing it.
>
> Q. Did he tell you why?
>
> A. He said, "Nobody makes money with binary."
>
> Q. What does he mean with "nobody"?
>
> MR. KING: Objection to form.
>
> A. He didn't see it as a profit-making – this is the way I took it. He didn't see it as -- at that point as profit-making for him or for the end user.
>
> Q. What do you mean by "end user"?

> A. The customer watching the video.
>
> Q. So the person who's going to be using this software?
>
> A. Correct.
>
> Q. So did you ask Michael Shah any follow-up questions?
>
> **A. He -- he also expressed he was concerned about the FTC.**
>
> Q. All right. What else did Mr. Shah say?
>
> A. He asked that I get rid of files, his old files.
>
> Q. Did you do that?
>
> A. To the best of my ability, yeah.
>
> **Q. All right. So when you say that Michael Shah asked you to get rid of his files, what exactly did he say?**
>
> **A. Just to delete, delete everything binary related.**
>
> **Q. He told you to delete everything binary related?**
>
> **A. Yeah.**

(*Id*. (emphasis added).)

Bill Berry testified that he was a freelance video producer for affiliate marketing projects. (Ex. 4, Berry Test. at 12:5-13:19.) Mr. Berry created numerous binary options trading system videos for Michael Shah, including one for the "auto binary bot." (*Id*. at 17:15-18:2, 60:13-62:6.) Berry produced the videos based on scripts provided to him by Michael Shah. (*Id*. at 33:2-34:11.) Michael Shah helped Berry pick out the actors that were used in the videos, and provided feedback on how he wanted the videos to look. (*Id*.)

Mr. Berry testified that in Fall 2016 Shah and told him to delete all binary options-related projects and communications. (*Id*. at 30:4-31:25.) Mr. Berry testified:

> *Q. Did Mike Shah ever ask you to delete any videos or documents or anything like that?*
>
> *A. He said you don't have to keep any of my stuff. Just go ahead and dump it all.*
>
> *Q. When did he say that?*
>
> *A. 2016.*
>
> Q. What month in 2016?
>
> A. Probably October or November.
>
> \*\*\*\*
>
> Q. Did he tell you why he didn't want you to have any of that material?
>
> A. Why? I believe that the gist was in case anybody – in case he got in any trouble about it.
>
> Q. Did he say that to you?
>
> A. Yes.
>
> *Q. What exactly did he say?*
>
> *A. "In case I have any problems with this in the future, I don't want you to have this material."*

(*Id*. (emphasis added).)

The Court should decline to modify the asset freeze in light of Shah's bad-faith document destruction.

**6.     Michael Shah Describes His Trading Systems as a "Scam."**

During discovery, the CFTC served subpoenas on Grayson Brookshire and Blake Barrett, who worked as "mailers," sending mass emails promoting the Zilmil Defendants' binary options trading systems. Messrs. Brookshire and Barrett produced a series of Skype

16

chat logs in which Mr. Shah talks about "scamming" customers with his binary options autotrading systems:

> [10/19/2014 5:24:30 PM] Mike S: Ladies and Gentlmen [sic] and Marc,
>
> Disclaimer: Part of this message is copied, but it's a classic.
>
> Before I announce my launch, I want to thank you all once again for your love, friendship and partnership.
>
> I'm humbled.
>
> *I want to gratefully ask you for support with my new scam.*
>
> *Millionaire Money Machine goes live at exactly 3AM EST Monday morning, as that's when all the brokers start their scammy days. I have a FIFTEEN broker rotation with some backups, so every one of your leads will get the utmost scam, no one will be spared:*
>
> >>> http://www.millionairemoneymachine.co/jv (I'll be posting up a BUNCH of NEW swipes in just a little bit)
>
> Testing has been GREAT so far and on that note, I want to announce a $20,000 contest!!!!!
>
> Check out the image on the jv page, that should speak for itself :)
>
> >>> http://www.millionairemoneymachine.co/jv
>
> Thank you again for your love, friendship, partnership and support.
>
> With Much Love,
>
> Mike

(Ex. 5-A to Dasso Decl. (emphasis added).)

In another series of chats, Shah says:

> *[4/16/2014 4:39:03 PM] Mike S: And 100% of the stuff here's bs.. if there was a magic system, then you wouldn't spend 10 hrs daily chatting here and would invest all ur money there.*
>
> *[4/16/2014 4:39:15 PM] Mike S: Proof is bs, systems bs everytthing is bs..*

****

[4/16/2014 4:40:36 PM] Mike S: And yes, if robots , signals made money, then ud invest  ur life savings there and not chat here 10 hrs

[4/16/2014 4:40:49 PM] Mike S: And yes people are stupid as well

*****

[4/16/2014 5:20:33 PM] Loz Lawn: [Wednesday, April 16, 2014 5:18 PM] ….

shut up Mike.. you started all this, you insulted me earlier, then say all bots are scams, when you came out iwth one tht took  alot of people's money and blew thier accounts out... and im the one being out of order? you must be Harris's wife?

****

*[4/16/2014 5:21:10 PM] Mike S: I never said mine was good.. i said they all scams lol*

[4/16/2014 5:21:12 PM] Mike S: LOLOLOL

(Ex. 5-B, Dasso Decl. (emphasis added).)

This additional evidence of the Zilmil Defendants' fraudulent scheme further justifies the asset freeze previously entered by the Court.

For the foregoing reasons, the CFTC respectfully requests that the Zilmil Defendants' motion to modify the asset freeze be denied, and that the asset freeze, receivership, and preliminary injunction continue upon the same terms set forth in the Consent PI.

Respectfully submitted,

/s/ Ashley J. Burden

Ashley J. Burden, trial counsel
Stephanie Reinhart, trial counsel
Joseph Konizeski, trial counsel
Rosemary Hollinger
Scott R. Williamson

Attorneys for Plaintiff
Commodity Futures Trading Commission
525 W. Monroe St.
Chicago, IL 60661
Tel. (312) 596-0700
Fac. (312) 596-0714
aburden@cftc.gov
sreinhart@cftc.gov
jkonizeski@cftc.gov
rhollinger@cftc.gov
swilliamson@cftc.gov

## **CERTIFICATE OF SERVICE**

I hereby certify that on the May 7, 2018, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF, which will simultaneously transmit an electronic copy of the foregoing to the following counsel:

Peter B. King
Jordan D. Maglich
WIAND GUERRA KING P.A.
5505 W. Gray Street
Tampa, FL 33609
pking@wiandlaw.com
jmaglich@wiandlaw.com
Counsel for Michael Shah and Zilmil, Inc.

*Counsel for the Zilmil Defendants*

Stanley H. Stone
STONE & STONE
PO Box 261727
Encino, CA 91426-1727
stonelawfirm@earthlink.net

Richard J. Landes
THE LAW OFFICE OF LANDES & JULIEN
736 2nd Street North
Jacksonville Beach, FL 32250
rjlandes@gmail.com

*Counsel for Jason B. Scharf and A & J Media Partners, Inc.*


  /s/ Ashley J. Burden

Ashley J. Burden
Attorney for Plaintiff
Commodity Futures Trading Commission
525 W. Monroe St.
Chicago, IL 60661
Tel. (312) 596-0700
Fac. (312) 596-0714
aburden@cftc.gov