# Exhibit 8

```
 1               IN THE UNITED STATES DISTRICT COURT
                     MIDDLE DISTRICT OF FLORIDA
 2                      JACKSONVILLE DIVISION

 3   COMMODITY FUTURES TRADING
     COMMISSION,
 4
                 Plaintiff,          Jacksonville, Florida
 5
           -vs-                      Case No. 3:17-cv-774-J-32MCR
 6
     JASON B. SCHARF (d/b/a          Wednesday, July 12, 2017
 7   Citrades.com and
     AutoTradingBinary.com); CIT     9:59 a.m.
 8   Investments LLC; Brevspand
     EOOD; CIT Investments Ltd.;     Courtroom 12C
 9   A & J Media Partners, Inc;
     Michael Shah; and Zilmil,
10   Inc.,

11               Defendants.
     _____
12

13              TRANSCRIPT OF IN CAMERA EX PARTE HEARING
                 BEFORE THE HONORABLE BRIAN J. DAVIS
14                  UNITED STATES DISTRICT JUDGE

15

16

17

18

19

20

21   OFFICIAL COURT REPORTER:

22        Shelli Kozachenko, RPR, CRR
          221 N. Hogan Street, #185
23        Jacksonville, FL  32202
          Telephone:  (904) 301-6842
24
                          (Proceedings reported by stenography;
25                          transcript produced by computer.)
```

1                    <u>A P P E A R A N C E S</u>

2

3    COUNSEL FOR PLAINTIFF:

4          **Ashley Burden, Esquire**
           Commodity Futures Trading Commission
5          525 West Monroe, Suite 1100
           Chicago, IL  60661
6
           **Eric Schleef, Esquire, via telephone**
7          U.S. Department of Justice - Antitrust Division
           209 LaSalle Street, Suite 600
8          Chicago, IL  60044

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**P R O C E E D I N G S**

Wednesday, July 12, 2017                          9:59 a.m.

- - -

COURT SECURITY OFFICER:  All rise.  United States District Court in and for the Middle District of Florida is now in session, the Honorable Brian J. Davis presiding.

Please be seated.

THE COURT:  Good morning to all.

Court is convened in camera to manage an ex parte request by the Commodity Futures Trading Commission for some extraordinary relief.

Representing the Commission today is Ashley Burden?

MR. BURDEN:  That's right, Your Honor.

THE COURT:  Welcome.

MR. BURDEN:  And by phone is Eric Schleef.

THE COURT:  Oh.  And not Joseph Konizeski?

MR. BURDEN:  As counsel of record, Your Honor, but not appearing telephonically today.

THE COURT:  All right.  Who is it that's appearing telephonically?

MR. BURDEN:  Eric Schleef, Your Honor.

THE COURT:  Eric Schleef.

How do you spell Schleef?

MR. BURDEN:  S-c-h-l- --

THE COURT:  Is he here?  I mean, if he's here

1  telephonically, he can tell us how to spell his name.

2       Mr. Schleef, can you hear me?

3    (No response.)

4       THE COURT:  Apparently he cannot, although I thought

5  I heard him conversing before I came in.

6       MR. SCHLEEF:  Oh, I had you on mute.  Yes.  My name

7  is S-c-h-l-e-e-f, like Frank.

8       THE COURT:  S-c-h-l-e-f, Mr. Schleef?

9       MR. SCHLEEF:  Yes.

10      MR. BURDEN:  It's S-c-h-l-e-e-f.

11      THE COURT:  E-e-f?

12      MR. BURDEN:  Yes, Your Honor.

13      THE COURT:  As in Frank.  All right.

14      Can you hear me, Mr. Schleef?

15      MR. SCHLEEF:  Not very well.  I can hear -- I can

16  hear Mr. Burden pretty clearly, but I'm having trouble hearing

17  Your Honor.

18      THE COURT:  All right.  Well, I'll make sure I keep

19  my microphone close so that you can hear.

20      This hearing is at the Court's insistence to get some

21  clarity around the scope of the relief that's being sought and

22  the basis of it.

23      Mr. Burden, I want you to talk to me first about the

24  standard of proof that is -- the standard of proof that's

25  applicable in these proceedings.  You know, normally injunctive

1   relief, in and of itself, requires a greater standard and

2   particularly when it's ex parte.

3        What do you understand the obligation of the Court is

4   when it comes to weighing the facts that have been adduced so

5   far?

6        MR. BURDEN:  Your Honor, the standard of proof to

7   obtain an ex parte SRO under the Commodity Exchange Act is a

8   prima facie case of a violation of that act, and that's been

9   set forth by the Eleventh Circuit.

10       So what we need to do, Your Honor, what I would

11  submit that we have done, is to adduce evidence that supports

12  each element of the claims that we are asking for an SRO on,

13  which in this case, Your Honor, are off-exchange trading,

14  specifically with respect to binary options, and also fraud.

15       THE COURT:  Yeah.  But am I to weigh what you have

16  alleged by clear and convincing evidence, by a preponderance of

17  the evidence?  What is the -- what's the standard that's

18  applicable?

19       MR. BURDEN:  Evidence, Your Honor, that goes to and

20  supports each element of the claim.  Not by a preponderance of

21  the evidence.  That's higher than is required for an ex parte

22  statutory restraining order here.

23       THE COURT:  And so what is it then, if it's not a

24  preponderance?

25       MR. BURDEN:  Well, Your Honor, the way the Eleventh

1   Circuit has phrased it is -- is a prima facie case of

2   illegality, which is -- which is proof that the defendant is

3   engaging or is engaged in conduct prohibited by the act or

4   regulations.

5          And the authority for that, Your Honor, is *CFTC*

6   *versus Hunter Wise Commodities* in which the preliminary

7   injunction requested by the commission was affirmed.

8          THE COURT:  I understand a prima facie case is

9   required, proof of that.  I think that the circuit has defined

10  it as being a standard somewhat less than is customary but it

11  defines it as a proper showing, if I remember correctly.

12         And some authority -- and I'm citing to *Hunter Wise*

13  *Commodities*, the *United States Commodity Futures Trading*

14  *Commission versus Hunter Wise Commodities*, at 749 F.3d 967.  It

15  talks about the standard being lower and a proper showing being

16  required, but I'm still trying to discern what a proper showing

17  is.

18         There's another case that we've located that talks

19  about -- and I'll cite it as well and get you to respond to it,

20  because I understand prima facie evidence, but what -- what am

21  I to consider once the evidence is produced?

22         Am I to find that the facts supporting the prima

23  facie case are established by a preponderance of the evidence,

24  by clear and convincing proof?  I'm just -- I'm looking for

25  some guidance.

1          I think some is found in the *Commission versus Garcia*

2    at -- and this is a Middle District case out of the Fort Myers

3    Division at -- actually, I'm having a little trouble

4    identifying the cite here.  It's not reported in F.Supp.

5          But they talk about the relevant consideration being

6    whether a reasonable likelihood exists of the proof and that

7    that analysis calls the Court to have to consider a number of

8    factors in determining whether the proof exists.

9          It's -- I was curious as to whether, in your

10   experience, you've had occasion to argue what standard of proof

11   is required.

12         MR. BURDEN:  You know, I haven't, Your Honor.  I

13   think -- *Garcia* was one of my cases, and reasonable likelihood,

14   I recall the judge saying, was their shorthand for the proof

15   that was required.

16         As Your Honor stated, it's something less than a

17   preponderance of the evidence.  A prima facie case is all that

18   the Eleventh Circuit has required.  I think what that means in

19   practice is whether the Court is satisfied sufficiently that a

20   violation has occurred such that the Court can enter the relief

21   requested.

22         THE COURT:  All right.  I'll continue to consider

23   those in applying the standard of proof as we move forward.

24         Tell me how it is that you believe your case has

25   established those requirements as they relate to temporary

 1   relief, generally; for example, the requirement that you have a

 2   reasonable likelihood of success on the merits.

 3        I need you to flesh out this complaint a little more

 4   clearly for me.  I'm having -- someone described it as being

 5   comprised of a dizzying array of corporate and financial

 6   transactions.  And I'm dizzied, if you will, by some of the

 7   allegations and haven't been able to make the connections that

 8   I think are necessary.

 9        So let me get you to expound on the proof that you've

10   adduced so far.

11        MR. BURDEN:  Great, Your Honor.

12        You know, I think the easiest way to think about this

13   case is first of all through the lens of a fairly standard

14   fraud case and a fairly standard off-exchange trading case.

15   There are really two counts -- and I think the proof is going

16   to proceed from there -- that are the basis for our SRO motion.

17        The first is off-exchange trading, instruments like

18   binary options.  Binary options in particular are required,

19   Your Honor, to be traded on a registered exchange under the

20   Commodity Exchange Act, so --

21        THE COURT:  Okay.  Let me stop you right there,

22   because I -- one of the questions that I had was whether or not

23   just that violation alone -- because that seems clear.

24        I mean, I was able to find that there is evidence,

25   and sufficient evidence, to establish, from the affidavits and

1  declarations you've offered, that this trading has been off

2  exchange, if you will.

3        Is that sufficient in and of itself to allow the

4  granting, in your estimation, of the relief that you sought?

5        MR. BURDEN:  It is, Your Honor.  In the *Hunter Wise*

6  case, in fact, the preliminary injunction that was affirmed

7  there was in part for off-exchange trading, because these

8  people are out there, Your Honor, continuing to -- or perhaps

9  on Citrades' case, but they have solicited individuals to do

10 this off-exchange trading.

11        And whether or not they're continuing to solicit

12 currently is unclear, although certainly they have retained the

13 funds that they have taken from more than a hundred thousand

14 different accounts and not returned it from this off-exchange

15 trading.

16        THE COURT:  Yeah.  Now, see, that conclusion is one

17 that I don't know I find supported by the evidence.  You've got

18 about four victims, if you will, testifying that they have

19 suffered a loss.

20        How do you get from that to a hundred thousand?

21        MR. BURDEN:  Your Honor --

22        THE COURT:  A hundred thousand may have been

23 solicited from what you've adduced, but how do you -- I'm not

24 sure how your loss calculation is deduced from what you've

25 offered.

1          MR. BURDEN:  Your Honor, we had a whistleblower in

2     this case who --

3          THE COURT:  The former employee?

4          MR. BURDEN:  That is correct, Your Honor.

5          And the former employee explained all this to us and

6     provided to us, Your Honor, a lengthy and detailed spreadsheet

7     from the Citrades operation, from Mr. Scharf's operations, and

8     what that showed was more than a hundred thousand accounts.

9          I don't know if that means a hundred thousand

10    customers, Your Honor, because I think a customer can have more

11    than one account, but more than a hundred thousand accounts and

12    approximately $16 million that these records reflect were taken

13    in from customers during about a two-year period.

14         And this is explained, Your Honor, in Exhibit 3,

15    which is the declaration of our --

16         THE COURT:  Investigator.

17         MR. BURDEN:  That's right, who's available by phone,

18    Your Honor, if you'd like to speak with her.

19         It is proper, on a motion for a statutory restraining

20    order, to consider hearsay.  Because the whistleblower at this

21    stage is desirous of retaining his anonymity, we didn't have

22    him sign the declaration.

23         THE COURT:  I see.

24         What period of time did the spreadsheet cover?

25         MR. BURDEN:  Your Honor, the spreadsheet covered the

1　period of time from -- it was 2013 through 2015.

2　　　　　THE COURT:  So about two years.

3　　　　　MR. BURDEN:  Yeah.

4　　　　　THE COURT:  And Citrades has been in operation for

5　how long?

6　　　　　MR. BURDEN:  We believe from 2013 -- because that is

7　the date of our earliest customer complaint, and some of the

8　complainants whose declarations are before the Court began

9　dealing with them in 2013 -- through, we believe, approximately

10　May of this year.

11　　　　　In May of this year it looks like the website -- the

12　Citrades website was taken down.  Certainly no customer funds

13　that we're aware of have been returned to any of the

14　complainants that we've spoken to.

15　　　　　THE COURT:  Which are the four victims who've offered

16　declarations?

17　　　　　MR. BURDEN:  Yeah.  We have actually three victims,

18　Your Honor --

19　　　　　THE COURT:  Three?

20　　　　　MR. BURDEN:  -- with declarations in this case.

21　　　　　But whether Mr. Scharf has simply taken the money and

22　ran or whether he has set up a new operation, a different

23　website, we don't know.

24　　　　　THE COURT:  So it's the commission's position, then,

25　that the thousands of accounts have all been subject to illegal

1  transactions in that they are all off exchange and involving

2  binary options.

3          MR. BURDEN:  That is correct, Your Honor.

4          THE COURT:  Why is this case filed here in

5  Jacksonville and not in California where Scharf is?

6          MR. BURDEN:  Your Honor, because Zilmil and its

7  principal, Michael Shah, reside here.

8          Michael Shah and Zilmil are the primary directors of

9  traffic, we understand and have adduced, to Citrades.  And

10  additionally, Citrades, we understand, has customers -- we

11  believe they have customers in Florida.  They certainly

12  solicited customers in Florida since they solicit on the

13  Internet.

14          So really for us, Your Honor, it was a question of is

15  it Florida or California?  There was more than enough of a

16  jurisdictional hook for Citrades in Florida.

17          And frankly, Your Honor, the precedent here is very

18  well developed.  The CFTC brings a lot of cases in the Eleventh

19  Circuit, here in the Middle District and in the Southern

20  District of Florida.  That tipped in favor of filing in

21  Florida, Your Honor.

22          THE COURT:  These websites have been shut down since

23  February of 2017 or maybe May of 2017?

24          MR. BURDEN:  Yeah, May, Your Honor.  February's the

25  last time we looked and they were up.  And that's May of, I

1   believe, 2017 -- sorry, February of 2017 they were still up.

2           In May, just a few months ago, the Citrades and

3   AutoTradingBinary website were taken down.  Well, the Citrades

4   website was taken down.  The AutoTradingBinary website says

5   "under construction" or "under maintenance."

6           THE COURT:  So if the solicitations have all

7   occurred, and none of the websites are active, why is there a

8   risk of prospective harm?

9           I mean, I need to -- you want me to prohibit -- I'm

10  not sure what there is to prohibit if the tools of this scam

11  are inoperative.

12          MR. BURDEN:  Well, let me start with Your Honor's

13  first -- first issue there, that -- that the fraud isn't

14  continuing or that the websites are no longer up.

15          The standard for an SRO for the CFTC is not the same

16  as a normal TRO.  Unlike other TROs, or a private litigant

17  might have to do, we do not have to demonstrate a likelihood of

18  continuing harm.

19          The purpose of a TRO, or rather an SRO in our case,

20  is to (1) preserve assets for restitution for customers, which

21  is why we moved to submit this ex parte, Your Honor.  And also

22  to preserve evidence, since defendants of this nature have a

23  tendency to destroy evidence or to simply fail to turn it over.

24          And that dovetails with the relief that we're asking

25  for, because in fact, Your Honor, for the SRO, we're not asking

1   for Citrades to be enjoined from this illegal conduct.  I think

2   we would ask for that in the preliminary injunction hearing if

3   the case proceeds to that.  We're not asking for that here.

4         What we're asking for, Your Honor, is the ability, as

5   we are entitled under our statute, with the Court's permission,

6   of course, to freeze defendants' assets, to examine their books

7   and records, and to image their computers that are related to

8   their business so they don't destroy evidence or dissipate

9   assets, which we know they have the ability to do.

10        I think we've been talking about Citrades because

11  Your Honor's concerned that the websites have very recently

12  been taken down.

13        Citrades, we have shown, and its principal,

14  Mr. Scharf, have multiple foreign accounts, have the ability

15  and the connections to have shell corporations with their own

16  bank accounts in jurisdictions like Bulgaria, which can be

17  difficult for us to reach.

18        So in this case the prospect of customer funds being

19  dissipated or transferred away is a very real possibility and

20  the reason for us seeking the SRO here, Your Honor.

21        THE COURT:  So you're not asking in your TRO that

22  Citrades or Scharf or Shah or Zilmil be enjoined from

23  continuing its operations?

24        MR. BURDEN:  No, we're not, Your Honor, and that

25  isn't so much strategic.  It's because our statute at the SRO

1    phase, Your Honor, only allows us to freeze assets, to examine

2    books and records, and to seek the appointment of a temporary

3    receiver.

4            We will move for a preliminary injunction --

5            THE COURT:  Well, isn't relief that you've sought for

6    the -- at least to the -- as it relates to the receiver's

7    powers, for him to be able to remove Scharf and Shah from

8    control of these organizations?

9            MR. BURDEN:  If the receiver and the Court determines

10   that is necessary, that is something we are moving for in

11   connection with the SRO, Your Honor.

12           THE COURT:  Well, isn't that tantamount to enjoining

13   the operation going forward?

14           MR. BURDEN:  The answer to that is no, Your Honor,

15   and the reason why is the duty of the temporary receiver is to

16   protect assets and the receivership estate for victims and

17   customers.

18           If this were, say, a legitimate business or there was

19   some legitimate aspect of it --

20           THE COURT:  And that's -- actually, my question kind

21   of presupposes that.

22           Do you have reason to believe that any of the

23   business is legitimate?

24           MR. BURDEN:  We do not, Your Honor.

25           THE COURT:  Oh.  So all of the business of Citrades

1   and Zilmil is generated through illegal off-exchange binary

2   option transactions.

3            MR. BURDEN:  With respect to Citrades -- and there is

4   no company called Citrades.  We're referring to the Citrades

5   defendants --

6            THE COURT:  Defendants, correct.

7            MR. BURDEN:  -- so you understand, Your Honor.

8            Everything's illegal, as far as we know.  It's hard

9   to imagine there would be anything legal in there, given the

10  nature of their business.

11           Zilmil is a little bit different.  Zilmil is an

12  affiliate Internet marketer.  What we have seen, what the

13  evidence we've adduced shows, is that the bulk of their

14  business is illegal.  I haven't seen them do anything that

15  isn't illegal.

16           Is it possible, Your Honor, that Zilmil is using

17  affiliate networks to promote legitimate products or at least

18  products outside the CFTC's jurisdiction?  Yes, that's

19  possible.

20           For Zilmil there could conceivably be a legitimate

21  aspect to their business, though the bulk of it is driving

22  customers to illegal binary options websites through fraudulent

23  autotrading system promotions.

24           THE COURT:  Right.  You know, I'm going to look more

25  at the proposed SRO you've given because my understanding of

1  the scope of the powers that you propose for the receiver

2  included basically removing control of those organizations,

3  both Zilmil and Citrades, from its principals entirely.

4  And my question was, if that were the case and Zilmil

5  has continuing legitimate business interests, is that not an

6  adverse consequence that would -- I would need to try to avoid?

7  MR. BURDEN:  You know, it might be, Your Honor.  And

8  I think a way to potentially address it is -- is to have the

9  receiver -- is to have the receiver ascertain whether there is

10  a legitimate aspect of the business.  And I think the receiver

11  could do that with the help and consultation of Mr. Michael

12  Shah and Zilmil.

13  The nature of Zilmil's businesses is -- is such that

14  it essentially automatically generates revenue through web

15  referrals.

16  If -- and I want to be clear.  I don't think there

17  is, and I haven't seen evidence that there is.  But if there is

18  a legitimate aspect of Zilmil's business, this is something

19  that the receiver could, in fact, continue on behalf of the

20  receivership estate.

21  So, Your Honor, any proceeds from that would --

22  would, I think, be for --

23  THE COURT:  Not only could but should.

24  MR. BURDEN:  Should, yes, Your Honor.  And that's --

25  well, the proceeds from any legitimate business activity would

1    and should eventually go to restitution for customers.

2            So the temporary receiver is certainly incentivized

3    and would be desirous of maximizing that receivership estate by

4    continuing any legitimate business that Zilmil has.

5            And I want to stress, Your Honor, I'm not aware of

6    any.  I just wanted to acknowledge that it's certainly

7    possible.

8            THE COURT:  Let me get you to turn your attention to

9    the GoDaddy records.

10           I think I understand why they're being offered, but

11   I'm not sure I can discern how it is that the cross-corporate

12   and individual connections that it purports to establish are,

13   in fact, established by the records.

14           So which -- which ones are they?  I forget the

15   number.

16           MR. BURDEN:  Oh, it's -- GoDaddy is Exhibit 2, Your

17   Honor.

18           THE COURT:  Exhibit 2?

19           Help me -- help me through that one, if you would.

20           MR. BURDEN:  Oh, certainly, Your Honor.

21           Well, so the GoDaddy records, we think, are

22   tremendously illuminating and helpful in terms of proving that

23   it is Scharf who is the mastermind behind these companies.

24   There's other evidence of this as well.

25           But just focusing on the GoDaddy records, because

1  they're not records that you see every day, what they show is

2  who owns the websites.

3          There are two websites that Citrades operates.

4  There's the Citrades.com, and there's the

5  AutoTradingBinary.com, so we wanted to know, Your Honor, who is

6  it that owns them?  To whom is the website registered?

7          And when we subpoenaed GoDaddy --

8          THE COURT:  Through some evidence other than your

9  former employee's declaration.

10         MR. BURDEN:  That's right.  Yeah, yeah, yeah.  That's

11 right, Your Honor.  So, yeah, we wanted to corroborate that,

12 and --

13         THE COURT:  So tell me how this does that, because

14 this was referenced to a shopper ID and that confused me.

15         What is it that allows you to deduce the conclusion

16 that you draw that Scharf and Shah are the owners of -- or I

17 guess in this instance it's Scharf.

18         MR. BURDEN:  Yeah.  This is just Scharf, Your Honor.

19         So what this exhibit 2-A1 reflects, which is shopper

20 ID 8905, what this reflects is a customer ID.  We had

21 subpoenaed GoDaddy and said, "Give us all your customer

22 information on who owns the Citrades website and who owns the

23 AutoTradingBinary website," and this is what we got.

24         Our first -- our first GoDaddy exhibit, 2-A, this is

25 for the Citrades website.  And it starts with simply the

1  customer's name, and then --

2          THE COURT:  That's on page 4?

3          MR. BURDEN:  Yes, sir, Your Honor, page 4.

4          THE COURT:  Okay.

5          MR. BURDEN:  So what we've got here is Jason Scharf,

6  and his e-mail is jbscharf@gmail.com.  And he is listed as

7  being associated with this company CIT Investments, which we

8  see elsewhere in the record.

9          And if you turn the page, Your Honor, to 5, this is a

10 domain list for this customer.  And what this shows is all the

11 domains that are registered to this customer.

12         And you'll see -- for some reason Citrades is on here

13 twice.  It's the fifth entry and then about halfway through the

14 page, so Citrades.com is a domain, a web address.

15         THE COURT:  And what confused me was this ownership

16 change reference and the created and expired.  I didn't know

17 what to make of that information.

18         MR. BURDEN:  Yeah.  We weren't sure either, Your

19 Honor, except that this shopper ID is the -- is the current ID,

20 and we had asked for current information on this website.

21         I think what that reflects, Your Honor, is either the

22 sale of this domain or the transfer of it, which is reflected

23 in our contact audit history.  And you'll see -- and that's on

24 page -- that's on page 9 through 10.

25         This catalogs -- the same way that you or I might

1    change our passwords for an online account we have or contact

2    information if we move or change companies, you can see

3    Mr. Scharf changing the contact information for these

4    companies.

5         So the most recent entry here looks like it's 2015,

6    is when Mr. Scharf changed the contact information for this.

7         THE COURT:  All right.  And were not these documents

8    in Exhibit 2 offered to show a connection between CIT

9    Investments and Brevspand LTD or not?  I thought --

10        MR. BURDEN:  Yeah, they were, Your Honor, because

11   Mr. Scharf -- I understand this is begging the question

12   somewhat, but Mr. Scharf controls these entities, transfers

13   funds between them.  And some of the evidence of that is the

14   fact that he uses CIT Investments and Brevspand

15   interchangeably.

16        So on the first page we saw, Your Honor, Mr. Scharf

17   had listed -- you know, he is identified as --

18        THE COURT:  First page being page 4 of the --

19        MR. BURDEN:  Sorry.  Yes, Your Honor, page 4.

20        THE COURT:  Okay.

21        MR. BURDEN:  He's associated with CIT Investments

22   there.

23        If you flip to -- to page 7 and page 8, the

24   registrant, technical contact, administrative contact, and

25   billing contact are Brevspand.

1           But, Your Honor, in terms of connecting -- you know,

2    our sort of best and most compelling evidence for connecting

3    Mr. Scharf with Brevspand is not sort of what he filled in on

4    his GoDaddy customer account applications.  It's the Brevspand

5    corporate formation documents --

6           THE COURT:  That was discovered by your investigator

7    in Exhibit 3.

8           MR. BURDEN:  Actually it's part of the GoDaddy

9    records.  It's Exhibit 2-C.

10          And Mr. Scharf does what I do all the time, which is

11   forget his password and lock himself out.  So in order to prove

12   that it was him, he helpfully sent in a copy of his driver's

13   license and his passport and corporate formation documents from

14   Bulgaria showing that he is the shareholder, manager, and

15   president of Brevspand.

16          And that, Your Honor, is -- yeah.  It starts on page

17   37.

18          THE COURT:  Right.

19          MR. BURDEN:  And the Brevspand corporate formation

20   documents, Your Honor, are 43 really through the end of -- the

21   end of that exhibit.

22          THE COURT:  I see.

23          So the submission -- the inclusion of his passport

24   and license here is evidence that he provided to Brevspand?

25          MR. BURDEN:  No.  This was evidence that Mr. Scharf

1   provided to GoDaddy because he locked himself out of --

2          THE COURT:  To GoDaddy.

3          MR. BURDEN:  Yeah.  He locked himself out of his

4   account.

5          And as you can see, Your Honor, we just looked and we

6   saw that Brevspand is the registration and technical contact.

7   So GoDaddy says to him, Your Honor, "Prove to me you're

8   Brevspand" --

9          THE COURT:  Right.

10          MR. BURDEN:  -- and he helpfully does.

11          THE COURT:  Okay.  All right.

12          MR. BURDEN:  And I want to address something you said

13   before, Your Honor, on Exhibit 2-A about the website expiring.

14          If you look on page 5 --

15          THE COURT:  Of Exhibit?

16          MR. BURDEN:  Of Exhibit 2, Your Honor --

17          THE COURT:  All right.

18          MR. BURDEN:  -- the GoDaddy items still, halfway down

19   the page there's another Citrades.com.

20          THE COURT:  I see it.

21          MR. BURDEN:  And you'll see it expires in 2019.

22          THE COURT:  Correct.

23          MR. BURDEN:  So I don't know why the other one

24   expired, Your Honor.  I won't pretend to know.  But certainly

25   Mr. Scharf was communicating with GoDaddy about these domains

 1  as recently as 2015, and probably through the present as well,

 2  since the expiration for this domain is in the future.

 3          THE COURT:  Tell me whether there is any

 4  significance, at least as far as the commission's entitlement

 5  to an SRO, of the involvement of foreign corporations.

 6          And I noticed that exchanges that occur on a foreign

 7  exchange or transactions that occur on a foreign exchange are

 8  apparently exempt from this act.  Is that right?

 9          MR. BURDEN:  That's not my understanding, Your Honor.

10  The hook here jurisdictionally, if nothing else, is the fact

11  that U.S. customers were solicited for participation in this

12  scheme.  And Scharf himself lives in California.

13          And also there is no exchange.  Customers are not

14  paired off against one another.  There's no central clearing.

15  Citrades doesn't really pretend to be an exchange.  In fact, in

16  its terms and conditions, it talks about how -- how Citrades --

17          THE COURT:  Over-the-counter --

18          MR. BURDEN:  Yes.  That's right, Your Honor.

19          THE COURT:   -- transactions predominate its business.

20          But to the extent that Scharf and Shah have access to

21  and use foreign corporations, are you confident that the

22  transactions -- that the solicitations did involve these

23  foreign corporations, at least from your view of the evidence?

24          MR. BURDEN:  The solicitations -- these foreign

25  corporations were a repository for customer funds.  This is

1  where customer money was sent to be misappropriated by

2  defendants.

3          Even if it was a foreign exchange, Your Honor, which

4  we submit it's not because it's not an exchange at all, the

5  fact that extraterritorial companies were used to receive

6  customer funds, U.S. customer funds, does not affect our

7  jurisdiction or ability to proceed.

8          THE COURT:  Okay.  You didn't provide any evidence of

9  your receiver's qualifications, but I've since located some for

10 Mr. Murena.

11         MR. BURDEN:  He's available by phone, Your Honor, if

12 you'd like to speak with him.

13         THE COURT:  All right.  I don't know that I need to

14 speak with him, but I did have questions about his

15 qualifications that I've found.

16         Obviously you-all submit that he is well qualified

17 and experienced to provide the oversight that you desire?

18         MR. BURDEN:  We do, Your Honor.  He -- that firm,

19 Damian & Valori, is often used by the CFTC in receivership

20 cases where we need a firm to take control of a business.

21         THE COURT:  Since the business is here in

22 Jacksonville -- Zilmil at least, arguably -- why would you not

23 want to have a receiver appointed that's in Jacksonville?

24         MR. BURDEN:  Your Honor, it was simply a case of

25 somebody who we knew was qualified and that we've worked with.

1   If the Court has another receiver that the Court prefers or

2   somebody located in Jacksonville, we would be just as happy

3   with that receiver.

4           But it's incumbent upon us, Your Honor, to propose a

5   receiver.  If the Court prefers somebody else, we would be --

6   be more than happy to have somebody local appointed, or more

7   local.

8           THE COURT:  All right.  Let me ask you about the last

9   mail-out.  Is April 2015 the last mass e-mail that you-all are

10  aware of?

11          MR. BURDEN:  Oh, from Zilmil --

12          THE COURT:  Correct.

13          MR. BURDEN:  -- Your Honor?

14          It is, yes.  It's the last one we have evidence of.

15  We have seen Zilmil since then -- and I will concede that this

16  is not in the record -- retain other similar e-mail firms much,

17  much more recently that essentially do the same thing, send out

18  these mass e-mails.

19          But as far as the record is concerned, 2015 is the

20  most recent mass e-mail.

21          THE COURT:  And how many complaints did that result

22  in, the use of those e-mails?  I forget the name of the company

23  now.

24          MR. BURDEN:  It was Critical Impact, Your Honor.

25  Well, there were a number of companies Zilmil used, but for the

1    e-mails it was a company called Critical Impact.

2           I understand they had received spam complaints.  They

3    received them.  I'm not sure it was quantified in the

4    declaration.  I would have to look.  But ultimately they wanted

5    to kind of terminate Zilmil as a customer.

6           THE COURT:  Because of the complaints.

7           MR. BURDEN:  Because of the complaints and because

8    they overloaded the system.  Other -- other people Zilmil

9    worked with have complained as well.

10          So one of our declarations, the final one, Exhibit

11   10, from Jennifer Johannsen is from a firm called ClickSure --

12   I'm sorry, ClickBank, which serves as sort of a clearinghouse

13   for these affiliate offers.

14          And they received numerous spam complaints as well,

15   as did Liquid Web, and that's a web hosting service.  That

16   is -- that is Exhibit --

17          THE COURT:  Is that -- it's one of the later

18   exhibits.

19          MR. BURDEN:  It's Exhibit 7, Your Honor --

20          THE COURT:  Right.

21          MR. BURDEN:  -- Mr. Dan Casler.

22          Liquid Web, for a period, was the web host of choice

23   where Zilmil would host a lot of its websites, which we list in

24   the declaration.

25          THE COURT:  Perhaps that was the one that was

1    quantified.  I remember there being a number attached to it.

2         MR. BURDEN:  Yeah.  Everybody complains about Zilmil,

3    Your Honor.

4         Yeah, Liquid Web, Your Honor, if you proceed to page

5    3 --

6         THE COURT:  Everybody that was associated with

7    Citrades, you mean.

8         MR. BURDEN:  Oh, Zilmil, Your Honor.  I was talking

9    about Zilmil.

10        THE COURT:  Yeah, but you said everybody complains

11   about Zilmil, but Zilmil was driving traffic to Citrades.  Is

12   that right?

13        MR. BURDEN:  Yeah, that's correct, Your Honor.  But

14   Zilmil drives traffic by advertising and promoting its own

15   fraudulent products.  What Zilmil purports to do is to sell or

16   to offer what they call autotrading systems.

17        So what Zilmil will claim to do -- and you'll see

18   this in Exhibit 1-D and E, which are samples of some of

19   Zilmil's website -- Zilmil will put out a website and they'll

20   say, "Hey, we have this great robot.  It's an algorithm.  You

21   can even use it to trick the binary options firms and make

22   millions of dollars."

23        That's sort of the gist of Zilmil's websites.  And

24   Zilmil would send out millions of spam e-mails as well saying

25   substantially the same thing.

1          So what Zilmil wants you to do is to somehow find
2    your way to their websites where they're offering these
3    autotrading systems, these money-making robots.
4          And they want you to sign up, and once you sign up,
5    they'll say, "All right.  You've got the secret now, the secret
6    to make your millions, so you're going to want to sign up with
7    a binary options firm.  Why not Citrades."  And that is how
8    Zilmil directs customer traffic to Citrades.
9          And Citrades pays Zilmil $450 for every person who
10   deposits because they know they're likely to get much, much
11   more out of them.
12         We have direct evidence of this, Your Honor, in
13   Exhibit 3 --
14         THE COURT:  Yeah.  I do want you to draw my attention
15   to that because I had a question as to what evidence there was
16   that Zilmil received $500,000 in commission.
17         MR. BURDEN:  Your Honor, we saw that from bank
18   transfers from -- that number, I should say, we got from
19   examining Scharf's and Brevspand's and CIT Investments' wires.
20         And you can see our investigator's summaries of those
21   bank records in Exhibits 3-H, 3-I, and I believe also 3-M.
22         THE COURT:  All right.  Give me just a moment.
23         MR. BURDEN:  Yes.  So if you look at 3-H, Your
24   Honor --
25         THE COURT:  Uh-huh.  Page 86?

1          MR. BURDEN:  Yes.  Thanks, Your Honor.

2          -- you will see that this is a summary of CIT

3   Investments' U.S. -- a bank they have in the U.S.  It's East

4   West Bank, and Zilmil is sending 182,000 -- I'm sorry, CIT

5   Investments is sending $182,000 to Zilmil.

6          THE COURT:  Where do you see the $182,000?

7          MR. BURDEN:  It's at the very bottom, Your Honor.  It

8   says Zilmil Inc. total.

9          THE COURT:  Debits, I see.

10          MR. BURDEN:  Yeah.

11          And then if you skip to --

12          THE COURT:  3-I -- I mean --

13          MR. BURDEN:  Yeah.

14          THE COURT:  -- page 88?

15          MR. BURDEN:  Yeah.  Let's -- let's skip, Your Honor,

16   rather than to that one, to -- to Exhibit -- you know, this is

17   the better one, Your Honor.  I apologize.  Exhibit 3-M.

18          THE COURT:  What page is that?

19          MR. BURDEN:  That's 96.

20          THE COURT:  All right.

21          MR. BURDEN:  Yeah.  So this is the better one to look

22   at, Your Honor.  I apologize.

23          So this is a summary that our investigator put

24   together of wire transfers that passed through Fedwire between

25   2011 and 2016.

1    You'll see that Brevspand transferred -- and this is

2    from their bank account in Bulgaria -- $323,000 --

3    THE COURT:  Correct.

4    MR. BURDEN:  -- to Zilmil.  And CIT Investments

5    LLC -- and we just looked at that on the other page so this

6    is my mistake because we're looking at it twice now --

7    $182,000.

8    THE COURT:  That's a little over 500,000.

9    MR. BURDEN:  Yeah.  That's right, Your Honor.

10   And we understand what this is because Zilmil did

11   produce a limited and anodyne set of documents and e-mails to

12   us that reflect Mr. Scharf corresponding to Mr. Shah, attaching

13   Brevspand bank accounts from Bulgaria and totaling up customer

14   accounts and how much they're owed.

15   And you can see that, Your Honor, at Exhibit 3-E, and

16   that's -- that starts, Your Honor, on page 48.

17   THE COURT:  Thank you.

18   MR. BURDEN:  Here you can see Jason Scharf

19   corresponding with -- with Mr. Shah about their wires.  He's

20   attaching payments to Mr. Shah.

21   THE COURT:  Right.  I'm glad you explained that

22   because I -- I did look at this previous and had some

23   difficulty understanding what it represented.

24   There was some problem with one of their agents

25   receiving a payment?

1    MR. BURDEN:  Yeah.  That's what it looks like, Your

2  Honor, and that was the occasion for the correspondence.

3    THE COURT:  Which gives you some idea of the

4  character of the transactions that we just discussed.

5    MR. BURDEN:  It does, Your Honor.

6    It shows that Mr. Scharf was in control of and

7  certainly affiliated with Brevspand, that he controlled and had

8  knowledge and understanding of Brevspand's bank accounts in

9  Bulgaria, and that Shah [verbatim], the person to whom the

10  Citrades and ATB websites are registered, was paying and

11  working with Michael Shah and Zilmil, which is -- as Your Honor

12  put it, I think, best, it shows the character of the

13  transactions, which is to say what Zilmil did for Citrades.

14    THE COURT:  You know, a lot of what Citrades and

15  Zilmil did could fairly be -- well, arguably be -- I don't know

16  if it's fairly, but arguably be characterized as puffing.  And

17  the testimonials, which you contend are false, certainly, if

18  they are false, is illegal.

19    How do you determine the falsity?  I understand that

20  there was a customer list provided, and these customers aren't

21  identified on that list.  But -- so are you contending that you

22  have identified all of the customers so that I can safely

23  assume that these people don't exist anywhere and that their

24  representations aren't true?

25    MR. BURDEN:  So we're just talking about the

1    testimonials or all of the misrepresentations that --

2           THE COURT:  Just the testimonials.

3           MR. BURDEN:  Just the testimonials.

4           So, Your Honor, I won't pretend to know or be able to

5    know every single -- every single customer that Zilmil has

6    because the spreadsheet of customers we have is limited.

7           The testimonials that are there, as Your Honor

8    pointed out, are not contained within any of the -- are not

9    contained --

10          THE COURT:  Customer lists.

11          MR. BURDEN:  That's right, Your Honor, yeah, the

12   customer lists.

13          The character of the testimonials themselves violates

14   the Commodity Exchange Act.  Under the Commodity Exchange Act,

15   if you are presenting a testimonial, you're required, and it's

16   fraudulent if you don't --

17          THE COURT:  That's pursuant to the regulation.

18          MR. BURDEN:  That's right, Your Honor.  Yes.

19          THE COURT:  Yeah.  So they don't have the disclaimers

20   that would be necessary, and because of that, in and of

21   themselves, they are considered violations.

22          MR. BURDEN:  Yeah.  That's right, Your Honor.

23          And I think as well, you know, what we have seen from

24   the customers that have complained, from the whistleblowers,

25   and through wire transfers -- which, you'll notice, don't

1  involve transfers back to any customers -- is that customers

2  don't get -- don't get their money back.  We have every reason

3  to believe that these testimonials are false.

4         But if we pretended for a moment they were true --

5  and, again, this is part of an illegal off-exchange enterprise

6  as well, which casts significant doubt on whether they could

7  ever be true.

8         But if we pretended for a moment, Your Honor, that

9  they were true -- I don't think they are, and I don't think we

10  should pretend that.  But if we pretended these testimonials

11  were true, they would still be fraudulent.  And the reason why,

12  Your Honor, is they create a false impression of what it's

13  going to be like to invest with Zilmil.

14         We have one customer testimonial that says, "This is

15  amazing.  I paid for a year of college through trading."

16         What we have seen from the customers who testified is

17  that they don't get their money back at all.  They get given

18  the runaround or ignored and told they can't have their money

19  back.  And some have invested quite a lot, as much as $100,000.

20         Another customer, Your Honor, talked about how

21  withdrawals are simple, easy, and on time.  And the customers

22  whose declarations are appended to our motion, I think, belie

23  that.

24         So even if those testimonials were real people really

25  saying those things -- which, again, we think they're not -- we

1   would still move on the basis of those testimonials being

2   fraudulent.

3          THE COURT:  So I've got the declaration of four

4   compared to thousands of others that we have not received any

5   complaints from?

6          MR. BURDEN:  No.  We've received many, many

7   complaints, Your Honor.  It's three, by the way.  We've got

8   three.

9          THE COURT:  I'm sorry.  I keep saying it's four.

10          MR. BURDEN:  Yeah.

11          THE COURT:  I'm not sure why I'm confused in that

12   regard.

13          MR. BURDEN:  We've received many, many complaints,

14   Your Honor.  I think dozens, certainly.  Perhaps more.

15          These were three that we talked to.  We didn't want

16   to overwhelm the Court with declarations.  If there's a need

17   for additional testimony, perhaps if we have a hearing in the

18   future, we have a deep bench of aggrieved customers to choose

19   from.

20          But these were the three that we felt were

21   representative, illuminating, and available.

22          THE COURT:  Yes.  Tell me about the effect, if any,

23   of the disclaimers that are included in some of the terms and

24   conditions of customers using -- I think it's Citrades.  It may

25   be Zilmil.  It basically says that you -- you're doing this at

1   your own risk.  You can lose money.

2          That's not indicative of fraud.  And let me couch

3   this another way.  Tell me what you think the defenses from

4   these defendants are going to be.

5          MR. BURDEN:  You know, Your Honor, I think

6   realistically -- I'm not sure what defense Citrades will have.

7   I think what they will probably say -- what Mr. Scharf, I

8   think, will say is that he wasn't in charge and he was merely

9   marketing.  I think that because that is what he has told banks

10  when they have asked him what he's up to.

11         I think Zilmil will say Shah -- I think what Mr. Shah

12  will say is that he's an affiliate marketer.  He just promotes,

13  so people pay him to promote.  He doesn't know what any of this

14  is, and he's not responsible for fraudulent statements.

15         I think we can easily disprove those defenses.  I

16  think that will be their defense.  I don't think, Your Honor,

17  that it will be anything to do with these disclaimers at the

18  end.

19         You know, it's well settled, Your Honor, that

20  disclaimers, especially ones in fine print in the terms and

21  conditions, don't render nonfraudulent otherwise fraudulent

22  statements.

23         As far as things being at your own risk, offering

24  off-exchange binary options contracts is illegal regardless of

25  whether it's at this person's own risk or not.  And I think the

1    disclosures and disclaimers in the terms and conditions don't

2    include the most important disclaimer of all, which is that

3    "You can't get your money back.  I will misappropriate it."

4           And I want to -- you know, Your Honor, you had asked

5    me before, and it's a question I'm asking myself, is you've got

6    three customers who certainly have interesting, I hope

7    compelling, stories to tell.

8           But what about these probably thousands of other

9    customers?  Certainly thousands of other accounts.  You know,

10   we can't talk to all of them, but what about them?

11          We're not trying to prove here, and we don't -- don't

12   have to prove, I think, that every single customer got ripped

13   off.  I think that is what we are going to see.

14          I think the nature of the misrepresentations is such

15   that you can infer this was a fraud.  I think the transfers

16   between the foreign entities and the lack of any transfers

17   to -- back to customers demonstrates that no one ever got their

18   money back.  The very business model itself, I think, suggests

19   strongly that it is a scam.

20          But if we only had these three customers, Your Honor,

21   and if everybody else did okay, these statements would still be

22   fraudulent, would still be actionable.

23          And these customers were still told that they could

24   expect profits, that there was real trading happening in their

25   accounts, that they could withdraw their money and their

1    profits when they wanted to.  And certainly, absolutely, none

2    of those things were true for these customers.

3         And I think we're going to find, Your Honor -- I

4    think Your Honor can infer from the treatment of these

5    customers that would be the case for many, many more.

6         THE COURT:  If it were, though, just for the three,

7    wouldn't that call into question the wisdom of shutting down a

8    company that perhaps was otherwise engaged in legal activity?

9         MR. BURDEN:  I think if it were just the three, that

10   might be a real concern, Your Honor.  But we're not, I think,

11   moving on the basis of just these three customers'

12   declarations.

13        What we see is a pattern of unlawful conduct.  And

14   when we start with the website, statements that Citrades -- I

15   think we're talking here about Citrades specifically.

16        The Citrades website offers -- as Your Honor put it,

17   it seems sort of unquestionably prohibited off-exchange

18   transactions.  This isn't something that normal or honest

19   people do.  It's illegal in and of itself.

20        The only question is, is Jason Scharf the person

21   responsible.  We have adduced that it -- that it is.

22        THE COURT:  Let me ask -- I wondered about that.  If

23   the transactions are, in and of themselves, illegal and you

24   first -- when did the commission first learn about them, learn

25   about Scharf and Citrades?

1        MR. BURDEN:  I -- you know, I am not sure that I can

2   say, Your Honor.  I believe --

3        THE COURT:  The reason I ask is that it appears to

4   have been permitted to continue for some time, which if it's

5   illegal simply because of its existence, an off-exchange option

6   trade, binary option trade --

7        MR. BURDEN:  Yeah.

8        THE COURT:  -- is illegal, why wait to try to

9   discover misleading or fraudulent activity?

10       MR. BURDEN:  Well, I certainly haven't waited.  I

11   don't think the commission has either.

12       This is a website that exists in the world.  It is --

13   it is one of many, many, many similar websites which offer

14   illegal off-exchange binary options.

15       If you look at the website, Your Honor, what you --

16       THE COURT:  Did you say one of many that offers

17   illegal --

18       MR. BURDEN:  Yes.

19       THE COURT:  -- off-exchange binary --

20       MR. BURDEN:  I did.  I did.

21       As far as I know, Your Honor, these are the ones that

22   Jason Scharf operates, but this is a thing that's going on in

23   the world, and there's a lot of it.  The commission has

24   recently issued consumer advisories on this.  It has sort of

25   proliferated.

1    And the reason why it's proliferated and have been,

2  as you can see from our evidence, quite so lucrative is because

3  it's difficult to figure out who's behind these things.

4    It's a website.  What it says on the bottom of the

5  website, Your Honor -- and you can see it in Exhibit 1 -- is

6  that it's owned by CIT Investments, which is a -- I forget

7  whether it says it's a Marshall Islands company or an Anguillan

8  company because they change it sometimes.  So it looks, to

9  anyone looking at the website, like it's foreign.

10    And so, Your Honor, if you go and you try to see,

11  using publicly available tools, who owns the website, it will

12  say it's anonymous.

13    Now, the CFTC does not have a group of people that

14  sits and does sweeps or goes on the Internet and looks for

15  these types of things.  The CFTC is, for better or worse,

16  responsive to customer complaints, especially for retail fraud

17  like this.

18    And when these customer complaints come in, people

19  look at them, and they try to ascertain if there's a case we

20  can bring, if it's a case that's worth bringing.

21    And at some point -- and I wouldn't -- not I

22  wouldn't, I couldn't say when or how, before it was assigned to

23  me, somebody decided that -- that it was worth looking into.

24    And we came to Citrades, Your Honor, through Zilmil.

25  It was in investigating Zilmil that we learned that Zilmil did

1   business with Citrades.  And we started to learn that Citrades

2   was not, in fact, foreign, that it was, in fact, based in the

3   U.S., at least its principals were, and that there were many,

4   many customer complaints that we had received, many of them

5   quite small.

6          But that's the great innovation of Citrades and these

7   binary options websites is they take payment through credit

8   card, which allows people -- customers and victims -- to invest

9   money they don't really have, which, of course, never comes

10   back to them, or certainly not in the evidence we have adduced.

11          THE COURT:  So the evidence that Mr. Pavel Abdulov,

12   the export trader -- he's mentioned at page 7 of your motion --

13   that his results are false are simply be- -- you believe -- he

14   wasn't a declarant --

15          MR. BURDEN:  No.

16          THE COURT:  -- and no one made a declaration about

17   him, but you -- how is it that you determined the falsity of

18   his result?

19          MR. BURDEN:  Your Honor, because these are -- he is

20   unregistered.  This is not a person that's been registered with

21   the CFTC.

22          The AutoTradingBinary website --

23          THE COURT:  So it's the absence of registration that

24   causes anything he says to be false.

25          MR. BURDEN:  I wouldn't say it's the absence of

1   registration, Your Honor.  But it is considered fraud -- and

2   we've cited cases in the brief to this effect -- that when you

3   tout results, whether they're true or they're false -- and here

4   we would submit that they're false, and it seems nobody makes

5   money trading illegal off-exchange binary options -- that by

6   itself is fraudulent because it doesn't send a balanced

7   message.

8           It suggests that the results will be the same for

9   people.  And it suggests, importantly -- and I think we're

10  coming full circle with this point.  It suggests that this

11  trader is going to be able to trade like that for you.

12          Now, we have a declarant -- which one was it?  It was

13  Iven Moore, Exhibit 5, who signed up for AutoTradingBinary,

14  AutoTradingBinary, who is supposed to have these fabulous

15  traders and they copy the trades.

16          And what he testified to was that AutoTradingBinary

17  traded what was at that point a positive balance of at least --

18          THE COURT:  Down to zero.

19          MR. BURDEN:  Yeah, down to zero.  So do I have a --

20  did I find this trader, Your Honor, and have a declaration from

21  him?  I didn't.  We don't have that.  What we do have though

22  are unequivocal statements of profit, which the case law says

23  is fraudulent in and of itself.

24          And we have declarations from users of the

25  AutoTradingBinary service suggesting that it not only doesn't

1    work the way it's supposed to, it doesn't work at all.  And I

2    think from those facts, Your Honor, we can easily infer that

3    these results are false.

4          THE COURT:  Tell me about the Banc de Binary

5    enforcement action.

6          MR. BURDEN:  Yeah.  The Banc de Binary enforcement

7    action was brought not by me but my members of my office.  It

8    was against an off-exchange, unregistered binary options firm

9    based in, I believe, Cyprus, but either way, it was not in the

10   U.S.

11         And the basis for the claim was not, I don't believe,

12   fraud.  It was simply unregistered off-exchange options

13   trading, our first claim against Citrades.

14         They had -- they responded to the complaint.  They

15   filed a motion to dismiss seeking to -- well, what they had

16   argued is that these binary options are essentially gambling.

17   They're not things that can be regulated by us.

18         The Court disagreed, said that binary options are

19   both swaps and options under the act and our various regs.  And

20   so shortly after that, Banc de Binary settled, and so there are

21   two cases on the books.

22         And one is the denial of Banc de Binary's motion to

23   dismiss, and then the other is a consent order where Banc de

24   Binary agrees to cert relief and to the entry of findings of

25   fact that it engaged in illegal off-exchange binary options

1   trading.

2            THE COURT:  All right.  Let's take a minute,

3   Mr. Burden, and look at your proposed order.

4            In paragraph 6 you reference immediate and

5   irreparable damage.  Tell me what that consists of.

6            MR. BURDEN:  The immediate and irreparable damage and

7   the harm that we're concerned of, Your Honor, is, I think for

8   Zilmil, continued solicitation of customers.  So as I mentioned

9   before, we're not moving for an order requiring them to cease

10  their business.

11           The irreparable harm and the concerns that we have

12  are twofold -- the dissipation of assets and the destruction of

13  evidence -- and that's what we're asking for with this SRO.

14           I know Your Honor's concerned about -- about the

15  receiver, especially with respect to Zilmil on the -- because

16  of the possibility that parts of the business might be

17  legitimate.  We can address that separately.

18           For the SRO, the relief that we really want and that

19  I've been sent here today to ask the Court for is the ability

20  to freeze their assets, to compel an accounting so we can get a

21  sense of where these customer funds have been transferred to

22  and to prevent defendants from dissipating them.

23           And also -- also to examine their books and records,

24  which you're entitled to do under statute, since they certainly

25  aren't going to give them to us voluntarily.

1          And we've seen -- our production from Zilmil -- I

2    mentioned Zilmil, unlike Jason Scharf, did receive a subpoena

3    from us, did make a voluminous but anodyne production of banner

4    ads and other sort of uninteresting documents, correspondence.

5          But some of the best documents that we have, we

6    believe, in support of our motion were not, predictably,

7    included in Zilmil's production, but we got them from another

8    agency.

9          And I'm talking here about correspondence between

10   Jared Davis and Michael Shah where they talk about how Michael

11   Shah's autotrading robots are designed to -- how do I say it?

12   Not rip people off but designed to trade their accounts down to

13   nothing.

14         And also where Michael Shah crows to this Jared Davis

15   that he is the No. 1 affiliate for the binary options industry,

16   that he has thousands of customers, first-time depositors, FTDs

17   he calls them, a day.

18         Those documents were not included in Zilmil's

19   production.  And we expect that simply proceeding with this

20   litigation as if it was some kind of normal civil case, maybe a

21   contract dispute or registration dispute, would be a mistake

22   and put the CFTC and also customers, which there are lots and

23   lots of them, at a tremendous disadvantage, because what we've

24   seen is Zilmil is willing to delete, destroy, or just simply

25   not turn over the most incriminating e-mails.

1          I think, Your Honor, that would be a concern no

2    matter what the factual circumstances are.  But I think here we

3    have actual concrete evidence that they've produced what they

4    want to produce.

5          With respect to Citrades, we know that they have the

6    ability to take customer funds or simply funds in their

7    possession that should go to customers and transfer them

8    overseas.  Not everyone has a Bulgarian bank account.  Not

9    everyone knows how to do that.  Many of our defendants don't.

10   Mr. Scharf does.

11          And so that's the core of the relief that we are

12   seeking with this SRO is the asset freeze and everything

13   attendant to that, an accounting, and also this ability to

14   inspect books and records, which is so critical, not just

15   for --

16          THE COURT:  And the vehicle through which you would

17   do that is the receiver?

18          MR. BURDEN:  No.  The vehicle, Your Honor, is simply

19   the relief we're requesting with respect to the asset freeze,

20   and that's on pages 7 through 10 of our proposed order, and

21   then our books and records inspection authority, if granted by

22   the Court, which is pages 10 through 12 -- sorry, 10 through

23   11.  And then 21.

24          The receiver we can talk more about with -- the

25   balance of that could be -- the receivers are helpful, Your

1   Honor, mainly -- and I want to address any concerns you have

2   because we're not -- especially with respect to the powers of

3   the receiver, we're always going to seek the maximum.  We think

4   that's what's best for customers.  We think that's probably

5   what's probably going to have to happen in this case.

6           But, you know, all that, I think, is subject to

7   discussion or revision without too much prejudice to our case.

8           With respect to the receiver, whether it's Mr. Murena

9   or somebody in or around Jacksonville, which would be just as

10  good, maybe better, because it's easier for them to come to

11  court, the CFTC doesn't have a bank account that we can get

12  customer funds into or, if customer funds are repatriated,

13  which is definitely going to be an issue here, that we can take

14  possession of.

15          So at the very least we need a receiver so if and

16  when -- and we hope it does -- money comes back from Bulgaria,

17  from perhaps Israel, or from Anguilla, if it turns out that CIT

18  Investments has accounts there -- it may -- that it can go

19  somewhere.  And that somewhere ought to be the receiver's bank

20  account.

21          In terms of taking over the defendants' businesses,

22  stepping into the shoes of their business, that's important.

23  When we talk about Citrades, you know, what we maintain -- and

24  I think the evidence shows -- is that they don't have a

25  legitimate business, certainly not that we're aware of.  This

1   seems to be a full-time job for Mr. Scharf, and these

2   transactions are, per se, illegal.

3          So if the receiver takes over -- takes over the

4   business, the receiver isn't obviously going to continue

5   soliciting customers for illegal binary options transactions.

6   That receiver is, instead, going to take possession of what the

7   Citrades defendants have possession of.

8          And what that's going to be is computer servers.

9   It's going to be cloud storage where customer lists and contact

10  lists are kept, where the accounting is done, because it's all

11  done behind the scenes in these sort of automated online

12  spreadsheets.

13         That's what the receiver is going to take possession

14  of.  And that's going to be our customer victim list, sort of

15  for potentially more witnesses or evidence if we -- you know,

16  if we needed it down the line but also a list of customers for

17  restitution.

18         For Citrades a temporary receiver would also be able

19  to take control of bank accounts, obtain bank records for us,

20  account numbers, things of that nature.

21         And it's good to have a receiver do it, because the

22  CFTC -- though like all federal agencies, you know, we're

23  understaffed -- our investigators are capable of doing these

24  things, Your Honor.

25         The problem is it's good to have a receiver who is a

1   third party who is an officer of the court be the one that

2   marshals these resources and this information about the

3   financial transactions of the Citrades defendants because they

4   can testify about it if need be.

5          And they're responsive to the Court.  They don't --

6          THE COURT:  Well, now, tell me what the receiver

7   does, for example, if he seizes a computer at Citrades.  The

8   computer might contain data that's immaterial to this case and

9   personal to individuals.

10         What has -- I'm not sure that the proposed order

11  addresses what the receiver should do in that instance.

12         MR. BURDEN:  Yeah.  I think -- it addresses it in

13  that the text of the order always says that the receiver takes

14  control of accounts or obtains records relating to the

15  allegations in the complaint or relating to the business or

16  transactions set forth in the complaint.

17         So the terms of the order would not allow the

18  receiver to take possession of Mr. Shah or Mr. Scharf's, say,

19  Facebook profile or something of that nature.  So I think it's

20  limited in that respect.

21         I think, though, Your Honor --

22         THE COURT:  But logistically, how does that work?

23         MR. BURDEN:  Yeah.  So logistically, Your Honor, the

24  temporary receiver is not going to seize any computers.

25         Logistically the way it works is that, if the SRO's

 1   granted and we receive our -- the CFTC receives its statutory

 2   restraining order, the first thing that we would do is go to

 3   Mr. Scharf and Mr. Shah's place of business, which in this case

 4   also happen to be their residences.

 5        We have computer forensics teams standing by.  We'll

 6   then image those computers, with the consent of -- and with

 7   signed consent forms that we have of defendants.  So that is

 8   going to be limited by defendants' consent and ideally also

 9   limited to just those things relating to the business.

10        To ensure that we don't come across any privileged

11   communications, we talk to them as to whether they have -- as

12   to whether they have counsel.  In this case Zilmil does in

13   connection with our investigation.

14        Shah may or may not.  We've never reached out -- not

15   Shah.  I'm sorry.  Let me start over with that because I think

16   I've confused it.

17        Mr. Shah does have counsel -- that's Zilmil -- in

18   connection with our investigation.  As I mentioned, we had

19   subpoenaed him, so we know Mr. Shah's counsel is a man named

20   John Cotton.

21        And the first thing we do after we serve Mr. Shah is

22   to call Mr. Cotton and say, "Your client was served with a

23   SRO."  He knows what that means because he used to be a CFTC

24   lawyer.  "We're going to be executing the SRO."

25        And once the computers are imaged and relevant e-mail

1   accounts like zilmil@gmail.com have been imaged, that then goes

2   back to D.C.  Our computer forensics people will take out any

3   e-mails between Mr. Cotton and Mr. Shah.

4          And we'll ask them to -- if there's any search terms

5   that we should look for for things to exclude to make sure

6   there's no attorney communications reflected in those e-mails.

7          As far as personal e-mails go, it's entirely possible

8   we could see some.  I haven't had that be a problem in the

9   past.  We could always devise or agree upon search terms.  If

10  the Court wants us to report back on that, we'd be more than

11  happy to.

12         I would be surprised if we found personal e-mails in

13  the zilmil@gmail.com account and the Michael Shah account.  We

14  may.  He may not give it to us.

15         THE COURT:  Well, are the -- point me toward the

16  language in the order that would provide the protection -- in

17  the proposed order that will provide the protection that you

18  just identified the receiver would be providing in terms that

19  authorize or at least direct him or her to engage in that

20  seizure in that manner.

21         I'm just trying to see --

22         MR. BURDEN:  Yeah.  Excuse me for just a moment, Your

23  Honor.  I'm going to grab a copy of it for a moment out of my

24  bag.

25         And you're talking here about the receiver, Your

1  Honor, or the simple execution of our books and records
2  inspection?
3          THE COURT:  Well, both, since they would be impacted
4  by both.
5          MR. BURDEN:  Yes.  So, Your Honor -- and we can be --
6  if this doesn't address your concerns, we can certainly be more
7  specific about it.
8          But if you look at page 11, paragraph 24, we say,
9  "Representatives of the commission should be allowed immediate
10  and continued access to inspect books, records, and other
11  documents that refer or relate in any manner to any transaction
12  or matter described in the complaint in this case, including
13  but not limited to electronic documents," etc.
14          And we'll see this in the receiver section too.  The
15  limiting language is this "documents that refer or relate in
16  any manner to any transaction described in the complaint,"
17  which is to say --
18          THE COURT:  All right.  Let's look at the receiver's
19  powers and see if you can identify that related language for
20  me.
21          MR. BURDEN:  Yeah, Your Honor.  So that same language
22  is not in the temporary receiver section.  We would certainly
23  be happy to see it added.
24          I think the reason that it's not in here is that the
25  temporary receiver -- we don't usually ask them to seize

1    computers or to -- or to take possession of the kinds of

2    accounts that might have personal information.

3           If you think that something limiting that is

4    appropriate, then, Your Honor, I certainly wouldn't -- I

5    certainly wouldn't disagree.

6           And we talk about computers, the temporary receiver's

7    interaction with computers and accounts, on pages 15 through

8    16.

9           THE COURT:   Uh-huh, that's where I'm looking.

10          MR. BURDEN:   Yeah, 28 -- paragraphs 28 and 29.

11          So I guess, Your Honor -- of course I might implicate

12   your concern is the last sentence in paragraph 29 where it

13   says, "The commission shall be authorized to make an

14   electronic, digital, or hard copy of the data contained on the

15   computers or mobile devices."  I guess that could potentially

16   not provide those same protections.

17          So maybe a way to address that, if Your Honor feels

18   it appropriate, is simply to add that same language about

19   documents or data relating to the allegations in the complaint.

20          THE COURT:   Yeah.  It just seemed that the receiver's

21   authority was extraordinarily broad.

22          For example, why is it necessary to permit him or her

23   access to safe deposit boxes rather than simply precluding the

24   targets of this investigation and complaint, the defendants,

25   from having access prior to -- prior to a preliminary

1  injunction hearing?

2          MR. BURDEN:  Your Honor, because if there's something

3  in a safety deposit box, the receiver is the one who should

4  take possession of it.

5          And while prohibiting the defendant from taking it

6  prohibits the defendant from taking it, it does not place it in

7  the custody or control of the temporary receiver, which is

8  really the -- I think one of the two big functions of the

9  receiver is to continue the receivership estate, bring money in

10  for customers, and then to essentially take possession of those

11  books and records that -- that defendants have.

12          I don't think safety deposit boxes are going to be an

13  issue here.  They might.  And I want to stress, Your Honor,

14  that this is a -- this is sort of our form order, and I have

15  modified it, I think, in a way that I hope is appropriate and

16  palatable to the Court.

17          If the Court would rather that the temporary receiver

18  not take possession of assets during the SRO phase, I think

19  that's -- that's probably fine.  I think we would seek

20  ultimately, at the preliminary injunction stage or later, for

21  that to occur.

22          At the very least, though, Your Honor, we think that

23  the temporary receiver has to be able to -- to set up accounts,

24  to take possession of any repatriated funds, since that's

25  certainly going to be at issue here, and also, we think, to

1    take control of the Zilmil and the Citrades businesses.

2            The reason why for Citrades is because we want this

3    third party to be the one who has possession of and access to

4    Citrades' servers, Citrades' records, Citrades' foreign bank

5    accounts.  I hope that's not controversial.

6            For Zilmil, I understand Your Honor's concern that

7    there may be some legitimate aspect of Zilmil's business.  I

8    haven't seen it, but it could be there.

9            We could address that, Your Honor, by including a

10   provision -- and Mr. Murena actually proposed this because I

11   had talked to him about this on a call a couple days ago.

12           But one of the duties of the receiver, with respect

13   to Zilmil, may be to ascertain whether there are legitimate

14   aspects of the business or not.

15           And I'm not -- I'm not sure that we need to leave it,

16   Your Honor, entirely up to the receiver.  I think the receiver

17   can work with Mr. Shah and his counsel, and I think the

18   receiver can work with the Court.

19           It could be that Shah and Zilmil say, "No.  You can't

20   have access to our accounts.  We don't want to continue running

21   our affiliate marketing business," and they don't dispute it.

22           It could be that they say, "Oh, no.  Ten percent of

23   our business is promoting diet pills," because it's always

24   something like that.

25           I don't know whether that would be legitimate, but it

1   certainly wouldn't be within the CFTC's jurisdiction.  If

2   that's the case, then perhaps the receiver could continue that

3   business under the direction or supervision of Shah, or we

4   could somehow peel that off.

5          I don't want to ask the Court to do something it's

6   not comfortable doing, and I'm willing to concede that there

7   could be something legitimate about Zilmil.

8          THE COURT:  All right.  I'm going to ask that you --

9   to the extent that we have discussed limitations and changes in

10  the proposed order, I'm going to ask you to take a -- take the

11  opportunity to prepare a modified proposed order that

12  incorporates those limitations as it relates to both the

13  receiver and to the scope of the limitation with respect to the

14  records that are seized, that they relate exclusively to the

15  allegations of the complaint or the violations alleged in the

16  complaint.

17         I think we discussed a couple points -- a couple of

18  places, at least one place, where that would be appropriate as

19  to that language being added.

20         MR. BURDEN:  And you're talking here about the

21  receiver section, Your Honor?

22         THE COURT:  Yes, sir.  But there's also -- we talked

23  about -- yeah, it is the receiver section, pages 15 and 16.

24         You drew my attention to limitations that relate to

25  any transaction or matter described in the complaint that's

 1  identified in the inspection and copying.  I need that same

 2  kind of limitation --

 3          MR. BURDEN:  Got it.

 4          THE COURT:  -- to be added to the proposed receiver's

 5  authority as it relates to --

 6          MR. BURDEN:  So I'll make that change --

 7          THE COURT:  -- seizure of computers and computer

 8  records.

 9          MR. BURDEN:  So I'll make that change, Your Honor,

10  and I'll add that same language to paragraph 29.

11          THE COURT:  I'm inclined to simply preclude access to

12  safe deposit boxes at this point in time.

13          MR. BURDEN:  Okay.

14          THE COURT:  Let's see.  What else was there?

15          Tell me about the expedited discovery.  What does

16  that contemplate occurring?

17          MR. BURDEN:  Not much that's special, Your Honor.

18  Just as Your Honor is well aware, typically the commission, as

19  a civil plaintiff in the case, would have to wait until after

20  the Rule 26(f) conference to do discovery.  And all we're

21  asking for is -- is the right to conduct normal civil discovery

22  prior to that.

23          In this case, Your Honor, that would likely take the

24  form of subpoenas to banks for records.  It would likely take

25  the form of depositions for Mr. Shah and Mr. Scharf and also

1    30(b)(6) deps for the corporate defendants.

2            I don't -- probably also we would wind up sending out

3    subpoenas to other web hosts or e-mail -- like, mass e-mail

4    service providers that we've since become aware of just so we

5    have that evidence in case -- in case we need it.

6            You know, Your Honor had pointed out before that for

7    Zilmil, you know, the most recent mass e-mail we have that he

8    sent millions and millions of them was 2015.  And Your Honor

9    asked is that sort of the most recent one.

10           And I said, well, it's the most recent one in the

11   record but we know what he's up to when he retains these e-mail

12   marketing firms.  They're the ones that send mass e-mails.

13           So when we see, in financial records we obtain, that

14   he's more recently hired other similar firms, we know what he's

15   doing with them.

16           But we're not going to, I think in the investigative

17   stage -- and because we were in a hurry, or at least as much of

18   a hurry as we can be in as the commission, we weren't going to

19   subpoena all of them.  We would probably subpoena them as well.

20           THE COURT:  So you have evidence now that he has

21   contracted with additional e-mail firms to arguably continue

22   the business, but you -- all you know is of a relationship

23   having been established.  You don't know its scope.  Is that

24   what you're telling me?

25           MR. BURDEN:  Yes, Your Honor.  Yeah.  This is what

1   he -- you know, this is -- Critical Impact is the name of the

2   firm that he used that we got a declaration from -- from one of

3   their principals.  And that's --

4            THE COURT:  But that's one that was -- has been

5   discontinued, is it not?

6            MR. BURDEN:  -- Exhibit 9.

7            Yeah.  So he has -- and it's because they kicked him

8   out.  He has continued this practice, Your Honor, and we have

9   seen him retain other -- other firms in bank records, which are

10  not part of the record.  I wouldn't want to mislead you.

11           THE COURT:  Okay.  Well, that's what I -- that's what

12  I was --

13           MR. BURDEN:  Yeah.

14           THE COURT:  -- curious about, as to whether or not

15  there was something in the record that suggested that he had

16  continued to seek out those kinds of business relationships.

17           MR. BURDEN:  Yeah.  No, Your Honor.  Nothing in --

18  nothing in the record.  I -- and perhaps the failing is mine.

19  Having sort of established his business model and having gotten

20  these records, I felt this was more than sufficient to show a

21  prima facie case of fraud, if only by showing the text of these

22  e-mails.

23           But yes, Your Honor, he's definitely still retaining

24  similar e-mail marketing firms to send out millions of similar

25  spam e-mails.

1          THE COURT:  All right.  I don't know that I've ever

2     precluded persons from bringing a suit except maybe with

3     respect to bankruptcy.

4          Do I have the authority to enjoin parties from

5     bringing suits against these entities?

6          MR. BURDEN:  You know, Your Honor, you have me at a

7     loss.  This is part of our form order.

8          I think you probably have authority to enjoin parties

9     from collecting on suits.  If Your Honor's more comfortable

10    striking that part of the order, that's fine, too, with the

11    commission.  I don't . . .

12         THE COURT:  Yeah.  I'm not -- I'm not comfortable in

13    denying access to the courts.  I mean, there are ways to deal

14    with their suits if they are filed and would impact the

15    commission's relief or -- but, now, that seems to be a bit

16    much.

17         The bankruptcy would result in a stay of any

18    proceedings, so I'm presuming -- well, I'm not sure how it

19    would be impacted.  But I felt -- certainly it had -- it runs

20    the risk of removing assets from the commission's reach and the

21    Court's reach, so I can understand the prohibition in that

22    regard a little easier than stopping someone from suing for a

23    slip and fall at the Citrades corporate office, which would be

24    Mr. Scharf's home?

25         MR. BURDEN:  Yes.  I think that's right, Your Honor.

1          No, Your Honor.  I would -- rather than try to defend

2    that provision, because I think it's unnecessary here and a

3    product of our own general counsel's thought process as to how

4    these orders should look, it's fine to simply, I think, take

5    those provisions out.

6          The CFTC would not, I think, feel our case is

7    impacted or impeded by that.

8          THE COURT:  All right.  Are you-all aware of the

9    CFTC -- that is, of any ongoing suits against defendants by any

10   of the duped investors?  Any --

11         MR. BURDEN:  No, Your Honor.  They can't figure out

12   where these guys are, Your Honor.

13         THE COURT:  Because of the dizzying maze of corporate

14   and financial transactions?

15         MR. BURDEN:  Your Honor, that -- you know, that

16   "dizzying maze" language, I think, came from our whistleblower

17   and certainly not from me.

18         There aren't all that many entities.  I think what

19   stopped the customers from filing suit -- well, I know it's

20   what stopped the customers from filing suit because I talked to

21   them -- is -- is anonymity.

22         All the customers of Citrades know is that they

23   logged on to a website.  They got a call from some telephone

24   marketer pretending to be a broker, talking a big game about

25   big returns.  They sent them some money, and they never got it

1    back.

2           A normal person, which is to say anyone without

3    subpoena power, including any of us, unless we're issuing a

4    subpoena, we can't figure out who owns a website if it's been

5    anonymized, which is a free service offered by all domain name

6    registrars, including GoDaddy.

7           To get behind that is easy enough.  Certainly it was

8    easy enough for us, Your Honor, but we did have to send a

9    subpoena.  And as Your Honor, I think, pointed out, the records

10   are -- they're a little confusing.  They're not intuitive.

11          I think they're pretty clear once you get a sense of

12   how the records are kept.  But Citrades customers don't have

13   access to these GoDaddy documents.  They couldn't get them.  In

14   fact, GoDaddy makes money off of not giving people these

15   documents and making sure that website owners are anonymous.

16          And, you know, with the three customers, Your Honor,

17   they sent money overseas.  They sent money to Bulgaria and

18   Swiss accounts, so obviously they have, you know, no ability to

19   determine who owns those accounts.

20          And the phone numbers -- we tried to track down the

21   phone numbers the defendants [verbatim] received calls from,

22   and we can't figure out where they're from.  It seems that

23   somebody hacked into a conference line somewhere.

24          So as far as the customers know it, the website's --

25   you've seen the website, Your Honor.  It's Exhibit 1.  It looks

```
 1   good.  It looks like a bank almost.  But there's no way for
 2   them to see who's behind it.
 3            THE COURT:  Right.
 4            MR. BURDEN:  There's no way for them to see where
 5   their money goes.
 6            THE COURT:  Let's see.  I think you may have answered
 7   the questions that I had and are aware of the changes that I'll
 8   ask you to take a -- take the opportunity to articulate in a
 9   new proposed order.
10            Give me just a minute.
11         (Brief pause.)
12            THE COURT:  Let me get you to look at the final
13   paragraph on -- paragraph III of your proposed order.  Starts
14   on page -- actually, it starts on page 3.
15            It says, From June of 2013 through the present, the
16   relevant period, the Citrades defendants, doing business
17   as . . . and AutoTrading-, etc., have operated a massive scam
18   in which the Citrades defendants fraudulently solicited
19   customers to enter into illegal off-exchange investments in
20   so-called binary options.
21            During the relevant period, the defendants received
22   at least 16 million in customer funds and opened more than
23   140,000 accounts.
24            The last sentence in particular is based on
25   declaration or Exhibit 3?
```

1          MR. BURDEN:  Correct, Your Honor.

2          THE COURT:  From your investigator.

3          MR. BURDEN:  Yes, Your Honor.

4          THE COURT:  All right.  I may modify that finding a

5    little bit as well.

6          Tell me about the repatriation process.  What does

7    that involve?  Does it not require some finding that those

8    funds that you're looking to are necessarily the product of the

9    fraud?

10          MR. BURDEN:  You know, it doesn't, Your Honor.  And

11   we haven't addressed this in the brief, but we'd be happy to

12   provide any kind of supplemental briefing on it.

13          Tracing is not required.  For us, Your Honor, the

14   basis for the SRO and for the asset freeze -- and the

15   repatriation is attendant to and part of the asset freeze --

16   comes from the -- the necessity of protecting funds for

17   customer restitution.

18          If -- if defendants are found to have defrauded

19   customers out of $10 million and they spent that $10 million

20   but they have 5 from the sale of a house, which happens often

21   enough, that 5 will -- is not traceable, perhaps, to the fraud,

22   but it will be -- it will wind up going to the customers for

23   restitution.

24          So we don't require tracing.  Tracing is only

25   required if we have, I believe, relief defendants, third-party

1  defendants who are not a part of the fraud and who we're

2  seeking to obtain money from.  I believe that's when tracing

3  comes into play.

4          Here there is going to be no tracing requirement that

5  the law imposes, Your Honor.

6          THE COURT:  So give me an example of how repatriation

7  would occur.

8          Let's assume that in a Bulgarian account you see that

9  Citrades has an account that it owns in that institution.  That

10  bank would be required to simply transfer the funds it

11  possesses and has custody of on behalf of Citrades to the

12  receiver and the receiver's account?  Is that what this

13  anticipates?

14          MR. BURDEN:  It's what it anticipates.  This could

15  happen a number of ways, depending on the jurisdiction, the

16  level of cooperation of the defendants, and what the receiver

17  wants to do.

18          I guess my knee-jerk reaction is to say this is

19  probably a request for the receiver once they've gotten

20  information from the defendants.  But I think even if you ask

21  the receiver, they wouldn't know at this juncture.

22          It could be that -- and this is the way it should

23  work, Your Honor.  We should just be able to order the

24  defendant, Mr. Scharf, if there are funds overseas, if he still

25  has access to those funds -- we think he does, but he might

1  not -- in, say, Brevspands' account, we should be able to order

2  him to repatriate those, and if he does, then he gives it to

3  the receiver.

4          There's a specific carve-out in the asset freeze

5  section -- I think on pages 9 or 10 -- that says it's okay for

6  defendants to transfer assets from abroad if they're

7  transferring them to the receiver.  That's the best and easiest

8  way to do it.

9          A harder way to do it, though we may have to do it

10  this way, is to -- is to have the receiver appointed as a

11  director and an officer, otherwise an agent of, say, Citrades

12  or Brevspand, which the receiver would be under the order, even

13  as modified by Your Honor, and seek to obtain transfer of those

14  funds.

15          Whether a Bulgarian bank would say, "Okay.

16  Everything's in order.  We're going to transfer money to you,"

17  or whether they wouldn't, I think, remains to be seen.

18          A third way to do it is to work directly with the

19  Bulgarian bank regulators to obtain repatriation of funds using

20  the receivership order.

21          I will say that the Bulgarian regulators -- we have a

22  long history of cooperation with them.  I don't know to what

23  extent they have the ability to unilaterally repatriate funds,

24  but certainly the CFTC would likely communicate -- let me

25  rephrase that or retract that.

1          The CFTC would definitely communicate with the

2    Bulgarian regulators about repatriation of assets there.  We do

3    communicate with them regularly.

4          THE COURT:  You know, I'm back to my original

5    question that has to do with the finding of illegality that

6    underpins the Court's order that -- you know, you've alleged --

7    I forget now -- and established a loss by victims, of the three

8    victims, a little less than $150,000.  I forget what the exact

9    figure was.

10          But the repatriation of more than that sum

11    presupposes, as this Court says, good cause existing for an

12    amount in excess of that to be repatriated.

13          And the good cause -- and you need to help me with

14    this -- isn't the establishment of fraud as it relates to any

15    specific victim or any specific transaction.  But it must lie

16    in the illegality of all of the transactions that emanate from

17    off-exchange binary option trading.

18          Is that -- I mean, is that what you would argue?

19    Because otherwise I'm having trouble understanding why more

20    than $150,000 or more at this point should be ordered

21    repatriated.  I don't have evidence of any other specific

22    losses.

23          MR. BURDEN:  Right.  Right.  And I think, Your Honor,

24    that the easy way to think about this -- and I think Your Honor

25    said this -- is that the good cause is -- is the -- is the

1  illegality of these off-exchange binary options transactions.

2        Even if we put aside the fraud claims, pretend we

3  didn't move on the fraud claims at all, Your Honor, each and

4  every single one of these -- these binary options transactions

5  was a violation of the Commodity Exchange Act.

6        And as a result, every single one of these customers

7  is entitled to restitution, rescission, the full range of

8  equitable remedies under our statute.

9        So even if we had not bothered with the fraud --

10  certainly it's inevitable that there is fraud in a case like

11  this, but had we not bothered with it, I think our request for

12  relief and the scope of the relief would be the same, which is

13  the sum total of the dollars invested by customers in these

14  alleged binary options.

15        With respect to the fraud -- and I think that's the

16  easy way to do it, Your Honor.

17        With respect to the fraud, you know, we have our

18  three declarants.  You know, I think it's impracticable and I

19  don't think the Court probably wanted to hear from every single

20  one of these customers, and this is a very, very large-scale

21  fraud.

22        A lot of our cases -- Dorian Garcia -- the *CFTC*

23  *versus Garcia* case you were reading before was one of mine.

24  There was maybe a hand- -- a few dozen victims in that case.

25  This case, because it uses the Internet and it's so well

1  coordinated, is a much larger scale.

2          So I think to let these guys off the hook just

3  because they have a much bigger fraud, I think, would not be --

4  it seems to be a strange result.

5          And while we've only adduced declarations from three

6  of these customers -- I think, you know, that's what's

7  practicable -- I think we've adduced ample evidence that the

8  entire operation is, in fact, a fraud.

9          We've shown this through the means by which

10  defendants advertise themselves, their outside statements on

11  profits.  We've shown this by the way they conceal their

12  identities through shell corporations and through anonymous web

13  pages.

14          We've seen this in the way that they transfer money

15  by and among these various controlled entities.  And we've seen

16  it, too, in their own business practices, in their use of, for

17  example, the AutoTradingBinary website which says, "Oh, we're

18  independent traders.  We'll trade for you.  We're not

19  affiliated with Citrades," when really they are.

20          The totality of circumstances, Your Honor, suggests

21  strongly that the entire operation, in addition to being

22  illegal by virtue of its being off-exchange trading, is, in

23  fact, fraud.

24          And while we only have three customers here -- again,

25  because I think that's what's practical and best -- perhaps not

1　best but certainly what's practicable -- we see a similar

2　pattern.  We see telephone solicitation, outrageous promises,

3　and then we see the runaround.  And we see as well transfers of

4　assets to these foreign jurisdictions by customers.

5　　　　　　THE COURT:  Not only -- not only outrageous

6　representations, but I found particularly interesting the

7　aspect of the solicitation that offered additional trading

8　power so that these -- some of these victims' accounts at some

9　point in time actually at least communicated a gain, if you

10　will, but apparently one that was never realized in dollars and

11　cents.

12　　　　　　MR. BURDEN:  Yeah.  That's right, Your Honor.  We

13　have two of the declarants, Schulte and Moore -- with Schulte

14　being by far the biggest investor, in their VIP club, by far

15　the biggest investor of the three.  I don't know if he's

16　biggest overall.

17　　　　　　You know what they found is they -- none of them

18　traded for themselves.  They all had account managers

19　supposedly trading for them.  So they would log in to their

20　account and see nice big returns and then be solicited for more

21　money, which -- which both Moore and Schulte sent.

22　　　　　　And it was only when they asked for the money back

23　that it was either suddenly traded down to nothing, or they

24　just were refused access to it.  So that seems to be part of

25　the game as well.  And we see a pattern even with these three

1    witnesses.

2         THE COURT:  You've got, in the portion of the order

3    dealing with service, a delivery to the commission's

4    Washington, D.C., office.

5         Is that -- is that what should be the case?  I don't

6    see an address for the Washington, D.C., office anywhere.

7         MR. BURDEN:  Yeah, Your Honor.  That's -- that's part

8    of the official form.  Elsewhere in here it also requires

9    service upon me at my office in Chicago.

10        THE COURT:  Yeah.  I did see that in connection with

11   paragraph 41 --

12        MR. BURDEN:  Thank you, Your Honor.

13        THE COURT:  -- but then in paragraph 42 it references

14   delivery to the commission's Washington, D.C., office and does

15   not reference you.

16        Should that be changed?

17        MR. BURDEN:  I think it should, Your Honor.  It's not

18   an error.  It was the way it should be.  I think we should

19   change it to me.

20        THE COURT:  Okay.  Why don't you make that change as

21   well.

22        When are you going to get that to me, Mr. Burden?

23        MR. BURDEN:  I think probably --

24        THE COURT:  I understood that there was some urgency

25   on the part of the commission trying to move forward on this

```
 1   case.
 2           I am going to find sufficient cause for the issuance
 3   of the SRO, but I do want the relief that's ordered to be a
 4   little more surgically tailored, if you will.  And I'll use
 5   your proposal as a base for making any additional changes that
 6   might be necessary after I've had a chance to consider it, as
 7   well as the evidence that you've adduced.
 8           MR. BURDEN:  Your Honor, I can get it to you -- I
 9   think within an hour of when we break --
10           THE COURT:  Okay.
11           MR. BURDEN:  -- would be pretty easy.
12           THE COURT:  Very good.
13           MR. BURDEN:  And to where should I send over a
14   version of the order, Your Honor?
15           THE COURT:  Brian_Davis@flmd.uscourts.gov.
16           MR. BURDEN:  Ryan_Davis at the court address?
17           THE COURT:  And to -- I think the original --
18   originally you may have sent it to Judge Corrigan's chambers?
19           MR. BURDEN:  I did.  And thank you, Your Honor, for
20   hearing our motion.
21           THE COURT:  Oh, you're quite welcome.
22           Send it to Judge Corrigan's chambers as well.
23           And, you know, my hearing is -- I'm always reluctant
24   to say this on the record -- not as good as it used to be, but
25   it's true.
```

1      And did you say Ryan or Brian when you repeated the

2 e-mail address to me?  I heard an R, but it should be a B.

3           MR. BURDEN:  Oh, Brian.  So it should be Brian.

4           THE COURT:  Correct.

5           MR. BURDEN:  B, as in boy.

6           THE COURT:  Right.

7           MR. BURDEN:  All right.

8           THE COURT:  And did you say Ryan, as in R?

9           MR. BURDEN:  Yes, I did, Your Honor.

10          THE COURT:  Oh, then my hearing is --

11          MR. BURDEN:  Yeah.

12          THE COURT:  -- perfect.

13          MR. BURDEN:  Okay.  Good.

14      So, Your Honor, just -- just so I've got everything,

15 I am going to, No. 1, add this limitation on business -- sorry.

16 For the receiver's examination of computers, I'm going to add

17 this limitation that it be relating to the business of the

18 complaint, etc. --

19          THE COURT:  Correct.

20          MR. BURDEN:  -- to paragraph 29.

21      Second, I'm going to take out this bit about access

22 to safe deposit boxes.

23          THE COURT:  Yes, sir.

24          MR. BURDEN:  Number 3, I'm going to strike all

25 provisions that enjoin suit against the receivership

1   defendants?

2          THE COURT:   That's fine.

3          MR. BURDEN:   And finally, I'm going to have it be

4   served, any responses be served, on me.

5          Does that address everything, Your Honor?

6          THE COURT:   I think it does.

7          Let me share with you some proposals to include or

8   dates to include, because I've had a chance to confer with

9   Judge Corrigan about this.

10          A preliminary injunction hearing to be scheduled for

11   July 26 at 2:00 o'clock in Courtroom 10D.

12          We're going to give the defendants until Monday, June

13   24th, at noon to serve --

14          LAW CLERK:   July, Judge.

15          COURTROOM DEPUTY:   It's July.

16          THE COURT:   I'm sorry, July 24th.   Thank you.   Had a

17   chorus of corrections on my date, and I appreciate it.

18          July 24th at noon for the defendants to respond to

19   show cause and give them up to 25 pages, exclusive of exhibits,

20   for the response since the motion was 31.

21          I think those are the only dates and times that need

22   to be included.   Let me just take a moment to be sure.

23          MR. BURDEN:   I'm sorry, Your Honor.   What did you say

24   about 31?

25          THE COURT:   That the motion for relief was 31 pages,

1   so I'm extending the amount of response --

2          MR. BURDEN:  Oh, from 31 to 25, Your Honor?

3          THE COURT:  Right, to -- no, to 25.  I'm going to

4   allow them 25 pages to respond.

5          I think it's normally 10, isn't it?

6          LAW CLERK:  Twenty.

7          THE COURT:  Twenty.  It's normally 20.

8          Give me another minute to check whether there are any

9   other dates and times.

10          I'm going to -- I'm not going to ask for a reply.

11   You can strike that sentence regarding a reply from --

12          MR. BURDEN:  Okay.

13          THE COURT:  -- plaintiffs or from the government, and

14   we'll determine at the hearing whether or not any additional

15   briefing is required.

16          MR. BURDEN:  Okay.  Now, Your Honor, I wanted to

17   address something else, just to make sure I'm on the same page

18   as the Court.

19          I know Your Honor was concerned that when we -- when

20   the receiver and when the CFTC did our books and records

21   examination that we not -- that the examination be limited to

22   those documents and information relating to the binary options

23   business or the affiliate marketing business.  That's easy

24   enough to do for most of these accounts.

25          With respect to e-mail, it may be a little less easy.

1   You know, on the spot our forensic technicians -- and likely

2   the receiver won't do this; we'll do it -- they sort of just

3   image the entire account.

4          And typically the concern is privileged e-mails.  And

5   we'll set up a wall, and some attorneys will review or the IT

6   people will review for privilege so the attorneys like me can't

7   see it.  And often we collaborate with the defendants and their

8   counsel on this.

9          With respect to any personal e-mails that might be

10   included -- I think will probably inevitably be included, at

11   least in the individuals' personal e-mail accounts, we would

12   not review or use those.

13          We could consult with defendants to make sure we

14   don't see them.  We could agree on search terms and use those

15   search terms ourselves and only pull out the e-mails that hit

16   on those search terms.

17          For example, if we took Mr. Scharf's -- Mr. Shah is a

18   better example.  So Mr. Shah is Zilmil.  There's a

19   Zilmil.com -- Zilmil.com e-mail address, zilmil@gmail.com.

20          We expect and anticipate that we will be able to

21   image that e-mail account.  We expect and anticipate that it

22   should not be personal.  There may be some personal stuff in

23   there.  Probably not.

24          Mr. Shah has other e-mail accounts, and if he says,

25   yes, there's some -- there's some business correspondence in

1   there or it's otherwise imaged, I think it's likely there's

2   probably personal correspondence in there, you know, if only

3   his cable bill or something.

4            And I think the way we would want to handle that,

5   given Your Honor's concerns, is we would run search terms

6   through those rather than reviewing them all, search terms like

7   "binary options."  We could decide unilaterally or agree with

8   counsel on what they are.  That could be a way to avoid it.

9            I wanted to front that issue for Your Honor because

10  the way we sort of examine the records, we sort of sweep up

11  everything.

12           THE COURT:  Right.

13           MR. BURDEN:  Is that acceptable to Your Honor?

14           THE COURT:  If you could add language that will

15  effect that limitation, I would feel more comfortable with it.

16           MR. BURDEN:  I'll do that, Your Honor.

17           And I think the way I probably will phrase it, Your

18  Honor, is with respect to e-mail accounts -- because I think

19  that's what -- where personal correspondence might get swept

20  in.

21           I think I would probably say with respect to personal

22  accounts, you know, counsel is directed to devise search terms

23  that will hit on relevant documents and not to review or

24  otherwise examine --

25           THE COURT:  And otherwise treat them as

1    confidential --

2             MR. BURDEN:  Okay.

3             THE COURT:  -- and not disclose them.

4             MR. BURDEN:  So I'll add that as well, Your Honor.

5             THE COURT:  Okay.  All right.  I think that answers

6    my concerns.

7             Let's see.

8             Paragraph 10, my clerk is drawing to my attention

9    paragraph 10.  I think the change from receiver to temporary

10   receiver would be appropriate --

11            MR. BURDEN:  Oh, okay.

12            THE COURT:  -- the appointment of a temporary

13   receiver to take control of all assets.

14            MR. BURDEN:  Got it.

15            THE COURT:  That is appropriate.

16            All right, Mr. Burden.  Thank you for your help in

17   gaining some clarity around the scope of the proof that's been

18   offered, as well as the relief that the commission is

19   requesting.

20            And I will give my attention to your proposed order

21   granting the SRO as soon as you get it to me.

22            MR. BURDEN:  Thank you very much, Your Honor.

23            THE COURT:  Thank you.

24            We're in recess.

25            COURT SECURITY OFFICER:  All rise.

1         (The proceedings were concluded at 12:01 p.m.)

2                             -   -   -

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          CERTIFICATE OF OFFICIAL COURT REPORTER

2

3

4   UNITED STATES DISTRICT COURT )

5   MIDDLE DISTRICT OF FLORIDA    )

6

7          I hereby certify that the foregoing transcript is a

8   true and correct computer-aided transcription of my stenotype

9   notes taken at the time and place indicated therein.

10

11          DATED this 27th day of July, 2017.

12

13                              s/Shelli Kozachenko
                                Shelli Kozachenko, RPR, CRR
14                              Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25