**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

Commodity Futures Trading Commission,

    Plaintiff,

vs.

Jason B. Scharf (d/b/a Citrades.com and AutoTradingBinary.com); CIT Investments LLC; Brevspand EOOD; CIT Investments Ltd.; A&J Media Partners, Inc.; Michael Shah; and Zilmil, Inc.

    Defendants.
_____/

Case No. 3:17-cv-774-J-32MCR

**ZILMIL DEFENDANTS' REPLY IN SUPPORT OF THEIR
MOTION TO MODIFY CONSENT PRELIMINARY INJUNCTION**

In their Motion to Modify the Consent Preliminary Injunction, the Zilmil Defendants identified numerous breaches by the CFTC of its heightened duty of candor at the SRO stage. Rather than addressing its clear breaches, the CFTC attempts to introduce new evidence that did not exist at that time. But as it did in the SRO Motion (Doc. 5) and during the *ex parte* SRO hearing, the CFTC's Response continues to misrepresent and mischaracterize the later-obtained evidence and continues to tell only half the story, creating a very misleading portrayal of the actual facts. The CFTC lacked an evidentiary basis for its allegations at the SRO stage, and the subsequent evidence -- including testimony of its own witnesses – underscores its glaring evidentiary shortcomings, contradicts its assertions, and negates its claims.

**A. The CFTC Implicitly Concedes That It Owed A Heightened Duty But Tries to Deflect Attention From The Extensive Evidence Of Its Misconduct.**

The CFTC does not, nor can it, deny that it owed the Court a heightened duty of candor during the SRO stage. The CFTC's Response is completely silent about its duty. Instead, it seeks to divert the Court's attention from its duty and focus instead on new, albeit unhelpful, evidence that did not exist at the time it told the Court that it did. The CFTC avoided the key issues raised in the Motion: (1) whether it breached its heightened duty of candor, and (2) whether those breaches warrant dissolution of the asset freeze and receivership. At its core, the issue is whether or not the CFTC told the Court the truth.

**B. "Zilmil Submitted No Declarations, Etc. To Rebut The CFTC's Evidence of Fraud."**

This assertion by the CFTC's is false. Doc. 119 p. 4. Zilmil pointed to numerous declarations that evidenced the CFTC's false assertions about the alleged fraud. Doc. 109 at p. 4 (citing declarations of Johannsen, Stinson, Schulte, Moore, Santos, and Barassamian (unsigned)). Zilmil explained in detail how the CFTC misrepresented and mischaracterized the declarations and how they actually negated rather than supported its assertions. Zilmil also pointed to the

1

CFTC's own statements, both in its SRO Motion and during the *ex parte* SRO hearing, and explained in detail how these statements were false, misleading, and told only half the story while leaving out material information that it was obligated to disclose to the Court. Zilmil also cited the CFTC's responses to written discovery in which it admitted many of the assertions in Zilmil's Motion. *See e.g.*, Doc. 109 pp. 15-16 (repeatedly emphasizing to the Court that it has not seen any legitimate business of Zilmil, while admitting in its discovery responses that it knows Zilmil was engaged in business unrelated to binary options).

The CFTC also lists several allegations that Zilmil "[does] not deny," falsely suggesting that Zilmil admitted them. *See e.g.*, Doc. 119 pp. 4-5. Like so many of the CFTC's assertions, this is absolutely false. Not only has Zilmil not admitted those allegations, it specifically denied each of them in its Answer. *See* Doc. 54 at ¶¶ 5, 94-96. In its zeal to prosecute Zilmil, however, it misrepresented these facts to advance its narrative and thus breached its duty of candor.[1] Doc. 109 pp. 1-2.

The CFTC also misrepresented disclaimers on the alleged Zilmil websites – the same ones it omitted from its SRO Motion and falsely told the Court did not exist. Doc. 109 pp. 16-17. It asserts that the disclaimer failed to disclose: (a) that the testimonial may not be representative of the experience of other clients; and (b) that the testimonial is not a guarantee of future performance or success. Doc. 119 p. 4 n. 1. The CFTC falsely states that "Zilmil's websites do not have this disclosure, the absence of which is in-and-of-itself a violation." *Id.* These two specific disclosures do, in fact, exist. Exh. B, Dasso Tr. at 215:10-220:11; Doc. 109-9, Disclaimer at 3. After

---

[1] The CFTC's zeal was on display during a recent deposition in which the CFTC repeatedly referred to Dr. Shah, in his presence, as "Shah." In response to a request to refer to him as "Mr." or "Dr.," counsel for the CFTC refused and said, "I don't know how much longer he's going to be a doctor, so I'm going to call him Shah." See Exh. A, Barrett Tr. 320:7-12.

breaching its duty of candor by falsely telling the Court the disclaimer did not exist, it breached again by falsely stating that disclosures that clearly appear in the disclaimer do not exist.

### C. "This is semantics."

Faced with the serious charge of misleading the Court, the CFTC tries to excuse its misconduct by labeling its failures as "semantics." Doc. 119 p. 6. But its conduct amounts to far more than mere "semantics." For example, it grossly mischaracterized the Johannsen declaration by misleadingly substituting the generic word "products" that she used in her declaration, with the words "autotrading systems" in the SRO Motion.[2] Doc 109 pp. 4-5. This is not semantics; the change it made to what Johannsen actually said is a knowing falsification that the CFTC continues to maintain despite its obvious falsity. This illustrates perhaps as well as anything that the CFTC does not understand its duty of candor, or worse clearly understands it and is seeking to disguise its failure to honor it.

The CFTC also dismisses as "semantics" Zilmil's assertion that Johannsen's declaration does not say that the alleged autotrading systems "do not work as advertised." In defense of its assertion, the CFTC points to one alleged customer complaint about a supposed "success rate." The complaint does not say that the subject product was an autotrading system; that misleading gloss was provided by the CFTC. Doc. 119 p. 7. The CFTC's corporate representative, Heather Dasso, testified that two of the reasons the CFTC suspects the products allegedly sold through ClickBank were autotrading systems are the product names and customer complaints. Exh. B,

---

[2] Johannsen testified that she knew nothing about Zilmil's alleged sales of autotrading systems. Exh. D, Johannsen Tr. at 217:2-219:23. She also testified that the products Zilmil offered through ClickBank were ebooks. *Id.* at 169:25-170:23. Counsel for ClickBank also advised the CFTC that the products Zilmil offered through ClickBank were primarily instructional guides. Exh. C, ClickBank Letter at 2. Tellingly, the CFTC did not ask Johannsen a single question during its direct examination about autotrading systems.

3

Dasso Tr. at 65:13-66:10. As an example, the CFTC cites one product name, "Binary Genetic ('The FIRST and ONLY Genetic Algorithm Binary Bot; ADVANCED Profit Doubler')." Doc. 119 p. 7. Consistent with the testimony of Johanssen and a letter from ClickBank's counsel, and inconsistent with the CFTC's assertion this is just "semantics," several of the customer complaints refer to Binary Genetic as an "ebook." *See* fn.2. Whether the complaints are reliable indicators of anything, or even admissible in evidence, is an open question. However, there is no question that the CFTC has long had in its possession evidence that is directly contrary to its assertion that Binary Genetic is an autotrading system and that it concealed this information from the Court.

Further exacerbating these misrepresentations, the CFTC admitted that it is unable to differentiate between the revenues Zilmil derived through binary options products vs. products unrelated to binary options. Exh. M, Doc. 74 at No. 74. The CFTC has never seen an autotrading system developed or sold by Zilmil (although it *has* seen autotrading systems in other cases), and does not know how they worked. Exh. B, Dasso Tr. at 105:18-106:10. The fact is, the CFTC is unable to show that *any* revenues received by Zilmil were the result of sales of autotrading systems.[3]

There is an explanation, however, for why the CFTC cannot show any Zilmil revenues from sales of autotrading systems: it is because Zilmil sold no autotrading systems. This fact is indisputably established by two of the government's "cooperating witnesses." Blake Barrett and Grayson Brookshire have entered into Cooperation Agreements with the CFTC and have

---

[3] As previously noted, even the evidence the CFTC cites in support of this allegation establishes that whatever product was being offered was being offered at no charge, thus Zilmil would have derived no revenues even if it provided them, which it did not. See Doc. 109 pp. 7-9.

communicated with the CFTC on multiple occasions beginning in February 2018.[4]  Exh. A, Barrett Tr. at 228:8-230:8; Exh. E, Brookshire Tr. at 214:22-217:2.  They both testified that Zilmil did not develop or sell autotrading systems.  Exh. A, Barrett Tr. at 248:21-249:2; Exh. E, Brookshire Tr. at 226:18-227:13.  Any autotrading systems they are aware of were developed and provided by the binary options dealers themselves, or by what are known as "aggregators," entities that have software platforms already in place.  Exh. E, Brookshire Tr. at 29:21-30:11; 226:18-227:13.  This testimony, and the corroborating evidence from Johannsen and ClickBank's counsel, establishes that the CFTC's assertion that Zilmil sold autotrading systems through ClickBank – or anywhere else – is completely false.

### D. "The CFTC is not required to provide" a breakdown of revenues for products sold.

The CFTC contends that it is not required to provide a breakdown of revenues for binary options trading systems vs. other products sold by Zilmil.  Doc. 119 p. 8.  In fact, the CFTC *cannot* provide this breakdown -- which it has already admitted -- and therefore cannot bear its burden of proving that Zilmil generated revenues from the sale of autotrading systems.  Exh. M, Doc. 74 at Nos. 74-86.  The CFTC blames this evidentiary lapse on Zilmil for failing to provide the evidence.[5]  Doc. 109 at p. 8.  This is another falsification by the CFTC.  The CFTC obtained tens of thousands of documents from Zilmil via subpoena in 2015.  It obtained a full image of Zilmil's computer hard drives, cell phones, and all documents from its paper files in August 2017 pursuant to the

---

[4] The Cooperation Agreements require them to give truthful testimony.  Both witnesses hope they will receive more favorable treatment in any CFTC enforcement action against them as a result of their cooperation.  Exh. A, Barrett Tr. at 237:17-238:11; Exh. E, Brookshire Tr. at 215:4-216:20.  Any bias in their testimony is clearly in favor of the government.

[5] The notion that a regulatory agency with the burden of proof can overcome a lack of supporting evidence by claiming the defendant failed to provide it, is so absurd as to almost require no response.  If such were the law, then the burden of proving the defendant's wrongdoing would be on it, not the government; a topsy-turvy result of ridiculous dimension.

SRO. Zilmil provided the Receiver all the access information that it could recall or obtain for every account at every affiliate network. Zilmil has fully complied with the SRO's requirement to produce documents and information (subject to Dr. Shah's assertion of his constitutional privilege not to testify or provide an accounting). Whatever information Zilmil had about the sources of its revenues has been in the CFTC's possession since no later than August 2017.

The CFTC investigated this case for two years before filing the SRO Motion and has since conducted another year of oppressive third-party discovery. The Receiver has spent tens of thousands of dollars on forensic accountants to identify the sources of Zilmil's funds. Throughout, the CFTC somehow failed to understand what Barrett and Brookshire surely told it in their February 2018 debriefing: that Zilmil never sold autotrading systems. Neither the CFTC nor the Receiver, after years of investigation and analysis, has been able to identify any autotrading systems or the first dollar Zilmil derived from sales of autotrading systems. This is not due to Zilmil withholding evidence. It is due to the simple fact that Zilmil never sold autotrading systems.

E.   "The Relevant Period . . ."

The CFTC contends that it may define the Relevant Period in its Complaint as beginning in June 2013 and then unilaterally extend it to July 2012 without seeking leave to amend. There are two flaws in the CFTC's contention: (1) it ignores the two-year investigation it conducted before filing its pleading, and (2) it mischaracterizes the only case it cites in support by omitting key qualifying language that actually negates its argument. The case, *Rosen ex rel. Egghead.com v. Brookhaven Capital*, 179 F. Supp. 2d 330 (S.D.N.Y.), does indeed contain some language relied on by the CFTC: ". . . Rule 9(f) does not operate to limit plaintiff to the time periods that she was in a position to aver. Defendants cite no case giving Rule 9(f) preclusive effect to such a pleading, and I decline to do so here." *Id.* at 335.

Quite significantly, however, this language is qualified. The important qualifying language that the CFTC intentionally omitted is, "In those circumstances, . . . ." The unique "circumstances" the court described were those where a private plaintiff (not a governmental agency with broad pre-suit investigatory powers) "avers that she lacks the requisite knowledge to plead the timing of further actionable conduct by Defendants whose occurrence she suspects." It is only "in those circumstances" that the court's specific holding applies but the CFTC omitted that limiting language. This limitation is consistent with other courts that have explained that the government is not like a private litigant because it has broad pre-suit investigatory powers and can obtain extensive information before filing suit. *See SEC v. Blackwell*, 2004 WL 6829614 at *3 (S.D. Ohio 2004) (contrasting SEC's two-year pre-suit investigation with "ordinary civil litigant that has yet to commence discovery" and compelling SEC to answer interrogatories based on "lengthy [pre-suit] investigation."). Here, unlike the plaintiff in *Rosen*, the CFTC investigated for two years before filing and had ample information at that point to determine the "Relevant Period." The government chose the Relevant Period and "in these circumstances" should now be bound by it.

### F. "The autotrader . . . [is] crushing people like immediately."

The CFTC has featured this email throughout this proceeding, purportedly as evidence that Zilmil developed and sold autotrading systems and did so with fraudulent intent. See e.g. Doc. 5 pp. 13-14; Doc. 119 p. 7 n.3. The CFTC, however, has mischaracterized the email in two important respects. First, it continues to misrepresent that the email is "between Michael Shah and Jared Davis." *Id.* This is false. The email is between Ryan Miller and Mr. Davis, not Dr. Shah, a fact the CFTC previously acknowledged in discovery but for some reason continues to misrepresent. Exh. M, Doc. 74 at No. 61. Second, the CFTC's Ms. Dasso testified that the subsequent emails in the chain reflect an effort by Dr. Shah to address a reported technology issue, and not an effort to

7

defraud people. Exh. B, Dasso Tr. At 221:16-225:7; 247:6-248:8. Ms. Dasso testified that the CFTC should have admitted this in response to Zilmil's Request for Admissions rather than stating that it could neither admit nor deny. *Id.* 247:6-248:8; Exh. M, Doc. 74 at No. 62. The CFTC attempts to take one sentence out of context from a much different email discussion and twist it into something it is not, a fact that the CFTC's representative now finally concedes.[6] These are additional examples of the CFTC's continuing breach of its duty of candor.

### G. There Is No Evidence To Support The CFTC's Claim Of Jurisdiction.

The CFTC's Response regarding its lack of jurisdiction, like so much of the Response, completely ignores the issue raised in the Motion: that the CFTC misrepresented to the Court that it had evidence that the funds Zilmil received were the result of binary options activity within the CFTC's jurisdiction. Doc. 109 pp. 7-9. The CFTC alleges that Zilmil received funds from two types of activities: (1) sales of autotrading systems; and (2) "funneling" customers to binary options dealers. These allegations are false and illusory. First, its own witnesses have testified that Zilmil did not sell autotrading systems so it is clear this allegation is false.

Second, as to the alleged binary options dealers, the CFTC has utterly failed after three years of investigation and discovery to find any evidence that the payments Zilmil received from overseas entities were the result of illegal activity. The CFTC has not determined what the payments were for and now admits it cannot make that determination until it talks to customers to determine whether they were directed to overseas entities through a landing page associated with Zilmil. Exh. B, Dasso Tr. at 273:1-276:21. The CFTC has not determined whether any Zilmil website was associated with any of these overseas entities or, if it was, whether Zilmil's or the

---

[6] Ms. Dasso gave this testimony (May 9, 2018) just two days after her colleagues filed the Response (May 7), in which they represented the email in a much different way than she did.

8

overseas entities' conduct was illegal. *Id.* The CFTC does not know whether anyone ever viewed any videos or websites ("landing pages") associated with Zilmil and does not know where any of the links embedded in the emails Zilmil allegedly sent led to or what was being offered. *Id*. at 276:11-21; 125:13-16; 138:13-139:15; 117:20-118:6. Every other witness who has testified about these matters has echoed this same critical absence.[7] There is no evidence of customers of such entities, or even transactions that can be identified as binary options. *Id.* at 276:11-21 (must first identify customers before CFTC can determine whether Zilmil funneled anyone to binary options firms). Despite testimony from its own witness that it has not connected Zilmil landing pages or emails to, or identified illegal activity involving, any binary options dealer, the CFTC nevertheless continues to contend that it has jurisdiction over conduct that it cannot identify.

The CFTC's blatant falsification of its allegations that Zilmil sold autotrading systems raises significant and troubling questions about its evidentiary shortcomings, both at the time it made its representations in July 2017 and now. The CFTC acknowledges Zilmil sold non-binary products but made no effort to determine the extent of Zilmil's activity that had nothing to do with binary options. Exh. B, Dasso Tr. at 96:4-98:3; 257:17-259:14. The CFTC does not dispute that payments Zilmil received were from overseas entities that were: (a) registered with its primary regulator (Cyprus Securities and Exchange Commission, "CySEC") and therefore operating legally in the countries in which they were registered; (b) engaged in binary options in jurisdictions like the United Kingdom where registration was not required to transact binary options; and (c) involved in other lines of business unrelated to binary options like gambling, casinos, and many

---

[7] *See e.g.*, Exh. G, Berry Tr. at 196:1-197:3; Exh. F, Wright Tr. at 85:9; 139:10-140:16; Exh. A, Barrett Tr. at 96:10; 156:5; 177:9; Exh. E, Brookshire Tr. at 84:10; 105:15; 113:21-114:16; 197:13; 244:16-245:1; Exh. H, Stinson Tr. at 197:14-199:3; 203:14-204:4; Exh. I, Clickbooth Tr. at 48:18; 68:10; 80:14; 138:9; 172:10; Exh. J, Revcontent Tr. at 38:19-39:5; 82:19-83:6.

other niches outside the CFTC's jurisdiction.[8] The CFTC has alleged that Zilmil collected millions of dollars from these entities but, at the time it represented this to the Court and even now, it made no effort to determine what those payments were for.[9]

Third, the CFTC omits crucial qualifying context from the case it cites in support of its claimed jurisdiction over Zilmil's activities with overseas entities. Doc. 119 p. 10. The court in *Lake Shore Asset Mgmt. v. CFTC*, 511 F.3d 762, 765-766 (7th Cir. 2007) held that federal law controls how Lake Shore must conduct itself within the U.S. even though most of its activity was with investors in foreign countries. However, the CFTC omitted key facts that led to the court's conclusion: (1) Lake Shore was actually registered with the CFTC and the National Futures Association and thereby voluntarily subjected itself to the CFTC's jurisdiction; and (2) Lake Shore held itself out as a firm registered with the CFTC. *Id.* at 765-766. "*Having registered with domestic agencies* . . . Lake Shore must abide by federal law.") *Id.* At 766 (emphasis added). Thus the fact that Lake Shore was registered with the CFTC was determinative of the CFTC's jurisdiction over Lake Shore's activities with investors in foreign countries. Unlike Lake Shore, Zilmil was not registered with the CFTC and did not hold itself out as being registered.

The CFTC also cites *CFTC v. Vision Financial Partners*, 190 F. Supp. 3d 1126 (S.D. Fla. 2016) which it describes as holding that it has jurisdiction over a U.S. defendant who solicited

---

[8] Wright testified that he produced videos for Zilmil for "dozens and dozens of different niches," including online casinos, diamonds, music, how to send money, travel, and others. Exh. F, Wright Tr. at 136:12; 179:15-180:8. He said that binary was a small percentage of his work for Zilmil. *Id.* at 156:15. Berry testified similarly. Exh. G, Berry Tr. at 56:11-57:23, 73:17-74:8.

[9] A likely explanation for the CFTC's failure to properly investigate came from Ms. Dasso, who explained how the CFTC is "resource strapped" and "anybody who is assigned to the investigation team is working on numerous investigations and litigations at the same time." Exh. B, Dasso Tr. at 236:1-237:24. A likely consequence of the lack of resources was the outsourcing of the CFTC's analysis and investigatory work to the Receiver, who used Zilmil's funds to do the CFTC's work.

investments in offshore binary options firms "like Banc de Binary." Doc. 119 pp.10-11. Citing to this case, however, does nothing to cure the CFTC's breach of its duty of candor by failing to advise the Court that it had no evidence that any revenues Zilmil received from foreign entities were the result of illegal conduct. Ms. Dasso confirmed that the CFTC has no such evidence. Exh. B, Dasso Tr. at 257:1-260:23 ("We're still trying to see if we can determine the activity that was associated to those payments."). The fact that the CFTC is just now in the process of determining the product or service for which Zilmil received payment establishes beyond debate that the CFTC lacked this evidence in July 2017 when it represented to the Court that it had such evidence.

### H. The CFTC's New Theory About Causation Fails, Just As Its Original Theory Failed.

The CFTC withheld from the Court crucial information about the appropriate legal standard applicable to claims for restitution. Specifically, the CFTC failed to advise the Court that such a claim requires a showing of causation, and that it had no evidence of causation at the time of the SRO hearing. Rather than addressing its omissions, the CFTC attempts to skirt the issue entirely by shifting the focus to new arguments about why it thinks an asset freeze can be based on disgorgement instead of restitution. Doc. 119 pp. 11-13. The CFTC told the Court six times during the *ex parte* SRO hearing that the purpose of the asset freeze was for restitution, but fails to address these representations in its Response. Doc. 27 pp. 13:19-21, 14:18-20, 15:15-17, 17:24-18:1, 64:13-17, 68:6-14. At no time during the SRO hearing did the CFTC mention the word "disgorgement" or state an intention to seek that remedy.

The CFTC's Response continues to misrepresent the law and facts in multiple ways. First, it states that "the CFTC is not required to establish causation to obtain an asset freeze," citing 7 U.S.C. s. 13a-1(a) and *CFTC v. Hunter Wise Commodities*, 749 F.3d 967 (11th Cir. 2014). Doc. 119 p. 11. Neither the statute nor the court in *Hunter Wise* state this. These two authorities stand

only for the proposition that a *preliminary injunction* may issue upon a "proper showing." They do not mention and have nothing to do with asset freezes, only preliminary injunctions.[10] The CFTC also incorrectly states that the court in *Lake Shore* "rejected the idea that proof of customer reliance is required to support an asset freeze." Doc. 119 p. 11. The CFTC has again omitted key context from *Lake Shore.* The court never decided the issue of whether an asset freeze is appropriate without a showing of causation where the sole reason given by the CFTC for the asset freeze is to secure funds for restitution. That specific question was not before the Seventh Circuit, nor did it discuss the differing standards applicable to restitution vs. disgorgement. *See Lake Shore Asset Mgmt*, 511 F.3d at 762-767.

The Eleventh Circuit, however, has addressed the issue squarely, holding that the remedy of restitution requires proof of "but for" causation. *CFTC v. Southern Trust Metals,* 880 F.3d 1252, 1267 (11th Cir. 2018). Tellingly, the CFTC fails to address the court's holding even though it is the controlling authority in this district, and once again presents an incorrect standard, just as it failed to advise the Court of the appropriate standard during the SRO hearing despite having been advised of the standard by numerous other courts. *Matrix Trading Group*, 2002 WL 31936799 at *12; *Southern Trust Metals*, 880 F.3d at 1269[11]

---

[10] Where the relief sought is more than to preserve the status quo, for example where an asset freeze or other mandatory relief is sought, a more substantial showing may be required to support the relief sought. *See SEC v. Unifund SAL,* 910 F.2d 1028, 1039 (2d Cir.1990) ("Like any litigant, the Commission should be obliged to make a more persuasive showing of its entitlement to a preliminary injunction the more onerous are the burdens of the injunction it seeks.") *CFTC v. Sterling Trading Group, Inc.*, 605 F. Supp. 2d 1245, 1291 (S.D. Fla. 2009).

[11] The CFTC cites *CFTC v. Amerman*, 645 Fed.Appx. 938, 944 (11th Cir. 2016) as its sole offering of Eleventh Circuit authority on the issue of whether it needed to advise the Court of the causation requirement for restitution. The court in *Amerman* never addressed this issue, however, because "the CFTC did not seek restitution; it sought disgorgement, which focuses on ill-gotten gains, not the victim's losses." 645 Fed.Appx. at 944.

It is obvious that the CFTC now recognizes its evidentiary failing and that it cannot show causation and therefore has no basis for the asset freeze, but it may not divorce itself from what it told the Court in July 2017. The CFTC now contends it was entitled to freeze assets to secure a *disgorgement* remedy. Doc. 119 p. 12. The CFTC's new theory is that while the funds Zilmil received "could be characterized as restitution, they are more easily and more naturally characterized as ill-gotten gains, i.e. disgorgement." Doc. 119 p. 12. But there was no "could be" in the way the CFTC characterized the basis for the asset freeze at the SRO hearing, and if it really was more "natural" to characterize the funds as ill-gotten gains, then surely the CFTC would have done so. But it did not mention the words "disgorgement" or "ill-gotten" at all, and this is clearly contrary to what it told the Court during the SRO hearing.

Even if disgorgement had been the basis for the freeze (and it was not), discovery has confirmed that the CFTC had no evidence that any of Zilmil's frozen funds were the result of illegal sales of autotrading systems or illegal activity with binary options firms. Having admitted that Zilmil was engaged in activity unrelated to binary options, and that it cannot distinguish between binary and non-binary revenues of Zilmil, it is clear that the CFTC was not able during the SRO stage (or now) to establish that any of Zilmil's funds were ill-gotten. Composite Exh. N, CFTC Discovery Responses at Doc. 74 Request Nos. 73-86 and Doc. 75 Request No. 6; Exh. B, Dasso Tr. at 260:2-23. Ms. Dasso testified that the CFTC lacks this evidence, but it failed to so advise the Court during the SRO stage.

The CFTC also contends that even under a restitution theory it need not show reliance by any individual customer because the "fraudulent misrepresentations are widespread and pervasive." Doc. 119 p. 12. It cites *CFTC v. Milton*, 2013 WL 2158428 (S.D. Fla. 2013), but once again omits important context which makes clear that the case does not apply. The *Milton* court

13

called the case "primarily an omissions case," an important distinguishing fact. In cases where the principal allegations are omissions, rather than misrepresentations, the government need not show reliance in order to obtain restitution. *Id*. at 5 (citing *Affiliated Ute v. United States*, 994 F.2d 595, 605-606 (9th Cir. 1993)). The CFTC's case against Zilmil was not pled as "primarily an omissions case" but rather as based on affirmative misrepresentations, and so *Milton* provides no support.

## I. The CFTC's Misleading Allegations About Alleged Destruction Of Documents And "Scam" Chats Are Impertinent Distractions.

The many examples of the CFTC's misrepresentations and omissions enumerated above were largely ignored in the CFTC's Response. Seeking once again to divert the Court's attention from its numerous breaches of its duty of candor, the CFTC alleges that Zilmil instructed third parties to destroy documents and that it participated in Skype chats about supposed "scamming." This attempted diversion does nothing to cure the CFTC's many breaches of its duty to tell the truth during the SRO stage and thereafter, including about these new issues. As it has throughout this proceeding, the CFTC has misrepresented the testimony by using select "sound bites" and omitting lengthy segments that provide the context needed for an accurate portrayal. For example, Berry's testimony evolved from destroying documents at Dr. Shah's request to "I destroyed documents due to storage space considerations," to "nobody told me to destroy documents," to "I destroyed documents only for my one-off clients," to "My iMac . . . died, and I had a new hard drive put in last year," to "I got rid of literally anything on my computer that said 'binary options' in it, just in case they raided me and took my computer." Composite Exh. K, Berry Tr. at 47:24-48:7; 178:22-179:19; 181:2; 184:7-14. This smorgasbord of explanations is essential to a full understanding of his testimony about the alleged "instructions" to destroy documents, but was omitted entirely from the CFTC's Response.

Similarly, the government's two cooperating witnesses both testified that use of the term "scamming" was used in a benign context. Exh. A, Barrett Tr. at 187:17-188:5; Exh. E, Brookshire Tr. at 117:16-118:10, 270:12-271:20. Each characterized the references as "exaggeration" used solely "to enhance their personas in the chats," acknowledging that such comments should be "taken with a grain of salt." Id. at 243:2. The CFTC's Response omitted this relevant context.

The CFTC's attempt to divert attention from its breaches of duty through incomplete and misleading portrayals of testimony notwithstanding, allegations of document destruction and group chats are irrelevant to the disposition of the Motion. Those issues will be litigated during summary judgment and trial. The relevant issue is whether the CFTC told the truth, and the whole truth, during the SRO stage. The incomplete testimony cited by the CFTC is relevant to that issue, but only to the extent it was presented in way that appears intended to mislead the Court.

### J. Clarification Of Zilmil's Prior Assertion About Barassamian Spreadsheet.

Zilmil erroneously stated that the Receiver described the Barassamian spreadsheet as incomplete and unreliable. Doc. 109 p. 13. The Receiver subsequently testified that he was not referring to the Barassamian spreadsheet, but rather customer data that Citrades provided to him. Exh. L, Murena Tr. at 59:15-60:22. The issue appears to be moot, though, because the CFTC does not intend to use the spreadsheet as evidence. Exh. B, Dasso Tr. at 55:19-56:2.

### CONCLUSION

For the foregoing reasons and those stated in the Motion, the asset freeze should be dissolved and the receivership terminated, and Zilmil's funds should be returned to it.

/s/ Peter B. King  
Peter B. King (FBN 0057800)  
Jordan D. Maglich (FBN: 0086106)  
WIAND GUERRA KING P.A.  
5505 W. Gray Street  
Tampa, FL 33609  
Phone: (813) 347-5100  
Fax: (813) 347-5198  
Email: pking@wiandlaw.com  
Email: jmaglich@wiandlaw.com  
Attorneys for Defendants Michael Shah and Zilmil, Inc.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on May 29, 2018, I served a copy of the foregoing via electronic mail to:

Ashley J. Burden
ABurden@CFTC.gov
Stephanie Reinhart
sreinhart@cftc.gov
Joseph A. Konizeski
jkonizeski@cftc.gov
Rosemary Hollinger
rhollinger@cftc.gov
Scott R. Williamson
swilliamson@cftc.gov
U.S. Commodity Futures Trading Commission
525 W. Monroe St., Suite 1100
Chicago, IL 60661

Kenneth Dante Murena
Damian & Valori LLP
1000 Brickell Avenue, Suite 1020
Miami, FL 33131
kmurena@dvllp.com

Russell Landy, Esq.
rlandy@dvllp.com
Damian & Valori LLP
1000 Brickell Avenue, Suite 1020
Miami, FL 33131

Stanley H. Stone
stonelawfirm@earthlink.net
Stone & Stone
PO Box 261727
Encino, CA 91426-1727

Richard Landes
rjlandes@gmail.com
The Law Office of Landes & Julien
736 2nd Street North
Jacksonville Beach, FL 32250

/s Peter B. King  

Peter B. King (FBN: 0057800)