# EXHIBIT B

```
 1                UNITED STATES DISTRICT COURT
                  MIDDLE DISTRICT OF FLORIDA
 2                  JACKSONVILLE DIVISION

 3            CASE NO.: 3:17-cv-774-J-32MCR

 4    _____

 5    COMMODITY FUTURES TRADING COMMISSION,

 6            PLAINTIFF,

 7    vs.

 8    JASON B. SCHARF (D/B/A 'CITRADES'.COM AND
      AUTOTRADINGBINARY.COM); CIT INVESTMENTS,
 9    LLC; BREVSPAND EOOD; CIT INVESTMENTS,
      LTD.; A&J MEDIA PARTNERS, INC.; MICHAEL
10    SHAH; AND ZILMIL, INC.,

11            DEFENDANTS.

12    _____/

13

14                VOLUME 1 (PAGES 1-131)

15

16

17

18    DEPOSITION OF:        HEATHER DASSO

19    DATE:                 MAY 9, 2018

20    TIME:                 9:20 A.M. - 5:08 P.M.

21    PLACE:                1000 BRICKELL AVENUE
                            SUITE 1020
22                          MIAMI, FLORIDA

23    REPORTED BY:          TAMARA MASCI TANNEN, RPR,
                            NOTARY PUBLIC, STATE OF FLORIDA
24

25
```



**Orange Legal**
**800-275-7991**

1        A.    No.

2        Q.    Okay.

3        A.    Other ways included the mass emails.

4        Q.    Okay.  Any other ways?

5        A.    I don't believe so.

6        Q.    Okay.  Okay.  We filed -- I say we.

7   Zilmil filed a motion to modify the preliminary

8   injunction; are you aware of that?

9        A.    Yes.

10        Q.    I'm not going to ask you about the motion.

11   But I do want to ask you about some information we

12   put in the motion.  And that had to do with the

13   reliability or the accuracy of the Romel

14   spreadsheet.

15        A.    Yes.

16        Q.    Do you remember seeing that in the motion;

17   did you ever read that?

18        A.    Yes.

19        Q.    Okay.  So has anybody made any effort

20   since that has been read to determine whether that's

21   a reliable document?

22        A.    I believe the Commission's stance is that

23   this document was used in the Complaint, in the

24   motion for SRO to show the judge and the court the

25   scope of the fraud.  And it won't be used in our



Commodity Futures Trading Commission vs Jason B. Scharf
Heather Dasso                                                                56

1    motion for summary judgment and it won't be used at

2    trial.

3            So, no, no further effort has been done

4    with that spreadsheet or with Romel, in general, in

5    discussions with him.

6       Q.   Okay.

7            MS. REINHART:  I don't know about Heather,

8       but I'm going to need a break in the near

9       future.

10           MR. KING:  This is a great time.  Thank

11      you.

12           (Whereupon, a recess was taken.)

13   BY MR. KING:

14      Q.   In the course of the investigation, did

15   you determine that Citrades was sending substantial

16   amounts of money to other sources other than to

17   Zilmil?

18      A.   I don't have direct knowledge of, I'm

19   sorry, Citrades' bank analysis, so I can't, I can't

20   respond to that.

21      Q.   Sure.  So there is an allegation by the

22   Commission that Zilmil sold autotrading systems.

23   Are you familiar with that allegation?

24      A.   Yes.

25      Q.   And specifically sold more than -- well, I

1  aware of whether that question's been asked, whether

2  anybody at the Commission has asked any of these

3  customers whether they still have the software on

4  their computer?

5      A.   The customer outreach is in the very early

6  stages.  I anticipate that is definitely a question

7  we will ask customers when we speak with them, yes.

8      Q.   Okay.  Well, there are, I believe, many,

9  many allegations in the Complaint and the SRO motion

10  that refer to customers using autotrading systems

11  and losing money.

12     A.   Yes.

13     Q.   My question is, how was that determination

14  made if you're at the very early stages and you've

15  never asked anybody to see the software?

16     A.   We -- the evidence for that is the

17  numerous customer complaints to ClickBank telling

18  ClickBank that the software doesn't work as

19  advertised.  There is evidence in emails that

20  Mr. Shah had with Jared Davis that the trading

21  software that Mr. Shah created or was promoting was

22  doing its job and crushing people, like,

23  immediately.

24          There are customer complaints.  I believe

25  Liquid Web, the web hoster, got a customer complaint



```
 1   saying that fraudulent, a fraud scheme was happening

 2   from one of the websites that they hosted that was

 3   basically like a get rich quick scheme and things

 4   weren't working.

 5          But customers have also complained to

 6   ClickBetter.  Mr. Shah himself calls these trading

 7   softwares a scam.  They are designed to make

 8   customers lose money in binary options.

 9          And that's the evidence we have as far as

10   all these allegations you're referring to.

11      Q.   But nobody's actually seen the software,

12   right?

13      A.   As far as seeing a tangible copy of the

14   software, we have not.  We would get that from,

15   generally, at the subject of interest, but, as part

16   of a subpoena or discovery, but Mr. Shah has not

17   produced that to us, unfortunately.

18      Q.   And no customer has identified a Zilmil

19   funnel; fair?

20      A.   No, that's not fair.

21      Q.   Okay.  Tell me why that's not fair.

22      A.   The customer could identify a funnel,

23   like, yes, I downloaded the Millionaire Machine and

24   not associate that with Zilmil.  But we know through

25   our evidence and investigation, that that is
```



Commodity Futures Trading Commission vs Jason B. Scharf
Heather Dasso                                                              96

```
 1   way?

 2        A.   Through his counsel when the investigation

 3   started.

 4        Q.   Did you see any evidence of that during

 5   your review, or did anybody at CFTC see evidence of

 6   transactions associated with Zilmil that were

 7   unrelated to binary options?

 8        A.   Very minimal.

 9        Q.   What were they?

10        A.   I can't recall.

11        Q.   Betting?

12        A.   I'm sorry.

13        Q.   Betting sites, casinos, gambling, Pokemon;

14   have you seen those?

15        A.   I don't, I don't recall, no.  Nothing was

16   lucrative other -- our evidence showed that nothing

17   was lucrative for Mr. Shah other than the binary

18   option stuff.

19        Q.   Did you attempt to quantify the non-binary

20   transactions?

21        A.   No, that's not within our jurisdiction.

22   We did not.

23        Q.   Right.  So your assessment that very

24   little had to do with non-binary is based on what?

25        A.   Like I said, all the documents that have
```



Commodity Futures Trading Commission vs Jason B. Scharf
Heather Dasso

```
 1   come in and that we had showed that Mr. Shah was

 2   primarily involved in promoting binary options.

 3   Mr. Shah can continue to promote other products.

 4   The SRO doesn't -- there was an opportunity for him

 5   to continue to promote other products.  And if they

 6   were lucrative, I think that perhaps he would

 7   continue to do so, but --

 8        Q.   Actually, the receiver now owns Zilmil.

 9        A.   Right.

10        Q.   So there is no opportunity for Dr. Shah to

11   do any of that today.

12        A.   But I believed -- I believe CFTC and the

13   court had a discussion that if the receiver wants to

14   do an analysis, if there is legitimate business that

15   Mr. Shah is doing, he can continue to operate, if it

16   was determined that he was doing legitimate

17   business.  And I don't believe that got anywhere.

18        Q.   Well, we will find out.

19        A.   I think Ash responded to all of this in

20   the, his motion.

21        Q.   Sure.  And we'll talk to the receiver

22   about that tomorrow.

23        A.   Okay.

24        Q.   But for today, I just want to make sure

25   we're clear that the CFTC made no effort to
```



```
 1    determine the extent of the activity that had

 2    nothing to do with binary, true?

 3         A.   Correct.

 4         Q.   Okay.  Let's look at -- oh, on the Racks

 5    Space server review, do you have some sense,

 6    Ms. Dasso, of when that will be complete?

 7         A.   I don't.  Like I said, it may be complete.

 8    We just have been resource strapped and nobody has

 9    looked at it.

10              MR. KING:  And Stephanie, we may need to

11         reserve on that as well.

12    BY MR. KING:

13         Q.   All right.  Let's turn back to the

14    Complaint, Exhibit 1.  And we're going to skip over

15    to page, excuse me, to paragraph 93, which is on

16    page 22.

17              And my question is, after you finish

18    reading paragraph 93, my question's going to be,

19    whether all of the allegedly illegal binary options

20    websites that are referenced in there are reflected

21    on Exhibit C to the interrogatories?

22         A.   To the best of my knowledge, yes, but

23    there may be, with the qualification that there may

24    be others that are related, other payments that

25    Mr. Shah received that are related to binary
```



```
 1        without a break and then break for lunch.  I

 2        don't really care.

 3             MS. REINHART:  If you give me a two-minute

 4        break, I can run out and come back.

 5             MR. KING:  Let's do that.

 6             MS. REINHART:  And then we can go for 20

 7        minutes or 30, minutes, whatever makes sense

 8        for lunch.

 9             MR. KING:  Sure.

10             MS. REINHART:  Thank you very much.

11             MR. KING:  Let's do that.

12             (Whereupon, a recess was taken.)

13             (Whereupon, a portion of the record was

14        read by the reporter.)

15             MR. KING:  Back on now, right?

16             MS. REINHART:  Just checking.  I hope so.

17     BY MR. KING:

18        Q.   If I asked you this earlier, Ms. Dasso, I

19     apologize.  Do you know if anybody at the Commission

20     has actually seen an autotrading system?

21        A.   That Zilmil promotes?

22        Q.   We can start there, yeah.

23        A.   No, we have not seen Zilmil, like a

24     physical download of Zilmil's systems, but we've

25     seen trading systems, obviously, in other
```



 1   investigations.

 2        Q.   So in other investigations, you're able to

 3   find them and look at them.  And as regards Zilmil,

 4   you were unable to do that; is that what you're

 5   saying?

 6        A.   Generally, we would get that from the

 7   subject of interest that we're investigating.  And

 8   they show us how they work.  Zilmil's not done that,

 9   so we don't have a copy of it to see what he was,

10   how they work specifically.

11        Q.   Okay.  Mm-hmm.  So looking back at Exhibit

12   A to the interrogatories, the list of the

13   autotrading systems that we were talking about just

14   a minute ago --

15        A.   So this is Tab 3 and Exhibit A.  Okay.

16             MS. REINHART:  This is --

17        A.   The tabs get --

18             MS. REINHART:  Dasso Exhibit 4?

19        A.   Maybe I should just, like, pull them out

20   and paper clip them.  Okay.

21        Q.   Okay.  So looking at Exhibit A -- and I'm

22   just kind of recapping where we just were a few

23   minutes ago.  -- is it, would it be accurate to say

24   that the only documents that reflect the alleged

25   sales of autotrading systems are those referenced in



1   evidence?

2       A.   Mr. Casler, who is the declarant for

3   Liquid Web, he testified that I think over 200,000,

4   they have a tracking system and over 200,000 people

5   clicked on the emails that were sent out by

6   Mr. Shah.  And we have customers that complained

7   through various producing parties that ClickBank,

8   and iContact, I believe, that were complaining about

9   systems that they, that were promoted through the

10  landing pages or the email, and the emails brought

11  the customers to the landing pages.

12      **Q.   I was asking you on that question -- and**

13  **maybe I wasn't clear.  -- specifically about videos**

14  **because -- well, let me just reask it.**

15      A.   And I answered your question about videos.

16  Then you asked me in general --

17      **Q.   Okay.**

18      A.   -- what is the evidence that customers

19  have clicked on?

20      **Q.   Let me be more specific.  I'm sorry.  With**

21  **respect to videos and the landing pages that we**

22  **looked at on Exhibit A, are you aware of any**

23  **evidence that anybody clicked on to see a video?**

24      A.   I don't think we have any evidence to show

25  that customers clicked on the video currently.



1        Q.    Then I guess -- I'm going to ask you

2    whether you know whether any customer took action as

3    a result of watching a video attributable to Zilmil?

4        A.    I don't believe we do now.  I don't -- I

5    was prepared to talk about the three customers that

6    are mentioned in the declaration.

7        Q.    Right.

8        A.    I know we sent out a Customer Survey and

9    other people have been tasked with reaching out to

10   these customers and conducting interviews.  And so,

11   I haven't reviewed their notes to specifically

12   answer your question one way or another.

13         But I know that as -- I can sit here today

14   and tell you that I don't believe so.  But again,

15   there is other evidence that we may have that I just

16   haven't reviewed or have knowledge of yet.

17         MR. KING:  And that's a little bit of a

18         quandary, Stephanie, because I don't know

19         whether there is another witness that we could

20         call or whether you would just provide that

21         information, if it exists, or how we go about

22         that.  I'm open to suggestions.

23         MS. REINHART:  Yeah, let's follow up with

24         this.  And whatever other topics that we

25         identify and then we can do a call with Ash and

```
 1        A.   Personally, no.

 2        Q.   Did anybody?

 3        A.   I can't be certain.  This just shows us

 4   that this was a campaign that Mr. Shah promoted on

 5   ClickSure.  That goes back to Exhibit A when you

 6   asked about documents that show where the products

 7   were promoted.

 8        Q.   Mm-hmm.

 9        A.   A lot of times these links show it's that

10   the affiliate market.  So this would be Shah was

11   paid on a CPA, cost per action, through ClickSure

12   for this, if somebody were to click on this email.

13        Q.   And I think we can agree that you don't

14   know what happens when you click on that link,

15   right?  I mean --

16        A.   This particular link, no.

17        Q.   And I -- I'm going to ask you to sort of

18   keep your finger here on page 31, but also flip to

19   Exhibit A, which you've already got tabbed.

20             MS. REINHART:  It's A of the

21        interrogatories.

22   BY MR. KING:

23        Q.   A of the interrogatories, right.  And I'm

24   going to ask you to look starting on page 4 where

25   the ClickSure things begin.
```



```
 1                UNITED STATES DISTRICT COURT
                  MIDDLE DISTRICT OF FLORIDA
 2                   JACKSONVILLE DIVISION

 3            CASE NO.: 3:17-cv-774-J-32MCR

 4      _____

 5    COMMODITY FUTURES TRADING COMMISSION,

 6
                  PLAINTIFF,
 7    vs.

 8    JASON B. SCHARF (D/B/A CITRADES.COM AND
      AUTOTRADINGBINARY.COM); CIT INVESTMENTS,
 9    LLC; BREVSPAND EOOD; CIT INVESTMENTS,
      LTD.; A&J MEDIA PARTNERS, INC.; MICHAEL
10    SHAH; AND ZILMIL, INC.,

11                DEFENDANTS.

12
      _____/
13

14                 VOLUME 2 (PAGES 132-286)

15

16

17      DEPOSITION OF:            HEATHER DASSO

18      DATE:                     MAY 9, 2018

19      TIME:                     9:20 A.M. - 5:08 P.M.

20      PLACE:                    1000 BRICKELL AVENUE
                                  SUITE 1020
21                                MIAMI, FLORIDA

22      REPORTED BY:              TAMARA MASCI TANNEN, RPR,
                                  NOTARY PUBLIC, STATE OF FLORIDA
23

24

25
```



**Orange Legal**
**800-275-7991**

```
 1    Pann, is reaching out directly to these customers

 2    trying to set up times to speak to them --

 3          Q.    Mm-hmm.

 4          A.    -- and then do an interview of them based

 5    on their response.

 6          Q.    Okay.  Before lunch we were talking about

 7    the Stinson Declaration, which is Exhibit 9 to the

 8    SRO motion.

 9          A.    Yes.

10          Q.    Talking about these email, I guess,

11    campaigns.  Can we use that word?

12          A.    Sure.

13          Q.    And I asked you about the Binary Boom

14    email on page 31.  And you told me that nobody had

15    clicked on the link there at Hobster.binaryboom,

16    right?

17          A.    I didn't tell you that no one did.  I told

18    you I don't have evidence or I don't have

19    information that anyone's clicked on the specific

20    link.

21          Q.    Okay.  So is it also true that other than

22    the name Binary Boom, you don't have any evidence of

23    what, what product was being offered with that

24    email, true?

25          A.    Not based on this.  Like I said before, we
```



1    may have other evidence from different parties that

2    tie this together, but based on this particular

3    document and page, no, that's correct.

4         **Q.   There's 32 pages here of emails.  Would**

5    **your answer to that question be the same with**

6    **respect to each email, that you don't really have**

7    **evidence of what was being offered other than as**

8    **you've described for Binary Boom?**

9         A.   Right.  For example, 2015 Millionaire, we

10   have evidence that that's binary options through

11   other sources like the chats between Mr. Shah and

12   other affiliate marketers and customer complaints

13   that people would have clicked on this link.  But

14   that answer is going to be the same for all of these

15   systems.

16        **Q.   Okay.  Because I didn't want to have to**

17   **walk through 32 pages and point out each one, so --**

18        A.   Yeah.  And I can't tell you the evidence

19   is the same for every system.

20        **Q.   Sure.**

21        A.   But those would be the sources of

22   documents that would pull that together.

23        **Q.   So I want to ask a little bit more about**

24   **2015 Millionaire.  Tell me again what evidence**

25   **connects that with binary, or autotrading systems, I**



 1    says, "and by engaging in the business of advising

 2    others."

 3              So in addition to paragraphs 93 through

 4    122, it says, "and engaging in the business of

 5    advising others."

 6              So what I'm interested in knowing is what

 7    advice did Zilmil provide with respect to trading

 8    and options, trading options?

 9        A.    The trading systems themselves that

10    customers were able to download told customers what

11    to trade in binary options.

12        Q.    They did?

13        A.    Customers complaints have shown that they

14    did.  Emails between Shah and Jared Davis show that

15    they did.

16        Q.    They did what?

17        A.    Showed customers, placed trades in

18    customers' accounts for binary options.

19        Q.    Which Jared emails, Jared Davis emails are

20    you referring to?  Are they in this material here?

21        A.    Let me show you.

22        Q.    Is it the crushing email?  Is that the one

23    you're thinking of?

24        A.    Yes.  It's referencing Shah's autotrading

25    systems.



**Orange Legal**
**800-275-7991**

```
 1          Q.    Okay.  So before we do this, let's make

 2    sure we're together on the exhibits.  So you're on

 3    Exhibit 8 to the SRO motion?

 4          MS. REINHART:  Tab 8, SRO.

 5    BY MR. KING:

 6          Q.    And you're on page 17 of that?

 7          A.    Page 18.

 8          Q.    Page 18.  Okay.

 9          A.    Seventeen and 18.

10          Q.    Yeah.  Okay.  So now I'm here.  So walk me

11    through it.

12          A.    So this email is talking about Shah's

13    autotrading systems.  And it's talking about placing

14    trades as soon as the trade ends.  It's talking

15    about placing trades automatically in customer

16    accounts.  That shows that Shah's systems are

17    advising customers on what to trade.  They're doing

18    it for them.

19          Q.    Okay.  So let's break that down.  Where

20    does it say that Shah is autotrading systems?

21          A.    The email at the very bottom on page 17 --

22          Q.    Yeah.

23          A.    -- from Ryan Miller.  The subject is,

24    "Mike's Money Millionaire Machine."

25          Q.    Right.  And what does that suggest to you?
```



```
 1    I mean, is that you're relying on that to determine
 2    this is Zilmil's autotrading system?
 3         A.   It's referring to Mike.  And then the
 4    email is forwarded to Mr. Shah asking what was going
 5    on here regarding his autotrading system.  And
 6    Mr. Shah is able to respond about the fact that
 7    he'll look into it and that he's going to talk to
 8    his programmer.
 9              So I think all of that together shows that
10    this is Mike Shah's autotrading system, that it's
11    placing trades automatically in customers' accounts.
12         Q.   And besides this, is there anything else?
13    This is what you've got?
14         A.   Customer complaints showing --
15         Q.   About --
16         A.   -- the same --
17         Q.   About Mike's Money Millionaire Machine?
18         A.   About autotrading systems that were
19    promoted and sold by Shah that were placing trades
20    in the customers' account.  They weren't doing what
21    they were supposed to.  Ten out of ten trades were
22    losing trades, that they just weren't working as
23    advertised, showing that these trading systems were
24    placing trades in customer accounts.
25         Q.   Okay.  So you said promoted and sold by
```



```
 1    BY MR. KING:

 2         Q.   Any of these landing pages and autotrading

 3    systems.

 4         A.   Yes, we have never seen a customer click

 5    through and do that particular process.  It's

 6    just -- it's my understanding that generically

 7    that's how it works.  And I believe ClickBank

 8    testified that that's how their products that are

 9    promoted there work.

10         Q.   Let's take a look in the Complaint at

11    paragraph 102.  It says, "Zilmil fails to disclose

12    that customers do not achieve the outside profits

13    touted on the landing pages."  Do you see that?

14         A.   Yes.

15         Q.   And Zilmil -- "Nor does Zilmil disclose

16    the risks associated with trading off exchange

17    binary options."  Right?

18         A.   Yes.

19         Q.   Let's turn, please, in your binder what --

20    I have a brand new exhibit towards the back, Exhibit

21    9, well, tab 9.

22              MR. KING:  And we're going to call that

23         Dasso Exhibit 6.

24         A.   We're only on Exhibit 6?

25         Q.   There's not many left.
```



Commodity Futures Trading Commission vs Jason B. Scharf
Dasso Heather                                                          216

```
 1              MS. REINHART:  This is docket 109-9.

 2              MR. KING:  Yes, yes.

 3              (Whereupon, the above-referred to document

 4    was marked as Dasso Deposition Exhibit Number 6 for

 5    identification.)

 6    BY MR. KING:

 7         Q.   So what we've done here, Ms. Dasso, Dasso

 8    Exhibit 6, is pull the first page of what was

 9    Exhibit I.  Actually, I'm sorry.  That was our

10    Exhibit I.  This was the first page of the Binary

11    Overdrive website?

12         A.   That was captured by Selma Mack.

13         Q.   Exactly.  We took the first page and last

14    couple of pages just for context, and then, or the

15    last page.  And then, what we did was we actually

16    included on the very last page of the exhibit,

17    included the disclaimer that was attached to the

18    original website download that was obtained by the

19    Commission when it downloaded this website.

20              And have you ever seen this before?

21         A.   I have not.

22         Q.   Would you agree with me that it, that it

23    does disclose risks?

24              MS. REINHART:  Can you give her a chance

25         to read it?  She's just testified that she's
```



**Orange Legal**
**800-275-7991**

 1          never seen it before.

 2                MR. KING:  Sure.  Yeah.

 3          A.   I'm sorry.  I just want to go back to

 4     that.

 5                Page 33 of the Complaint.  I just want

 6     to -- just for reference, what were we looking at.

 7     Twenty-two of the Complaint.

 8          **Q.   Page 23, paragraph 102.**

 9          A.   Okay.  Let me just go ahead and mark this

10     so I can --

11          **Q.   Sure.**

12          A.   This isn't right.  Twenty-three of the

13     Complaint.

14                MS. REINHART:  I'll just pull my page out.

15          A.   For context, where was this disclaimer

16     located in the website?

17          **Q.   This was attached to the website that was**

18     **downloaded by the Commission.**

19          A.   Right.  But on the actual website, where

20     was the disclaimer?

21          **Q.   I don't remember.  I don't know.  Do you**

22     **know?**

23          A.   No.  How was the disclaimer obtained by

24     you, what I'm looking at?  Was it obtained --

25          **Q.   It was provided to us by the Commission.**



```
 1        A.    Okay.  So it was a website that we

 2   downloaded?

 3        Q.    Yes.

 4        A.    But it was not -- this page was not

 5   included in Selma Mack's declaration, the website

 6   that was attached to her declaration?

 7        Q.    Yes, I believe that's true.  And it was

 8   not attached -- well, yes, that is true.  In fact, I

 9   think we have Selma Mack's deposition or declaration

10   here, if you'd like to look at it.  Actually, we

11   already looked at the website.  If you want to go

12   back and look, I don't think you'll see it.

13             MS. REINHART:  I think she's just trying

14        to make sure she knows where this came from.

15        A.    So we provided you -- I'm sorry.

16             MS. REINHART:  This was part of the Selma

17        Mack download that was produced to you.

18             MR. KING:  Yes.

19   BY MR. KING:

20        Q.    To clarify --

21        A.    But it was not on --

22        Q.    Not on her declaration.

23        A.    Not on her exhibit, Binary Overdrive

24   exhibit?

25        Q.    Provided to us, but was excluded from her
```



```
 1   declaration.

 2        A.   So this is the first time I've seen this

 3   because I haven't reviewed the website downloads,

 4   but I've had a chance to skim it.

 5        Q.   Okay.  The top of the first paragraph in

 6   the middle it says, "The typical purchaser does not

 7   make any money using this system."  Do you see that?

 8        A.   Yes.

 9             MS. REINHART:  Where are you?

10             MR. KING:  Middle of the first paragraph.

11             MS. REINHART:  Thank you.

12   BY MR. KING:

13        Q.   It goes on to say, "BinaryOverdrive.com

14   does not guarantee income or success.  And examples

15   shown in this presentation do not represent an

16   indication of future success or earnings."  Do you

17   see that?

18        A.   Yes.

19        Q.   And just for context, I'll read the last

20   sentence as well.  "The company declares the

21   information shared is true and accurate."  The next

22   paragraph starts out, "U.S. government required

23   disclaimer:  Trading foreign exchange on margin

24   carries a high level of risk and may not be suitable

25   for other investors," et cetera, et cetera.
```



Commodity Futures Trading Commission vs Jason B. Scharf
Dasso Heather
220

```
 1              So turn back to paragraph 102.  Can we
 2     agree that that, the allegation in the first
 3     sentence is false?
 4        A.   As it relates to Binary Overdrive, it
 5     appears there was a disclosure on there.
 6        Q.   So the answer is yes?
 7        A.   The paragraph 102 talks in general about
 8     Zilmil not disclosing.  I'm only looking at one
 9     website, so I just want to be clear that for
10     purposes of this website, yes, it appears Zilmil
11     made some disclosures.
12        Q.   Did anybody at the CFTC make any effort to
13     determine that any other website that alleges Zilmil
14     had a similar disclosure?
15        A.   I don't know.  We will have to go back and
16     look at -- I'd have to go back and look at the
17     downloads.
18             MS. REINHART:  I'm going to need a break
19        in ten, 15 minutes, just to give you fair
20        warning.
21             MR. KING:  Okay.
22             MS. REINHART:  Do you have any estimate on
23        how long we're going to go to today?
24             MR. KING:  We're going right down to the
25        wire, I think.
```



1          MS. REINHART:  And the wire is what?

2          MR. KING:  The wire is whenever you have

3      to leave for your flight.

4          THE WITNESS:  Okay.  I don't know Miami

5      traffic.

6          MS. REINHART:  Right.  Five would probably

7      be --

8          THE WITNESS:  Our flight's at 7:30, so I

9      just don't want to get --

10         MR. KING:  Richard, five, five thirty,

11     six?

12         MR. LEONARDIS:  You have to catch a 7:00

13     flight?

14         (Whereupon, a recess was taken.)

15 BY MR. KING:

16     Q.   Okay.  Let's look back for a second,

17 Ms. Dasso, at Exhibit 8 to the SRO motion, the

18 emails, the crushing people email.

19         MS. REINHART:  Eight, you said?

20         MR. KING:  Eight, the last page of that.

21 BY MR. KING:

22     Q.   So it sounds to me like you're pretty

23 familiar with this email, like you spent some time

24 with it.  Is that a fair statement?

25     A.   Yeah, we've referenced it quite a bit in

 1    our responses.

 2         Q.    Right.

 3              So the way it's been portrayed by the

 4    Commission is this is evidence that Zilmil knew that

 5    it was designing autotrading systems that would

 6    basically steal people's money, right?

 7         A.    Yes.

 8         Q.    Okay.  So if that's true, what about the

 9    rest of the context of the email once you get past

10    the sentence about crushing people like immediately?

11    It goes on to say that, "The problem is they are all

12    saying they turn it off and it keeps placing trades

13    as soon as the trade ends and there's money back in

14    the account.  Typically, I hold little weight to

15    comments like that from people, but it's basically

16    everyone that's saying it.  They say they can't get

17    an answer out of the support from there.  Is there

18    some way we can contact them to get them to look

19    into this?"

20              Does that sound to you like somebody who

21    is reporting a known issue with a website, like,

22    there is a problem with the website and this is the

23    problem?

24              MS. REINHART:  I'm going to object to the

25         extent that calls for speculation.  I mean, the



```
 1          document says what it says.

 2          A.    There is a problem with the autotrader

 3     system.

 4          Q.    Right.  And by the way, this email was not

 5     sent from Mr. Shah, Dr. Shah.  It wasn't sent to

 6     Dr. Shah; is that correct?  It was from Ryan Miller

 7     to Jared Davis, right?

 8          A.    The initial email, and then it was

 9     forwarded to Mr. Shah.

10          Q.    Forwarded to Mr. Shah, but he wasn't a

11     party to the original email, correct?

12          A.    Correct.

13          Q.    Okay.  So then, we go to the next email on

14     November 13th at, 2014 at 9:16 A.M. where Mr. Davis

15     writes:  "Can you assist with the below.... support

16     not working, et cetera."  Do you see that?

17          A.    Yes.

18          Q.    Does that appear to you to be Mr. Davis

19     forwarding an IT issue on to Dr. Shah?

20          A.    Yes.

21          Q.    And then Dr. Shah's response that same day

22     at 7:49 P.M. says, "When they turn off, should turn

23     off at that night of that day... but asking

24     programming team."

25                And then Mr. Davis responds, "What?
```



1    Support isn't answering emails or working.  We don't

2    have any contact information for them."

3              And then Dr. Shah replies, "No, I meant

4    whenever a customer turns off autotrader in member's

5    area, they shouldn't be receiving any trades after

6    midnight that day.  I am also asking my programmer

7    to check into this further."

8              So when you put this in context, doesn't

9    it appear as if somebody's reporting an issue and

10   Dr. Shah is trying to be responsive to it?

11             MS. REINHART:  I'm going to object to the

12        extent that calls for speculation.  She's not

13        in their heads.

14             MR. KING:  Well, she was in their heads on

15        the first sentence.

16             MS. REINHART:  She read the sentence.

17             MR. KING:  And I'm reading the rest of the

18        sentence.

19             MS. REINHART:  The document speaks for

20        itself.

21             MR. KING:  Well, the document speaks for

22        itself, and then there were representations

23        made about what the document said.

24             MS. REINHART:  Legal arguments made.

25             MR. KING:  Sure.



```
 1    BY MR. KING:

 2        Q.   And so, what I'm asking is can you see

 3    what I'm suggesting is that somebody's reporting an

 4    issue and Dr. Shah's trying to respond to it?

 5        A.   Yes, they're reporting an issue with the

 6    autotrading system not working like it should and

 7    Mr. Shah is responding trying to fix the software.

 8        Q.   Okay.  That's all I'm asking.  Let's look

 9    back at -- the Complaint.

10            So I think you've done -- you spent a lot

11    of time in response to my questions explaining how

12    these sites work and the autotrading systems and the

13    funneling of customers to the binary dealers.

14            If I use the term binary dealers, does

15    that make sense to you, we're talking about places

16    like Citrades?

17        A.   Yes.

18        Q.   So sending customers to binary dealers

19    like Citrades.

20            Are you, are you aware that customers

21    would then be contacted by the dealers directly?

22        A.   Yes.

23        Q.   And are you -- would you agree with me

24    that in many instances, that contact is intended to

25    induce the person to deposit money with the dealer?
```



```
 1        Q.   Okay.  So in April 2016, the Commission

 2   had possession of a list of names somewhere in the

 3   neighborhood of 200,000.  That list contained email

 4   addresses and phone numbers and physical addresses,

 5   and things like that, right?

 6        A.   Right.

 7        Q.   So why is it then in response to Request

 8   for Admission, Request for Admission number 37, the

 9   CFTC contends that it hasn't been able to interview

10   or request documents from anybody?

11        A.   I want to clarify.  I'm sure this has been

12   produced to you.  But I believe Melissa Caver sent

13   out a Customer Survey too early on in the

14   investigation.

15        Q.   I don't recall that, but it's possible.

16        A.   Okay.  She may have, just to let you know.

17   I don't know the responses.  But we just, as you

18   know, there's been hundreds of thousands of

19   documents coming in.

20        Q.   Mm-hmm.

21        A.   We, as a Commission and agency, are

22   resource strapped.  And anybody who is assigned to

23   the investigation team is working on numerous

24   investigations and litigations at the same time.

25        Q.   Mm-hmm.
```



```
 1        A.    So it just hasn't been a focus of ours --

 2        Q.    Mm-hmm.

 3        A.    -- to do the customer outreach related to,

 4   to what this is asking for.

 5        Q.    So when it says the CFTC has not been able

 6   to interview or request, is that simply a resource

 7   issue?

 8        A.    Yeah, I just don't think we've made it a

 9   priority until now.

10        Q.    Well, I mean, the question asked -- you're

11   unable to identify any.  And as of the date of these

12   admissions, which were signed on January 5th, 2018,

13   the answer would have been admit, we haven't

14   identified any customer who has, haven't been able

15   to identify any customers who communicated with

16   Zilmil directly, correct?

17        A.    That's correct.

18        Q.    So why does it say it can't truthfully

19   admit or deny, instead of admit?

20        A.    I'm not sure.  As of the date these

21   interrogatories, I'm sorry, Request for Admissions

22   were signed, it, we can admit that we have been

23   unable to identify any customer; however, with the

24   caveat that we're still undergoing efforts.

25        Q.    Okay.  Let's turn back to Exhibit 2, which
```



```
 1              THE WITNESS:   7.

 2              MR. KING:   7.   Thank you.

 3    BY MR. KING:

 4       Q.   And on page 11, Request for Admission

 5    number 62.   This is, this is the Jared Davis email

 6    we talked about earlier that referenced crushing

 7    people.   And requests is to admit the context of

 8    that email exchange, including the subsequent emails

 9    in the same chain reflects an effort by Shah to

10    assist in rectifying a problem that had been

11    reported to him by a third party.

12              And the Commission responded by saying it

13    cannot truthfully admit nor deny this request.   As a

14    non-party to the email, the CFTC lacks the knowledge

15    or information to do so."

16              So if the CFTC lacks the knowledge or

17    information to respond to the question about the

18    context, how could it have the knowledge or

19    information sufficient to make the allegation that

20    that email was evidence of an intent by Dr. Shah to

21    defraud people?

22       A.   I believe I did admit to this in the

23    deposition --

24       Q.   Okay.

25       A.   -- that it was an attempt by Mr. Shah to
```



Commodity Futures Trading Commission vs Jason B. Scharf
Dasso Heather                                                                           248

1    rectify the problem.

2         Q.    Okay.  So this --

3         A.    I think this is the same objection

4    Stephanie made that as a non-party to the email --

5         Q.    Okay.

6         A.    -- we weren't admitting to this.  But I

7    did, I believe, give you an admission in my

8    deposition that Mr. Shah was rectifying the problem.

9         Q.    Okay.  Fair enough.  Thank you.

10             Flipping back to Exhibit 2, which was the

11   SRO motion, page 15, the allegation at the top of

12   the page is that, "Zilmil collaborates with the

13   binary options websites to make sure that their

14   sales representatives are ready to convert customers

15   who come in through Zilmil's funnels."  And that

16   cites apparently an email by Dr. Shah to a binary

17   options website operator.  And it inserts, I guess,

18   that email, in, on page 15.

19             Do you know what binary options website

20   this was directed to?

21        A.    Yes.  It is the email on page, Exhibit 8

22   to the motion for SRO, page 10.

23        Q.    Okay.

24        A.    It's copied and pasted from there, I

25   believe.  And so, it would be a solicitation for the



```
 1          Q.    Interrogatory number 4 also asked the

 2    Commission to identify the product or service for

 3    which the funds were paid.  I don't see that.  Maybe

 4    that's in the narrative response.  Actually, I don't

 5    see that in the response.

 6          MS. REINHART:  If you go down,

 7       notwithstanding is the last little bit on page

 8       2, there's some --

 9          MR. KING:  Are you talking about in

10       response to interrogatory number 4?

11          MS. REINHART:  Showing payments of 4.

12       You're on page 2 of the interrogatories?

13          MR. KING:  Yes, mm-hmm.

14          MS. REINHART:  Okay.  What was your

15       question?

16    BY MR. KING:

17          Q.    So the interrogatory asks to identify the

18    product or service that the funds were paid for.

19          MS. REINHART:  I see.

20    BY MR. KING:

21          Q.    And I'm looking for that and I'm not

22    seeing it.  I might be misreading, but I don't see

23    it.  Do you know what these are for?

24          A.    Right.  It says, The CFTC objects to the

25    requests to identify each payment on a per product
```

 1    basis as unduly burdensome.

 2         **Q.   Okay.  Well --**

 3         A.   So that's why these are not, that's not

 4    reflected in this.

 5         **Q.   Does that information exist anywhere, the**

 6    **product service for which these funds were paid?**

 7         A.   As far as a spreadsheet form, it does not.

 8    I'm still trying to decipher the ClickSure records.

 9    They provided us with a payment ledger which shows

10    money coming in.  It actually shows the credits that

11    are, that ClickSure received and then money going

12    out to Zilmil, among others.  And so, we're still

13    trying to see if we can determine the activity that

14    was associated to those payments.

15         **Q.   Well, okay.  I mean, the Commission**

16    **acknowledges that there was non-binary products**

17    **being sold by Zilmil through the affiliate networks,**

18    **right?**

19         A.   Yes.

20         **Q.   So would you -- you would agree it's**

21    **important to understand what is, what revenues were**

22    **binary-related products and what revenues for**

23    **non-binary related products, right?**

24         A.   Yes.

25         **Q.   And so, what we see in Attachment B then**



```
 1    doesn't distinguish between binary options related

 2    products and products unrelated to binary options,

 3    correct?

 4         A.   Right.

 5         Q.   They're all lumped in together?

 6         A.   Right.

 7         Q.   So if I understand your testimony -- well,

 8    I'm not sure I understand your testimony.  Is the

 9    Commission in the progresses of making those

10    distinctions?

11         A.   Yeah.  Preparing for trial, we will

12    definitely be doing further analysis of bank records

13    and all the evidence that has come in as a result of

14    discovery to, to present at trial.

15         Q.   When does Zilmil get to know the answer to

16    that question?

17         A.   I'm sorry.  I don't understand the answer.

18    So you -- everything that we used to derive this

19    Attachment B --

20         Q.   Mm-hmm.

21         A.   -- to the interrogatories, you have all

22    the underlying documents that we have.  So preparing

23    for summary judgment or preparing for trial we will

24    be going through all those documents, all that

25    evidence.  And as you know, there's a lot of things
```



```
 1   coming in, trying to piece everything together.
 2       Q.   Right.  Well, the -- I mean, the reason
 3   it's interesting to us is because the Commission
 4   bears the burden of proving that any of these
 5   payments relate to binary options.  And so, you
 6   know, I understand that the information exists in
 7   the many gazillions of documents that have been
 8   produced in this case.
 9            But you know, we've asked the Commission
10   to identify revenues associated with binary options.
11   And I think we're entitled to know what the
12   Commission's view of that is.  So -- and I guess
13   I'll just take this up with the legal team and we
14   can sort that out, but -- but as it stands --
15            MS. REINHART:  Setting aside that your
16       client is probably in the best position person
17       to tell you this.
18   BY MR. KING:
19       Q.   But for the time being, I think all we've
20   established with Attachment B is that these are
21   revenues and they don't differentiate between binary
22   and non-binary products, right?
23       A.   Correct.
24       Q.   Okay.  Let's look at Exhibit C, Attachment
25   C to the interrogatory responses.  And this
```



```
 1        Q.   Does YTF do things other than binary

 2   options?

 3        A.   I don't know of any other activity, but

 4   they may.

 5        Q.   Yeah.  Do you understand that YTF has a

 6   regulated Forex operation?

 7        A.   I believe they have a registered binary

 8   options --

 9        Q.   Yeah.  I meant to say registered.  Sorry.

10        A.   Registered binary options.

11        Q.   How about Forex?

12        A.   I'm not aware of that.

13        Q.   Do you know where they're located?

14        A.   I'm not aware of that.

15        Q.   How were you able to determine that

16   whatever this payment is for is for illegal

17   activity?

18             MS. REINHART:  I'm going to object.  That

19        calls for a legal conclusion.

20   BY MR. KING:

21        Q.   Well, is it the Commission's contention

22   that these payments are for illegal activity from

23   YTF Trading Limited?

24        A.   Yes.  These are payments that are

25   attributable to binary options websites activity.
```



Commodity Futures Trading Commission vs Jason B. Scharf
Dasso Heather                                                                 274

```
 1          Q.    How were you able to determine that
 2    whatever Zilmil did with respect to YTF Trading
 3    Limited was illegal?
 4               MS. REINHART:  That calls for a legal
 5          conclusion.  I'm going to object.
 6    BY MR. KING:
 7          Q.    You can answer.
 8          A.    Because it's my understanding and to the
 9    best of my knowledge, YTF Trade Limited is involved
10    in binary options.
11          Q.    Legally or illegally?
12               MS. REINHART:  Again, I'm going to object.
13          That calls for a legal conclusion.
14    BY MR. KING:
15          Q.    If you know.
16          A.    I don't think it's relevant, so I don't
17    know.
18          Q.    Why do you -- well, let me try to explain
19    the relevance.  Then maybe you can clarify the
20    issue.
21               So if Zilmil was simply advertising for
22    YTF Trading Limited and YTF Trading Limited is a
23    registered and perfectly legal operation and was
24    paying Zilmil for its advertising services --
25               MS. REINHART:  That's a big stipulation.
```



```
 1            I don't think we have any evidence before us

 2            that YTF is engaged on a legal basis.  That's

 3            not an issue in this case.

 4                 MR. KING:  What's not an issue?

 5                 MS. REINHART:  We haven't investigated YTF

 6            and made any allegations about YTF in this

 7            Complaint.  So if you're asking her to assume

 8            YTF is operating on a foreign legal basis, we

 9            can proceed on the assumption and she can

10            answer your question.  But you haven't given

11            her facts to establish that everything YTF does

12            is legal.

13                 MR. KING:  Well, I'm just asking because I

14            understand that the Commission is wanting

15            Zilmil to disgorge all of this money that was

16            paid to it by YTF Trading Limited.  And I'm

17            trying to understand the basis for that.

18                 MS. REINHART:  And I think she answered

19            your question that it's binary options related.

20            A.   I don't know if they were regulated or

21       unregulated at this time.  If you're saying they're

22       unregulated now, it's possible that at the time of

23       these payments, they were not regulated.

24            Q.   I don't have any idea one way or the

25       other.  I'm just wondering whether the Commission
```

```
 1    did any due diligence to determine whether the

 2    request for disgorgement on these transactions is

 3    legitimate or not?

 4         A.   If it was binary options related activity

 5    that was being manufactured, for lack of better

 6    words, by Mr. Shah located in the United States, we

 7    considered that activity to fall within our

 8    jurisdiction.

 9         Q.   What activity did they do for YTF Limited?

10         A.   Funneled customers to binary options.

11         Q.   And can you identify the funnels that were

12    sending people to YTF Trading Limited?

13         A.   Not as I sit here today.

14         Q.   Can you -- is it possible at all based on

15    the information you are aware of today?

16         A.   Until we talk to customers that are able

17    to identify the funnel that brought them to a

18    particular binary options' website, we can't tie the

19    binary option, I'm sorry, the Zilmil funnel to the

20    binary option dealer, which is how you refer to

21    them.

22         Q.   So you need customers to tell you that,

23    right?

24              MS. REINHART:  Assuming your client

25         continues to take the Fifth.
```

