**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

Commodity Futures Trading Commission,

      Plaintiff,

vs.

                                          Case No. 3:17-cv-774-J-32MCR

Jason B. Scharf (d/b/a Citrades.com and
AutoTradingBinary.com); CIT Investments
LLC; Brevspand EOOD; CIT Investments
Ltd.; A&J Media Partners, Inc.; Michael
Shah; and Zilmil, Inc.

      Defendants.

_____/

**DEFENDANTS ZILMIL INC. AND MICHAEL SHAH'S MOTION FOR**
**SUMMARY JUDGMENT AND SUPPORTING MEMORANDUM OF LAW**

Defendants Zilmil Inc. and Michael Shah (collectively **"Zilmil"**), pursuant to Rule 56 of the Federal Rules of Civil Procedure and for the reasons set forth in the incorporated memorandum of law, move for entry of summary judgment on Counts Eight, Nine, Ten, Eleven, and Twelve of the Complaint.

<u>**MEMORANDUM OF LAW**</u>

## I.  INTRODUCTION

Relying principally on inadmissible hearsay and other flawed, misrepresented, and incompetent evidence, Plaintiff CFTC alleges that Zilmil violated provisions of the Commodity Exchange Act (the **"Act" or "CEA"**) and made millions of dollars through activity in binary option and sales of binary option autotrading systems. After three years of investigation and discovery, however, the CFTC's evidentiary failings are staggering. It cannot identify a single binary option transaction connected to Zilmil in any way. It cannot identify any revenues Zilmil received from its alleged sales of autotrading systems or from promoting binary option websites. It cannot identify any customer who paid Zilmil money. It cannot identify a single customer who communicated with Zilmil or determine that Zilmil had any customers. Even more fundamentally, the CFTC is unable to establish that it even has jurisdiction over the conduct or transactions at issue.

The CFTC alleges Zilmil made millions of dollars selling autotrading systems but it has never seen and cannot identify any Zilmil autotrading system. It cannot identify any transactions that took place using a Zilmil autotrading system. It cannot identify any binary option videos that were posted to the internet. It has not been able to identify a single person

who actually viewed a Zilmil binary option video, or to even determine whether Zilmil actually published any.  It has no witness who has attested to viewing a Zilmil email and no evidence showing where any of the links in the emails led.  No person has attested to buying binary options, or losing money, as a result of Zilmil's alleged conduct.

The CFTC came to the Court on an *ex parte* basis in July 2017 and made representations that it knew it had no evidence to support but, in repeated and unquestionable breaches of its heightened duty of candor, failed to advise the Court of its utter lack of evidence.  In many instances, the CFTC misrepresented the evidence – both that it had and that it didn't have.  The result is a collection of very serious allegations, including fraud, that have no evidentiary support.  Zilmil is entitled to summary judgments on all counts.

## II.    LEGAL STANDARD

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits show that there is no genuine issue as to any material fact. . . ." Fed. R. Civ. P. 56.  Summary judgment is not regarded "as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 327 (1986) (quoting Rule 1, Fed. R. Civ. P.).  The party moving for summary judgment "bears the exacting burden of demonstrating that there is no genuine dispute as to any material fact . . . ."  *Celotex v. Dougherty County, GA*, 684 F.2d 1365, 1368 (11th Cir. 1982).  The mere existence of some alleged factual dispute will not defeat an otherwise

properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).

Rule 56(e), Fed.R.Civ.P., requires that affidavits and documents that support or oppose a motion for summary judgment "shall be made on personal knowledge, [and] shall set forth facts as would be admissible in evidence." The "general rule is that inadmissible hearsay cannot be considered on a motion for summary judgment." *Macuba v. Deboer*, 193 F.3d 1316, 1322-23 (11th Cir. 1999) (citations and quotations omitted). A district court may consider hearsay on a motion for summary judgment only "if the statement could be reduced to admissible evidence at trial." *Id.* "The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated." *Martin v. Allied Interstate, LLC,* 192 F.Supp.2d 1296, 1302 (S.D.Fla. 2016). Much of the CFTC's evidence is in the form of inadmissible hearsay, which cannot be considered on summary judgment.

## III.   ARGUMENT

The facts in this case present several novel legal issues that have scant precedent in the courts. The CFTC seeks to expand its jurisdiction beyond the limits established by Congress and seeks to apply the Act to alleged conduct in ways that no court has recognized. Despite its extensive investigations, the CFTC has failed to establish evidence to support its claims. There is no dispute as to the material facts and Zilmil is entitled to summary judgment on all counts.

**A. The CFTC Has Failed To Establish Its Jurisdiction Over Zilmil's Alleged Conduct.**

From the day it commenced this action, the CFTC has glossed over the gateway issue of its limited territorial and subject matter jurisdiction and has largely sought to ignore it. And with good reason.  It alleged that the Court has subject matter jurisdiction pursuant to 7 U.S.C. § 13a-1(a).  Doc. 3 ¶ 13.  It has never alleged any ultimate facts, however, that would establish its own jurisdiction to regulate the conduct alleged.  Zilmil raised these significant jurisdictional questions in its Motion to Modify Preliminary Injunction (Doc. 109 pp. 7-9). The CFTC's weak-kneed response to the jurisdictional questions reveals a superficial and flawed analysis.  Doc. 113 pp. 9-11.  More important, however, is that the CFTC has failed to adduce any evidence to support its claim of jurisdiction over Zilmil's alleged conduct.  Two primary issues must be resolved: (a) whether the CFTC has extraterritorial jurisdiction over the foreign transactions it has alleged; and (b) whether the evidence shows that Zilmil engaged in conduct anywhere that can be reached by its limited subject matter jurisdiction.

**1. The CFTC has failed to establish extraterritorial jurisdiction over the foreign transactions it has alleged.**

The CFTC alleges that Zilmil received millions of dollars from binary options dealers that operate outside the United States.  Doc. 5 p. 28.  This raises the issue of extraterritorial jurisdiction -- whether the CFTC's jurisdictional reach extends to conduct or transactions outside the United States, even by persons allegedly acting inside the U.S.  "[T]he question of whether a statute can be applied extraterritorially essentially asks how far a statute's prohibitions reach . . . ."  *CFTC v. Garofalo,* [2010 U.S.Dist.LEXIS 145379 at *14] (N.D.Ill. 2010).  "When a statute gives no clear indication of an extraterritorial application, it has none."  *Morrison v. Nat'l Australian Bank Ltd.,* 499 U.S. 244, 248 (1991).  "An affirmative

4

indication that [a statute] applies extraterritorially" is required as "clear evidence of congressional intent" to overcome the presumption against extraterritorial jurisdiction. *Id.*

In analyzing the jurisdictional reach of Section 10(b) of the Securities Exchange Act of 1934, the U.S. Supreme Court held that it applied to "only transactions in securities listed on domestic exchanges, and domestic transactions in other securities." *Id.* at 267. "Domestic transactions" are determined by "whether the purchase or sale is made in the United States." *Id.* at 268-270.[1]  Like the then-current Section 10(b), none of the statutory or regulatory provisions cited in Counts Eight through Twelve specifically provide for application to extraterritorial transactions.

The CFTC contends that "the Act and Regulations expressly apply to conduct by U.S. residents relating to overseas transactions."  Doc. 119 p. 10, citing 7 U.S.C. § 6(b)(2) and *CFTC v. Vision Financial Partners, LLC,* 190 F.Supp.3d 1126 (S.D.Fla. 2016).  However, the analysis by the CFTC (and by the court in *Vision Financial*) is at odds with the intent expressed by Congress in the Act itself.  Section 4 of the Act pertains to the "Regulation of futures trading and foreign transactions."  Section 6(b)(2) provides:

**(2) Persons located in the United States**

**(A) In general**.  The Commission may adopt rules and regulations proscribing fraud and requiring minimum financial standards, the disclosure of risk, the filing of reports, the keeping of books and records, the safeguarding of customers' funds, and registration with the Commission by any person located in the United States, its territories or possessions, who engages in the offer or sale of any contract of sale of a commodity for future delivery that is made or to be made on or subject to the rules of a board of trade, exchange, or market located outside the United States, its territories or possessions.

---

[1] Congress subsequently amended the Securities Exchange Act to provide extraterritorial application. 15 U.S.C. §§ 77v(a), (c).

**(B) Different requirements.**  Rules and regulations described in subparagraph (A) may impose different requirements for such persons depending upon the particular foreign board of trade, exchange, or market involved.

**(C) Prohibition.**  Except as provided in paragraphs (1) and (2), no rule or regulation may be adopted by the Commission under this subsection that—

**(i)** requires Commission approval of any contract, rule, regulation, or action of any foreign board of trade, exchange, or market, or clearinghouse for such board of trade, exchange, or market; or

**(ii)**  governs in any way any rule or contract term or action of any foreign board of trade, exchange, or market, or clearinghouse for such board of trade, exchange, or market.

### a.  Section 6(b)(2) does not apply to the conduct alleged.

Section 6(b)(2) applies only to persons who "engage in the offer or sale of any contract of sale of a commodity for future delivery. . . ."  The CFTC does not allege that Zilmil engaged in "the offer or sale of" any such contract, nor is there evidence that it did so. Zilmil is alleged only to have sold autotrading systems and funneled people to binary option firms.  Nothing about this alleged conduct involves the "offer or sale of any contract of sale."

Additionally, Section 6(b)(2) applies only to the specific type of contract specified: a "contract of sale of a commodity for future delivery."  The heading of Section 6(b)(2) confirms that it applies only to "futures trading."  Such contracts are not alleged to be at issue here, and there is no evidence that they are. The only transactions at issue are binary option transactions, which are distinct from contracts of sale of a commodity for future delivery. The various separate provisions of the Act make clear distinctions between these products. For example, Section 4m(1) (Count Nine) applies only to "commodity options and swaps." It does not apply to "contracts of sale of a commodity for future delivery."  Inversely, Section 6(b)(2) applies only to "contracts of sale of a commodity for future delivery" and does not

apply to "commodity options and swaps."  Section 6c(a)(1) (not at issue here) draws the distinction between these two products within the same provision, referring to them in the alternative: "the purchase or sale of any *commodity for future delivery (or any option on such a transaction or option on a commodity)*. . . ."  7 U.S.C. § 6c(a)(1) (emphasis added).  Further illustrating the distinctions among products, "commodity option" is listed in its own subsection separate from "commodity for future delivery" in several other provisions.  *See e.g.,* 7 U.S.C. § 1a(10), (12), and (22).  Congress's intent is clear from the plain language of these statutes, and it is clear that Section 6(b)(2) does not apply to binary options.

**b.  <u>Section 6(b)(2) does not provide jurisdiction in the absence of a rule of regulation.</u>**

Section 6(b)(2) itself does not provide the CFTC jurisdiction over persons located in the United States who are alleged to have engaged in the specified conduct on or subject to the rules of a foreign exchange.  Rather, Section 6(b)(2) is merely an enabling statute and is limited to authorizing the CFTC to "adopt rules and regulations" proscribing fraud and imposing other requirements on persons located in the United States who engage in the offer and sale of specified contracts "to be made on or subject to the rules of" a foreign exchange. 7 U.S.C. § 6(b)(2)(A).  Nothing in subpart A, or any other relevant part of the Act, establishes the CFTC's jurisdiction over such persons and transactions.

A full reading of Section 6(b)(2) makes clear that further rulemaking by the CFTC is required to establish any extraterritorial jurisdiction.  Subpart B specifically states that such rules and regulations contemplated in subpart A may impose different requirements for such persons depending on the particular foreign board of trade, exchange or market involved. Subpart B contemplates that such rules and regulations, if and when implemented, will vary

according to the needs of a particular foreign jurisdiction.  Subpart C imposes prohibitions on the scope and content of such rules and regulations, if and when implemented.  When Subsection 6(b)(2) is read in its entirety, it is clear that Congress expected the CFTC to adopt rules and regulations regarding extraterritorial jurisdiction and did not grant the CFTC broad, general jurisdiction over such activities.

If Congress had intended to establish extraterritorial jurisdiction without requiring further rulemaking by the CFTC, it certainly knew how to do so.  Congress did so specifically and unambiguously, for example, in amending the Securities Exchange Act.  In the section titled "Jurisdiction of offenses and suits," Congress specifically provided:

> **(c) Extraterritorial jurisdiction.**  The district courts of the United States and the United States courts of any Territory shall have jurisdiction of an action or proceeding brought or instituted by the Commission or the United States alleging a violation of section 77q(a) of this title involving—
>
> **(1)** conduct within the United States that constitutes significant steps in furtherance of the violation, even if the securities transaction occurs outside the United States and involves only foreign investors; or
>
> **(2)** conduct occurring outside the United States that has a foreseeable substantial effect within the United States.

15 U.S.C. § 77v(c).

The contrasting language – and intent -- is obvious.  When Congress intended to establish extraterritorial jurisdiction over conduct by persons in the United States, "even if the securities transaction occurred outside the United States and involves only foreign investors," it used unambiguous language to do so.  In stark contrast, the language used by Congress in Section 6(b)(2)(A) is clear as to its intent only to enable the CFTC to adopt rules and regulations pertaining to such persons and transactions.  The CFTC, however, has not

adopted any such rules or regulations. "Using congressional silence as a justification for judge-made rules violates the traditional principle that silence means no extraterritorial jurisdiction." *Morrison,* 561 U.S. at 261.

Instead, several provisions of the Act relevant to this proceeding expressly *preclude* extraterritorial application, indicating Congress's further intent to restrict the CFTC's jurisdiction over certain conduct pertaining to foreign jurisdictions even when the CFTC adopts such rules and regulations:

- Section 4b prohibits contracts designed to defraud or mislead, but the section is inapplicable to activity that occurs on exchanges or markets outside the United States. 7 U.S.C. § 6b(d).

- Provisions of the Act relating to swaps "shall not apply to activities outside the United States," except in specific enumerated circumstances. 7 U.S.C. § 2(i).

The CFTC recognized the territorial limitations set by Congress in other rules and regulations it adopted, including two at issue in this proceeding: Regulations 32.2 (Count Eight) and 32.4 (Count Ten) expressly exclude foreign transactions. *See* 17 C.F.R. § 32.1, "Scope."[2]

The U.S. Supreme Court explained the importance of a thorough and accurate jurisdictional analysis:

> Like the United States, foreign countries regulate their domestic . . . exchanges and . . . transactions occurring within their territorial jurisdiction. And the regulation of other countries often differs from ours as to what constitutes fraud, what disclosures must be made, what damages are recoverable, . . . and many other matters. . . . The probability of incompatibility with the applicable laws of other countries is so obvious that if Congress intended such foreign application it would have addressed the subject of conflicts with foreign laws and procedures.

---

[2]   Regulation 32.1 excludes transactions conducted or executed on or subject to the rules of either a designated contract maker or a foreign board of trade. "Foreign board of trade" means any board of trade, exchange or market located outside the United States, its territories or possessions, whether incorporated or unincorporated.   17 CFR § 1.3.

*Morrison,* 561 U.S. at 269 (internal quotations and citation omitted).  The allegation that Zilmil received funds from off-shore binary options firms requires the CFTC to establish its jurisdiction over those transactions.  *See e.g.,* Doc. 119 pp. 10-11.  In light of these allegations and against the backdrop of the cross-jurisdictional and conflict of laws concerns identified by the *Morrison* Court, Zilmil has pointed out that some countries like the United Kingdom did not regulate binary options during the Relevant Period, but rather considered it gambling.  Doc. 109 pp. 8-9; Doc. 125 pp. 9-10.  The gambling (binary option) transactions in the U.K. that allegedly resulted from Zilmil's conduct were not considered illegal in the U.K.  The CFTC also alleged that some of Zilmil's activity was through Banc de Binary and suggested that it was illegal even though it has never provided any evidence of illegality.  *Id.*

The CFTC seeks to infringe on the jurisdiction of foreign regulators (like the U.K and CySEC) but has no congressional authority to do so under the laws it alleges Zilmil violated. The CFTC has not adopted any rules or regulations providing extraterritorial jurisdiction for the violations alleged in Counts Eight through Twelve (the court in *Vision Financial* cited no such rules, either).  *See* Doc. 119 p. 10; *Vision Financial,* 190 F.Supp.3d at 1131 (citing only Section 6(b)(2)).[3]  Absent a clear expression of congressional intent, the presumption against extraterritorial jurisdiction stands.

### 2. The CFTC lacks evidence of any conduct by Zilmil that can be reached by its limited subject matter jurisdiction.

The CFTC alleges that Zilmil acted as an affiliate marketer for numerous illegal binary option websites.  Doc. 3 ¶ 93.  It alleges that Zilmil's landing pages and mass emails

---

[3] The CFTC at least implicitly concedes an absence of any rule or regulation extending its jurisdiction to activity of Zilmil inside the U.S. directed to persons and markets outside the U.S.  Doc. 119 pp. 9-11 (failing to mention such rules or regulations).

contain numerous false and misleading representations that trading profits are guaranteed. *Id.* ¶ 95. It alleges that Zilmil made millions of dollars promoting binary option websites and selling autotrading systems. *Id.* ¶¶ 103, 117. The CFTC's causes of action are all based on provisions of the Act that pertain to commodity option transactions. *Id.* However, the CFTC has failed to identify a single commodity option transaction and has failed to identify any evidence that funds Zilmil received were associated in any way with such transactions. This is in contrast to the alleged conduct of the Citrades Defendants (**"Citrades"**), and the conduct of the defendants in *Vision Financial,* who were alleged to have received funds from investors, conducted trading in customer accounts, misappropriated customer funds, provided bogus performance reports, and lied about the investments. Doc. 3; 190 F.Supp.3d at 1128-1129. The CFTC alleges no such conduct by Zilmil.

The CFTC has failed to find any evidence that the payments Zilmil received from any entity, domestic or foreign, were the result of illegal activity. According to the CFTC's corporate representative (and one of its lead investigators), Heather Dasso, the CFTC has not determined what the payments were for and admits it cannot make that determination until it talks to customers to determine whether they were directed to binary option firms through a landing page associated with Zilmil. Exh. A, Dasso Tr. at 273:1-276:21.[4] The CFTC has not determined whether any Zilmil website was associated with any of these firms. In the case of overseas entities, it has been unable to determine whether Zilmil's or the overseas entities' conduct was illegal. *Id.*

---

[4] As of the date of this filing, the CFTC had produced no such evidence. *See* Exh. B (email to CFTC requesting the production of declarations, etc. the CFTC has agreed to produce).

The CFTC does not know whether anyone ever viewed any videos or websites ("landing pages") associated with Zilmil and does not know where any of the links embedded in the alleged Zilmil emails led or what was being offered.  *Id.* at 276:11-21; 125:13-16; 138:13-139:15; 117:20-118:6.  Every other witness who has testified about these matters has echoed this testimony.[5]  There is no evidence of customers of such entities or transactions that can be identified as binary options.  *Id.* at 276:11-21 (CFTC must first identify customers before it can determine whether Zilmil funneled anyone to binary option firms).  Despite testimony from its own witness that it has not connected Zilmil landing pages or emails to, or identified illegal activity involving, any of the binary option dealers it identified, the CFTC nevertheless continues to contend that it has jurisdiction over this unidentifiable conduct.  It is now too late for the CFTC to be implicitly arguing that it needs more time to locate the evidence it needs to support its claims.  Discovery is over and trial is near, and if the CFTC cannot meet its burden of proof now then its claims are ripe for summary judgment.  That is the very reason for the protection offered by Rule 56, Fed.R.Civ.P.

**B.  Zilmil Is Entitled To Summary Judgment On Count Eight.**

Count Eight of the Complaint alleges a violation of Section 4c(b) of the Act:

> No person shall offer to enter into, enter into or confirm the execution of, any transaction involving any commodity regulated under this chapter which is of the character of, or is commonly known to the trade as, an "option", "privilege", "indemnity", "bid", "offer", "put", "call", "advance guaranty", or "decline guaranty",   contrary   to   any   rule,   regulation,   or   order   of

---

[5] *See e.g.*, Exh. C, Berry Tr. at 196:1-197:3; Exh. D, Wright Tr. at 85:9; 139:10-140:16; Exh. E, Barrett Tr. at 96:10; 156:5; 177:9; Exh. F, Brookshire Tr. at 84:10; 105:15; 113:21-114:16; 197:13; 244:16-245:1; Exh. G, Stinson Tr. at 197:14-199:3; 203:14-204:4; Exh. H, Clickbooth Tr. at 48:18; 68:10; 80:14; 138:9; 172:10; Exh. I, Revcontent Tr. at 38:19-39:5; 82:19-83:6.

the Commission prohibiting any such transaction or allowing any such transaction under such terms and conditions as the Commission shall prescribe. . . .

7 U.S.C. 6c(b).[6]   The CFTC alleges that Zilmil violated Section 4c(b) by violating Regulation 32.2:

> Subject to §§ 32.1, 32.4, and 32.5, which shall in any event apply to all commodity option transactions, it shall be unlawful for any person or group of persons to offer to enter into, enter into, confirm the execution of, maintain a position in, or otherwise conduct activity related to any transaction in interstate commerce that is a commodity option transaction, unless:
>
> (a) Such transaction is conducted in compliance with and subject to the provisions of the Act, including any Commission rule, regulation, or order thereunder, otherwise applicable to any other swap, or
>
> (b) Such transaction is conducted pursuant to § 32.3.

17 C.F.R. § 32.2.

The CFTC contends that Zilmil violated Regulation 32.2 by: (i) developing and selling autotrading systems (Doc. 3 ¶¶ 5, 94, 97, 103); and (ii) making misrepresentations in the promotion of autotrading systems which then "funnel" customers to binary option websites. *Id.* ¶ 95-97; 113-114.  Importantly, the CFTC does not allege that Zilmil "offered to enter into, entered into, or confirmed the execution of" any option transaction, the specific conduct proscribed by Section 4c(b).   Instead, it asserts that Zilmil was "[otherwise] conducting activities" relating to commodity options in violation of Regulation 32.2.  Doc. 5 p. 21.[7]  The only issue under Count Eight, therefore, is whether Zilmil can be liable for

---

[6] The Act's numbering conventions can be less than clear, e.g., 7 U.S.C. § 6c(b) is referred to as "Section 4c(b)."  *See* www.cftc.gov/lawregulation/ceaconvchart.html.

[7] This is in contrast to the alleged violations of Citrades which are limited to the conduct described in the statute ("offering to enter into, entering into, and confirming the execution of

"otherwise conducting activity" relating to binary options under this "residual provision" of Regulation 32.2, despite no allegation of the conduct specified in Section 4c(b).

Zilmil is entitled to summary judgment on Count Eight for at least three reasons, in addition to the CFTC's failure to establish its jurisdiction over the conduct alleged (Section III.A, *supra*): (a) the conduct alleged by the CFTC is not proscribed by the Act and the CFTC has no authority to enforce Regulation 32.2 as to such conduct; (b) the residual provision of Regulation 32.2, "otherwise conducted activity related to . . . a commodity option transaction," is unenforceable because it is unconstitutionally vague; and (c) there is no evidence that Zilmil developed or sold autotrading systems or that Zilmil's alleged funneling was related to a binary option transaction.

### 1. Zilmil's alleged conduct is not proscribed by the Act and the CFTC has no authority to enforce Regulation 32.2 as to such conduct.

"The power of an administrative [agency] to administer a federal statute and to prescribe rules and regulations to that end is not the power to make law ... but the power to adopt regulations to carry into effect the will of Congress as expressed by the statute. A regulation which does not do this, but operates to create a rule out of harmony with the statute, is a mere nullity." *Legal Envtl. Assistance Found., Inc. v. U.S. E.P.A.*, 118 F.3d 1467, 1473 (11th Cir. 1997) (internal quotations omitted) (quoting *Dixon v. United States*, 381 U.S. 68, 74 (1965)).  The CFTC has previously sought through its rulemaking to expand the scope of statutes enacted by Congress by purporting to regulate conduct that is not encompassed by the statute.  Such efforts have been rejected by the courts, including the

---

commodity options") and do not include the conduct described in the "residual provision" of the regulation ("conducting activity relating to commodity options").  Doc. 5 pp. 19-21.

Eleventh Circuit in a case in which the alleged conduct of the defendants -- advertising about commodity options -- was remarkably similar to the alleged conduct of Zilmil.  *See CFTC v. Mass Media Mktg,* 156 F.Supp.2d 1323 (S.D. Fla. 2001), *aff'd,* 297 F.3d 1321 (11th Cir. 2002).  The Eleventh Circuit affirmed summary judgment for defendants on the CFTC's claims alleging conduct that, while encompassed by the CFTC's "anti-fraud regulation," was not encompassed by the statute that enabled it, Section 4c(b), the same statute at issue in Count Eight.  *Mass Media Mktg.,* 297 F.3d 1321; *see also, CFTC v. Sentinel Mgmt. Grp., Inc.,* 2012 WL 1080166 at * 6 (N.D.Ill. 2012), *aff'd in relevant part on reconsid'n,* 2012 WL 3234277 at * 2-3 (N.D. Ill. 2012) (granting summary judgment in favor of defendants, and noting "[u]ltimately, the CFTC seeks to expand the scope of the CEA beyond its plain language. . . .  [T]he CFTC lacks the authority to extend the purview of a statute beyond what was intended by Congress.").

Applying the U.S. Supreme Court's time-honored *Chevron* analysis, the court in *Mass Media* found that the Act "clearly and unambiguously permits the CFTC to enforce its rules and regulations only on entities who 'offer to enter into, enter into or confirm the execution of any transaction involving any commodity regulated by the Act.'" 156 F. Supp. 2d at 1334 (citing *Chevron v. Council, Inc.,* 467 U.S. 837, 842–43 (1984)).  The unambiguous language of Section 4c(b) and its legislative history showed that Congress did not intend for the statute to confer on the CFTC the authority to impose its anti-fraud rules and regulations on entities "who do not participate in commodity trading transactions."  *Id.* at 1334.

15

In *Mass Media*, the CFTC attempted under another of its regulations to reach defendants who "engaged in fraud, 'directly or indirectly' 'in connection with' commodity options 'by any means whatsoever.'" *Id.* at 1333 (quoting 17 C.F.R. § 33.10 (1982)). The court found that the CFTC was attempting to impose its regulation on entities clearly excluded by the enabling statute – entities that were not accused of "offering to enter into, entering into or confirming the execution of" commodity option transactions – and held that the CFTC had no authority to impose its anti-fraud rules on defendants. The district court entered summary judgment for defendants on all claims and the Eleventh Circuit affirmed. *Mass Media*, 297 F.3d at 1326.

The only conduct the CFTC alleges as to Zilmil under Count Eight is that it "otherwise conducted activity relating to" commodity options. Doc. 5 p. 21. Congress did not include this conduct in Section 4c(b); the CFTC simply tucked it in during its rulemaking process. *CFTC v. Sentinel Mgmt. Grp., Inc.,* 2012 WL 1080166 at * 6 ("[T]he CFTC lacks the authority to extend the purview of a statute beyond what was intended by Congress."). The residual provision of Regulation 32.2 does not reach the alleged conduct of Zilmil for the same reasons the court expressed in *Mass Media.* 156 F.Supp.2d at 1333-1334 (holding that "any rules or regulations promulgated by the CFTC, including the anti-fraud regulations at issue in this case, are applicable only to entities who engage in the activities listed in § 4c(b)"). Despite the Eleventh Circuit's unmistakable rejection of the CFTC's argument, it is now back in this circuit making the very same argument.

**2. The residual provision of Regulation 32.2 is unenforceable because it is unconstitutionally vague.**

"[A] fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc*., 132 S. Ct. 2307, 2317-20, 183 L. Ed. 2d 234 (2012); *see also Connally v. General Constr. Co.,* 269 U.S. 385, 391 (1926) ("[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law"); *Mason v. Florida Bar,* 208 F.3d 952, 958–59 (11th Cir.2000). "To find a civil statute void for vagueness, the statute must be 'so vague and indefinite as really to be no rule or standard at all.'" *Seniors Civil Liberties Ass'n, Inc. v. Kemp*, 965 F.2d 1030, 1036 (11th Cir. 1992)(citing *Boutilier v. INS*, 387 U.S. 118, 123, (1967)). "This requirement of clarity in regulation is essential to the protections provided by the Due Process Clause of the Fifth Amendment." *Fox Television Stations, Inc*., 132 S. Ct. at 2317. Due process "requires the invalidation of laws that are impermissibly vague. A conviction or punishment fails to comply with due process if the statute or regulation under which it is obtained 'fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Id.*

"The root of the vagueness doctrine is a rough idea of fairness. The void-for-vagueness doctrine serves two central purposes: (1) to provide fair notice of prohibitions, so that individuals may steer clear of unlawful conduct; and (2) to prevent arbitrary and discriminatory enforcement of laws." *Mason,* 208 F.3d at 959 (citation omitted); *Fox Television Stations, Inc*., 132 S. Ct. at 2317 (citation omitted). "[T]he due process protection

against vague regulations 'does not leave regulated parties ... at the mercy of *noblesse oblige*.'" *Fox Television Stations, Inc.,* 132 S. Ct. at 2318 (citation omitted).

The "otherwise conducting activity" provision in Regulation 32.2 is so vague and indefinite that it could subject any person to sanctions under the Act for any conduct, however indirect or remote, "related to any transaction in interstate commerce that is a commodity option transaction" unless he or she meets the specified conditions.  It provides no guideposts for courts and is ripe for arbitrary, inconsistent, and unfair adjudications.  *See, Johnson v. U.S.*, 135 S. Ct. 2551, 2557 (2015) (in interpreting Armed Career Criminal Act, finding that residual clause "otherwise involves conduct that presents a serious potential risk of physical injury to another" was unconstitutionally vague because it invited "arbitrary enforcement by judges" and failed to give "fair notice to defendants," thereby denying due process of law.)  The phrase fails to provide fair notice to persons unfamiliar with the byzantine array of regulations pertaining to the Act – and those who are unaware they even exist -- and puts them at extreme risk of unintentional and unknowing violations, because the residual provision could encompass virtually any conduct.  The Act does not provide any guidance for interpreting this provision, thus leaving absurd possibilities as potential avenues for a person to unknowingly become subject to the Act.  *See e.g., Humanitarian Law Project v. U.S. Dept. of Treasury*, 463 F. Supp. 2d 1049, 1070 (C.D. Cal. 2006), *on reconsid'n,* 484 F. Supp. 2d 1099 (C.D. Cal. 2007), *aff'd sub nom.,* 578 F.3d 1133 (9th Cir. 2009) (holding that the term "otherwise associated" was void for vagueness because it was not susceptible of a clear meaning and was undefined, and was also unconstitutionally overbroad because it was a catch-all designed to reach conduct not specified in prior provisions).

18

As an example, the affiliate networks through which Zilmil allegedly sold autotrading systems (e.g., ClickBank, ClickBetter) did not "offer to enter into, enter into or confirm the execution" of binary option transactions and are not accused of doing so.  Yet the fact that their networks facilitated the alleged sale of autotrading systems by affiliate marketers could theoretically subject them to the residual provision of Regulation 32.2 because, under the CFTC's overbroad construction, they "otherwise conducted activity" relating to binary options.  Similarly, employees of ClickBank and ClickBetter could also be unwittingly ensnared to the extent they provided customer support or technology support for the services the networks allegedly provided to Zilmil.  The exceedingly vague residual provision could arguably be applied to these and many other actors and scenarios, none of which are encompassed by the conduct specified in Section 4c(b).  The residual provision of Regulation 32.2 provides no fair notice of what conduct is proscribed.  It is therefore unconstitutionally vague and cannot be enforced without violating Zilmil's constitutional right to Due Process.

### 3. The undisputed material facts establish that Zilmil did not develop or sell autotrading systems.

The undisputed facts show that Zilmil did not engage in the conduct alleged as the basis for Count Eight – the development and sale of autotrading systems that automatically place trades intended to generate losses in a customer's account opened at a binary option dealer.  Doc. 3 ¶¶ 5, 94, 113; Doc. 5 pp. 11, 16.  The CFTC alleges that Zilmil's sales of autotrading systems generated more than $5 million in revenues but the CFTC has adduced no evidence that Zilmil developed or sold autotrading systems.  Doc. 3 ¶ 7.  Instead, testimony from its own representatives, third parties who provided declarations and testimony, and cooperating government witnesses directly contradicts its allegations.

Heather Dasso, the CFTC's corporate representative, recently testified:

- The CFTC is aware of and has seen autotrading systems in other cases, but has never seen nor has in its possession a physical or digital copy of any alleged Zilmil binary option autotrading system, campaign, or funnel.  Exh. A, Dasso Tr. 105:18-106:10; 149:24 – 150:19; *see also* Exh. J, Nos. 25, 51, 54.

- "We don't have a download of any system that was sold by Mr. Shah."  Exh. A, Dasso Tr. 174:18-175:5; 244:2-18.

- The CFTC believes that a customer would download Zilmil's autotrading system to his/her computer and that there might be "directions" to follow, but has never seen any directions nor has any idea what a customer does once they download the software (which it has never seen).  *Id.* 60:9-14, 60:21-61:2; 62:4-15.

- "I can only speculate how [an autotrading system] works."  *Id.* 4:13-5:4.

- The CFTC alleges that some customers downloaded autotrading software, but does not know where the customers obtained it [i.e., does not know whether it came from Zilmil].  *Id.* 62:24-63:4.

- The CFTC has no idea how much an autotrading system costs [i.e., has no evidence regarding the amount Zilmil allegedly charged].  *Id.* 162:17-20.[8]

### a. The CFTC has no evidence that Zilmil developed or sold autotrading systems.

Ms. Dasso suggested that the anticipated testimony of cooperating government witnesses Brookshire and Barrett would evidence Zilmil's activities with autotrading systems.  *See e.g.,* Exh. A, Dasso Tr. 59:11-60:8.  But that suggestion fell flat when the two were deposed.  Messrs. Brookshire and Barrett are affiliate marketers who have entered into cooperation agreements with the government hoping that their cooperation and favorable testimony will garner leniency in any future action taken against them by the CFTC or other

---

[8] Ms. Dasso initially referred to "the emails with Mr. Shah and Mr. Davis" as the "best evidence" for the allegation that Zilmil sold autotrading systems.  Exh. A, Dasso Tr. 102:22-24.  As explained in Section III.C, *infra,* the evidence shows this to be false, Ms. Dasso eventually conceded that the CFTC misrepresented the substance of the communication, and the email is inadmissible hearsay in any event.

regulators.   Exh. F, Brookshire Tr. 214:22-216:20; Exh. E, Barrett Tr. 237:10-238:11.

Despite Ms. Dasso's hoped-for substantiation, their testimony directly contradicts the

CFTC's unproven allegations.   Mr. Brookshire testified that he had no information that

Zilmil developed or created the software.   Exh. F, Brookshire Tr. 226:18-22.   Both also

testified that Zilmil did not sell or provide autotrading systems.   Exh. E, Barrett Tr. 248:21-

249:2; Exh. F, Brookshire Tr. 226:18-227:13.   Both testified that they had never seen or used

autotrading systems.   Exh. E, Barrett Tr. 256:14-20; Exh. F, Brookshire Tr. 226:9-17.   Any

autotrading systems they are aware of were developed and provided by the binary option

dealers themselves, or by what are known as "aggregators," entities that provide the software

directly to their customers.   Exh. E, Barrett Tr. 113:3–115:8; 118:9-22; Exh. F, Brookshire

Tr. 29:21-30:11; 33:19-34:21; 226:18-227:13.

### b. __The CFTC has no evidence of Zilmil being paid for autotrading systems.__

The CFTC alleges "Zilmil made more than $4 million in gross sales through at least

one affiliate network [ClickBank], most if not all of it from fraudulent binary option

autotrading products."   Doc. 5 p. 16.   In support, the CFTC relied on the declaration of

Jennifer Johannsen, the corporate representative of ClickBank.   *Id.* pp. 15-16.   Although the

CFTC presented Ms. Johannsen's declaration as the key piece of evidence supporting these

assertions, it does not say what the CFTC represented.   In fact, the declaration says nothing

about autotrading systems and does not identify the products that generated the alleged $4

million in sales. *Id.* Ex. 10 ¶¶ 8-9.[9]  Ms. Johannsen confirmed this during ClickBank's Rule 30(b)(6) deposition when she was asked to "confirm that you never attested to anything about autotrading systems in Paragraph 8 of your declaration."  Ms. Johannsen agreed, saying, "I didn't.  I said products."  Exh. K, Johannsen Tr. 218:20-23.[10]

The Johanssen declaration does not characterize the "products" offered by Zilmil through ClickBank as "autotrading systems" and definitely does not say that any revenues were attributable to sales of them.[11]  Doc. 5 Ex. 10 ¶¶ 8-9.  In fact, Ms. Johannsen testified she "[does not] know anything about autotrading systems" and does not know whether Zilmil was a vendor of such systems, and that ClickBank does not allow "trading systems" to be sold on its platform.  Exh. K, Johannsen Tr. 194:4-7; 217:7-8; 218:9-12.

### c.  **The CFTC admits it cannot identify any Zilmil autotrading system.**

The CFTC's discovery responses and testimony also contradict its allegations.  *See, Footman v. Cheung*, 139 Fed. Appx. 144, 146 (11th Cir. 2005) (affirming imposition of Rule 11 sanctions for conduct including "filing an amended complaint that contained false

---

[9] Ms. Dasso later confirmed this when she testified that "[w]e are not able to tie the binary options firm that the customer was directed to to the payment from the affiliate network, no." Exh. A, Dasso Tr. 72:1-3.

[10] This is a critical passage because it shows the CFTC actually *altered the words in Ms. Johannsen's declaration* when citing it in the SRO Motion by substituting her word "products" with the CFTC's words "autotrading systems."  It did this to intentionally create the false impression that Ms. Johannsen would be the witness (the sole witness as it turns out) to support its allegation that Zilmil sold autotrading systems through ClickBank.

[11] Wright produced videos for Zilmil for "dozens and dozens of different niches," including online casinos, diamonds, music, how to send money, travel, and others.  Exh. D, Wright Tr. 136:12-21; 179:15-180:8.  Binary was a small percentage of his work for Zilmil. *Id.* 156:15. Berry testified similarly.  Exh. C, Berry Tr. 56:11-57:23, 73:17-74:8.

and unsupported allegations ... [and] filing interrogatory answers that contradicted allegations in the amended complaint."). The CFTC has now admitted (while trying not to admit) that it is unable to identify any autotrading systems that Zilmil sold. Doc. 74 Ex. 1 Req. Nos. 25, 50-51, 53-54.[12] The CFTC's representative, Ms. Dasso, first testified that the allegation of the alleged $4 million in sales of autotrading systems would have been based on ClickBank documents. Exh. A, Dasso Tr. 176:12-17. In a lengthy exchange in response to questions about the CFTC's basis for this allegation, Ms. Dasso made numerous assumptions but cited no evidence. *See e.g., id.* 80:21-84:17. When asked what analysis the CFTC did to determine the source of the revenues coming from ClickBank to Zilmil, Ms. Dasso responded that she was "not prepared to answer that question because I don't know the answer to it." *Id.* 84:12-17. She also stated that she didn't know what information the CFTC had from ClickBank before it filed the Complaint and, "if we got it as a result of discovery, we wouldn't have had the opportunity to [review the ClickBank product list to determine which of these subscriptions was betting sites and which were for binary options] for the Complaint and SRO motion. I just don't know." *Id.* 82:23-83:15.

---

[12] The CFTC cites the Stinson declaration in a further but even lesser attempt to support allegations of Zilmil's sales of autotrading systems (Doc. 5 at 12, 14), but Mr. Stinson's declaration was mischaracterized just like Ms. Johannsen's. First, the Stinson declaration identifies only email marketing campaigns allegedly conducted by Zilmil, not sales of autotrading systems. Second, nothing in the Stinson declaration or attachment refers to autotrading systems. Exh. G, Stinson Tr. 216:16-218:18 (establishing the CFTC's mischaracterization of his declaration in its SRO Motion). Third, even if the Stinson declaration established that Zilmil was associated with autotrading systems (and it does not), the declaration establishes only that each of the emails cited by Mr. Stinson is either silent as to the cost of whatever is being offered, or states that it is being offered free of charge, both of which actually negate the Commission's representations that Zilmil made money by selling them. *See e.g.*, Doc. 5 Ex. 9 at 22, 25, 28, and 31.

Ms. Dasso also acknowledged that Zilmil sold non-binary products but the CFTC made no effort to determine the extent of Zilmil's activity that had nothing to do with binary options. *Id.* 96:4-98:3; 257:17-259:14.

Because it has no evidence, the CFTC can only "assume" that Zilmil sold autotrading systems, and that unfounded assumption – rather than evidence – is the basis for the CFTC's allegation.   Ms. Dasso testified that, based on the names of the products Zilmil allegedly offered, it determined that Zilmil's business model was autotrading systems, and because that was Zilmil's business model, it can now look at product names and determine that Zilmil was selling autotrading systems.   She agreed, however, that such reasoning was circular.   *Id.* 165:10 – 169:15.   Such reasoning is also deeply flawed and, more importantly, does not constitute evidence that Zilmil sold autotrading systems.   The CFTC's "assumptions" about the products Zilmil was promoting – which are the result of its inability to determine whether the product is an eBook or an autotrading system or something else -- are repeated throughout Ms. Dasso's testimony:

> Q:      So is it true then that you don't also know whether this Binary Boom email is promoting an eBook or autotrading systems . . . or something else?
>
> A:      We assume its promoting autotrading systems just based on our knowledge of Shah's business model and what he did.  But that, that's my only basis of my knowledge.

*Id.* 130:2-131:9.[13] Rather than providing evidence of transactions associated with Zilmil's alleged autotrading systems, the CFTC made this and numerous other assumptions about key

---

[13] Counsel for ClickBank advised the CFTC that "for a period of time, Zilmil utilized ClickBank's platform to offer instructional guides for those interested in foreign exchange investments, including binary trading." Exh. L, p. 2.  This is the only evidence of the nature of the products Zilmil marketed through ClickBank, and negates the CFTC's speculative assertion that the "names" of the products Zilmil promoted through ClickBank determine

allegations, including: *Id.* 4:13-5:4 ("I can only speculate how [an autotrading system] works."); 60:21-65:7; 76:6-84:17 (multiple "assumptions" and "presumptions"); 99:23-103:3.[14]  This is a stunning series of admissions in light of the centrality of these allegations to the CFTC's case and the three years of investigation and discovery that preceded Ms. Dasso's May 9, 2018 testimony.  The CFTC has utterly failed to prove that Zilmil developed or sold autotrading systems and, in fact, the undisputed evidence establishes that it did not.

### d.  There is no evidence of a "commodity option transaction" with respect to which Zilmil "conducted activity."

Even if the CFTC had evidence (rather than mere assumptions) that Zilmil sold or provided autotrading systems, it has no evidence of (and admits that it has not identified) a single commodity option transaction related to them.  Exh. J, No. 30.  Similarly, the CFTC has identified no commodity option transaction with respect to which Zilmil "otherwise conducted activity" in its alleged funneling to binary option firms.  Absent evidence of a binary option transaction, the CFTC cannot establish that Zilmil "otherwise conducted activity related to" a commodity option transaction.

### C.  Zilmil Is Entitled To Summary Judgment On Count Nine.

---

they are autotrading systems. The CFTC's speculation and assumptions, in the absence of evidence, do not create a disputed issue of fact.  *See Patrick v. Publix Super Markets, Inc.*, 2017 WL 1159104, at *2 (S.D. Ala. 2017) ("Conclusory allegations and speculation are insufficient to create a genuine issue of material fact." *Valderrama v. Rousseau*, 780 F.3d 1108, 1112 (11th Cir. 2015) (citing *Cordoba v. Dillard's Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) ("Speculation does not create a genuine issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment.")).

[14] Ms. Dasso later conceded that the Jared Davis email was not, in fact, evidence of Zilmil trying to steal people's money.  *See* detailed discussion, *infra* Section III.C.

Count Nine of the Complaint alleges that Zilmil violated Section 4m(1) of the Act by acting as an unregistered commodity trading advisor (**"CTA"**).   7 U.S.C.  §  6m(1). Specifically, the CFTC alleges that Zilmil "for compensation or profit, engaged in the business of advising others, either directly or through publications, writings, or electronic media, as to the value or the advisability of trading in commodity options or swaps without registration as a CTA."  Doc. 5 ¶¶ 179 – 181.  The facts alleged are that Zilmil was "selling, promoting, or otherwise offering binary option trading systems, which purport to place trades [sic] in customers' accounts or to provide customers with trading 'signals.'"  Doc. 3 ¶ 103; Exh. M, Nos. 12, 16-17.  Ms. Dasso confirmed this: "the trading systems themselves give customers advice related to binary options."  Exh. A, Dasso Tr. 190:3-7.

As discussed, *supra* Section III.B.3, the evidence does not support the CFTC's allegation that Zilmil sold autotrading systems.  The governments' cooperating witnesses have refuted these allegations.  Ms. Dasso conceded that the CFTC has never seen a trading system that was created, developed, or sold by Zilmil (even though the CFTC has seen such systems in other cases).  Ms. Johannsen and ClickBank's counsel both stated that Zilmil sold educational materials (ebooks), not autotrading systems.   These are likely some of the reasons why Ms. Dasso could not "speculate [as to] the particular advice that was given" by a Zilmil autotrading system.  *Id.*  190:17-24.

When asked for the basis of the CFTC's claim that Zilmil sold autotrading systems and that the trading systems told the customers what to trade, Ms. Dasso pointed to customer complaints and "emails between Shah and Jared Davis."  *E.g., id.* 194:6-18.  Neither source, however, rescues the CFTC from summary judgment on Count Nine because the customer

complaints and the Davis email are inadmissible hearsay.  "Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  Rule 801(c), Fed. R. Evid.  Hearsay is inadmissible unless the statement is not hearsay as provided by Rule 801(d) or falls into one of the hearsay exceptions in Rules 803, 804, or 807.  *U.S. v. Baker,* 432 F.3d 1189, 1203 (11th Cir. 2005).

Records produced by third parties (ClickBank and ClickBetter) purport to reflect what the CFTC describes as "complaints" by people it alleges bought autotrading systems from Zilmil.  Lacking evidence of actual sales by Zilmil, the CFTC has repeatedly relied on these documents to attempt to establish the truth of the matter asserted – that Zilmil developed and sold autotrading systems.  Exh. A, Dasso Tr. 4:13-5:4; 65:8-66:10; 89:16-91:8;  120:14-121:17;  138:6-141:10;  164:6-171:18;  193:2-199:17;  230:22-231.   The documents contain scant information about the purported complainants, the nature of the unauthenticated complaints, and whether Zilmil was the subject of the complaint and are thus completely unreliable.  The putative complaints do not identify Zilmil as the provider of any autotrading systems.  The most critical failure is that the CFTC has produced no written statements, sworn or unsworn, from any of the putative complainers and has not otherwise remedied the status of the putative complaints as inadmissible hearsay.  The CFTC has offered no indication, for example, that any of the putative customers will testify at trial.  "The possibility that unknown witnesses will emerge to provide testimony . . . is insufficient to establish that the hearsay statement could be reduced to admissible evidence at trial."  *Jones v. UPS Ground Freight,* 683 F.3d 1283, 1293-94 (11th Cir. 2012).

The CFTC has likewise placed great emphasis on an email between Jared Davis and Ryan Miller in which Mr. Miller said that an autotrading system was "crushing people like immediately." *See e.g.,* Doc. 3 ¶ 112. The CFTC now admits that it falsely alleged the email was written to Dr. Shah and that it misleadingly characterized the substance and context of the email. Exh. J, No. 61; Exh. A, Dasso Tr. 221:16-225:7; 247:4-248:8). The comment about "crushing people" (out of context though it was) is hearsay. No witness has authenticated the document or provided an affidavit. In addition to undisputed evidence that Zilmil did not sell autotrading systems, these and other key pieces of evidence upon which the CFTC relies to support its allegation are inadmissible hearsay.

**D. Zilmil Is Exempt From Registering As A Commodity Trading Advisor.**

Even if Zilmil could be considered a CTA, Zilmil would be exempt from registration. CFTC Rule 4.14(a)(9) provides that a person or entity is exempt from CTA registration if:

> (9) It does not engage in any of the following activities:
> (i) Directing client accounts; or
> (ii) Providing commodity trading advice based on, or tailored to, the commodity interest or cash market positions or other circumstances or characteristics of particular clients.

17 C.F.R. § 4.14(a)(9). "Directing" client accounts, as used in the context of the exemption, "refers to agreements whereby a person is authorized to cause transactions to be effected for a client's commodity interest account without the client's specific authorization." 17 C.F.R. § 4.10(f).

The exemption from registration was created after multiple courts held that the registration requirement was unconstitutional as to persons that "provided only standardized commodity trading advice through a variety of media, including Internet web sites, computer

software, voice recordings accessible by telephone, e-mails, facsimiles, and periodicals."
Exemption From Registration as a Commodity Trading Advisor, 65 FR 12938-01, March 10,
2000. As the implementing release indicated, "the district courts found in these cases that the
plaintiffs did not have discretionary control over their clients' accounts, did not provide
advice tailored to the financial situation of any specific client, and had no personal contact
with their clients. All of the information provided to each client was identical." *Id.*

Zilmil is exempt from registering as a CTA because there is no evidence that it
directed client accounts or provided specific advice tailored to particular clients. The CFTC
has conceded it has no evidence that Zilmil caused transactions to be effected for client
accounts, or of any advice provided by Zilmil that was based upon knowledge of or tailored
to a particular trading account or trading activity. Exh. J, Nos. 30-31. "Zilmil didn't have a
direct relationship with a retail customer," and Ms. Dasso had "[no knowledge] that Zilmil
had an insight as to what was going on inside an actual retail customer's trading account [at a
binary options firm]." Exh. A, Dasso Tr. 199:18-203:25. The CFTC admitted (while trying
not to admit) that it was unable to identify customers who sent their binary option login
credentials to Zilmil or any evidence that Zilmil had logged into a customer's binary option
trading account. Exh. J, Nos. 38-39. The CFTC also admitted that it has been unable to
identify any customer who communicated directly with Zilmil. Exh. A, Dasso Tr. 234:6-
237:24; Exh. J, No. 37 (Dasso testifying that the CFTC should have admitted No. 37). These
undisputed facts make clear that Zilmil did not "direct" any customer account.

The CFTC also admitted that is has no evidence that Zilmil provided particularized or
specific trading advice to clients. Exh. M, No. 17. The CFTC alleges instead that Zilmil

hosted websites, produced videos, and sent emails about autotrading systems with identical content to millions of people.  Doc. 5 pp. 11-17.  By these very allegations (though unproven), however, the CFTC at least implicitly concedes that the alleged advice was not based on, or tailored to, the specific circumstances of any particular customer and that everybody received the same advice.[15]

In both the Final Rule implementing the amendments to Rule 4.14 and related no-action letters, the CFTC has stated that parties who provided similarly non-specific advice are exempt from registration, and gave these examples:[16]  The Final Rule outlined conduct that would not require CTA registration pursuant to Rule 4.14(a)(9), including:

- A CTA providing commodity trading advice, including specific buy/sell recommendations, only through newsletters, books and periodicals where recipients of publications all receive the same advice.

- A CTA providing specific commodity trading advice based on a computerized trading system through e-mails, facsimiles, an Internet web site, telephone calls and face-to-face meetings with customers, with the advice provided on a daily basis and all clients all receive the same advice.

- A CTA providing commodity trading advice through an Internet web site to users who receive different advice based on their indicated various preferences for certain trading products, as the CTA is merely allowing its clients to select which advisory services they wish to purchase.

The common denominator in each of these scenarios is identical advice provided to all recipients regardless of their underlying investment objectives or trading goals, and not

---

[15] By contrast, the CFTC has alleged activity by Citrades that would likely preclude Citrades from relying on this exemption from registration.  According to the declarations of the three Citrades customers, Citrades directed the trading in their account and/or provided particularized or specific trading advice to them.  Composite Exh. N.  No such conduct by Zilmil has been alleged, much less evidenced.

[16] See https://www.cftc.gov/sites/default/files/foia/fedreg00/foi000310a.htm

specific to any individual's particular circumstances.  Even if the CFTC had evidence that Zilmil acted as a CTA (and it does not), Zilmil would be exempt from CTA registration pursuant to Rule 4.14(a)(9). Zilmil is therefore entitled to summary judgment on Count Nine.

### E.  Zilmil Is Entitled To Summary Judgment On Count Ten.

Count Ten alleges another violation of Section 4c(b) of the Act, which makes it unlawful for any person to offer to enter into, enter into, or confirm the execution of any transaction involving an option contrary to any CFTC rule, regulation, or order.  7 U.S.C. 6c(b).  The CFTC alleges Zilmil violated Regulation 32.4:

> In or in connection with an offer to enter into, the entry into, or the confirmation of the execution of, any commodity option transaction, it shall be unlawful for any person directly or indirectly:
>
> (a) To cheat or defraud or attempt to cheat or defraud any other person;
>
> (b) To make or cause to be made to any other person any false report or statement thereof or cause to be entered for any person any false record thereof; or
>
> (c) To deceive or attempt to deceive any other person by any means whatsoever.

17 C.F.R. § 32.4.  Zilmil is entitled to summary judgment on Count Ten for two principal reasons, in addition to the CFTC's failure to establish its jurisdiction over the alleged conduct (Section III.A, *supra*).  First, the CFTC seeks to expand the jurisdictional reach of Section 4c(b) beyond the conduct intended by Congress.  Second, there is no evidence that Zilmil's alleged conduct was "in or in connection with" an offer to enter into, entry into, or confirmation of the execution of any commodity option transaction.

### 1.  The CFTC seeks to expand the jurisdictional reach of Section 4c(b) beyond the conduct intended by Congress.

For the same reasons discussed in Section III.B.1, *supra*, the CFTC cannot expand its jurisdiction, through its regulations, to conduct that Congress did not specify in Section 4c(b).   Section 4c(b) applies only to persons who "participate in commodity option transactions" through an "offer to enter, entry into, or confirm[ation of] the execution of" a commodity option transaction.  *Mass Media*, 156 F.Supp.2d at 1333-1334 ("The CFTC has cited to no portion of the Act or the Act's legislative history that confers the CFTC with the authority to impose its anti-fraud rules and regulations on entities who do not participate in commodity trading transactions.")  Section 4c(b) does not extend to persons whose conduct is merely "in connection with" such transactions. There is no evidence that Zilmil engaged in the conduct proscribed by Section 4c(b).

## 2. Alternatively, there is no evidence that Zilmil's conduct was in or in connection with a commodity option transaction.

The absence of any evidence that Zilmil offered to enter, entered, or confirmed the execution of a commodity option transaction should end the inquiry.  Even if the analysis could continue, however, Regulation 32.4 requires proof that the alleged conduct was "in or in connection with" an offer to enter into, the entry into, or the confirmation of the execution of a commodity option transaction.   However, the CFTC has not identified any option transactions with which Zilmil's alleged conduct was "in or in connection."  Exh. J No. 30. There is likewise no evidence of any offers to enter, the entry into, or the confirmation of the execution of option transactions that Zilmil defrauded or deceived anyone "in or in connection with."   There is simply no connection between Zilmil's alleged representations and any offer to enter, entry into, or confirmation of the execution of any option transaction. *See Sentinel Mgmt.,* 2012 WL 3234277 at * 3 (finding that "Sentinel made no

misrepresentations that induced customers to enter into futures trading contracts. It therefore is not liable under Section 4b" (prohibiting fraud "in connection with" any futures contract.)).

The same analysis applies to the allegation that Zilmil failed to disclose an affiliate marketing relationship with Citrades and that it received payments from Citrades for first-time depositors.  Doc. 5 p. 27.  There is no evidence that this alleged omission was in or in connection with an offer to enter, the entry into, or the confirmation of a commodity option transaction.  No payments from Citrades to Zilmil have been identified as pertaining to anything.  There is no evidence connecting any such payments with any option transaction. Exh. A, Dasso Tr. at No evidence suggests that an option transaction was a prerequisite to Zilmil's receipt of such payments or is even associated with them.  By contrast, the decisions by the three Citrades customers to deposit funds was based entirely on the sales presentations by representatives of Citrades.  None of them identified Zilmil or any funnel associated with Zilmil, nor has any other Citrades customer.  Composite Exh. N.

Even if the CFTC had evidence that Citrades paid Zilmil based on "first-time depositors" (Doc. 3 ¶ 102) (and it has none), such payments were not made as a result of any offer by Zilmil to enter into, the entry into, or confirmation of the execution of binary options transactions.  In fact, even the CFTC's unsubstantiated allegation make clear that the only precondition for such payments would have been a deposit of funds.  The evidence and the CFTC's allegations make clear that Zilmil's alleged conduct had nothing to do with an offer to enter, the entry into, or confirmation of the execution of an option transaction.

The Ninth Circuit addressed a similar issue in *CFTC v. White Pine Trust Corp.*, 574 F.3d 1219, 1225-1227 (9th Cir. 2009).  An investment manager raised money from customers

for investment in discretionary trading accounts.  The fund prospectus stated that customer funds would be invested in spot and options markets for foreign currency.  The account manager hired a solicitor who raised funds by making alleged misrepresentations to investors.  The CFTC asserted claims against the solicitor for violations of the Act.  574 F.3d at 1220-1223.  The solicitor argued the CFTC lacked jurisdiction because "he was not offering customers any particular financial product, whether options or anything else, but rather a service – discretionary investing."  *Id.* at 1225.  He contended that because the relevant provision of the Act (similar to 4c(b) here) requires "an option" that "is offered," it is not enough to solicit money for an investment account that may invest in options.

"White Pine offered to manage the money of investors, not to place orders on the options markets or any other financial instrument."  *Id.* 1225-1226.  "While it might make sense to view a broker, who accepts a specific order for options, as offering options when he solicits investors, we cannot say the same of a fund or discretionary account manager."  *Id.* 1226.  The CFTC pointed out that the White Pine solicitation materials stated that it might invest customers' money in options but, as the court distinguished, the materials do not thereby offer options.  The court noted that an "option" is not a term of art but rather is specifically defined by the Act.  *Id.*  It means "the contract whereby the creator (or writer) of the option grants to the purchaser 'the right, for a specified period of time, to either buy or sell the subject of the option at a predetermined price.'"  *Id.*

Ms. Dasso's testimony makes clear that Zilmil's alleged conduct was, like the solicitor's in *White Pine*, not an offer to enter into an option transaction.  Ms. Dasso said the primary use to which Zilmil put the alleged autotraders was to accumulate contact

information for lead lists.  Exh. A, Dasso Tr. 6:24-7:13.  Secondarily, Zilmil allegedly used the autotraders to funnel people to a "binary options firm, [where] they would get access to the [trading] software. . . ."  *Id.*  Nowhere does Ms. Dasso testify that Zilmil offered to enter into, entered into, or confirmed the execution of any option transaction.  Her testimony underscored the very different conduct of Citrades, which would "solicit [customers] to invest and open an account at Citrades, deposit money.  Sometimes they got on the phone once they got the [customer] contact information.  If the customer wouldn't purchase the software right away or invest right away, [Citrades] would take that, their name and their information and then telemarket them or solicit them to deposit money."  *Id.* 27:18-29:7.  Zilmil did not engage in such conduct nor did it receive funds from customers for trading in binary options.  *Id.* 28:18-29:7; 225:10-226:5; Exh. J, No. 40.

Ms. Dasso also described the autotrading system software a "marketing tool."  Exh. A, Dasso Tr. 67:4-68:1.  Even though she had never seen a Zilmil alleged autotrading system, Ms. Dasso testified that she "understood" based on other investigations unrelated to Zilmil that autotrading systems would somehow lead a person to a binary option firm.  *Id.* 244:2-246:1.  But she could cite no example of a customer who was actually led to a binary option firm by a Zimil autotrading system or any other type of promotion.  Exh. A, Dasso Tr. 117:20-118:6.  Just as the CFTC in *White Pine* "could not clearly point to the 'agreement, contract, or transaction in foreign currency . . . that is an option," it likewise cannot point to one here.  The Ninth Circuit held that the CFTC had no jurisdiction over the solicitor's conduct in *White Pine*.  Based on the undisputed facts, the same result obtains here.

**F.  Zilmil Is Entitled To Summary Judgment On Count Eleven.**

Count Eleven alleges that Zilmil committed fraud while acting as a CTA in violation of Section 4*o*(1) and Regulation 4.41(a), which prohibits fraudulent advertising.  7 U.S.C. § 6*o*; 17 C.F.R. § 4.41(a).  A necessary element of the claim requires that the CFTC prove Zilmil acted as a CTA.  For the same reasons stated in Section III.C (and III.B.3), *supra,* Zilmil was not a CTA and is therefore entitled to summary judgment on Count Eleven.

**G.  Zilmil Is Entitled To Summary Judgment On Count Twelve.**

Count Twelve is a claim for violation of Section 6(c)(1) of the Act which prohibits, "in connection with any swap, or a contract of sale of any commodity in interstate commerce, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commission shall promulgate."  7 U.S.C. § 9(1).  The CFTC alleges that Zilmil violated Section 6(c)(1) and Regulation 180.1 by, in relevant part, the use or attempted use of "manipulative devices, schemes, and artifices to defraud."

Claims under Section 6(c)(1) require both manipulative and deceptive conduct, because requiring either manipulative *or* deceptive conduct would duplicate Section 4b's prohibition on "fraud in covered retail commodity transactions" and thus "render § 4b superfluous," and inherently conflict with the thrust of other Act provisions.  *CFTC v. Monex Credit Company*, 2018 WL 2306863, at *8 (C.D. Cal. 2018) (noting that an interpretation of Section 6(c)(1) requiring either fraudulent or manipulative conduct would "eliminate the Actual Delivery Exception").  The legislative history makes this clear.  *Id.* at * 9.  "Nowhere does the legislative history contemplate extending CFTC's authority under § 6(c)(1) to allow it to combat fraud absent market manipulation."  *Id.* at * 9.  "The Act unambiguously

forecloses the application of § 6(c)(1) in the absence of actual or potential market manipulation…[and] § 6(c)(1) prohibits fraud-based manipulation." *Id*.[17]

To show manipulation, the CFTC must establish that: "(1) Defendants possessed an ability to influence market prices; (2) an artificial price existed; (3) Defendants caused the artificial prices; and (4) Defendants specifically intended to cause the artificial price." *In re Amaranth*, 730 F.3d 170, 173 (2d Cir. 2013) (quotations and citation omitted). For attempted manipulation the CFTC must demonstrate: (1) that Defendants specifically intended to cause an artificial price (*i.e.*, a price that does not reflect legitimate supply and demand); and (2) some overt act in furtherance of that intent. *See CFTC v. Wilson*, 27 F. Supp. 3d 517, 531-32 (S.D.N.Y. 2014); *CFTC v. Parnon Energy Inc.*, 875 F. Supp. 2d 233, 250 (S.D.N.Y. 2012). Courts require a specific intent to cause the artificial price. *In re Amaranth,* 730 F.3d at 183 ("There is . . . no manipulation without intent to cause artificial prices."). Courts and the CFTC have recognized that the applicable intent requirement is intent to create an artificial price. *In re Ind. Farm Bureau,* 1982 WL 30249, at *6 ("[S]pecific intent to create an 'artificial' or 'distorted' price is a *sine qua non* of manipulation."); *In re Hohenberg Bros. Co.*, CFTC No. 75-4, 1977 WL 13562, at *7 (C.F.T.C. Feb. 18, 1977) ("We discern no difference in the intent required to accomplish a manipulation and that required by an

---

[17] The *Monex* court relied on rules of statutory construction and the rule against surplusage in finding that statute requires both manipulative and deceptive conduct. *Monex*, 2018 WL 2306863 at *8. The court also considered, among other things, the title of Section 6(c) ("Prohibition regarding manipulation and false information") and Section 6(c)(1) ("Prohibition against manipulation"). Construing Section 6(c)(1) to prohibit fraudulent conduct alone would "render Section 4b superfluous…[and] also eliminate the Actual Delivery Exception." *Monex*, 2018 WL 2306863 at *8.

attempted manipulation, which is simply the performance of an act or conduct which was *intended to effect an artificial price*") (emphasis added).

Before addressing the utter lack of evidence, it is important to note that the Complaint itself is entirely devoid of any factual allegations to support the claim that Zilmil manipulated, attempted to manipulate, or had the specific intent to effect an artificial price. This should end the inquiry into this obviously frivolous claim. But in addition, the CFTC adduced no evidence of market manipulation or any attempted manipulation. There is no evidence that: (1) Zilmil possessed an ability to influence market prices; (2) an artificial price existed; (3) Zilmil caused the artificial prices; or (4) Zilmil specifically intended to cause the artificial price. *See, In re Amaranth Nat. Gas Commodities Litig.*, 730 F.3d at 173. Zilmil is therefore entitled to summary judgment on Count Twelve.

### H. Zilmil Is Entitled To Summary Judgment On The Claims For Aiding And Abetting.

Counts Ten, Eleven, and Twelve claim that Zilmil aided and abetted the Citrades Defendants' violations of the Act and Regulations and thus is equally liable as the Citrades Defendants for each such violation. Complaint at ¶¶ 187, 195, 200; 7 U.S.C. § 13c(a). "[B]oth the CFTC and courts have found that the standard to be applied in determining liability under the CEA mirrors the standard applicable for aiding and abetting under the criminal law. *CFTC v. Grossman*, 2015 WL 11197766, at *4 (S.D. Fla. 2015); *In re Richardson Securities, Inc.,* Comm.Fut.L.Rep. (CCH) ¶ 21,144 at 24,642 (CFTC 1981) ("The express intent of the drafters [of the CEA] ... was to emphasize that ... proof of a specific unlawful intent to further the underlying violation is necessary before one can be found liable for aiding and abetting a violation of the Act."). The CFTC must show that

38

Zilmil "(1) had knowledge of the principal's [ ] intent to commit a violation of the Act; (2) had the intent to further that violation; and (3) committed some act in furtherance of the principal's objective." *Grossman* at * 4.  This requires "not only knowledge of the principal's objective but a desire to help him attain it." *Bosco v. Serhant*, 836 F.2d 271, 279 (7th Cir. 1987).  Inferences of knowledge alone are not enough; the CFTC must demonstrate Zilmil's actual knowledge of Citrades' illegal transactions, but it has not done so.  *See, Sentinel Mgmt. Group, Inc.*, 2012 WL 3234277 at *6.

Courts have denied aiding and abetting claims brought by securities regulators for failing to prove the necessary elements.  *See S.E.C. v. Lucent Techs., Inc.*, 610 F. Supp. 2d 342, 367 (D.N.J. 2009) ("the record lacks facts that could plausibly lead the jury to conclude that Carter had knowledge of the underlying fraud. The Court grants Carter's motion for summary judgment on the aiding and abetting liability claim."); *S.E.C. v. Cedric Kushner Promotions, Inc.*, 417 F. Supp. 2d 326, 335 (S.D.N.Y. 2006) (awarding summary judgment to defendant on aiding and abetting claims where "SEC has not made the slightest showing that Angel was involved with any of the subjects – cash flow, etc. – which turned out to be falsely presented."); *Sentinel Mgmt. Group, Inc.*, 2012 WL 3234277 at * 6 (denying summary judgment on CFTC's aiding and abetting claim for failure to demonstrate party's actual knowledge of violative transactions and conduct).

The CFTC has failed to adduce supporting evidence for any of the required elements for aiding and abetting Citrades' violations.  It has no evidence: (a) that Zilmil had knowledge of Citrades' intent to violate the Act; (b) that Zilmil had the intent to further Citrades' violations; or (c) that Zilmil committed any act in furtherance of Citrades'

objective.   The only evidence of dealings between Zilmil and Citrades are email communications regarding payment issues, but the CFTC has provided no evidence of the basis or reason for the payments.   There is no evidence that Zilmil had any other interactions with Citrades or was otherwise involved in Citrades' interactions with its customers; rather, the evidence demonstrates the contrary.   For example, the three Citrades' customer declarations each refer to direct communications they had with Citrades; none of them reference Zilmil.   Comp. Exh. M; *see also* Exh. J, Nos. 26, 48, 52, 55.   The CFTC conceded that Zilmil was not involved in any telemarketing done by any binary dealers like Citrades nor was Zilmil involved with the process to induce anyone to deposit money with the dealer. Exh. A, Dasso Tr. 28:18 – 29:7; 225:20 – 226:5.   The CFTC has also admitted that it has not identified any customers who were funneled to Citrades by Zilmil. *Id.* 230:22 – 232:4. The CFTC can show no losses by any such customer.   The evidence shows none of the elements required for the aiding and abetting claim and Zilmil is entitled to summary judgment on Counts Ten through Twelve.

**IV.    CONCLUSION**

The CFTC made its allegations and asserted its claims without evidence to support them.  Its lengthy investigation and discovery have come up short.  It has attempted from the start to link Zilmil to the conduct of Citrades and establish guilt through association, assumptions, and speculation rather than facts.   In its zeal, the CFTC has repeatedly misrepresented and omitted key facts and breached its duty of candor to the Court.   The CFTC has ultimately failed to adduce the evidence needed to support the alleged violations and Zilmil is therefore entitled to summary judgment on all counts.

/s/ Peter B. King
Peter B. King (FBN 0057800)
Jordan D. Maglich (FBN: 0086106)
WIAND GUERRA KING P.A.
5505 W. Gray Street
Tampa, FL 33609
Phone: (813) 347-5100
Fax: (813) 347-5198
Email: pking@wiandlaw.com
Email: jmaglich@wiandlaw.com
*Attorneys for Defendants Michael Shah
and Zilmil, Inc.*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on July 12, 2018, I served a copy of the foregoing via

electronic mail to:

Ashley J. Burden
ABurden@CFTC.gov
Stephanie Reinhart
sreinhart@cftc.gov
Joseph A. Konizeski
jkonizeski@cftc.gov
Rosemary Hollinger
rhollinger@cftc.gov
Scott R. Williamson
swilliamson@cftc.gov
U.S. Commodity Futures Trading
525 W. Monroe St., Suite 1100
Chicago, IL 60661

Stanley H. Stone
stonelawfirm@earthlink.net
Stone & Stone
PO Box 261727
Encino, CA 91426-1727

Kenneth Dante Murena
Russell Landy, Esq.
Damian & Valori LLP
1000 Brickell Avenue, Suite 1020
Miami, FL 33131
kmurena@dvllp.com
rlandy@dvllp.com

Richard Landes
rjlandes@gmail.com
The Law Office of Landes & Julien
736 2nd Street North
Jacksonville Beach, FL 32250

/s Peter B. King
Peter B. King (FBN: 0057800)