IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA, JACKSONVILLE DIVISION

| | |
|---|---|
| Commodity Futures Trading Commission,<br><br>Plaintiff,<br><br>vs.<br><br>Jason B. Scharf (d/b/a Citrades.com and AutoTradingBinary.com); CIT Investments LLC; Brevspand EOOD; CIT Investments Ltd.; A & J Media Partners, Inc.; Michael Shah; and Zilmil, Inc.,<br><br>Defendants. | Case No. 3:17-cv-774-J-32MCR<br><br>Plaintiff CFTC's Motion for Summary Judgment Against the Zilmil Defendants<br><br>Hon. Timothy J. Corrigan |

Defendant Michael Shah ("Shah"), acting through his company Defendant Zilmil, Inc. ("Zilmil"), is the mastermind of an extremely lucrative internet scam involving so-called binary options. Between July 2012 and the present, Shah and Zilmil (collectively, the "Zilmil Defendants") made more than $18.6 million in proceeds from their fraudulent scam.

Using fraudulent misrepresentations, the Zilmil Defendants induced people to deposit money with illegal binary options trading websites that purported to offer customers the ability to trade so-called binary options contracts online. Binary options are essentially bets that the price of a particular commodity will be above (or below) a certain number at the time the option expires. The binary options trading websites marketed by the Zilmil Defendants were not registered with Plaintiff Commodity Futures Trading Commission ("CFTC"), as required in order to legally offer binary options contracts to the public, and are themselves a scam. Nevertheless, the Zilmil Defendants convinced customers to deposit money with the binary options websites by offering miracle software "trading systems" with names like 2014

Millionaire, Binary Genetic, and Millionaire Money Machine.  For each person who deposited money with one of these trading websites, the Zilmil Defendants received a commission of as much as $450.

The Zilmil Defendants claimed in emails and websites that their trading systems would automatically place profitable trades for the user or provide "signals" for the user to make profitable trades.  A customer who signed up for one of the Zilmil Defendants' trading systems would be instructed to deposit money with a binary options website.  Customers who deposited money with a binary options website rarely, if ever, received any money back.  Their money was typically misappropriated by the binary options website operators.

Defendant Shah acknowledged in chat messages and emails that the trading systems he promoted were fraudulent and did not work as advertised.  Shah acknowledged as well that the customers who attempt to trade binary options will not make money, and that the customers' funds will be misappropriated by the trading websites.  Defendant Shah referred to his trading systems as "B.S." and to the binary options websites as scammers.

Through the marketing of its so-called trading systems, the Zilmil Defendants were able to convince thousands of customers to deposit money with binary options websites.  They were able to do this because of the large scale of their operation and their use of numerous methods to reach potential customers.  The Zilmil Defendants used email marketing firms to send SPAM with misrepresentations about the trading systems to millions of people, paid video producers to make elaborate—and fraudulent— video testimonials promoting the trading systems, and used hosted dozens, if not hundreds, of web pages falsely extolling the virtues of the trading systems.  The Zilmil Defendants also relied on other

internet marketers, referred to as "affiliates," to help spread the word about the Zilmil Defendants' trading systems.  These affiliates sent SPAM messages and links to websites provided by Defendant Shah to their own email lists in return for a share of commissions.

In testimony, the Zilmil Defendants have refused to answer any substantive questions about their operations.  Instead, the Zilmil Defendants have repeatedly invoked the rights against self-incrimination under Fifth Amendment.

Since learning they were under investigation, the Zilmil Defendants have engaged in a campaign of witness-tampering, specifically instructing at least three witnesses to destroy all documents relating to the Zilmil Defendants' fraudulent conduct.

There is no genuine issue of material fact that the Zilmil Defendants engaged in a fraudulent scheme—and made misrepresentations and omissions—in violation of the anti-fraud provisions of the Commodity Exchange Act and Regulations.  Nor is there any genuine issue of material fact that the Zilmil Defendants, through their trading systems, acted as a "commodity trading advisor" without registration, as required by the Act.  Moreover, by acting as an independent marketer for unregistered binary options websites, the Zilmil Defendants violated the Act's and Regulations' prohibitions against engaging in activity with respect to unregistered binary options.   Accordingly, the Court should enter summary judgment in favor of the CFTC on all counts against the Zilmil Defendants.

The Court should also enter an order of disgorgement against the Zilmil Defendants in the amount of $18,671,793.97.  This number represents commissions paid to the Zilmil Defendants by the binary options websites during the relevant time period or, in other words, the unlawful gain to the Zilmil Defendants.  The Court should also enter a civil monetary

penalty against the Zilmil Defendants in an amount no greater than three times disgorgement, an amount commensurate with the Zilmil Defendants' extraordinary misconduct and utter lack of mitigating circumstances.

## I. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317, 323 (1986); *see also* FED. R. CIV. P. 56(c).

Once the moving party establishes that there are no genuine issues of material fact, the burden shifts to the non-moving party, who "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The nonmoving party is required to "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324. "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be

evidence on which the jury could reasonably find for the [non-movant]." *Liberty Lobby*, 477 U.S. at 252.

## II.  THE PARTIES

Plaintiff Commodity Futures Trading Commission ("CFTC") is the independent federal regulatory agency charged with the administration and enforcement of the Commodity Exchange Act ("Act") and regulations ("Regulations") promulgated thereunder.

Defendant Michael Shah is a natural person who resides in Jacksonville, Florida. (*Compare* Compl. ¶ 23 (Doc. 3), *with* Zilmil Defs.' Answers and Affirmative Defenses ¶ 23 (Doc. 54) (admit).)  Shah has never been registered with the CFTC in any capacity.  (*Id*.)

Defendant Zilmil, Inc. ("Zilmil") is a Florida Corporation with its principal place of business in Jacksonville, Florida.  (*Compare* Compl. ¶ 24 (Doc. 3), *with* Zilmil Defs.' Answers and Affirmative Defenses ¶ 24 (Doc. 54) (admit).)  Zilmil has never been registered with the CFTC in any capacity.  (*Id.*)

Michael Shah controls and supervises Zilmil's day-to-day operations.  Shah is a signatory to and controls Zilmil's bank accounts.  *Compare* Compl. ¶ 25 (Doc. 3), *with* Zilmil Defs.' Answers and Affirmative Defenses ¶ 25 (Doc. 54) (admit).)  Shah is the president, director, and shareholder of Zilmil.  (*Id.*)  He also enters into contracts on behalf of Zilmil.  (*Id.*)

## III.  STATEMENT OF UNDISPUTED FACTS

### A.    Customers Who Signed Up for the Zilmil Defendants' "Trading Systems" Were Defrauded.

The Zilmil Defendants' scheme is illustrated by the experience of customers Valerie Tate and Jan Silver.  These individuals signed up for trading systems promoted by Shah, and

5

were solicited to deposit money with unregistered binary options websites.  The trading systems did not work as advertised, and both had their funds misappropriated by the binary options website operators.

### 1.     Valerie Tate

In 2014, Valerie Tate was living in Gwynn Oak, Maryland.  (Tate Decl. ¶ 2.)  Ms. Tate had recently retired from the federal government and was looking for a way to supplement her income.  (*Id*. ¶¶ 3-4.)

Ms. Tate started receiving emails from someone named "Stan Lutz."  (*Id*. ¶¶ 5-6.)  The emails promoted a binary options trading system called "2014 Millionaire."  (*Id*. ¶ 6.)  According to the emails, 2014 Millionaire was a software application that "over 75 multimillionaires use to generate profits of more than $57,858 + daily."  (*Id*.; *see also* Ex. A to Tate Decl.)  The emails explained that if Ms. Tate deposited money with a binary options website called "LBinary," Ms. Tate could "gain access to the software and … start generating THOUSANDS per day at the push of a button."  (Tate Decl. ¶ 6; *see also* Ex. A to Tate Decl.)  2014 Millionaire was one of the Zilmil Defendants' trading systems, and the Zilmil Defendants acted as marketers for the LBinary website.  (Dasso Decl. ¶ 16.)

Ms. Tate signed up for the 2014 Millionaire system and used her credit card to make an initial deposit of $250 with LBinary.  (Tate Decl. ¶¶ 7-8.)  The 2014 Millionaire application automatically placed trades in Ms. Tate's account at LBinary.  (*Id*. ¶¶ 9-10.)  The autotrader performed as designed, though not as advertised, however, and after several losing trades, Ms. Tate's account dwindled to nothing.  (*Id*.)  After that, Ms. Tate began receiving calls and emails from "brokers" at LBinary who claimed they could profitably trade Ms.

Tate's account for her.  (*Id*. ¶¶ 11-12.)  The brokers promised that they would only make "insured" trades for Ms. Tate, and that she could never lose money.  (*Id*.)  Based on the brokers' representations, Ms. Tate deposited another $3,000 with LBinary.  (*Id*. ¶ 14.)

For a while, it appeared that the brokers were placing profitable trades in Ms. Tate's account.  (*Id*. ¶ 15.)  When Ms. Tate asked to withdraw $3,000 to pay her mortgage, the brokers told Ms. Tate that company policy prohibited her from marking any withdrawals until her account balance reached $125,000.  (*Id*. ¶¶ 17-18.)  After that, losing trades started appearing in Ms. Tate's account.  (*Id*. ¶¶ 19-21.)  Before long, Ms. Tate's accounts had been traded down to nothing.  (*Id*.)

### 2.     Jan Silver

In 2013, Jan Silver was living in Gainesville, Florida.  (Silver Decl. ¶ 2.)  Mr. Silver was suffering from a debilitating medical condition and looking for a way to make money from home.  (*Id*. ¶¶ 3-4.)

Mr. Silver began receiving unsolicited emails advertising something called "Binary Genetic."  (*Id*. ¶ 5.)  The emails touted Binary Genetic as "the FIRST and ONLY Genetic Algorithm Bot" and an "Advanced Profit Doubler."  (*Id*.)  Mr. Silver then watched a video about Binary Genetic, which he viewed on the internet.  (*Id*.)  The video and emails explained that Binary Genetic would automatically place profitable binary options trades on the user's behalf.  (*Id*.)  Based on these representations, Mr. Silver purchased the Binary Genetic software for $54.  (*Id*. ¶ 6.)

Shortly after purchasing the software, Mr. Silver received emails from Binary Genetic support instructing him to open an account with their "recommended broker," Global Trader

365.  (*Id.* ¶¶ 8-9.)  The Zilmil Defendants acted as marketers for the Global Trader 365

website.  (Dasso Decl. ¶ 16.)  Mr. Silver went to Global Trader's website and opened an

account with a $500 deposit that he charged to his credit card.  (Silver Decl. ¶ 10.)

      Mr. Silver wrote to Binary Genetic for instructions on how to use the software.

Binary Genetic support responded that the software would "automatically alert [him] about

trades," and that Mr. Silver should place trades according to its "signals."  (*Id.* ¶ 10; *see also*

Ex. D to Silver Decl.)

      Mr. Silver soon began receiving calls from "brokers" at Global Trader 365.  (Silver

Decl. ¶ 11.)  The brokers convinced Mr. Silver to let them place trades on his behalf.  (*Id.*)

Based on the brokers' representations, Mr. Silver deposited another $5,000, which he

charged to his credit card.  (*Id.*)

      At first, the Global Trader brokers appeared to be placing profitable trades.  (*Id.* ¶ 12.)

After a while, though, the trades became less profitable, and Mr. Silver's account balance

declined to zero.  (*Id.*)  At the urging of the brokers, Mr. Silver deposited another $5,000,

which was also lost to trading by the brokers.  (*Id.*)

      The  Global Trader brokers encouraged Mr. Silver to deposit another $10,000 and

offered to teach Mr. Silver how to recover his losses.  (*Id.* ¶ 13.)  When Mr. Silver declined,

the brokers offered to refund his $10,000 deposits in return for $6,000 in "taxes and fees,"

which Mr. Silver paid.  (*Id.* ¶¶ 13-14.)  Mr. Silver never received any money back from

Global Trader.  (*Id.* ¶¶ 14-16.)

**B.      The Zilmil Defendants Were Internet Marketers for Unregistered Binary Options Websites.**

From at least July 2012 through July 2017 (the date of the statutory restraining order in this case), the Zilmil Defendants acted as internet marketers for numerous unregistered binary options websites.  (*See* Giacca Decl. ¶¶ 10-12; Dasso Decl. ¶¶ 4-8, 11-13, 16.)  The Zilmil Defendants do not dispute this.  (*Compare* Compl. ¶¶ 7, 115 (Doc. 3), *with* Zilmil Defs.' Answers and Affirmative Defenses ¶¶ 7, 115 (Doc. 54) (admitting that the Zilmil Defendants "received compensation from Citrades for its advertising efforts," and that the Zilmil Defendants "did business with binary options websites").)

The binary options websites marketed by the Zilmil Defendants offered to enter into binary options transactions with the retail public via an online trading platform.  (Giacca Decl. ¶ 11.)  Binary options are contracts that customers can buy or sell that allow them to make predictive trades on whether the price of a certain commodity, index or foreign currency will go "up" or "down" at a future date and/or time.  *See CFTC v. Vault Options, Ltd.*, No. 1:16-CV-01881, 2016 WL 5339716, at *2 (N.D. Ill. July 20, 2016); *CFTC v. Banc de Binary Ltd.*, No. 213CV00992MMDVCF, 2016 WL 782927, at *5-6 (D. Nev. Feb. 29, 2016).  Depending on the underlying asset, the customer may select expiry times as short as 60 seconds and as long as 23 hours and 59 minutes.  *See  Banc de Binary Ltd.*, 2016 WL 782927, at *5-6.  At expiry, the customer who has correctly predicted the price movement of the commodity receives a credit to the customer's account, while a customer who has incorrectly predicted the price movement of the commodity loses the full amount paid for the option.  *Id.*

9

The Zilmil Defendants acted as marketers for the following binary options websites: LBinary, Global Trader 365, Vault Options, TraderXP, Trade Rush, Banc de Binary, Citrades, OptionMint, OptionRally, RBOptions, Bloombex Options, Redwood Options, BeeOptions, Amber Options, OptionsXO, and SpotFN.  (Dasso Decl. ¶ 16.)  None of these websites or their operators are or ever have been registered to offer binary options contracts to the public.  (*Id.* ¶ 17.)

The Zilmil Defendants' business is to drive internet "traffic," i.e., customers, to unregistered binary options websites so that they will open and fund an account.  (*See* Giacca Decl. ¶ 11; Ex. C to Dasso Decl. (Zilmil Defs.' counsel explains that Zilmil "assisted in getting prospective customer internet traffic to [Vault and Global Trader 365] for the purpose of allowing the two to themselves convert interested members of the public to actual customers."); March 16, 2018 Hearing Trans. at 73:8-74:4 (Zilmil Defs.' counsel explains that "through a series of clicks, you can get to a Citrades, for example.  And then Citrades would pay, as Mr. Burden described, $450 per first-time depositor.").)

The Zilmil Defendants do this on a massive scale, as Defendant Shah explains in an email to Jared Davis, who operates the "OptionMint," an unregistered binary options website:

> I'm Mike Shah, probably have heard of me, we do several thousand ftds a month on spot brands alone...
>
> They told me you were a good broker for USA and we were considering adding you guys in a rotation with ten other brokers we rotate on our launches. We do high volume, steady traffic, so hit me up if you guys got room on floors/leads.

(Ex. A to Google Decl.)

The Zilmil Defendants receive a commission, typically between $450 and $600, for each person that deposits money as a result of their marketing efforts.  (Giacca Decl. ¶ 12; Ex. C to Google Decl. ("Total is 73 traders at $450 each or $32,850"); Exs. to Dasso Decl., e.g., Ex. A ("I've set the CPA as per your other campaigns at $450" (Zilmil-01-0000034)); Ex. D (email from Banc de Binary showing commissions of $450-600 (ZILM0049834).)

The Zilmil Defendants have made millions of dollars in commissions from binary options firms.  Between July 2012 and the present, the Zilmil Defendants received at least $18.6 million in commissions for their marketing activities.  (Dasso Decl. ¶ 15; *see also* Davis Decl.)  Defendant Shah brags about this in chat messages with his compatriots:

> [4/13/2014 9:44:46 PM] Brookshire: ***so u been making pretty good money on previous binary offers?***
>
> ***[4/13/2014 9:45:17 PM] Mike S: 2013 about 4 mil***
>
> [4/13/2014 9:45:44 PM] Mike S: We had the highest cpas on market etc.. Like from TraderXP set of brands we did 2.2 mil

(Ex. 165[1] (emphasis added); *see also* Brookshire Test. at 75:12-80:1 (explaining exhibit).)

Through their marketing efforts, the Zilmil Defendants have caused thousands of people to deposit money with unregistered binary options websites.  (*See, e.g.,* Giacca Decl. ¶ 25; Ex. A to Dasso Decl. (email showing 369 depositors for Vault/ Global Trader 365 (Zilmil-01-0000039).)  This is reflected in Defendant Shah's messages to his fellow internet marketers:

> [7/9/2015 12:40:42 AM] Mike S: Hey guys,
>
> **\*\*\*\* We are quickly approaching the magic 1000 FTD mark!**

---

[1] The CFTC consecutively numbered its exhibits throughout the course of the depositions in this case.  Those exhibits are attached to the brief in a series of bookmarked PDFs titled "CFTC Trial Exhibits."

(Ex. 177 (emphasis added); *see also* Brookshire Test. at 104:2-109:1 (explaining exhibit).)

> [10/20/2014 9:07:29 AM] Mike S: Now gay stuff aside, push
> http://www.millionairemoneymachine.co/jv
>
> [10/20/2014 9:07:46 AM] **Mike S: Doing great, over 100 ftds
> and just starting the day!**

(Ex. 172 (emphasis added); *see also* Brookshire Test. at 137:7-138:16 (explaining exhibit).)

**C.     The Zilmil Defendants Use Fraudulent Binary Options "Trading Systems" to Get Customers to Deposit Money with Binary Options Websites.**

The Zilmil Defendants attempt to induce customers to deposit with the binary options websites by offering them so-called "trading systems." (Giacca Decl. ¶¶ 13-14.)  In emails and videos and on websites, the Zilmil Defendants claim that their trading systems are special software programs that will either automatically place profitable trades in the user's account, or will provide the users with "signals" showing them how to make profitable trades.  (*Id.* ¶¶ 13-15; Brookshire Test. at 23:9-24:8; Barrett Test. at 39:8-41:12; Wright Test. at 24:7-25:3, 28:19-29:15.)  These emails, videos, and websites are described in greater detail below.

In reality, the Zilmil Defendants' trading systems were marketing tools designed to lead people "down the path" of opening up an account with one of the binary options websites.  (Giacca Decl. ¶¶ 13-14; Barrett Test. at 28:19-32:7.)  When people sign up for or purchase one of the Zilmil Defendants' trading systems, they are directed to open and fund an account with one of the binary options websites.  (Giacca Decl. ¶¶ 13-14; Brookshire Test. at 23:9-24:8, 63:3-67:21; Barrett Test. at 39:8-41:12, 49:19-50:4*; see also* Exs. 77B, 77C and Wright Test. at 58:2-60:16, 67:24-69:17 (explaining exhibits).)

Ideally, the person will immediately make a deposit using a credit card through the binary options website.  (Barrett Test. at 40:9-41:12.)  If the person fails to make a deposit, the Zilmil Defendants follow up with emails encouraging the person to deposit money with a "broker" so they can start using the trading systems.  (Brookshire Test. at 129:12-131:2.) (These emails are described in greater detail below.)

The binary options website operators also follow up to encourage the person to deposit money, from their call-centers in Israel.  (Barrett Test. at 40:9-41:12; Brookshire Test. at 26:1-27:11, 86:4-87:19.)  The call centers use high-pressure phone tactics to get people to deposit money, as reflected in call center notes that the operators of Trader XP, an unregistered binary options website, sent to Defendant Shah:

> ***not sure whats going on with this guy pushed  him super hard to do depost today***
>
> calling talking to him  kids everywhere in the background he s working in mines asking about trade bots asking minimum 250 said he will send email
>
> want to test his bot , says 200 by tomorrow cause card not next to him, with his wife. ***sound  extremlly old and wired***

(Ex. E to Dasso Decl. (ZILM0029299) (emphasis added); *see also* Ex. A to Dasso Decl. ("We added a new phone system that has 300 local numbers in the US 25 in UK, 20 in Germany. This allows us to show local caller ID when we call. We are already seeing a 30% increase in the number of people who are answering when we call."  (Zilmil-01-0000046)).)

The Zilmil Defendants were directly involved in the call center efforts to "convert" customers.  In one email, Defendant Shah instructs the operators of Trader XP to "make sure

all these people are being hammered for deposits." (Ex. A to Dasso Decl. (Zilmil-01-0000017).) In an email to the operators of OptionMint, Shah writes:

> So we have a \*SUPER\* important launch this Monday (Oct 20th).
>
> ***And conversions and PLVs depend on everyone being on same page and on top of their game, especially sales/retention.***
>
> ***Literally can scale this to be 5000+ ftds like last one.***
>
> ***So PLEASE really pay close attention...***
>
> Launch name : Millionaire Money Machine
>
> Front page : http://www.millionairemoneymachine.co
>
> Members area : http://www.millionairemoneymachine.co/members
>
> Software area (after they register on members area): http://software.millionairemoneymachine.co/
>
> \*\*\*\*
>
> ***Please check it out thoroughly, make sure sales/retention etc people are all aware and know funnel because that WILL really help conversions..and we need it to convert from day 1 minute 1. As that is what will make this succesfull..***
>
> Dedicated team, etc.. whatever is needed..
>
> Thing is affiliates and our partners send us traffic, and if they don't see conversions off the bat, they stop.. so we need you guys to be on right off the bat....

(Ex. F to Google Decl. (emphasis added).)

### D.     Defendant Shah Acknowledged in Chat Messages and Emails That His Trading Systems are "B.S." and the Binary Options Websites "Scam" Customers.

The Zilmil Defendants' trading systems did not work as advertised, and were in fact designed to place losing trades in customer accounts. Moreover, the Zilmil Defendants were

14

aware that customer funds would be misappropriated by the binary options website operators.

This is reflected in chat messages that Defendant Shah sends to other internet marketers

(described in more detail below) that help Shah promote his trading systems.

In one message, Defendant Shah writes:

> [8/10/2014 7:53:26 PM] MIKE S: Ladies and Gentlmen and Imran,
>
> ****
>
> *I want to gratefully ask you for support with my new scam.*
>
> *2014 Millionaire goes live at exactly 3AM EST Monday morning, as that's when all the brokers start their scammy days. I have a TEN broker rotation with some backups, so every one of your leads will get the utmost scam*

(Ex. 171 (emphasis added); *see also* Ex. 172 (same, for Millionaire Money Machine).)  In

another message, Shah writes:

> [2/22/2015 7:35:29 PM] MIKE S: Ladies and Gentleman,
>
> *Rather than copying my BCC, just wanna thank everyone for all the support and scams through the years.. it's about the time for the ultimate scam:>>>*
> http://www.2015Millionaire.co/jv
>
> 2015 Millionaire will go live 3AM EST, and *should be the scammiest offer to date.. but rest assured, your customers will be well taken care of..*

(Ex. 174 (emphasis added); *see* Brookshire Test. at 97:6-99:1 (explaining exhibit); *see also*,

*e.g.,* Ex. 170 (introducing "Binary Chaos" trading system to "fellow spammers and

scammers").)

When one of the internet marketers suggests that not all trading systems are scams,

Defendant Shah sets him straight and assures him that they are "100% … bs":

*[4/16/2014 4:39:03 PM] Mike S: And 100% of the stuff here's bs.. if there was a magic system, then you wouldn't spend 10 hrs daily chatting here and would invest all ur money there.*

*[4/16/2014 4:39:15 PM] Mike S: Proof is bs, systems bs  ood row g is bs..*

****

[4/16/2014 4:39:41 PM] Loz Lawn: and my stuff is bs as well>?

[4/16/2014 4:39:54 PM] Loz Lawn: u aint? Ok then… doh..lol

[4/16/2014 4:40:36 PM] Mike S: And yes, if robots , signals made money, then ud invest  ur life savings there and not chat here 10 hrs

*[4/16/2014 4:40:49 PM] Mike S: And yes people are stupid as well*

****

[4/16/2014 4:41:26 PM] .+ Cedric Smith: Not all of them is a scam

[4/16/2014 4:41:30 PM] Mike S: Ok Loz, so can your invest all your savings into those bots?

[4/16/2014 4:41:41 PM] Mike S: And trust  it to not lose it?

[4/16/2014 4:41:44 PM] Harris Fellman: damnit – I just read all this.. tried to pull my life savings out of the bot/broker I was investing in .. and they won't give me my moneis

[4/16/2014 4:41:56 PM] Mike S: LOL

[4/16/2014 4:42:04 PM] Mike S: :D

****

[4/16/2014 5:20:33 PM] Loz Lawn: [….]

*shut up Mike.. you started all this, you insulted me earlier, then say all bots are scams, when you came out iwth one tht took  alot of people's money and blew thier accounts out…*

16

> *and im the one being out of order? You must be Harris's*
> *wife?*
>
> ****
>
> *[4/16/2014 5:21:10 PM] Mike S: I never said mine was good..*
> *i said they all scams lol*
>
> *[4/16/2014 5:21:12 PM] Mike S: LOLOLOL*

(Ex. 167 (emphasis added); *see also* Brookshire Test. at 179:8-180:2, Barrett Test. at 102:11-103:14 (explaining exhibit).)

Shah crows about how he and his compatriots are "ruining lives" with their fraudulent scheme:

> [2/23/2015 4:53:07 PM] MIKE S: Fuck guys this shit
> converting! *We ruining lives one ftd at a time :*
> http://www.2015Millionaire.co/jv

(Ex. 174 (emphasis added) *and* Brookshire Test. at 114:17-116:6, Barrett Test. at 154:9-155:14 (explaining exhibit); *see also* Ex. 181 ("That means ur screwing up a solid # of lives") *and* Brookshire Test. at 143:9-144:7 (explaining exhibit).)  Defendant Shah told another compatriot in a telephone conversation that "nobody … makes money with binary." (Wright Test. at 42:3-44:5.)

In an email exchange with Defendant Shah, the operators of OptionMint complain that one of the Zilmil Defendants' systems ("Millionaire Money Machine") is doing its job too well:

> *The autotrader attached to this is doing it's job and is doing it*
> *great, crushing people like immediately.* The problem is they
> are all saying they turn it off and it keeps placing trades as soon
> as a trade ends and theres money back in the account. Typically
> I hold little weight to comments like that from people but it's
> basically everyone thats saying it. They say they cant get an

answer out of the support from there. Is there someway we can
contact them to get them to look into this.

People that seem willing to put more money in are saying they
can't/won't because this thing will just suck it up right away.
Making retention on these customers much more difficult .

--

Best,

Senior Account Manager
Skype- Optionmint
www.optionmint.com
USA: 800-528-3559

(Ex. L, to Google Decl. (emphasis added).)  Jared Davis, the principal of OptionMint,

forwarded the email to Shah, who promised to check with his "programming team."  (*Id.*)

### E.    The Zilmil Defendants Used SPAM to Promote Their Fraudulent Trading Systems.

The Zilmil Defendants utilized email marketing firms to send millions of mass

emails, *i.e.*, SPAM, to spread the word about his binary options trading systems and

encourage people to deposit with unregistered binary options websites.  (Giacca Decl. ¶ 13;

Stinson Decl. ¶ 7; *see also* Ex. 196 (Shah talks about using email marketing firms iContact

and Critical Impact to send mass emails).)  The Zilmil Defendants' mass emails included

misrepresentations about profits that users could expect from the trading systems.  (*See* Exs.

130, 131 (emails sent via iContact) *and* Reese Decl. ¶¶ 10-13, Reese Test. at 93:3-93:14,

114:15-116:6 (explaining exhibits); Ex. B to Stinson Decl. (emails sent via Critical Impact)

*and* Stinson Decl. ¶¶ 6-9 (explaining exhibits).)  The emails also encouraged recipients to

deposit money with unregistered binary options websites.  (*Id.*)

In one email, for example, the Zilmil Defendants wrote:

Dear %%firstname%% %%lastname%%,

Welcome to the 2014 Millionaire Club! Congratulations.

After reviewing thousands of applications, you have been chosen few, you should be proud %%firstname%%.

Please save your login details:

Login link (click here): http://members.2014millionaire.com

****

Have you already made your first $100,000 yet?

Most of our members have, but it seems like you haven't activated your account by funding it?

%%firstname%%, I want to make you money now, but for me to do that, I need you to at least fund your account so that I can change YOUR life.

You joined us so that you can start afresh, make the millions that you always dreamed about, right?

So allow us to do just that... we just need you to at least fund your account so we can take care of all that.

You can do that by logging in here:

Click here to be instantly logged in to activate and fund your account:

****

Best wishes,

Stan Lutz & the 2014 Millionaire Team

(Ex. B to Stinson Decl. at 8.)  In another email, the Zilmil Defendants wrote:

We already received stats from the first new members of the Millionaire Society, check this out:

Christina K. made $4,337 yesterday

Martin S. made $3,833 yesterday

George T. made $8,733 yesterday

Roger T. made $11,722 in the last 2 days(Yesterday top earner, started with just $200!)

And of course, all of this was done 100% on autopilot by simply using our fully automated Millionaire Society Software.

****

Last year Millionaire Society member Susan was invited just like you were today to become one of our members and she was a stay at home mum with less than $300 left in her savings.

Susan never traded in her life and all she did was signing up for our recommended broker in the Millionaire Society, funded the account with just $250 and simply turned the software "on".

Today, less than 12 months after you can see below where Susan accounts stands like and the funniest part is she STILL doesn't really know anything about trading as the software does everything100% on autopilot and with NO work on her side.

Susan is now sitting on $1,897,200 in profit! And you can now do the SAME! Are you ready to make as much as $5,000 or even$10,000 within the next 24hrs, like the other members who just joined us?

Then simply go to the members area, open and fund your new broker account and let the software do everything for you!

I created this special step-by-step video for you to get started, go watch it now, so you can start pulling as much as $500 to $1000 per day within the next few minutes:

(Ex. 131 (iContact-00000581).)

The representations in these emails were false.  The Zilmil Defendants paid a

copyrighter to draft these emails, referred to as "swipes."  The copywriter simply made up

the text in the emails and passed them on to Defendant Shah.  (Wright Test. 7:25-11:10 (Shah

paid Wright to draft email swipes about trading systems); 100:23-101:22 (Wright confirming

that he drafted 2014 Millionaire/Stan Lutz swipes); 130:16-131:4 (claims in emails

fabricated); *see also* Ex. 80A (Christmas Profit swipes drafted by Wright) *and* Wright Test.

at 90:10-92:10 (explaining exhibit); Ex. 82A (Alderley Code swipes drafted by Wright) *and*

Wright Test. at 125:6-126:14 (explaining exhibit); Ex. 85 (Azure Method swipes drafted by

Wright) *and* Wright Test. at 129:20-130:5 (explaining exhibit).)

**F.     The Zilmil Defendants Used Fraudulent Videos to Promote their Binary Options Trading Systems.**

The Zilmil Defendants worked with video producers to shoot elaborate testimonials

promoting the Zilmil Defendants' trading systems.  (Giacca Decl. ¶ 15; Berry Test. at 17:15-

18:6, 20:2-20:22, 21:24-22:12, 23:5-23:10, 54:18-56:10 (Berry produced videos for Shah);

Ex. 88 (lists of videos that Berry produced for Shah); *see also* Wright Test. 7:25-11:10

(Wright produced videos for Shah).)  These videos were posted on websites or shown as

"webinars."  (Giacca Decl. ¶ 19.)

The videos typically featured a presenter who claimed to be the system's inventor.

(*See* Exs. 90 ("AutoBinaryBot" video and trans.), 98 ("Stripped Down Binary" video and

trans.), 101 ("Binary Cash Bot" video and trans.), 104 ("Automated Income" video and

trans.), 106 ("Live Profits" video and trans.), 108 ("Drexel Code" video and trans"), 109

("Brooks Blueprint" video and trans.), 111 ("Infinity App" video and trans.).)  The presenter

would talk about how much money he or she made using that system, and that "you" could

make just as money.  (*Id.*)  Sometimes the videos also featured testimonials from other users.

(*Id.*)  The presenters (and users) were often shown driving luxury cars or living in mansions,

and they attributed their success to the trading system.  (*Id.*)

In one video, for a trading system called "Stripped Down Binary," a presenter who identifies herself as "Zoe Sinclair" claims that she is a former stripper who became an "overnight binary options millionaire." (Ex. 98; *see also* Berry Test. at 85:8-86: (explaining video).) She claims to have done this "with just one click" using "underground software" that she obtained from blackmailing a computer trading expert. (Ex. 98.) The presenter claims that "with only 10 months trading binary options I cleared my first million in net profit online," and that she makes as much as $4,000 per day. (Ex. 98.) She purports to corroborate these claims with screenshots of large account balances with several unregistered binary options websites, including Easy Trader and TradeRush. (Ex. 98.)

In another video, for a system called "Infinity App," a presenter who identifies himself as "Mark Stevenson" claims that thirty-five lucky beta testers will receive "free and unlimited access to my one-of-a-kind money-making software, a software that using a few lines of code based on some of the most advanced NASA technology is capable of returning push button profits." (Ex. 111; *see also* Berry Test. at 135:11-139:1 (explaining video).) According to the presenter, "[t]his software has been consistently making me between $15,000 and $50,000 per day for the past six years, and it's about to do the same for you." (Id.) He claims that the software will "generate rapid profits of 100% on auto pilot" and then drives an exotic McLaren sports car to visit a "Robert Williams," who claims to be an early user of the Infinity App software. (*Id.*) "By the end of the first week," Williams claims, "I was sitting on over $50,000." (*Id.*)

These videos were a fraud. The people who appeared in them were actors who had never traded binary options or used the Zilmil Defendants' systems. (Giacca Decl. ¶ 18;

Berry Test. at 60:21-61:17, 63:14-63:24 ("AutoBinaryBot"), 85:8-86:9 ("Stripped Down

Binary"), 95:3-96:9, 98:16-99:8 ("Binary Cash Bot"), 107:12-109:4 ("Automated Income"),

111:7-112:14, 114:3-114:12, 115:14-115:18 ("Live Profits"), 124:21-126:5, 127:3-127:7,

127:13-128:7 ("Drexel Code"), 130:21-132:24 ("Brooks Blueprint"), 135:11-136:10, 137:10-

139:1 ("Infinity App."); Wright Test. at 24:7-27:8 (hired actors for false testimonials).)

Everything the actors said in the videos was from a script provided by Shah—a script

that Shah would pay a copywriter to come up with.  (Wright Test. at 7:25-9:17, 10:16-10:22,

34:20-36:5 (wrote scripts for Shah); Berry Test. at 23:13-25:11, 89:19-90:17 (Shah sent

scripts over skype).)  Everything in the scripts was false.  (Wright Test. at 28:18-31:17, 24:7-

27:8 (Wright came up with script "off the top of his head").)  According to the scriptwriter,

Shah would tell him the basics of what he wanted the video to be about, and the scriptwriter

would come up with "the scenario to sell that video."  (*Id*. at 28:18-31:17.)

Shah was intimately involved in the production of these videos, and approved every

aspect of their content.  (Berry Test. at 23:13-25:11, 34:1-34:11, 36:24-38:3, 140:24-141:6;

Wright Test. at 15:3-16:23, 28:18-31:17, 39:3-39:14.)  Shah weighed in on the actors, the

cars, and the mansions used in the videos.  (Berry at 23:13-25:11, 34:1-34:11, 36:24-38:3,

140:24-141:6.)

Shah also provided graphics to be used in the video.  Shah provided false account

statements and logos from binary options websites he worked with to encourage viewers to

deposit.  (Berry Test. at 86:14-88:10 (EasyTrader and TradeRush), 62:11-62:20 (TraderXP),

79:11-79:15 (Cedar Finance), 96:20-98:5 (Trader XP, Global Trader 365), 100:2-100:10 (EZ

Trader), 109:9-110:1 (Empire Options), 128:13-130:3 (Bloombex Options, Binary Book,

Porter Finance), 132:25-133:11 (GT Option).)

G.     **The Zilmil Defendants Paid to Host Fraudulent Websites Promoting Their Trading Systems.**

The Zilmil Defendants used webhosts to host dozens of not hundreds of web pages

advertising his trading systems.  (Giacca Decl. ¶ 16; Casler Decl. ¶¶ 2, 5, 10.)  The websites

contained false representations about the performance, as well as fake testimonials about the

trading system.  The websites encouraged people to enter their email addresses to sign up for

the trading system, after which they would be solicited to open an account with a binary

options websites.  (*See* Exs. A through G to Mack Decl.)

One website that Zilmil paid to host was www.binarygenetic.com.  (Casler Dec. ¶

10.)  The Binary Genetic website purports to offer a "trading robot" invented by a "24 year

old math teacher" named Ian Harris.  (Ex. B to Mack Decl.)  According to the website, Harris

developed "an entirely new way of profiting from the binary markets with mathematical

certainty."  (*Id.*)  The website claims that Harris developed an "all new genetic algorithm

technology that literally evolves to become better, faster and more profitable with every

binary signal it generates."  (*Id.*)  The website shows millions of dollars in Ian Harris's bank

account, and claims that Harris achieved trading results of $2,100 in a single day with Binary

Genetic.  (*Id.*)  The website claims that results like these are "unavoidable" if you purchase

Binary Genetic for $27.00 and open a trading account with a binary options websites.  (*Id.*)

These representations on the websites were false.  As set forth above, the trading

systems did not work as advertised and instead were merely a marketing tool to get people to

deposit money with binary options firms.  Shah worked directly with copywriters, whom he

paid to come up with the text for the websites on the websites.  (Wright Test. 7:25-11:10, 24:7-24:8, 28:18-31:17.)

**H.     Shah Used Affiliates to Reach Even More People About His Fraudulent Trading Systems.**

The Zilmil Defendants used other internet marketers, referred to as "affiliates," to help spread the word about the Zilmil Defendants' trading systems.  (Giacca Decl. ¶¶ 20-21; Barrett Test. at 28:19-30:20; Brookshire Test. at 21:8-22:22.)  Affiliates did this simply by sending mass emails to their own email lists, through email marketing firms.  (Giacca Decl. ¶¶ 20-21; Barrett Test. at 55:21-56:22; Brookshire Test. at 21:22-22:14.)

In return for their assistance, the affiliates would receive a percentage of the commission paid by the binary options firm.  (Giacca Decl. ¶ 22; Brookshire Test. at 41:19-42:16; Barrett Test. at 35:9-35:20.)  Typically, the Zilmil Defendants' affiliates would receive between $250 to $300 per FTD.  (Giacca Decl. ¶¶ 22; Brookshire Test. at 41:19-42:16; Barrett Test. at 28:19-30:20.)   The Zilmil Defendants would take the rest.  (Giacca Decl. ¶¶ 22.)

Shah relied on a small circle of affiliates, who he communicated with regularly through Skype.  (Brookshire Test. at 21:8-22:22, 41:3-42:16.)  Shah would provide the affiliate marketers with a link to his website and video for whatever trading system he wanted them to promote that week.  (Giacca Decl. ¶ 21; Brookshire Test. at 21:8-22:22, 41:3-42:16.)  Shah would also provide them with "swipes" containing false representations about the trading systems.  (Brookshire Test. at 82:20-83:17.)  Shah encouraged the affiliates to email people about his trading systems, and even offered prizes.  (*See, e.g*., Exs. 166 ("Click4Profits"); Ex. 169 ("Autoprofits"); Ex. 170 ("Binary Chaos"); Ex. 171 ("2014

Millionaire"); Ex. 172 ("Millionaire Money Machine"); Ex. 173 ("Christmas Profits"); Ex.

174 ("2015 Millionaire"); Ex. 175 ("Confirmed Profits"); Ex. 176 ("Profit with Cindy"); Ex.

177 ( "21 Days to Riches")Ex. 178 ("Proven Profits"); Ex. 179 ("Profits Today"); Ex. 180

("Phoenix Trading"); Ex. 188 ("Drexel Code").)

## I.     After Learning He Was Under Investigation, Defendant Shah Attempted to Destroy Evidence.

In 2015, the CFTC's Division of Enforcement was investigating two binary options

websites, Vault Options Ltd. and Global Trader 365.  (Dasso Decl. ¶ 4.)   During the course

of the investigation, Staff noticed payments totaling $367,200 from Targeted Marketing

Solutions, a payment conduit for Vault and Global Trader 365 ("GT 365").  (*Id.*)  On October

30, 2015, Staff subpoenaed Zilmil for documents relating to those payments and any work

done for Vault or GT 365.  (*Id.* ¶ 5.)  In response, Zilmil, through its then-attorney, John

Cotton, produced emails and financial transfer documents between Zilmil and Vault and GT

365 showing that Zilmil was an independent marketer for GT 365, and that Zilmil was being

paid commissions on the basis of first-time depositors (referred to as "FTDs").  (*Id.* ¶¶ 5-6.)

On January 4, 2016 the CFTC sent a subpoena for testimony to Michael Shah.  (*Id.* ¶

9.)  In testimony, Shah refused to explain or provide any information with respect to his work

for Vault, GT 365, or with respect to binary options, or with respect to the sources of his

income, and he invoked the Fifth Amendment against self-incrimination in response to every

substantive question.  (*Id.*)  After that, the CFTC opened an investigation into Zilmil and

Shah's activities.  (Dasso Decl. ¶ 10.)  On February 4, 2016, the CFTC subpoenaed Zilmil for

documents relating to binary options, binary options trading systems, and various enumerated

entities which provided payments (typically large ones) to Zilmil.  (*Id.* ¶ 11.))

Knowing that he was under investigation, and well aware of the incriminating nature of his conduct, Defendant Shah promptly embarked on a campaign of witness tampering and document destruction.

In late 2015 or early 2016, Defendant Shah met with Antonio Giacca, one of his affiliate marketers, in Las Vegas.  (Giacca Decl. ¶¶ 34-35.)  Shah told Giacca that he had received a subpoena for information relating to one of the binary options websites.  (*Id*.)  Defendant Shah told Giacca that he was not going to cooperate, and that he was going to make sure he did not have any documents.  (*Id*.)  Shah said that Giacca should do the same; at Shah's instruction, Giacca deleted all his binary options-related documents and communications.  (*Id*.)

In March 2016, Shah deleted any Skype messages that he could delete between himself and his binary options mailers.  (Ex. 188; Brookshire Test. at 195:15-198:22; Barrett Test. at 203:2-206:12.)  Later, in the summer of 2016, Shah called Michael Wright, one of his video producers and script writers.  Shah instructed Wright to destroy all documents relating to Shah's binary options projects, including emails and communications.  (Wright Test. at 42:3-44:5, 48:15-49:7.)  Shah explained to Wright that this was because of "concerned about the FTC."  (*Id*. at 42:3-44:5, 48:15-49:7.)  Wright complied, and deleted all the binary options-related material from Shah that he could find.  (*Id*. at 42:3-44:5, 48:15-49:7.)

In October or November 2016, Shah reached out to William Berry, another of Shahs binary options video producers, on Skype and instructed him to delete all of the projects he had worked on for Shah.  Shah told Berry to delete the documents in case Shah had "any

problems in the future." (Berry Test. at 30:4-32:6.)  Berry obliged and deleted substantially

all of his records and communications from working with Shah.  (*Id.* at 224:10-225:8.)

**J.      Defendant Shah Has Refused to Testify Pursuant to the Fifth Amendment Right Against Self-Incrimination.**

On May 22, 2018, Staff for the Division took testimony of Michael Shah, both in his

individual capacity and as a 30(b)(6) witness for Zilmil.  Shah refused to answer any

substantive questions during testimony, and invoked his Fifth Amendment right against self-

incrimination.  (Shah Test. (excerpts).)

## IV.  LEGAL ANALYSIS

**A.      The Court Should Enter Summary Judgment for the CFTC on its Options and Swaps Fraud and Registration Claims.**

The Zilmil Defendants[2] violated the portions of the Act and Regulations that prohibit

fraud with respect to options and swaps.  (Compl. ¶¶ 1184-88 (Count X (options fraud)),

197-201 (Count XII (fraud in connection with swaps)).)  The Zilmil Defendants also violated

the portions of the Act and Regulations that prohibit activity with respect to options and

swaps trading other than on a registered exchange.  (*Id.* ¶¶ 172-177 (Count VIII (off-

exchange activity).)

### 1.      Binary Options Qualify as Both Options and Swaps Under the Act.

The Zilmil Defendants[3] violated the portions of the Act and Regulations that prohibit

fraud with respect to options and swaps.  (Compl. ¶¶ 1184-88 (Count X (options fraud)),

197-201 (Count XII (fraud in connection with swaps)).)  The Zilmil Defendants also violated

---

[2] Because Defendant Shah is the controlling person of Zilmil, he is liable as a principal for any violation of the Act or Regulations by Zilmil.  7 U.S.C. § 13c(b) (imposing liability on controlling persons).

[3] Because Defendant Shah is the controlling person of Zilmil, he is liable as a principal for any violation of the Act or Regulations by Zilmil.  7 U.S.C. § 13c(b) (imposing liability on controlling persons).

the portions of the Act and Regulations that prohibit activity with respect to options and swaps trading other than on a registered exchange.  (*Id.* ¶¶ 172-177 (Count VIII (off-exchange activity).)

The Zilmil Defendants' violations involved so-called binary options.  Courts have recognized that binary options qualify as both options and swaps within the meaning of the Act and Regulations.[4]  *See, e.g.*, *CFTC  v. Vision Fin. Partners, LLC*, 190 F. Supp. 3d 1126, 1130 (S.D. Fla. 2016) (holding that binary options fall within 7 U.S.C. § 6c(b)); *CFTC v. Trade Exch. Network Ltd.*, 117 F. Supp. 3d 29, 35–37 (D.D.C. 2015) (same); *CFTC v. Banc de Binary Ltd.*, No. 2:13-CV-000992-MMD, 2014 WL 691590, at *3-4 (D. Nev. Feb. 20, 2014) (same); *CFTC v. Vault Options, Ltd.*, No. 1:16-CV-01881, 2016 WL 5339716, at *6 (N.D. Ill. July 20, 2016) (default judgment, holding that binary options fall within 7 U.S.C. § 6c(b), 17 C.F.R. 32.4 and 7 U.S.C. § 9(1), 17 C.F.R. 180.1.(a)).

> **2.     The Zilmil Defendants Committed Fraud in Connection with Options and Swaps.**

Section 4c(b) of the Act and Regulation 32.4 prohibit the use of fraud or deception in connection with a commodity option transaction.  7 U.S.C. § 6c(b) (prohibiting commodity options transactions except as permitted by CFTC Regulations); 17 C.F.R. § 32.4 (prohibiting fraud in connection with commodity options transactions).

Section 6(c)(1) of the Act and Regulation 180.1(a) prohibit the use of any device, scheme, or artifice to defraud, or the making of any untrue or misleading statement of fact, or

---

[4] Binary options qualify as swaps because the definition of swaps includes "any agreement, contract or transaction … that is a put, call … or similar option of any kind that is for the purchase or sale, or based on the value, of one or more … currencies, commodities, securities … [or] indices …."  7 U.S.C. § 1a(47)(i)(A).

omission of any material fact necessary to make statements not untrue of misleading, in connection with a swap transaction.  7 U.S.C. § 9(1) (prohibiting fraudulent schemes, misstatements or material omissions in connection with swaps); 17 C.F.R. § 180.1(a) (same).

In order to establish a fraud claim under the Act and Regulations, the CFTC must prove: (1) the making of a misrepresentation, misleading statement, or a deceptive omission; (2) scienter; and (3) materiality." *CFTC v. R.J. Fitzgerald & Co., Inc.*, 310 F.3d 1321, 1328 (11th Cir. 2002). In an enforcement action brought to protect the public interest, the CFTC need not prove reliance to establish a fraud claim.  *CFTC v. Gutterman*, No. 12-21047-CIV, 2012 WL 2413082, at *5 (S.D. Fla. June 26, 2012); *see also R.J. Fitzgerald & Co*., 310 F.3d 1321at  n.6.

As set forth above, there is no genuine issue of material fact that the Zilmil Defendants engaged in fraud with respect to options or swaps, i.e., binary options.  The Zilmil Defendants were the masterminds of a wide-ranging fraud scheme designed to get members of the retail public to deposit money with, and trade on, binary options websites.  In order to do this, the Zilmil Defendants offered or sold binary options trading systems, which were presented as software which either trades automatically or provides signals.  The Zilmil Defendants made misrepresentations about the profitability of their trading systems, and of the profitability of trading binary options in general.  The Zilmil Defendants failed to disclose that they were marketers working on commissions from the binary options websites.

In reality, the trading systems were merely a marketing tool to get people to deposit with binary options websites.  All representations about trading systems were fabricated by the Zilmil Defendants.  Moreover, the Zilmil Defendants were aware that the trading systems

did not work as advertised, an in fact were designed to place losing trades.  The Zilmil

Defendants were also aware that the binary options website operators would misappropriate

money from customers.

Defendant Shah refused to answer questions during his deposition, and instead

invoked his Fifth Amendment right against self-incrimination.  As a result, the CFTC is

entitled to an adverse inference against the Zilmil Defendants.  *See SEC v. Monterosso*, 768

F. Supp. 2d 1244, 1268-69 (S.D. Fla. 2011) (summary judgment for SEC; adverse inference

against defendant based on Fifth Amendment), *aff'd*, 756 F.3d 1326 (11th Cir. 2014*); see

also SEC v. Simmons*, No. 8:04–CV–2477–T–17MAP, 2008 WL 7935266, at *17-18

(M.D.Fla. Apr. 15, 2008) (same); *FTC v. Glob. Mktg. Grp., Inc*., 594 F. Supp. 2d 1281, 1287

(M.D. Fla. 2008) (same, for FTC).

The Court should grant summary judgment for the CFTC on its fraud claims relating

to options and swaps*.  See, e.g*., *CFTC v. Next Fin. Servs. Unlimited*, No. 04-80562-

CIVRYS, 2006 WL 889421, at *2-5 (S.D. Fla. Mar. 30, 2006) (summary judgment for CFTC

in options fraud case); *CFTC v. TradeMasters, USA, LLC*, No. 216CV01938GMNNJK, 2017

WL 4079015, at *5-7 (D. Nev. Sept. 13, 2017) (granting summary judgment for CFTC

against seller of "fully automated" trading software).

### 3. The Zilmil Defendants Violated the Prohibition Against and Swaps Trading Other Than on a Registered Exchange.

The Zilmil Defendants violated the portions of the Act and Regulations that prohibit

activity with respect to options and swaps trading other than on a registered exchange.

(Compl. ¶¶ 172-177 (Count VIII (off-exchange activity).)

Taken together, Section 4c(b) of the Act, Section 2(e) of the Act, and Regulation 32.2(a) provide that it shall be unlawful for any person to offer to enter into, enter into, or otherwise conduct activity with respect to swap transactions other than on a registered exchange.  *See* 7 U.S.C. § 6c(b) (prohibiting commodity options transactions except as permitted by CFTC Regulations); 7 U.S.C. § 2(e) (prohibiting swaps transactions with retail investors other than on registered exchange); 17 C.F.R. § 32.2(a) (providing that rules applicable to swaps apply to commodity options).

The Zilmil Defendants offered trading systems for binary options on unregistered binary options websites.  The Zilmil Defendants used those trading systems as a marketing tool to get those customers to make deposits with unregistered binary options websites.  By so doing, the Zilmil Defendants were "conducting activity" with respect to options or swaps other than on a registered exchange.  And by offering software that purported to trade on behalf of customers, the Zilmil Defendants were "offering to enter into" options or swaps transactions other than on a registered exchange.[5]

The Court should therefore enter summary judgment for the CFTC on its off-exchange trading claims.  *See CFTC v. Sterling Trading Grp., Inc.*, 605 F. Supp. 2d 1245, 1354–55 (S.D. Fla. 2009) (summary judgment against defendants who offered options transactions to the public without registration); *Trade Exch. Network Ltd.*, 117 F. Supp. 3d 29, 34–35 (same).

---

[5] The Zilmil Defendants may attempt to argue that some of the persons who invested in binary options were outside of the U.S.  Because Defendant Shah invoked his Fifth Amendment right against self-incrimination on this point, they are precluded from arguing it. *See SEC v. Ahmed*, 308 F. Supp. 3d 628 (D. Conn. 2018) (granting SEC's motion for summary judgment in fraud case, applying adverse inference to "domesticity of the transactions" at issue).

**B.      The Court Should Enter Summary Judgment for the CFTC on its Commodity Trading Advisor Fraud and Registration Counts.**

     **1.      The Zilmil Defendants Act as a Commodity Trading Advisor.**

The Zilmil Defendants violated prohibitions in the Act and Regulations against fraud by, and failure to register as, a commodity trading advisor ("CTA").  (Compl. ¶¶ 189-196 (Count XI (CTA fraud).)

A CTA is someone who, for compensation or profit, engaged in the business of advising others, either directly or through electronic media, as to the value of or the advisability of trading in options or swaps.  7 U.S.C. § 1a(12)(A) (defining CTA).  Courts have consistently held that people who offer so-called software trading systems qualify as CTAs within the meaning of the Act and Regulations.  *See, e.g*., *TradeMasters, USA, LLC*, No. 216CV01938GMNNJK, 2017 WL 4079015, at *3 (person who sold "fully automated" commodity futures trading software qualified as CTA); *CFTC v. Hall*, 49 F. Supp. 3d 444, 449-52 (M.D.N.C. 2014) (person who sold "trading system" that provided advice via email qualified as CTA), *aff'd*, 632 F. App'x 111 (4th Cir. 2015); *CFTC v. Vartuli*, 228 F.3d 94, 103-105 (2d Cir. 2000) (seller of computer software that "provided specific buy, sell, stop and profit objectives recommendations" qualified as CTA).

The Zilmil Defendants advised people on trading options or swaps, to wit, binary options, through their trading systems.  In marketing materials, and according to customers, the trading systems would provide automatic trades or trading signals.

Not only that, the Zilmil Defendants did this for money.  Some of the Zilmil Defendants' trading systems were sold to customers for money.  (*See* Silver Decl.)  Others were provided for free, but the compensation was provided by the binary options websites as

a commission for getting customers to deposit.  *See CFTC v. Savage*, 611 F.2d 270, 279-80

(9th Cir. 1979) ("We do not believe that the definition of commodity trading advisor requires

that the 'compensation or profit' flow directly from the person or persons advised."); *CFTC*

*v. British Am. Commodity Options*, 560 F.2d 135, 141 (2d Cir. 1977) (holding that brokerage

firm which provided "gratuitous" trading advice to customers was CTA because firm "could

only hope to profit if its customers and prospective customers acting on its regular

information and advice concerning the value and market prospects of commodities and

commodity options, purchased such options" from the firm), *cert. denied*, 438 U.S. 905

(1978).

> **2.     The Zilmil Defendants Committed Fraud as a Commodity Trading Advisor.**

Section 4o(1) of the Act and Regulation 4.41(a) prohibit the use by a CTA of any

device, scheme, or artifice to defraud a customer or potential customer, or to engage in any

practice or course of business that would operate as a fraud or deceit on any customer or

potential customer.  7 U.S.C. § 6o(1) (prohibiting fraud by CTA; 17 C.F.R. § 4.41(a) (same).

Regulation 4.41(a)(3) contains a specific proscription against the use of any testimonial in

advertising or sales materials that fails to prominently disclose that the testimonial may not

be representative of the experience of other customers, or that the testimony is no guarantee

of future performance. 17 C.F.R. § 4.41(a)(3).

For the same reasons that Zilmil Defendants are liable for swaps and options fraud,

they are also liable for CTA fraud.  Moreover, the testimonials included in the Zilmil

Defendants' videos fail to include the required disclosures.

The Court should therefore enter summary judgement in favor of the CFTC on its CTA fraud claims.  *See Hall*, 49 F. Supp. 3d 444, 449-52 (M.D.N.C. 2014) (summary judgment for CFTC on CTA fraud claims); *TradeMasters, USA, LLC*, 2017 WL 4079015, at *4 (same); *CFTC v. Heffernan*, 245 F. Supp. 2d 1276, 1292-1299 (S.D. Ga. 2003) (same, for software that provided "trading signals" to users).

### 3. The Zilmil Defendants Failed to Register as a CTA.

Section 4m(1) of the Act provides that it shall be unlawful for a person to act as a CTA without having registered as such with the CFTC.  7 U.S.C. § 6m(1).  Registration is required for CTAs that direct customer accounts.  17 C.F.R. § 4.14(a)(9)(i) (no exemption from registration where CTA directs client accounts).  Accordingly, courts have recognized that the purveyor of a trading system that purports to automatically place trades on behalf of the client must register as a CTA.  See *TradeMasters, USA, LLC*, , 2017 WL 4079015, at *4 (D. Nev. Sept. 13, 2017) (summary judgment on CTA registration claims where trading software "exercised trading authority over customer trading accounts and executed trades for those accounts"); see also *CFTC v. Vartuli*, 228 F.3d 94, 110-112 (2d Cir. 2000) (affirming judgment that seller of "automatic" trading system required to register as CTA).

The Zilmil Defendants claim in many marketing materials that the trading software trades "automatically" for users.  Indeed, this was consistent with the declarations submitted by customers.  The Zilmil Defendants are not registered as CTAs.  Accordingly, the Court should grant summary judgment for the CFTC on its registration claim.

**C.      The Court Should Enter an Order for Disgorgement Against the Zilmil Defendants.**

Section 6c of the Act provides that the Court may enter an order against any person found to have violated the Act or Regulations requiring disgorgement of gains received in connection with the violation.  7 U.S.C. § 13a-1(d)(3)(B).

The focus of disgorgement is the defendants "ill-gotten gains," not customer losses. *CFTC v. Amerman*, 645 F. App'x 938, 943-44 (11th Cir. 2016) (affirming disgorgement awarded on summary judgment).  The CFTC need only produce a "reasonable approximation" of the defendant's ill-gotten gains to support a disgorgement order.  *Id.*  After that, the burden shifts to the defendants to show that the number is not reasonable.  *Id*. "Exactitude is not a requirement," and "any risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty."  *Id*.

The Zilmil Defendants received approximately $18.6 million in commissions from unregistered binary options websites.  These commissions represent the proceeds of the Zilmil Defendants' fraudulent marketing activities vis a vis the trading systems.

The Zilmil Defendants cannot dispute the CFTC's disgorgement number because the Zilmil Defendant have chosen to invoke their rights under the Fifth Amendment.  *See SEC v. Whittemore*, 659 F.3d 1, 12–13 (D.C. Cir. 2011) (affirming order of disgorgement where defendant invoked Fifth Amendment in depositions); *SEC v. Invest Better 2001*, No. 01 CIV. 11427 (BSJ), 2005 WL 2385452, at *3 (S.D.N.Y. May 4, 2005) (granting SEC's motion for summary judgment on disgorgement, precluding opposing evidence where defendants invoked Fifth Amendment).

Accordingly, the Court should enter an order of disgorgement against the Zilmil Defendants of $18,671,793.97.

**D.     The Court Should Enter a Civil Monetary Penalty Against the Zilmil Defendants.**

Section 6c of the Act also authorizes the Court to impose on any person found in the action to have committed any violation, a civil monetary penalty ("CMP") of not more than the amount of "triple the monetary gain to the person for each violation," or an amount adjusted for inflation pursuant to federal law.  7 U.S.C. § 13a-1(c)(1); *see also Annual Adjustment of Civil Monetary Penalties to Reflect Inflation—2018*, 83 Fed. Reg. 9,426 (Mar. 6, 2018); *Annual Adjustment of Civil Monetary Penalties to Reflect Inflation—2017*, 82 Fed. Reg. 7,643 (Jan. 23, 2017).[6]

A court may impose a CMP at the summary judgment stage if the defendants are found liable for the violations at issue.  *See CFTC v. Stroud*, Civ. Action No. 3:12-cv-00203, 2016 WL 9774506, at *7-8 (M.D. Ala. Mar. 1, 2016) (granting summary judgment for CFTC and ordering CMP in amount of three times the gain to defendants); *CFTC v. Leben*, Case No. 3:14-cv-866-TLW, 2016 WL 7354359, at *8-9 (Aug. 5, 2016) (granting summary judgment for CFTC and ordering CMP in amount of three times the gain to defendants); *CFTC v. Angus Jackson, Inc.*, No. 12-60450-CIV, 2013 WL 320185, at *15-17 (S.D. Fla. Jan. 28, 2013) (granting summary judgment in part for CFTC and ordering CMP in amount of two times the gain to defendants); *see also CFTC v. Brown*, Case No. 3:15-cv-354-J-

---

[6] When this case was filed on July 10, 2017, the inflation-adjusted civil monetary penalty for actions filed pursuant to Section 6c of the Act was $170,472 per violation.  82 Fed. Reg. at 7,644.  At present, the inflation-adjusted civil monetary penalty for actions filed pursuant to Section 6c of the Act is $173,951 for penalties assessed after March 6, 2018 for violations occurring on or after November 2, 2015.  83 Fed. Reg. at 9,427. The alternative measure for a civil monetary penalty, three times the monetary gain to a defendant, is not affected by adjustments for inflation and is sought here.

39MCR, ECF 88, Comm. Fut. L. Rep. (CCH) ¶ 34,228, at pp. 10-11, 14 (M.D. Fla. Mar. 12, 2018) (applying summary judgment standard to CFTC motion for restitution and CMP, granting motion and ordering CMP in amount of three times the gain to defendants).

Courts are given "broad discretion" in imposing civil monetary penalties, though such penalties should be "rationally related" to the offenses. *CFTC v. Levy*, 541 F.3d 1102, 1112 (11th Cir. 2008). In evaluating the appropriate civil monetary penalty under the Act, the Court should consider "the general seriousness of the violation as well as any particular mitigating or aggravating circumstances that exist." *CFTC v. Wilshire Inv. Mgmt. Corp.*, 531 F.3d 1339, 1346 (citing *JCC, Inc. v. CFTC*, 63 F.3d 1557, 1571 (11th Cir. 1995)). "Defrauding customers is a violation of the core provisions of the [Act] and 'should be considered very serious.'" *Wilshire Inv. Mgmt. Corp.*, 531 F.3d at 1346 (quoting *JCC, Inc.*, 63 F.3d at 1571). Defrauding multiple investors over a period of several years "support[s] the imposition of a substantial civil penalty." *Stroud*, 2016 WL 9774506, at *7. No mitigating circumstances are present where a defendant has made knowing and repeated violations, or where the defendant has made no attempt to cure past violations or make restitution to defrauded victims. *Wilshire Inv. Mgmt. Corp.*, 531 F.3d at 1346. Securities fraud penalties have been assessed by courts in the Eleventh Circuit in amounts far in excess of a violator's ability to pay. *SEC v. Warren*, 534 F.3d 1368, at 1370 (11th Cir. 2008).

The CFTC has established facts sufficient to show that the Zilmil Defendants knowingly and repeatedly made fraudulent statements and misrepresentations, including about the profitability of their binary options trading systems, to convince members of the retail public to deposit money with binary options websites that were designed to result in

38

customer losses.  The Zilmil Defendants operated their blatantly fraudulent scheme for years, and not once have they made any attempt to return funds to defrauded victims.  Instead, they continue to shirk responsibility.  Accordingly, the Court should assess a CMP commensurate with the gravity of their offenses and lack of mitigating circumstances: $56,015,381.91, triple the amount of the Zilmil Defendants' unlawful gain.

## V.  CONCLUSION

For the foregoing reasons, the CFTC respectfully requests that its motion for summary judgment against the Zilmil Defendants be granted.  The CFTC requests further that an order for disgorgement be entered against the Zilmil Defendants jointly and severally in the amount of $18,671,793.97, and that a CMP of $56,015,381.91 be entered jointly and severally against the Zilmil Defendants.

Respectfully submitted,


 /s/ Ashley J. Burden

Ashley J. Burden, trial counsel
Stephanie Reinhart, trial counsel
Joseph Konizeski, trial counsel
Rosemary Hollinger
Scott R. Williamson

Attorneys for Plaintiff
Commodity Futures Trading Commission
525 W. Monroe St.
Chicago, IL 60661
Tel. (312) 596-0700
Fac. (312) 596-0714
aburden@cftc.gov
sreinhart@cftc.gov
jkonizeski@cftc.gov
rhollinger@cftc.gov
swilliamson@cftc.gov

## CERTIFICATE OF SERVICE

I hereby certify that on the July 12, 2018, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF, which will simultaneously transmit an electronic copy of the foregoing to the following counsel:


Peter B. King
Jordan D. Maglich
WIAND GUERRA KING P.A.
5505 W. Gray Street
Tampa, FL 33609
pking@wiandlaw.com
jmaglich@wiandlaw.com
Counsel for Michael Shah and Zilmil, Inc.

*Counsel for the Zilmil Defendants*

Stanley H. Stone
STONE & STONE
PO Box 261727
Encino, CA 91426-1727
stonelawfirm@earthlink.net

Richard J. Landes
THE LAW OFFICE OF LANDES & JULIEN
736 2nd Street North
Jacksonville Beach, FL 32250
rjlandes@gmail.com

*Counsel for Jason B. Scharf and A & J Media Partners, Inc.*


 /s/ Ashley J. Burden

Ashley J. Burden
Attorney for Plaintiff
Commodity Futures Trading Commission
525 W. Monroe St.
Chicago, IL 60661
Tel. (312) 596-0700
Fac. (312) 596-0714
aburden@cftc.gov