**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

Commodity Futures Trading Commission,

      Plaintiff,

vs.

                               Case No. 3:17-cv-774-J-32MCR

Jason B. Scharf (d/b/a Citrades.com and
AutoTradingBinary.com); CIT Investments
LLC; Brevspand EOOD; CIT Investments
Ltd.; A&J Media Partners, Inc.; Michael
Shah; and Zilmil, Inc.

      Defendants.
_____/

**DEFENDANTS ZILMIL INC. AND MICHAEL SHAH'S**
**OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY**
**JUDGMENT AND INCORPORATED MEMORANDUM OF LAW**

## I.    INTRODUCTION

The CFTC alleges that Zilmil made millions of dollars by deceiving thousands of people into buying binary options through unregistered dealers.  The evidence, however, falls far short.  The CFTC attempts to prove that Zilmil defrauded victims by using the testimony of everyone except the victims.  The sum total of the evidence the CFTC has come up with after three years of unfettered investigation including "outreach" to these thousands of victims?  Two people who say they were misled, not by Zilmil but by binary option firms.  The total amount Zilmil allegedly made from these two people?  $54.  This is the extent of the pertinent evidence the CFTC has been able to muster.[1]  The CFTC found no victims.  The Receiver, despite the generous spend, found no victims, nobody who could say that any conduct of Zilmil caused them harm.  The CFTC's Motion for Summary Judgment (**"Motion"**) should be denied.

## II.    LEGAL STANDARD

In considering a motion for summary judgment, the Court must consider the facts in the light most favorable to the non-moving party.  *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).  The moving party must identify those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  An issue is "material" if it is a legal element of the claim under applicable substantive law that may affect the resolution of the action.  *See Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).  An issue is "genuine" if the record,

---

[1] On the basis of even less evidence, the CFTC froze $10 million of Zilmil's assets and caused the appointment of a receiver who has spent upwards of $300,000 of Zilmil's assets investigating conduct for which the CFTC has no evidence.

taken as a whole, could lead a rational trier of fact to find for the non-moving party.  *See id*. Although the nonmovant need not present evidence that would be admissible at trial, it may not rest on his pleadings.  *Id.*  "[T]he plain language of rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Catrett*, 477 U.S. at 317; s*ee also Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1281-82 (11th Cir.1999).

### III.    THE CFTC'S STATEMENT OF UNDISPUTED FACTS IS FULL OF DISPUTED FACTS

The CFTC's purported "Statement of Undisputed Facts" are not undisputed.  This is a blatantly false presentation because many of the "facts" have no evidentiary support and others are quite clearly in dispute (some are not material).  One of the CFTC's fundamental failings is to present evidence supporting its allegation that "trading systems" were created, owned, controlled, or sold by Zilmil.  Rather than laying an evidentiary foundation, the CFTC simply assumes it is true, mostly by using the possessive form (e.g., "Zilmil's autotrading systems"). The issue of Zilmil's ownership is a material fact, and Zilmil has outlined the substantial evidence that it did not control or sell autotrading systems.  Doc. 135 pp. 19-25.

Apparently in recognition that its original allegations about Zilmil's control and ownership of autotrading systems lack evidence, the CFTC obtained (after the close of discovery) an affidavit from Antonio Giacca.  Giacca's declaration employs the same misleading convention as the CFTC's Motion, using only conclusory allegations with no evidentiary support, and language that assumes Zilmil's ownership of autotrading systems

mainly through use of the possessive form.[2]  The CFTC is keenly aware of the substantial body of evidence negating its unfounded allegation but nevertheless falsely represents to the Court that the fact of Zilmil's ownership and control of trading systems is undisputed, based solely on one inadmissible declaration.  Doc. 136 p. 6.  The undisputed *competent* evidence shows that Zilmil did not own autotrading systems.

### A. "Customers Who Signed Up For Zilmil's Trading Systems Were Defrauded."

#### i.  The CFTC's theory and facts regarding Zilmil's conduct as a CTA have completely changed.

The CFTC's claims that Zilmil acted and committed fraud as a commodity trading advisor (**"CTA"**) were previously based entirely on its allegation that Zilmil sold binary option autotrading systems.  Doc. 3 pp. 38-40 (Counts Nine and Ten); Doc. 5 p. 22 fn.8 ("The Zilmil Defendants acted as CTAs by selling customers autotrading systems that place binary options trades in customer accounts.").  It alleged these sales were through ClickBank.  Doc. 5 pp. 16, 21, 28.  It relied heavily on the declaration of Johannsen, the ClickBank Rule 30(b)(6) witness, falsely stating that she attested that Zilmil sold autotrading systems through ClickBank.  *See* Doc. 109 pp. 4-6.  Zilmil has since provided substantial undisputed evidence showing that it never sold autotrading systems through ClickBank.  *Id.*; Doc. 135 pp. 19-24.  Two of the CFTC's own cooperating witnesses have verified that Zilmil sold no autotrading systems.  Exh. A, Barrett Tr. 248:21-249:2; Exh. B, Brookshire Tr. 226:18-227:13.

---

[2] The declaration should be disregarded for the reasons stated in Zilmil's pending Motion to Strike Declarations.  Doc. 146.  Once stricken, the CFTC is left with no evidence supporting its allegation that Zilmil owned or controlled autotrading systems.

In apparent recognition that its prior allegations were frivolous and lacked any evidentiary support, the CFTC has abandoned its claim that Zilmil sold autotrading systems. *See* Doc. 3 ¶ 103 (alleging sales of $5 million).  The claim has morphed from "developing and selling" autotrading systems (*Id.* ¶ 93) into simply "marketing" them.  Doc. 136 pp. 1-2. Absent from the declaration of the CFTC's Rule 30(b)(6) witness is any mention of Zilmil's alleged sales of $4 million of autotrading systems through ClickBank.  Exh. C, Dasso Decl. Dasso attests that the revenues from ClickBank, now just $619,147, came entirely from binary option websites, not sales of autotrading systems.  *Id.* ¶¶ 14-15.  The CFTC overstated the revenues Zilmil received from ClickBank by over 900% and mischaracterized the products that generated the revenues.  This is another example of the CFTC's well-documented breach of its duty of reasonable due diligence and its duty of candor.  *See* Doc. 109.

### ii.  The CFTC lacks evidence to support its CTA claims.

The CFTC alleged that Zilmil defrauded thousands of customers, including over 200,000 people that Zilmil allegedly "funneled" to Citrades.  Exh. D, Cavers Decl. ¶¶ 26-27; Exh. E, No. 3.  Dasso, the CFTC's Rule 30(b)(6) witness, testified that by the date of her deposition (May 9, 2018) the CFTC had contacted "thousands" of customers as part of a "customer outreach."   Exh. F, 135:5-136:15.   Yet the fruit of the CFTC's three-year investigation and efforts to recruit thousands of customers is a total of just two people who say they were directed to binary option websites through marketing efforts the CFTC alleges were by Zilmil.[3]  The total revenues paid by one customer were $54, but the alleged vendor has no

---

[3] The Tate and Silver declarations are the subject of the pending Motion to Strike (Doc. 146) and should be disregarded.  Pending ruling on its motion, Zilmil will address the deficiencies.

record of the transaction.  The other customer paid nothing.  Out of the thousands of people

the CFTC contacted, these are the best – and only -- examples it could find.  The declarations

are full of contradictions and do more to undermine the CFTC's allegations than to help them.

### 1.  The Tate declaration.

The declaration is a misleading narrative, obviously crafted by the CFTC to shore up

its crumbling case, and contradicts the exhibits, particularly in its flawed attempt to pin the

blame for Tate's alleged losses on 2014 Millionaire.[4]  Tate bought nothing and never used any

software from 2014 Millionaire.  Exh. G, Tate Decl. ¶ 9 ("there was no software that ever

downloaded to my system.").  The exhibits show that every binary option trade she made was

done solely at the recommendation of the binary option dealer, LBinary.  *Id.* exh. E (Tate

telling LBinary that 2014 Millionaire "is supposed to have software, but if not then I will have

to trust your expertise in placing trades for me.").  Nothing in the Tate exhibits reflects any

transactions done on 2014 Millionaire software.  The declaration fails to make any connection

between Zilmil and LBinary, and the CFTC has pointed to no evidence of any connection.

Tellingly, LBinary is not one of the binary option websites the CFTC identified as sending

payments to Zilmil.  Exh. C, Dasso Decl. ¶¶ 14-15.

On August 28, Tate responded to Audrey at LBinary: "Why is LBinary calling me?  I

thought this system was automatic?  Do you recommend trading early in the day?"  Exh. G,

Tate Decl. exh. F.  By this time, Tate had clearly placed no trades, whether automatic or

otherwise, through any software.  Exhibits G and H, further communications between Tate and

---

[4] Despite its agreement to do so, the CFTC has never turned over its communications with
Giacca's counsel about any declarations and only turned over its communications with Tate
and Silver on August 6, 2018 after another request by Zilmil on August 2, 2018.  *See* Doc. 146.

LBinary, make clear there still have been no trades.  On September 5, Tate received an email from 2014 Millionaire confirming that Tate had not yet traded using the "software."  *Id.* exh. L.  Tate responded: "you have not seen me trade because I was losing money."  *Id.*  Tate's losses were apparently incurred with unrelated dealers and/or software.  *Id.* exh. E ("I have tried several of these programs and so far I have only los. . . .).  Exhibits N through W to Tate's declaration show that LBinary is advising Tate and handling whatever transactions she is executing.  It is clear that 2014 Millionaire is not associated in any way with Tate's trading.

In fact, when Tate filed her complaint with the Consumer Finance Protection Board in May 2015, she complained only about LBinary and said nothing about any representations by 2014 Millionaire or that she used an "app" or that she thought the trading would be done "automatically" through 2014 Millionaire software.  *Id.* exh. W.  Tate's only complaint was that LBinary made false promises and would not return her money.  *Id.*

## 2.  The Silver declaration.

The Silver declaration is similarly problematic for the CFTC.  In addition to the other issues discussed in Zilmil's Motion to Strike Declarations, Silver's lack of personal knowledge renders the declaration inadmissible.  *See* Doc. 146 pp. 17-18.  Silver attests that he bought Binary Genetic through ClickBank, but ClickBank's records do not reflect the transaction. Exh. H, Silver Decl. ¶ 6.[5]  He states that he opened an account with Global Trader 365 and deposited $500 and began receiving calls from brokers at Global Trader 365.  *Id.* ¶¶ 8-11.

---

[5] ClickBank produced a spreadsheet that purportedly represents all the Zilmil transactions during the Relevant Period.  Exh. AX, Johannsen Tr. at 97:16-98:3; Exh. AW.  Neither Silver, his email, nor the "receipt ID" for his alleged purchase (shown in Exhibit A to Silver's declaration) are listed there.

Silver does not say that he actually placed any trades using Binary Genetic or that he lost money as result of trades done with its software. The declaration describes how all losses were on trades recommended or directed by Global Trader 365, with no involvement from Binary Genetic. *Id.* ¶¶ 11-14. Silver also told the CFTC the losses were caused by the representations of Global Trader 365, not Binary Genetic. Exh. I. The CFTC omitted this email from Silver's declaration. Neither the Tate nor Silver declarations support the allegation that Zilmil sold autotrading systems; they actually negate the allegation. With no evidence to support this allegation, the CFTC's claims that Zilmil acted as a CTA must be denied.

### B. "Zilmil Was An Internet Marketer For Unregistered Binary Options Websites."

The CFTC asserts that none of the binary option websites were registered to offer binary option contracts to the public. Doc. 136 p. 10. This assertion is false. Banc de Binary was a website that sent funds to Zilmil, and it was in fact registered through the Cyprus Securities and Exchange Commission. Exh. J. This allegation is also misleading because many of the binary option websites from which Zilmil received funds were in jurisdictions outside the reach of the Commodity Exchange Act (**"Act"**) and consequently outside the limited jurisdiction of the CFTC. Binary options were considered gambling in the United Kingdom and firms were not required to be registered. *See* Doc. 109 p. 9. The CFTC has never addressed the significant evidentiary shortcomings regarding its limited jurisdiction. *See* Doc. 135 pp. 4-12 (incorporated herein by reference). The CFTC has failed to establish that any product Zilmil sold is subject to its jurisdiction. Witnesses have testified that most of Zilmil's

work with which they were familiar was for activities unrelated to binary options. Exh. K, Wright Tr. 136:12-23, 179:15-180:8; Exh. L, Berry Tr. 56:11-57:23, 73:17-74:8.[6]

Undercutting its assertion that Zilmil provided advice regarding binary options, the CFTC alleges that Zilmil acted as "marketer" for 16 binary option websites. Doc. 136 p. 10. The Eleventh Circuit has made clear that such conduct is not proscribed by the Act. *CFTC v. Mass Media Mktg,* 297 F.3d 1321, 1326 (11th Cir. 2002); *see* Doc. 135 pp. 14-16 (incorporated by reference).[7] The CFTC has presented no evidence that any person bought binary options, much less based on any representation by Zilmil. In fact, the CFTC's witnesses (both of them) testified that their purchases were made based on representations and encouragement by the binary option dealers, not on anything the CFTC has attempted to attribute to Zilmil.[8]

### C. "Zilmil Used Fraudulent Binary Options Trading Systems To Get Customers To Deposit Money With Binary Option Websites."

---

[6] The Giacca declaration, discussed in detail *infra*, states that 90-95% of what he was aware Zilmil was marketing related to binary options. Exh. M, ¶ 24. Just a couple of months before he signed his declaration, Giacca's lawyer told a different story to the CFTC – that Giacca did "lots" of non-binary with Zilmil. Exh. N. Further contradicting Giacca's statement, a large percentage of the documents Giacca produced to the CFTC pertained to marketing with Zilmil unrelated to binary options. *See e.g.,* Exh. O (examples of non-binary). The CFTC was aware of this information but nevertheless presented a declaration that it knew contradicted the representation of Giacca's counsel and the evidence it received from Giacca.

[7] The CFTC's failure to cite *Mass Media Mktg.* is notable. It represents the law of the Eleventh Circuit and is perhaps the only case in any jurisdiction with similar allegations of marketing for binary option dealers.

[8] The CFTC cites a number of chat messages that it attributes to Zilmil. Doc. 136 pp. 10-12. Witnesses who participated described the chats generally as "hype," "exaggeration," not reliable, and to be "taken with a grain of salt." *See* Section III.D, *infra.*

The CFTC has made a wholesale retreat from its original allegation that Zilmil developed and sold autotrading systems. It now alleges that Zilmil merely "marketed" binary option websites. Doc. 136 pp. 1-2, 12-13. Glaringly absent is the original allegation that Zilmil sold more than $5 million in autotrading systems. Doc. 3 ¶ 103. In fact, the amount of revenues it now claims Zilmil generated ($18.6 million) includes no revenues from alleged sales of autotrading systems. Exh. C, ¶¶ 13-16 (no mention of revenues from sales of autotrading systems). This flatly contradicts the CFTC's original allegation that Zilmil generated millions in revenues selling autotrading systems. By its current allegations, the CFTC concedes that it lacked the evidence to support its original allegations at the time it made them or at any time since. *See* Rule 11, Fed.R.Civ.P.; *Von Grabe v. Fleming*, 2006 WL 2640640, at *11 (M.D. Fla. 2006) (Rule 11 provides for imposition of sanctions if plaintiff brings claims without reasonable factual support).

The CFTC's new theory is that all Zilmil's revenues were "commissions" paid by binary option websites for new depositors. *But see* Section IV.A.b, *infra* (CFTC is estopped from introducing new theories). The two customer declarations (Tate, Silver) fail to support the CFTC's new theory for the reasons stated above, leaving a gaping evidentiary hole – the CFTC has still identified no customers who have attested to using "Zilmil's trading systems." The CFTC tries to plug this hole with the declaration of Giacca, another witness with a formal cooperation agreement with the CFTC to provide evidence in exchange for what he surely hopes will be lenient treatment in any future government action against him. Exh. M, ¶ 36.

Giacca's declaration uses the same convention as the CFTC's Motion – it does not provide a basis for the assertion that Zilmil developed, controlled, or sold any autotrading

systems.  Instead, he makes conclusory allegations that assume it is true.  This is apparent, for example, where Giacca asserts "I worked with Michael Shah between 2013 and 2017, helping him promote *his* binary options trading systems."  *Id.*  ¶ 10 (emphasis added).  Giacca never explains the foundation for the assertion that the trading systems are "Zilmil's" – the same way the CFTC simply asserts in the possessive form and without foundation that they are "Zilmil Defendants' trading systems."  Doc. 136 pp. 2-3, 6, 12.  *See Jacoby v. Baldwin County*, 666 Fed. Appx. 759, 762 (11th Cir. 2016) (unpublished) ("[t]his court has consistently held that conclusory allegations [in an affidavit] without specific supporting facts have no probative value."); Doc. 146 pp. 14-17.  Giacca's own chats belie his declaration and reflect that "aggregators" like BoostAff and BOA, not Zilmil, provided trading systems.  Exh. P.

The CFTC relies solely on persons with no personal knowledge of any customer who was led "down the path" to a binary option website by any email, video, or website owned or controlled by Zilmil.  Doc. 136 p. 12.  Neither Tate nor Silver made any connection between Zilmil and 2014 Millionaire or Binary Genetic.  Neither of them traded binary options using an autotrading system from Zilmil.

Of the "thousands" of customers the CFTC alleges were "led down the path," there is a striking shortage of them coming forward.  No witness has responded to the CFTC's "outreach" to say they have "signed up" for a Zilmil autotrading system.[9]  Instead, the CFTC attempts to plug the evidentiary gap with a surrogate, Giacca, who lacks personal knowledge.

---

[9] The CFTC falsely asserts that Zilmil was "directly involved" in telemarketing by binary option dealers.  Doc. 136 pp. 13-14.  Its lead investigator testified to the contrary.  Exh. F, Dasso Tr. 28:1-29:7; 225:20-226:5.

Giacca identifies no customers or transactions associated with Zilmil.  He says only that he received $2 million in commissions from his affiliate marketing account at Clicksure "during that period from my work as an affiliate marketer for Shah's trading systems."  Exh. M, ¶ 26. Giacca does not say that any portion of those commissions resulted from any work, or any binary option marketing, associated with Zilmil.  He says only that his ClickSure account "received payments" during that time, trying to make a connection through nothing more than a coincidence of timing.  *Id.*

Contradicting the CFTC's unfounded presumption that Zilmil sold autotrading systems, two of the CFTC's cooperating witnesses testified that autotrading systems were offered by aggregators or the binary option websites, not by affiliate marketers like Zilmil. Exh. B, Brookshire Tr. 29:21-30:11, 33:19-34:5, 226:18-227:13; Exh. A, Barrett Tr. 113:3-115:8, 118:9-22.  Additionally, the first eight funnels Giacca identifies appear (with funnels of other marketers) on the internet protocol ("IP") address, 5.189.129.26, along with the domain of the aggregator BoostAff.  Compare Exh. M ¶ 23 with Exh. AT.  The last two funnels Giacca identifies appear on the aggregator BOA.  Exh. AU (showing IP 199.223.214.224 belongs to BOA); Exh. AV (showing the two funnels on IP 199.223.214.224).  These records, along with Giacca's chats, corroborate the testimony of Brookshire and Barrett that trading software was owned and controlled by aggregators BoostAff and BOA, not Zilmil.

### D. "Shah Acknowledged In Chats And Email Messages That His Trading Systems Are BS And The Binary Option Websites Scam Customers."

The CFTC alleges that the trading systems did not work as advertised but has offered no evidence of how the two trading systems it identifies (2014 Millionaire and Binary Genetic) actually worked.  Doc. 136 pp. 2, 6, 14, 24, 30-31.  This is because it has provided no evidence

that any trading systems actually existed or that anyone actually used one.  Neither Tate nor Silver attest to actually using a trading system to place binary option trades – they traded through the binary option firms.  None of the thousands of other customers the CFTC contacted attested to using one.[10]

The CFTC alleges that the trading systems "were in fact designed to place losing trades" and that "Zilmil was aware that customer funds would be misappropriated by the binary options website operators," but cites no evidence in support.  Doc. 136 pp. 14-15.  The cited Skype chats (ten chat segments out of approximately 17,000 pages of chats) show nothing about Zilmil's alleged knowledge that binary option websites would misappropriate customer funds.  The CFTC presumably is referring to the use of terms like "scam" and "ruining lives," but the uncontroverted testimony of its cooperating witnesses was that such terms were used only in reference to the fact they had figured out "ways to make money online without working the 9-to-5," not that they were cheating people.  Exh. A, Barrett Tr. 187:17-188:5; Exh. B, Brookshire Tr. 117:16-119:21.  The term "scam" was used in many other equally benign contexts like life insurance and trying to make a living online.  Exh. B, Brookshire Tr. 270:12-271:20.  Much of what was said was "exaggeration" solely "to enhance their personas in the chats," "to hype up [the] affiliates to promote the offer," and should be "taken with a grain of salt."  *Id.* 243:2-22.[11]  There is no evidence that anyone was "scammed" or had their life ruined.

---

[10] If this were the scam the CFTC alleges and if "nobody gets their money back" as the CFTC has falsely alleged, why did only two people provide declarations?  *See* Doc. 109 pp. 17-18.

[11] *See also* Exh. B, Brookshire Tr. 116:7-118:20, 151:11-14, 238:8-240:7, 241:8-243:19, 247:4-16, 249:14-250:2, 257:3-259:14, 268:12-271:20; Exh. A, Barrett Tr. 155:22-158:8, 184:1-185:16;  187:17-188:5,  241:13-242:12,  246:16-248:20,  279:2-280:13  281:1-284:4, 286:12-287:1, 298:14-300:8; 302:16-303:10, 308:10-309:22, 316:23-317:16.

The CFTC completely omits these facts from its Motion and falsely presents its version as "undisputed."

The CFTC once again attempts to use the "crushing" email involving Jared Davis.  Doc. 136 pp. 17-18.  The email is unauthenticated hearsay and inadmissible on summary judgment. *Funderburk v. Fannie Mae*, 654 Fed. Appx. 476, 478 (11th Cir. 2016) (unpublished).  Further, the CFTC has misrepresented it.  Dasso acknowledged that the email reflected an effort by Zilmil to rectify an issue, rather than trying to cheat people.  Exh. F, 221:16-225:7, 247:4-248:8; *see* Doc. 135 pp. 26-28.

### E.  "Zilmil Used Spam To Promote Fraudulent Trading Systems."

Having no evidence that Zilmil "sold" autotrading systems, the CFTC must change course and argue that Zilmil "spread the word" about them.  Doc. 136 p. 18.  The CFTC alleges Zilmil sent millions of emails but omits the testimony of the two email marketing firms that the CFTC says sent them.  *Id.*  They both testified it is common practice for a few individuals to send emails from the same account.  Exh. Q, Reese Tr. 122:19-123:23; Exh. R, Stinson Tr. 150:17-154:9; *see also* Exh. A, Barrett Tr. 255:17-256:19.  There is no evidence that Zilmil accessed the email campaigns.  There are, in fact, many funnel names referenced in the Critical Impact documents that the Skype chats show belong to Giacca and other group members. *Compare* Exh. S *with* Exh. T.  With respect to many others on the Critical Impact list, the CFTC did not identify them as funnels associated with Zilmil.  Exh. E.[12]

---

[12] The CFTC alleged those funnels were used by Zilmil to funnel customers to binary option firms.  Doc. 5 p. 12 (citing Stinson Decl. and Exh. 9-B thereto).  Zilmil asked the CFTC to identify the funnels used by Zilmil.  In response, the CFTC identified only 4 of the 26 funnels in Stinson's declaration: 2014 Millionaire, 2015 Millionaire, Millionaire Money Machine, and

The CFTC alleges the emails included misrepresentations about profits users could expect. Doc. 136 p. 18. It cites CFTC's Exhibits 130 and 131, but there are no representations about expected profits in these exhibits, nor is the cited testimony pertinent. *Id.* The CFTC cites two other specific email campaigns, 2014 Millionaire and Millionaire Society, that it falsely attributes to Zilmil.[13] *Id.* pp. 19-20. The CFTC has not met its burden of proving that these specific emails were actually sent, that anyone ever viewed them, or that any representations in them are untrue. Further, the CFTC concedes it cannot show that the links in the emails led to binary option websites, or that anyone was actually "led down the path" to one. Exh. F, Dasso Tr. 117:20-118:6, 125:13-16, 138:13-139:15, 276:11-21.

The CFTC falsely states that the "copywriter simply made up the text in the emails and passed them on" to Zilmil. Doc. 136 p. 20. Wright said nothing like this. "We would talk about it enough for me to get information to write about it, but we didn't get into specifics because it wasn't important." Exh. K, 29:21-30:7, *and* 25:12-13; 30:17; 164:5-165:10. He said merely that he did not verify the claims. Wright also denied authoring swipes (emails) the

---

Christmas Profits. Exh. U, No. 8 and Attachments A, D, and E referenced therein ("**Funnel List**") (for ease of reference, Exh. U also includes a composite alphabetical listing of the Funnel List). Similarly, the CFTC alleged that Zilmil used five specific autotrading systems to funnel customers to Citrades, but only one of the five was identified on the Funnel List. *Compare* Doc. 5 p. 17 *with* Exh. U. This is additional proof that: (a) the vast majority of Zilmil's business was unrelated to binary options, and (b) the CFTC has made numerous false allegations regarding Zilmil's ownership of funnels and autotrading systems.

[13] The evidence shows that Millionaire Society was controlled by Giacca, not Zilmil. Exh. V (ANTONIO: so if you can please send some traffic mate you gonna get really good EPC and will help me a lot: www.themillionairesociety.net/jv/indexNP.php). *See also* Exh. W. The CFTC's failure to identify Millionaire Society on its Funnel List (see fn.[12]) corroborates it is not associated with Zilmil.

CFTC attributes to Zilmil. *Id.* 101:3-104:11; *see also* Exh. X (showing Alderley Code associated with K. Gill); Exh. Y (Azure Method invoiced to R. Montano).

### F. "Zilmil Used Fraudulent Videos To Promote Binary Options Trading Systems."

The CFTC lists a number of videos it says Zilmil commissioned to promote autotrading systems. Doc. 136 p. 21-24. The CFTC shows this to be false by failing to include Automated Income, Infinity App, and Live Profits on its Funnel List.[14] Exh. E, Attchmt. A. Other evidence corroborates that many funnels attributed to Zilmil belonged to others. *E.g.,* Exh. AB (Live Profits); Exh. AC (Drexel Code and Brooks Blueprint). Berry testified about a list of video projects he claims to have done for Zilmil. Exh. L, 50:10-22 and Exh. 88 thereto. Other evidence provided by Berry and others contradicts his testimony. Exh. AD (Berry's billing associating AIA with Atkinson); Exh. AE (chats showing same); Exh. AF (chats associating Lie Detector with Ashley); Exh. AG (associating Greenwood Formula with "Greg"); Exh. Y (Wright invoice associating Azure Method with Montano); Exh. AH (Berry's records associating FreeCashApp with Liburd); Exh. AI (associating FreeCash App with Taylor).[15]

The CFTC contends that Wright wrote the scripts for Zilmil and then passed them to Berry who produced the videos. This contention is not supported by the evidence. The list of

---

[14] Additionally, the original Infinity App video created by Bill Berry states in the first minute that it is not related to binary options. Exh. Z. Even if it were binary-related, Berry testified that the video was modified after he created it, a fact confirmed by the CFTC. Exh. L, Berry Tr. 135:11-137:6; Exh. AA, No. 93. There is no evidence that Zilmil posted any video to YouTube or anywhere else.

[15] Further undermining the CFTC's allegation, many of the binary option websites cited made no payments to Zilmil. Exh. C, Dasso Decl. at ¶¶ 14-15 (list includes fewer than half of those listed on pp. 23-24 of the CFTC's Motion).

projects Wright purportedly did for Zilmil does not match up with the list of Berry projects. *Compare* Exh. AJ (Wright list) *with* Exh. AK (Berry list).  Likewise, the Berry list does not match the list of videos Giacca attributes to Zilmil.  *Compare* Exh. AK (Berry list) *with* Exh. M, Giacca Decl. ¶ 23.

The CFTC alleges that "videos were posted on websites or shown as webinars."  Doc. 136 p. 21.  Though he is cited as the sole support for this allegation, Giacca did not attest that he ever saw these videos posted for public viewing or that he has personal knowledge that Zilmil posted them.  Of the ten "trading systems that I promoted for Shah," Giacca does not attest to seeing any videos associated with them.  Exh. M, ¶ 23.  In fact, no witness – and more importantly, no customer -- testified that they ever saw one, nor has anyone said they lost money as a result of any representation made on any video.

### G. "Zilmil Paid To Host Fraudulent Websites Promoting Its Trading Systems."

The CFTC alleges Zilmil hosted websites that contained fraudulent representations.  Doc. 136 p. 24.  There is no evidence, however, that anyone saw the websites.[16]  In the absence of customer testimony that the representations were false, the CFTC attempts to use Wright as a surrogate.  *Id.*  But Wright did not testify about Binary Genetic and it does not appear on his purported list of Zilmil projects.  Exh. AJ.  There is simply no evidence that any representations were false; the CFTC fails to identify which representations were false or show how they were

---

[16] The CFTC alleges people would be solicited to open an account with a binary option website after entering their email address to sign up for a "trading system."  Doc. 136 p. 24.  But it cites no evidence of this and none of the websites cited in the Mack declaration mention anything about such deposits (they do, however, contain extensive disclosures).  Exh. AL, Mack Decl.

false.  There is none of the evidence one would normally expect to see in a case alleging a massive fraud: no evidence of customers, no evidence of anyone buying binary options, and no evidence that anyone lost money based on any representation made by the alleged perpetrator of the fraud, Zilmil.

### H. "Shah Used Affiliates To Reach Even More People About Fraudulent Trading Systems."

The CFTC alleges that Zilmil relied on affiliates to help "spread the word" about trading systems.  Doc. 136 p. 25.  It alleges that Zilmil would provide the affiliates with "swipes" (emails) containing false representations about the trading systems.  It relies on the testimony of its three cooperating witnesses, Giacca, Brookshire, and Barrett.  None of this testimony helps.  Giacca attests that Zilmil wrote the email swipes.  Exh. M, ¶ 21.  But this testimony is contradicted by Giacca's own Skype chats in which he repeatedly stated he wrote his own swipes.  *See e.g.,* Exh. AM.  The testimony of Brookshire and Barrett is no help, either.  They testified that they used their own swipes.  Exh. B, Brookshire Tr. 21:8-22:11 ("we would put it into what – Blake [Barrett] and I had a rotation of links of generic emails."); Exh. A, Barrett Tr. 55:21-57:3 ("Either myself or [Brookshire] would have [drafted the text of the email swipes].").  Even more fundamentally, there is no evidence of content of the alleged swipes and therefore no evidence they contained any misrepresentations.

### I. "After Learning He Was Under Investigation, Shah Attempted To Destroy Evidence."

The CFTC falsely asserts that these facts are "undisputed" and tells a very misleading story, omitting crucial context.  The CFTC subpoenaed Zilmil for documents (for the second time) on February 4, 2016 and says that Zilmil then asked others to destroy evidence.  Doc.

136 pp. 26-27.   The CFTC has omitted that Zilmil produced more than 50,000 pages of documents in response to the subpoena.  Doc. 136 p. 11 (referencing document ZILM0049834, a numerical count); Exh. C, Dasso Decl. ¶ 12.  Rather than providing this truthful context, the CFTC has attempted to paint a misleading picture of obstruction.[17]

The allegations and evidence conflict.  Shah allegedly told Giacca that he was going to make sure he didn't have any documents and told Giacca "to do the same."  Giacca attests that he deleted all documents "at Shah's instruction."   Exh. M, ¶ 35.  Shah, however, had plenty of responsive documents and turned them over to the CFTC.  Giacca's attestation is further contradicted by his and others' statements about his own destruction of documents, two years before Shah allegedly told him to destroy documents.  Exh. AN.

The CFTC again tells only half the story by omitting relevant testimony by Wright and Berry and other evidence that undermines the "sound bites" it cites, and which contradicts the testimony selectively presented by the CFTC.  For example, Berry's counsel wrote to the CFTC explaining how Berry "previously disposed of and/or lost data that may have been responsive to the Commission's Subpoenas," but omits any mention of Shah or his supposed instructions.  Exh. AO.  Berry's counsel listed four specific reasons why Berry did not have certain responsive documents, and none had anything to do with Shah.  This conflicts with Berry's cited testimony.  Doc. 136 pp. 27-28.

---

[17] The CFTC seized Zilmil's computer, email accounts, and all other materials pursuant to the SRO and presumably conducted a forensic examination of the hard drive to determine, among other things, whether files had been deleted.  If evidence of deletion had been found, the CFTC would surely have said so, but did not.  Similarly, if the CFTC had found evidence of autotrading systems on Zilmil's computer, it would have said so, but did not.

Berry also contradicts himself, evolving from "Shah told me to destroy documents," to "I destroyed documents due to storage space considerations," to "nobody told me to destroy documents," to "I destroyed documents only for my one-off clients," to "I had HDD and email server failures," to "I literally got rid of everything on my computer that said 'binary options' on it just in case they raided me and took my computer." Exh. L, 47:24-48:7; 178:22-186:18. Wright similarly testified his deletion of files was not unusual and was done for space considerations, and that Montano may have also asked him to delete files. Exh. K, 171:5-9; 172:19-24. These witnesses' extensive self-contradictions create disputed facts.

### J.   "Shah Has Refused To Testify."

Shah invoked his constitutional right not to testify. The CFTC wants the Court to draw adverse inferences on that basis but does not specify what inferences it wants the Court to draw – other than the inference that the CFTC should get summary judgment. Courts may draw adverse inferences in civil proceedings based on a party's invocation of his right not to testify unless it is the sole basis for plaintiff's prima facie case or will cause the "automatic entry of summary judgment." *FTC v. Transnet Wireless Corp.*, 506 F.Supp.2d 1247, 1252 n.4 (S.D.Fla. 2007) (citing *U.S. v. Premises Located at Route 13*, 946 F.2d 749, 756 (11th Cir. 1991)); *SEC v. Suman*, 684 F. Supp. 2d 378, 386 (S.D.N.Y. 2010) ("a motion for summary judgment cannot be granted on an adverse inference alone; rather, the inference must be weighed with other evidence in the matter in determining whether genuine issues of fact exist."); *U.S. v. Inc. Vill. of Island Park*, 888 F. Supp. 419, 432 (E.D.N.Y. 1995) (the moving party "must produce independent corroborative evidence of the matters to be inferred before liability will be imposed"). Here, key evidence on core issues is lacking and adverse inferences may not be

used in its place.  The CFTC may not rely on Dr. Shah's silence in lieu of "sufficient evidence." *See e.g.,* Doc. 136 p. 31 (seeking adverse inference to substitute for lack of evidence of fraud); *LiButti v. U.S.*, 107 F.3d 110, 124 (2d Cir. 1997) (citation omitted).

## IV.   LEGAL ANALYSIS

### A.  Options And Swaps Fraud And Registration Claims.

The CFTC has never established that Zilmil's alleged conduct falls within its limited jurisdiction.  It has failed to show any evidence that the payments Zilmil received from any entity, domestic or foreign, were the result of Zilmil's alleged violations of the Act.  It has not determined what Zilmil's revenues were for and admits it cannot make that determination until it talks to customers to determine whether they were directed to binary option firms through a landing page associated with Zilmil, which it has never done.  Exh. F, Dasso Tr. 273:1-276:21. The CFTC had not identified any customer who was directed to a binary option firm through anything associated with Zilmil or who lost money on binary options, and the inadmissible customer declarations are of no help.  The CFTC has not determined whether any Zilmil website was associated with any binary option firms.  In the case of overseas entities, it has been unable to demonstrate that Zilmil's or the overseas entities' conduct was illegal.  *Id.*

The CFTC admitted it did not know whether anyone had ever viewed any videos or websites associated with Zilmil and does not know where any of the links in the alleged Zilmil emails led or what was being offered.  Exh. F, Dasso Tr. 276:11-21, 125:13-16, 138:13-139:15, 117:20-118:6.  Every other witness who has testified about these matters has echoed this

testimony.[18]   There is no evidence of customers of such entities or any binary option transactions.  *Id.* 276:11-21.  The CFTC has tried to avoid the jurisdictional issue altogether, despite (perhaps because of) the issue being decided against it on very similar facts in *Mass Media Mktg*., 297 F.3d at 1326.  The CFTC asks the Court to plug these numerous substantive evidentiary holes with adverse inferences, in essence alleviating it of its evidentiary burden. *SEC v. Calmes*, 2010 WL 11505260, at *4 (S.D. Fla. 2010) ("[adverse] inferences may not result in automatic summary judgment in favor of the Commission").[19]

### a.   "Zilmil Committed Fraud In Connection With Options And Swaps."

#### i.   Count Ten.

The CFTC misrepresents the legal standard.  It contends that "Section 4c(b) of the Act and Regulation 32.4 prohibit the use of fraud or deception in connection with a commodity option transaction."  Doc. 136 p. 29.  That is not what the statute or the regulation provide. The statute makes it unlawful for a person to "*offer to enter into, enter into, or confirm the execution of any transaction* involving an option contrary to any CFTC rule, regulation, or order."  7 U.S.C. § 6c(b).  Regulation 32.4 prohibits the use of fraud "in or in connection with

---

[18] *See e.g.*, Exh. L, Berry Tr. 196:1-197:3; Exh. K, Wright Tr. 85:9, 139:10-140:16; Exh. A, Barrett Tr. 96:10, 156:5; 177:9; Exh. B, Brookshire Tr. 84:10, 105:15, 113:21-114:16, 197:13, 244:16-245:1; Exh. R, Stinson Tr. 197:14-199:3, 203:14-204:4; Exh. AP, Clickbooth Tr. 48:18, 68:10, 80:14, 138:9, 172:10; Exh. AQ, Revcontent Tr. 38:19-39:5, 82:19-83:6.

[19]   The CFTC mischaracterizes *SEC v. Ahmed*, 2018 WL 1585691 (D. Conn. 2018), by suggesting that the sole basis for the court's finding of jurisdiction over foreign transactions was the defendant's invocation of his Fifth Amendment rights.  Doc. 136 p. 32 n.5.  The CFTC omits the crucial fact that the court used an adverse inference to supplement, not in place of, testimony of another witness.  *Ahmed*, 2018 WL 1585691 at *26-27 ("this inference can be applied at the summary judgment phase, balanced against the other evidence in the record."). Here, the CFTC has no other evidence and seeks an inference as the sole basis for jurisdiction.

*an offer to enter, entry into, or the confirmation of the execution of,* any commodity option transaction."  17 C.F.R. § 32.4.  The CFTC omits the key italicized language and by doing so misrepresents the applicable standard.  Zilmil addressed the CFTC's legal and evidentiary shortcomings in detail in its Motion for Summary Judgment and incorporates the discussion herein.  Doc. 135 pp. 32-35.

### ii.  Count Twelve.

The CFTC contends Zilmil violated Section 6(c)(1) of the Act and Regulation 180.1.  Doc. 136 pp. 29-30.  As explained in Zilmil's Motion, incorporated herein by reference, claims under Section 6(c)(1) require both manipulative and deceptive conduct, because requiring either manipulative *or* deceptive conduct would duplicate Section 4b's prohibition on "fraud in covered retail commodity transactions" and thus "render § 4b superfluous," and inherently conflict with the thrust of other Act provisions.  *CFTC v. Monex Credit Company*, 2018 WL 2306863, at *8 (C.D. Cal. 2018).  *See* Doc. 135 pp. 36-38.

### b.  "Zilmil Violated The Prohibition Against Trading Swaps Other Than On A Registered Exchange." [Count Eight]

The CFTC now alleges Zilmil violated the Act by marketing binary option trading systems.  Doc. 136 pp. 31-32.  It alleges that Zilmil used the trading systems as "marketing tools" to get customers to make deposits with such websites, and that by doing so was "conducting activity" with respect to options or swaps other than on an exchange.[20]  *Id.*  It has failed, however, to show any example of these purported trading systems.  Exh. F, Dasso Tr.

---

[20] Zilmil explained why "conducting activity" is not a violation of the statute and why Zilmil's alleged conduct was not a violation.  *See* Doc. 135 pp. 14-25, incorporated herein by reference.

62:24-63:4, 66:11-17, 105:18-106:10.  The CFTC cites no testimony as to what they look like or how they work.

The CFTC also introduces a new theory: that "by offering software that purported to trade on behalf of customers, the Zilmil Defendants were 'offering to enter into' options or swaps transactions . . . ."  Doc. 136 p. 32.  This is another example of the CFTC changing its story as the deficiencies of its evidence and legal theories are exposed.  It previously stated that its sole basis for the claim of violations of Regulation 32.2 was that Zilmil was "conducting activities" relating to commodity options.  Doc. 5 p. 21.  It now says this same conduct constitutes "offering to enter into" option transactions.  The CFTC appears to have done this to hedge against the likelihood that "conducting activities" is not a viable legal position, for the reasons stated in Zilmil's Motion.  *See* Doc. 135 pp. 12-25.

The CFTC is estopped from changing its prior legal position without leave of Court. "Eleventh Circuit precedent establishes that a party impermissibly asserts a new claim at the summary judgment stage where the party asserts new facts that would provide a new theory of recovery.  The new claim need not involve assertion of an entirely independent legal right but new facts that would provide a theory of recovery under a previously asserted legal right." *Arthur v. Thomas,* 2014 WL 466143, at *4 (M.D.Ala. 2014); *Reyes v. BCA Fin. Services, Inc.*, 312 F. Supp. 3d 1308 (S.D. Fla. 2018) ("[h]aving proceeded through discovery without amending (or seeking to amend) [her] Complaint to reflect that fundamental change [in the basis for her claims, Reyes is] not entitled to raise it in the midst of summary judgment."). Regardless, the CFTC's eleventh-hour theory does not rescue its claim because it has shown no "offer to enter" a binary option transaction by Zilmil.

**B.  CTA Fraud and Registration.**

    **a.  "Zilmil Acted As A CTA."  [Counts Nine and Eleven].**

As it did with its Regulation 32.2 theory, the CFTC has shifted gears on the CTA claims.  Instead of acting as a CTA as a result of "selling" autotrading systems, the CFTC now alleges that Zilmil acted as a CTA by "marketing" binary option websites through autotrading systems.  Doc. 136 p. 32.  The three cases the CFTC cites, however, all involve defendants that sold software.  *Id.*  None the cases involve conduct that was limited to the marketing of commodity firms, which is essentially the conduct the CFTC has alleged here.  As already established, the evidence shows that any autotrading systems were provided by aggregators (Boost or BOA) or by the binary option dealers, not by Zilmil.  *See* Section III.C, *supra.*

The CFTC alleges that Zilmil "advised people on trading options or swaps, to wit, binary options, through their trading systems."  Doc. 136 p. 33.  The CFTC has presented no evidence that the alleged trading systems advised anyone.  In fact, the only two customers willing to give (inadmissible) declarations did not use the alleged trading systems; they traded options only through binary option dealers.  Exh. G, Tate Decl. ¶ 9-14; Exh. H, Silver Decl. ¶ 11-14.  Further, there is no evidence showing what advice the alleged autotrading systems gave.  Exh. F, Dasso Tr. 190:17-24 (could not "speculate [as to] the particular advice that was given").  This is undoubtedly because the CFTC has never seen a trading system associated with Zilmil (even though it had seen such systems associated with others).  *Id.*  This fact alone distinguishes all the cases the CFTC cites, where there was no dispute that the defendants owned or controlled the software.  *See* Section IV.C, *infra.*

The CFTC contends "courts have consistently held that people who offer so-called software trading systems qualify as CTAs." Doc. 136 p. 33. This statement is misleading because the cases it cites all involve defendants who *owned and sold* software, opened accounts for customers, and accepted customer funds. Those cases are inapplicable because the CFTC alleges only that Zilmil marketed binary option firms. *Id.* p. 12 ("Zilmil's trading systems were *marketing tools* designed to lead people down the path of opening up an account") (emphasis added); *id.* p. 24 ("The trading systems . . . were *merely a marketing tool* to get people to deposit money") (emphasis added). Whatever the product was, autotrading software was not created, owned, or provided by Zilmil. Exh. B, Brookshire Tr. 29:21-30:11, 33:19-34:5, 226:18-227:13; Exh. A, Barrett Tr. 58:13-60:10, 113:3-115:8, 118:9-22; Exh. K, Wright Tr. 139:3-22. Zilmil's alleged conduct does not fall within the ambit of a CTA.

The CFTC alleges that Zilmil "did this for money." Doc. 136 p. 33. The lone example the CFTC cites is Silver and his $54 purchase. *Id.* But Silver's (inadmissible) recollection that he paid ClickBank is contradicted by the business records of ClickBank, which reflect no such transaction. No evidence shows this was an autotrading system nor is there evidence that Zilmil received compensation on this or any specific customer transaction. The CFTC's assertion that Zilmil received indirect "commissions" from the binary option dealers based on customer deposits actually negates the assertion that Zilmil was compensated for giving advice. The assertion means, if anything, that the binary option dealers provided advice, not Zilmil. Doc. 136 pp. 33-34. There is no evidence Zilmil received such compensation on the Tate or Silver alleged transactions, nor evidence of any other such transactions, and therefore no evidence that any Zilmil revenues were based on advice it provided about binary options.

### b.  "Zilmil committed fraud as a CTA."  [Count Eleven].

Lacking evidence to support its allegation that Zilmil acted as a CTA, there can be no CTA fraud.  This should end the inquiry, but even an evaluation of the evidence shows the CFTC has not met its burden.  The CFTC alleges "the testimonials included in the Zilmil Defendants' videos fail to include the required disclosures."  Doc. 136 p. 34.  The CFTC has cited no evidence that any video associated with Zilmil was posted for public viewing and therefore failed to show any website on which it was posted.  Every example of a website attributed to Zilmil, moreover, had the required disclosures, contrary to the CFTC's false assertions.  *See* Exh. AL, Mack Decl. (disclosures on each website); Doc. 125 pp. 2-3.

### c.  "Zilmil failed to register as a CTA."  [Count Nine].

Even if the CFTC had evidence to support its claim that Zilmil acted a CTA (and it does not), Zilmil was exempt from registration as a CTA for the reasons stated in Zilmil's Motion for Summary Judgment, incorporated herein by reference.  Doc. 135 pp. 28-31.

### C.  The CFTC's cases do not apply to the conduct alleged.

None of the cases cited by the CFTC relating to its claims for options fraud and CTA fraud apply to the alleged conduct of Zilmil and are easily distinguished.  All of them involve defendants that:

- had direct interactions with customers in providing commodity options;
- appear to have been dealers;
- accepted customer funds for deposit;
- provided advice and recommendations as to commodity option transactions; and
- executed commodity option transactions.[21]

---

[21] *See CFTC v. R.J. Fitzgerald*, 310 F.3d 1321, 1334 (11th Cir. 2002); *CFTC v. Gutterman*, 2012 WL 2413082, at *2 (S.D. Fla. 2012); *CFTC v. Next Fin. Svcs.*, 2006 WL 889421, at *2 (S.D. Fla. 2006); *CFTC v. Trademasters*, 2017 WL 4079015, at *1 (D. Nev. 2017); *CFTC v.*

There is no evidence that Zilmil engaged in any such conduct.  Unlike the defendants in the CFTC's cases, the evidence establishes that Zilmil acted as nothing more than a marketer of binary option firms.  The allegations that Zilmil offered off-exchange options, provided advice, or committed fraud in connection with offers of binary options are completely unsupported by the evidence.

Some of the cited cases involving CTA fraud involve sellers of software. *Trademasters,* 2017 WL 4079015, at *1; *Hall*, 249 F. Supp. 3d at 444; *Vartuli*, 228 F.3d at 94; *Heffernan*, 245 F. Supp. 2d at 1276.  In each of those cases the sale of software was not a disputed fact.  Here, in stark contrast, there is no evidence of the existence of software, much less sales of software by Zilmil.  Exh. F, Dasso Tr. 62:24-63:4, 66:11-17, 105:18-106:10; Exh. B, Brookshire Tr. 29:21-30:11, 33:19-34:5, 226:18-227:13; Exh. A, Barrett Tr. 58:13-60:10, 113:3-115:8, 118:9-22.  In the CFTC's cases, there also appears to be no dispute that the software actually provided trading advice.  Here, there is no evidence that software provided advice; rather, according to the CFTC, any alleged (but unidentified) "software" was merely a "marketing tool" used to funnel customers to binary option firms.  Further, in each of the CFTC's cases, there appear to have been actual trades executed by the commodity dealers. Here, there is no evidence of any binary option transactions associated with any alleged

---

*Sterling*, 605 F. Supp. 2d 1245, 1249 (S.D. Fla. 2009); *CFTC v. Trade Exhg. Network*, 117 F. Supp. 3d 29, 31 (D.D.C. 2015); *CFTC v. Hall*, 49 F. Supp. 3d 444, 447 (M.D.N.C. 2014), *aff'd*, 632 Fed. Appx. 111 (4th Cir. 2015) (unpublished); *CFTC v. Vartuli*, 228 F.3d 94, 98 (2d Cir. 2000); *CFTC v. British American*, 560 F.2d 135, 137 (2d Cir. 1977); *CFTC v. Savage*, 611 F.2d 270, 273 (9th Cir. 1979); *CFTC v. Heffernan*, 245 F. Supp. 2d 1276, 1281 (S.D. Ga. 2003).

conduct of Zilmil.  None of the cases the CFTC cites address persons who are merely marketers for commodity option dealers.  Indeed, the CFTC has steered clear of the only relevant case, *Mass Media Mktg.*, 297 F.3d 1321, because it guts the CFTC's case against Zilmil.

### D.  Disgorgement And Civil Monetary Penalties.

The CFTC has not proven its claims and is not entitled to disgorgement.  It has failed to show evidence tying Zilmil revenues to conduct that falls within its limited jurisdiction or that violates the Act.  For example, the CFTC shows over $10 million paid by ClickSure to Zilmil, the single largest payor.  Exh. C, Dasso Decl. ¶ 15.  The CFTC asserts contrary to the evidence that "substantially all" payments from ClickSure were commissions from binary option websites.[22]  The only basis cited for this assertion is the testimony of its cooperating witnesses Barrett and Brookshire.  *Id.* ¶ 13(ii).  The CFTC asked, "Were all of the offers you promoted for Mr. Shah binary options related?"  Barrett said "I think so," but also testified "I'm not sure if he had any offers outside of, you know, binary options . . . ," (Exh. A, Barrett Tr. 34:10-18), indicating he was unaware of the full extent of Zilmil's internet marketing activities unrelated to binary options, which other witnesses have described as extensive, including Giacca's lawyer.  Exh. K, Wright Tr. 136:12-21, 179:15-180:8; Exh. L, Berry Tr. 56:11-57:23, 73:17-74:8; *see also, supra* fn.6.

Barrett and Brookshire's limited view of Zilmil's internet marketing activities does not overcome the substantial evidence – of which the CFTC is fully aware but omits from its

---

[22] This is the identical hyperbole the CFTC used when it asserted that "substantially all" of the 200,000 customers on the Barassamian spreadsheet had been funneled to Citrades by Zilmil. Exh. E, No. 3; Doc. 5 p. 14.  The CFTC found no evidence to support that assertion and has ditched it, making no reference to Barassamian or the 200,000 customers in its Motion.

"undisputed facts" – that Zilmil was extensively engaged in internet marketing for many products unrelated to binary options.  The Receiver confirmed this, stating that he learned during his review that Zilmil was involved with "various types of products, how-to Manuals, you know, self-help manuals, advertising for other companies."  Exh. AR, 28:22-32:12; *see also* Doc. 55 p. 24 (revenues from gambling products).  The CFTC admitted that Zilmil marketed products unrelated to binary options.  Exh. AS, Nos. 72-86; Exh. F, Dasso Tr. 258:15-260:23.  Its attribution of 100% of Zilmil's revenues to binary options ignores this fact, contradicts its admissions and testimony, and creates a dispute as to these material facts.

Even in the event of findings of liability, an award of disgorgement would be premature because Zilmil is entitled to an evidentiary hearing for the Court to resolve disputed issues of fact about the amount.  *See CFTC v. Amerman*, 645 Fed. Appx. 938, 943-44 (11th Cir. 2016) (district court may abuse its discretion in declining to hold evidentiary hearing where calculation of disgorgement award is contested); *SEC v. Megalli*, 157 F.Supp.3d 1240, 1254 (N.D. Ga. 2015) (insufficient evidence to award disgorgement or civil monetary penalties at summary judgment stage without evidentiary hearing).

The CFTC bears the burden of "proving the disgorgement figure reasonably approximates the amount of unjust enrichment."  *CFTC v. Sidoti*, 178 F.3d 1132, 1138 (11th Cir. 1999).  The CFTC has failed to establish that any of the funds Zilmil received represent enrichment that is unjust.  There must "be a relationship between the amount of disgorgement and the amount of ill-gotten gain," and it is improper to disgorge funds "obtained without the aid of any wrongdoing."  *Id.*  It is an abuse of discretion for a court to award disgorgement "for a period during which there was no record evidence of fraud."  *Id.*  Further, the CFTC alleges

all of Zilmil's gross receipts are "ill-gotten gains" for disgorgement, but only profits may serve as such a measure. *SEC v. ETS Payphones,* 408 F.3d 727, 735 (11th Cir. 2005). The Receiver's forensic accountants identified substantial payments by Zilmil to third parties which appear to be for operating expenses, which would result in a substantially lower amount of profits to be disgorged. Such disputed issues of fact must be resolved through an evidentiary hearing.

The CFTC seeks a civil monetary penalty in an amount three times the requested disgorgement. Any penalty must "be rationally related to the offense charged or the need for deterrence." *CFTC v. Fleury*, 2010 WL 3835134, at *2 (S.D. Fla. 2010), *aff'd,* 479 Fed. Appx. 940 (11th Cir. 2012). There is no requirement to impose a civil monetary penalty at all, let alone a multiple of any disgorgement or restitution figure. *See SEC v. Wyly*, 56 F. Supp. 3d 394, 433–34 (S.D.N.Y. 2014) (large disgorgement and prejudgment interest award was "more than sufficient to deter future violations" and thus civil monetary penalty was not necessary).

The imposition of a civil monetary penalty is unwarranted given the lack of evidence that Zilmil engaged in any conduct proscribed by the Act. Zilmil did not make or participate in any trade recommendations, solicit or otherwise accept any investment funds from customers, or participate in any interactions between binary option dealers and their customers. Each of the cases cited by the CFTC involve serious direct misconduct and the exchange of funds between customers and wrongdoers. Such conduct is far different than Zilmil's alleged internet marketing. No civil monetary penalty is warranted for Zilmil.

## V.   CONCLUSION

For the foregoing reasons, the CFTC's Motion for Summary Judgment should be denied.

/s/ Peter B. King
Peter B. King (FBN 0057800)
Jordan D. Maglich (FBN: 0086106)
WIAND GUERRA KING P.A.
5505 W. Gray Street
Tampa, FL 33609
Phone: (813) 347-5100
Fax: (813) 347-5198
Email: pking@wiandlaw.com
Email: jmaglich@wiandlaw.com
Attorneys for Defendants Michael Shah
and Zilmil, Inc.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on August 9, 2018, I electronically filed the foregoing

with the Clerk of the Court by using the CM/ECF system.

/s/ Peter B. King
Attorney